## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **LEIGH BOLICK** | : | **Civil Action No. 3:03CV165 (PCD)** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **vs.** | : | |
| | : | |
| **ALEA GROUP HOLDINGS, LTD.** | : | |
| **et al.** | : | |
| **Defendants.** : | | **February 10, 2004** |

## DEFENDANTS' STATEMENT OF UNDISPUTED FACTS PURSUANT TO FEDERAL RULE 56(A)(1) and LOCAL RULE 9(C)(1)

Defendants, Alea Group Holdings, Ltd. ("AGH"), Alea North America Company ("ANAC") and Robert Byler, hereby respectfully submit their Statement of Undisputed Facts Pursuant to Federal Rule 56(a)(1), and Local Rule 9(c)(1), in further support of their Motion for Summary Judgment as to each and every cause of action contained in the Complaint of the Plaintiff, Leigh Bolick.

**A.     The Parties**

1.     Defendant ANAC is a reinsurance intermediary. (Byler Dep. 110; Bolick Dep. 153, 156-57)

2.     Defendant Byler, who is accused of retaliation against Bolick for her internal complaints, is the Chief Executive Officer of Alea Alternative Risk ("AAR"), an operating division of ANAC. (Complaint ¶ 16; Byler Dep. 31)

3.     Defendant Bennett, who is accused of sexual harassment and retaliation, was AAR's Senior Vice President of Marketing and Bolick's supervisor. Bennett resigned from his employment with ANAC in February 2002. (Byler Dep. 49-51)

4.      Defendant AGH is ANAC's parent company.  (Purkiss Dep. 5-6)

5.      Bolick is a high school graduate with two years of college credit, but never earned a college degree.  (Bolick Dep. 83)

6.      Just prior to joining ANAC, Bolick was a Senior Underwriter for the Argonaut Insurance Company in Texas, earning between $72,000 and $73,000 per year.  Her territory at Argonaut covered Texas, Oklahoma, Louisiana, Arkansas and Mississippi.  (*Id.* 85-87)

7.      Bolick had lived in Texas for approximately 20 years.  In September 2000, ANAC hired her as an Assistant Vice President.  (*Id.* 108, 112)

**B.      The Terms of Bolick's September 2000 Hire**

8.      After being referred to ANAC by an employment recruiter, Bolick submitted her resume to ANAC and was interviewed by Bennett and Byler, among others.  (Bolick Dep. 84, 98, 100)

9.      Bennett advised Bolick that the position of Assistant Vice President of Marketing required approximately 40% travel, a requirement Bolick admitted did not cause her concern.  (*Id.* 98-100)

10.     Bolick signed ANAC's September 19, 2000 offer letter, which confirmed that she was being hired as an Assistant Vice President at an annual salary of $100,000, and that she was eligible for insurance benefits, relocation expenses from Texas of up to $10,000, and a possible bonus, which was purely discretionary.  (Bolick Dep. 108-09, 112-14 and Exhibit F to Memorandum of Law)

11.     The offer letter specifically provided that the bonus was not guaranteed, but rather, was purely discretionary, considering "overall group profit".  Bolick confirmed her

understanding of the terms of the offer letter, and acknowledged further that she was employed at will. (*Id.* 113-17, 566; Exhibit F).[1]

12.     Bolick also understood the offer letter to be the only "representation" of the terms of her employment. (*Id.* 113, 116-119, 414)

13.     On October 10, 2000, Bolick started at ANAC's Rocky Hill office in Connecticut. (*Id.* 295) She reported directly to Bennett. (*Id.* 112, 157)

**C.     Bolick's Job Duties and Responsibilities at ANAC**

14.     While employed by ANAC, Bolick attempted to market insurance products. (Bolick Dep. 152-53)

15.     She traveled extensively, particularly in the midwest and southeast regions, including Texas, to market ANAC products. (*Id.* 439-41)

16.     Bolick admits that based on her prior residence and places of employment, her business and professional contacts were concentrated in this part of the country. (*Id.* 160, 478)

17.     As Byler described, Bolick was expected to be willing to "take on more responsibility and authority" as the organization changed, and to therefore be someone who could "accept and deal with change...". (Byler Dep. 26)

18.     Bolick knew when she joined ANAC it was considered a "start-up" operation. (Bolick Dep. 159; Byler Dep. 26, 53-55)

19.     As a marketer, Bolick was expected to bring in prospective clients and accounts, then to work closely with the underwriters to write the business. Bolick, as the marketer, had the ultimate responsibility to "close" deals. (Byler Dep. 171-72)

---

[1] "The performance factors driving the bonus amounts will be reviewed and possibly changed. There will be no bonus guarantees". Exhibit F

20.    Bolick could recall closing only one deal during her entire employment with ANAC. (Bolick Dep. 520-21)

**D.    Bolick's November 2000 Complaint to Byler Was Promptly Resolved**

21.    According to Bolick, during her first week on the job in October 2000, Bennett was rude, yelled at her, and questioned whether she could do the job. (Bolick Dep. 161-67, 171-72, 299-302)

22.    She claimed also that Bennett told her she was "too cocky," and could not go on marketing calls by herself until she had a dry run in the office. He also allegedly told Bolick it was a mistake to have hired her. (*Id*. 164-66, 172, 299, 315)

23.    On a business trip in October 2000, he allegedly: (1) put his arm around her shoulder while they walked down a street; (2) stood too close to her and whispered in her ear; and (3) asked if she had brought workout clothes for the hotel gym. (*Id*. 172-73, 315-21)

24.    Bolick knew that Bennett worked out in gyms both at home and on the road, and she could not recall whether Bennett whispered in her ear about a business or non-business matter. (*Id*. 172-73, 319-20)

25.    She also confirmed that none of the "close" talk was sexual in nature or content. (*Id*. 320) Bolick never alleged any overt sexual advances or requests to take drugs with him; indeed, Bolick admitted she did not even believe Bennett "ever did drugs". (*Id*. 211, 295-97, 328, 330, 391)

26.    Also according to Bolick, during a second business trip in October 2000, Bennett allegedly: (1) put his head on her shoulder on an airplane; (2) read to her a sexually-oriented passage from a book; (3) asked her to play cards for fun and money; (4) asked if she had brought workout clothes; (5) tried to discuss cocaine parties and tongue rings with her; and (6) asked

what her husband thought about their traveling together and if she and her husband "discussed" him. (*Id.* at 186, 201-02, 323-28, 333-34, 337-44)

27.     Based solely on the above-described conduct, and although Bennett made no specific requests or demands of a sexual nature, Bolick inferred that he wanted to have sex with her. (*Id.* 175-77, 295-97, 351-91)

28.     Yet, again, Bolick did not allege any overt request to take drugs with him. (*Id.* 295-97, 328, 349-50, 391)

29.     On November 6, 2000, she complained to Byler about Bennett's conduct. (*Id.* Dep. 177-79)

30.     Bolick told Byler specifically that she did not want Bennett to be fired, but asked Byler to resolve the issue. (*Id.* 263)

31.     By her own characterization, Byler was "very positive" in attitude with her during the meeting and asked if she wanted the Human Resources Department to become involved. (*Id.* 180-81) Bolick responded "no," and that she did not want Bennett to know that she complained, but also said that she did not want to travel with him on an upcoming marketing trip. (*Id.* 180, 184-85; Byler Dep. 178-79)

32.     Byler agreed to her request, although Byler could have required an investigation by the Human Resources Department before acquiescing to Bolick's requests.  Thus, Byler immediately arranged that Bolick and Bennett would not travel together on that upcoming trip. Byler also promised she would participate in an expedited course of training so she did not have to travel with Bennett. (Bolick Dep. 181-82; Byler Dep. 22-23, 179-82)

33.    Byler and Bolick had several follow-up conversations.  (Bolick Dep. 183)  Each time, she told Byler that she and Bennett were not traveling together, did not see much of each other, and that the situation was "acceptable."  (Bolick Dep. 183, 243-44, 370-71)

**E.    Bolick's January 2002 Sexual Harassment Complaint Resulted In Bennett's Departure**

34.    During the year that followed, Bolick saw Bennett approximately twice each month in the office, and attended two conventions that he also attended.  (Bolick Dep. 360-62)

35.    They did not travel together, nor did Byler make Bennett aware of Bolick's complaint to him from November 2001, as Bolick had requested.  (*Id.* 243, 351-52; Byler Dep. 22-24)

36.    In December 2001, however, Bennett asked Bolick if she wanted to accompany him on a marketing trip to Los Angeles, and she said she would.  (Bolick Dep. 415-18)

37.    She also said his mood still varied; one day he was complimenting her, and the next he was telling her she was doing a terrible job.  (*Id.* 244, 355-56, 391-93)

38.    She never told Byler or Bennett she did not want to go on that trip.  (*Id.* 416; Byler Dep. 180)

39.    During the trip, Bennett allegedly told her that he and his wife had previously stayed at the hotel where they were staying, and that the hotel was "romantic".  (Bolick Dep. 418-21)  Bolick also alleges that Bennett got "too close to her" when they were walking to a restaurant, put his arm around her shoulder, asked her to work out with him again, and later called her an idiot for not knowing how to drive back to the hotel.  (*Id.* 200, 421-24)

40.    Bolick conceded, however, that Bennett had called male employees idiots, as well, and had called one male employee a "fat ass".  (*Id.* 312-13)

41.     On December 21, 2001, after they returned from the trip and were sitting in his Rocky Hill office, Bennett allegedly moved closer to Bolick, raised his fist, and stated he was going to "sit close enough to hit her." (*Id.* 189-93; Complaint ¶ 25; Lametta Dep. 108-09)

42.     The conversation concerned Bolick having had expressed reservations to Byler about hiring a candidate, Sandra Duncan, for a Marketing position. (*Id.*)

43.     Bolick responded by rebuking Bennett in an e-mail, and then she started a vacation. (Bolick Dep. 194-96, 453-57)

44.     Bolick viewed Bennett's alleged statement that he wanted to hit her as part of his "sexual harassment." (*Id.* 198-99) Bolick acknowledges that Bennett did not actually attempt to strike her. (*Id.* 193)

45.     On January 10, 2002, which was several days after she returned from her vacation, Bolick complained to Byler and ANAC's Human Resources Department that Bennett had sexually harassed her. (*Id.* 195-98, 451-53)

46.     Bolick continued to infer that Bennett's conduct signified that he wanted to have sex with her, although admittedly he never said he harbored that intention, nor had he ever expressly made any sexual advances or demands. (*Id.* 295-97, 391)

47.     Lametta commenced an investigation. (Lametta Dep. 32-33; Bolick Dep. 457-58, 462-63)

48.     Before ANAC's investigation into Bennett's conduct ended and any determinations were made as to the merit of Bolick's allegations, Bennett voluntarily resigned his employment with ANAC and received a severance package. (Byler Dep. 113, 203; Lametta Dep. 40)

49.    During the investigation period, Bolick had been told she could work from home, due to her articulated stress and inability to concentrate in the office. (Bolick Dep. 462-65; Byler Dep. 201) Bennett was instructed to stay away from the office. (*Id.*)

50.    Thus, Bolick had no contact with Bennett literally from the instant she complained to Human Resources. (Byler Dep. 201-02)

51.    In or about February 2002, then Vice President and Director of Human Resources, Marti Lametta, and Byler contacted Bolick at home to notify her that Bennett had left ANAC. (Bolick Dep. 231, 458-59)

52.    They confirmed that Bolick would be returning to her current position, with the same and possibly expanded responsibilities, while expressing their enthusiasm at her return. (*Id.* 465-69; Byler Dep. 89-90)

53.    Rather than returning that enthusiasm or even agreeing to a prompt return, Bolick expressed resistance. (Bolick Dep. 465-69; Byler Dep. 203-04) Byler and Lametta were stunned. (Byler Dep. 89, 203; Lametta Dep. 105-06)

54.    During deposition, Bolick explained her reaction by testifying that she remained "fearful" of Bennett, despite his absence from the workplace, and she was concerned because Lametta and Byler would not specify whether Bennett's employment had been voluntarily or involuntarily terminated.  (Bolick Dep. 465-69, 230-32)  Bolick, though, could not provide any specifics concerning the bases for her fear of the departed Bennett, or provide any valid reason why she could not immediately return to work.

55.    Indeed, Bolick did not return to the office until in or about late February/early March, and even then, continued to often work from home. (*Id.* 524-25, 547) [2]

---

[2] The exact date of her return to work is difficult to determine as Bolick continued to work extensive amounts of time from home. (Lametta Dep. 118-19)

F.   **ANAC Promoted Bolick To Vice President and Hired Other Vice Presidents**

56.   From the time that she had been hired, Bolick was aware that ANAC planned to divide the Marketing Department into regions and hire a marketer for each region.  (Bolick Dep. 258, 432-33, 436-37, 557-58)

57.   Consistent with those discussions, in January 2002, ANAC hired Sandra Duncan as the Marketing Vice President for the Midwest Region at an annual salary of $125,000 and paid more than $30,000 in relocation expenses.  (Biegen Aff. and Ex. 1)

58.   Duncan possessed a MBA Degree in Management and Economics, having graduated from American International College summa cum laude.  (*Id.*)  Prior to joining ANAC, she had been the Manager of Client Services for Risk Enterprise Management and had spent approximately 15 years with the highly-regarded firm of Tillinghast-Towers Perrin, the last three as a Senior Risk Management Consultant.  (*Id.*)  When Duncan left Risk Enterprise Management as part of a reduction-in-force, her annual salary was $120,000.  (*Id.*)

59.   Bolick acknowledged there could be areas where Duncan was more experienced than she.  (Bolick Dep. 519)

60.   In February 2002, ANAC hired Scott Roe as the Marketing Vice President for its West Region at an annual $130,000 salary, plus a one-time $20,000 signing bonus.  (Biegen Aff. and Ex. 2)

61.   Prior to joining ANAC, Roe attained a BA in Finance and an MBA in Finance, and had worked as a Vice President for Aon Risk Services and a Senior Sales Consultant at Broadwing Technology Solutions.  (*Id.*)  He earned more than $120,000 in 2001.  (*Id.*)

62.   Also in February 2002, ANAC hired Jeffrey Alexander at an annual $130,000 salary as the Marketing Vice President for its northeast region, which stretched from Maine to North Carolina, including Bermuda.  (Byler Dep. 56, 156-58, 197-98; Biegen Aff. and Ex. 3)  He

also received a one-time $25,000 signing bonus. (Biegen Aff. And Ex. 3) Alexander had obtained a B.S. in Business Administration at Villanova University. (*Id.*) He earned more than $130,000 per year as a Second Vice President at Discover Reinsurance Company in Farmington, Connecticut, and had spent his entire career in the insurance industry. (*Id.*)

63.    Bolick admitted she did not know if Alexander had "more" contacts than she in the northeast region, the region she preferred be assigned to her, or if he was otherwise a "better fit" to service that territory. (Bolick Dep. 448, 474, 477-78). Bolick knew that Alexander actually lived in Connecticut. (*Id.* 438)

64.    On April 1, 2002, Bolick was promoted to Vice President and received a 15%, or $15,000 raise, bringing her annual salary to $118,000 per year.[3] (*Id.* 265, 472, 479-80)

65.    The timing of the implementation of this promotion was consistent with ANAC's longstanding policy and practice whereby raises are given and promotions implemented for incumbent employees on April 1 of each year. (*Id.* 235-37; Byler Dep. 44; Purkiss Dep. 34)

66.    Bolick served as the Marketing Vice President for the southeast region, which included Texas where, as previously described, she had maintained numerous business contacts and where she had lived and worked for 20 years. (Bolick Dep. 439-41, 447-48, 478; Exhibit H)

**G.    Bolick's May 2002 Retaliation Claim Against Byler Found To Be Meritless**

67.    On May 31, 2002, Bolick complained to Byler that she believed he had been retaliating against her for previously complaining about Bennett. (Bolick Dep. 547; Complaint ¶ 39)

68.    Her specific contentions are set forth in the Complaint as follows:

As a result of plaintiff's complaint of sexual harassment and the retaliatory conduct of the Defendants, she experienced the

---

[3] She also received a raise in April of 2003 in the amount of $3,450 per year in anticipation of her return to work. (Exhibit I)

> following: plaintiff was functionally demoted within the
> department, and was paid less than less experienced new hires.
> The physical office of the Senior Vice President, John Bennett,
> who left the company, was given to the newest, least experienced
> male marketing staff member, while plaintiff was in a cubicle.
> This same individual was given the most desirable territory that
> had been promised to Ms. Bolick. The career path that was laid
> out for plaintiff when she was hired, including being part of the
> management team, was no longer available.

(Complaint ¶ 41)

69.    In addition to the allegations of the Complaint, Bolick also claimed during deposition that Byler had been "giving her the cold shoulder", and focused on a particular marketing meeting. She alleged during that meeting Byler was rude, abrasive, and acted in a generally inappropriate manner toward her. (Bolick Dep. 265-68, 527-28)

70.    Bolick expanded on these allegations at her deposition as follows:

(a) As to the "functional demotion" assertion, Bolick conceded that after she complained to Byler about Bennett, she was actually <u>promoted</u> to Vice President and given a $15,000 raise. (Bolick Dep. 265, 558)

(b) As to being "paid less than the less experienced new hires," Bolick testified that she meant the newly hired Vice Presidents had less experience <u>at ANAC</u>, and not less career experience. (*Id.* 513, 558)

(c) Moreover, Bolick could not proffer any evidence to contradict that Duncan, Roe and Alexander actually had superior experience to her to perform their marketing functions, or to contradict that each earned $120,000 or more before joining ANAC, compared to the $72,000 to $73,000 that she earned prior to her hire. (*Id.* 85-86, 448, 476-78, 519; Byler Dep. 56-58, 61-65, 193-98, 217; Biegen Aff. and Exhibits 1-3)

(d) As to Alexander being given Bennett's former office, Bolick testified, <u>contrary</u> to the Complaint, that she, Duncan and Roe all had cubicles, and that she and Alexander

both moved into offices of about the same size in September 2002. (Bolick Dep. 558-63) Moreover, Bennett's office was actually shared by several employees after his departure, as opposed to being "assigned" to Alexander. (*Id.* 558-61).

(e) As to being assigned the southeast region rather than the northeast region, Bolick acknowledged that she had numerous contacts in the southeast region, especially in Texas where she had lived for 20 years before joining ANAC. (*Id.* 440-42) She further testified that before Alexander was hired, she spent significant time marketing for ANAC in the southeast region and very little exposure to the northeast region. Thus, her only nexus with the northeast was her recent relocation to Connecticut. (*Id.* 439-40)

(f) Bolick also conceded that the assignment of regions did not affect her and the other Vice Presidents' compensation or status in any way. (*Id.* 497; Byler Dep. 208-09)

(g) Bolick complained further that she was not assigned Bermuda as part of her territory. Yet, she agreed that she had never before closed a deal in Bermuda, and could not dispute that Bermuda was always considered to be part of the northeast. (Bolick Dep. 541, 543, 564)

(h) As to Bolick's generic allegation that she was no longer on her desired "career path", she testified that she had been promised a promotion to Vice President two months before she complained about retaliation. (*Id.* 479-80, 558) Consequently, she believed her promotion was being delayed, despite the company practice of waiting until April to implement that promotion. (*Id.* 238)

71.    Again, the promotion did go into effect, in accordance with ANAC standard policy and practice, in April of 2002, accompanied by a substantial raise in salary. (*Id.* 235-37; Byler Dep. 44; Purkiss Dep. 34)

72.    Finally, as to the allegation that Byler was giving her the "cold shoulder", Bolick claimed that he was not paying attention to her, avoiding her, and at the meeting referred to above, was particularly abrasive in front of the other members of the Marking Department. (Bolick Dep.265-68, 527-28)

73.    Marti Lametta, ANAC's Human Resources representative, and Leonard Goldberg, ANAC's Chairman, CEO and President, conducted an investigation into Bolick's claim that Byler had acted inappropriately toward her during a Marketing Department meeting. (Bolick Dep. 547-48; Goldberg Dep. 38-43; Exhibit J)

74.    Before they formed any conclusions, and after Bolick told them she did not believe she could work again with Byler, Bolick told them that her complaint could be resolved by promoting her into Bennett's former Senior Vice President position, which was vacant, thereby increasing her compensation, and installing her as the supervisor of the three other Marketing Vice Presidents. (Bolick Dep. 549-51)

75.    Such a promotion would then compel Bolick to work even more closely with Byler, as the Senior Vice President reported directly to him. (Lametta Dep. 99-101, 126-27)

76.    After the investigation, which primarily included interviews with a number of participants who attended the subject marketing meeting, it was determined that Bolick's allegations could not be substantiated. In fact, the attendees interviewed stated that Byler had not acted "inappropriately", and some even opined that Bolick did not consistently behave in an appropriate manner toward Byler and her other superiors. (Lametta Dep. 90, 125-26; Bolick Dep. 547; Byler Dep. 164-65)

77.    With respect to the claim regarding her promotion, Bolick was reminded that her promotion was not "delayed", but was implemented in accordance with ANAC standard policy (Bolick Dep. 235-37; Byler Dep. 44; Exhibit J).

78.    Finally, with respect to Bolick's suggestion that she be moved into Bennett's spot, thus obtaining an "instant" promotion, Lametta and Goldberg advised Bolick that she was well suited to continue in her position as Vice President.  (Byler Dep. 186-88; Lametta Dep. 126-27; Exhibit J)  Goldberg and Lametta thus underscored ANAC's desire to have Bolick remain in her position, performing her functions, and participating in ANAC's growth and anticipated prosperity.  (Bolick Dep. 552; Exhibit J)

**H.    Bolick Takes A Leave and Was Ultimately Terminated**

79.    Despite ANAC's repeatedly articulated desire to have Bolick continue as a Vice President, on September 17, 2002, Bolick stopped working and commenced a disability leave, claiming stress and anxiety from the events at ANAC prevented her from working.  (Bolick Dep. 6-7, 13-14, 548, 554-55, 568-69, 602)

80.    Bolick never returned to work, yet ANAC continued to keep Bolick as an employee for approximately ten months, and thus, for a number of months even beyond her exhaustion of all statutorily guaranteed leave time.  Eventually, on July 15, 2003, however, ANAC terminated Bolick's employment.

81.    Counts One and Three of the Complaint, Bolick alleges hostile environment sexual harassment by her then supervisor, Defendant Bennett, in violation of the CFEPA and Title VII.  In support of these causes of action, however, Bolick proffers only the factual allegations set forth above.

82.    Bolick conceded during her deposition that Bennett never asked her for sex, never made a sexual advance, never asked her out for a date, never touched her in a sexual way, and

never even said in words that sex or actually taking drugs with her were on his mind. (*Id.* 295-97, 308-14, 321-23, 357-60, 430)

## I.    Plaintiff Has Not Sustained Her Burden of Proving Hostile Environment Sexual Harassment

83.    The alleged conduct, even if true, does not constitute actionable hostile environment sexual harassment within the scope of Title VII or comparable state law. The underlying allegations relate to episodic, infrequent behavior, wholly unrelated to her gender or which otherwise she has not shown were specific to her gender.  Indeed, Plaintiff herself admitted similar behavior by Bennett toward males in the office.  (Bolick Dep. 312-13**).**

84.    Even if the conduct of which Bolick complains to constitute hostile environment sexual harassment by Bennett was established, this claim must nevertheless be dismissed as no tangible employment action was taken against her and it is undisputed that (a) the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) Plaintiff was unreasonable in taking advantage of the corrective opportunities provided by ANAC.

85.    Specifically, a purported "delay" in her promotion from August of 2001 until April of 2002, based on a claimed promise by Bennett that she would be promoted sooner; an alleged promise by Bennett before his departure from the company that she would be the "#2 person" in Marketing", and she would further be involved with the hiring of the new people and assignment of territories, even if true, do not constitute tangible employment actions.

86.    Additionally, Bolick's dissatisfaction with the assignment to her of territory which did not include Bermuda, and that she was not "put in charge" of captive business are not tangible employment actions.

87.    Moreover, the starting salaries of the three new Vice Presidents (hired in January and February of 2002) were based on legitimate business considerations.

88.    It is undisputed by Plaintiff that she was given her promotion in April of 2002, with a significant, 15% raise, at the time ANAC typically effectuated promotions.  (Bolick Dep. 237, 558)

89.    Second, Bolick could not substantiate her inference that the salaries of the new Vice Presidents were connected with her claim of harassment, as opposed to being connected to Byler's legitimate view of their respective qualifications.  (Byler Dep. 56-58, 61-65, 193-98, 217)

90.    It is equally undisputed that after Plaintiff's initial complaint to Defendant Byler on November 6, 2000 (demonstrating her knowledge of an appropriate route established by ANAC for her complaint), Byler immediately implemented steps, to which she agreed, which resulted in her having very limited interaction with Bennett during the following year.  Byler asked Bolick if she wanted to complain further at that time to Human Resources, and Bolick declined that invitation.  (Bolick Dep. 181-82, 238-39; Byler Dep. 22-23, 179-82)

91.    Noteworthy, Plaintiff's request that she not be asked to accompany Bennett on business trips was granted in that same conversation with Byler.  Thereafter, Bolick was not asked to, nor did she, accompany Bennett during that following year plus on any business trips. (Bolick Dep. 184-85, 403-05).

92.    She never complained to Byler again during that year, despite her demonstrated knowledge of her avenues of complaint within the company, and told him the situation was "acceptable". (*Id.* 183, 243-44, 370-71) During that interim year, she and Byler had brief conversations during which she indicated she could "deal with" Bennett in the office, and

confirmed she had not been asked by Bennett to go on any trips with him. In short, Bolick now claims only that Byler should have handled Bennett's "behavioral issues" by, for example, administering a "drug test." (*Id.* 403-05)

93.    Bolick concedes at that time she did not request Bennett's termination. (*Id.* 263) It was not until January of 2002 that Bolick complained to Lametta of Human Resources. Bolick claimed that the timing of this complaint to Human Resources was triggered by Bennett's threat to "hit her" while they were discussing her interaction with Byler concerning a new hire. (*Id.* 195-98)

94.    It is likewise undisputed that this complaint triggered an investigation, and the ultimate departure of Bennett by January 31, 2002. (*Id.* 451-52, 466-70) It is also undisputed that from the date of that complaint to Lametta, Bolick had <u>no</u> <u>additional</u> <u>interaction</u> whatsoever with Bennett.

95.    Rather than take advantage of these measures taken, it was Plaintiff who unilaterally opted not to return immediately to work, simply because she did not know the specifics of his departure. (*Id.* 465-70)

96.    Thus, even if the conduct of which Bolick complains to have created an actionable, hostile work environment, her claims should nevertheless be dismissed based on the absence of a tangible employment action, followed by Defendants' prompt, remedial action coupled with Plaintiff's failure to act on the corrective action by making additional complaints after November 6, 2002, and by promptly returning to work when she was notified of Bennett's departure.

**J.    Bolick's Claims of Retaliation Similarly Fail By Operation of Law**

97.    Bolick alleges the following purported "adverse" actions by Defendants: (a) three newly hired Vice Presidents in her department were paid more in salary than she even after being promoted into the Vice President position, and a claimed promise she would be placed in charge of the "captive unit" of the department; (b) the assignment of territory to members of the Marketing Department, and that she was not assigned Bermuda as part of her territory; (c) a delay in her promotion to the position of Vice President; and (d) not being given Bennett's office. (Bolick Dep. 237-38, 252-56, 402, 473-74, 491-92, 508-09)  She also claims Byler gave her the "cold shoulder" after her complaint about Bennett. (*Id.* 265-66, 584-55, 557-60)

98.    At the same time, however, Bolick failed to contradict, with evidence, the testimony provided by Byler as to the bases for the salaries of the three new Vice Presidents. (Byler Dep. 56-65; Bolick Dep. 237, 265, 393-94, 472-73).

99.    Further, Bolick failed to establish that the assignment of territories or whether she would be "in charge" of captive business or the "#2 person" had any impact whatsoever on her compensation---i.e., she earned the same amount irrespective of her territory. (Bolick Dep. 497, 539-43)  She has not contradicted Byler's testimony that all marketers were involved in "captive business", and each would be in charge of their assigned region or territory. (Byler Dep. 156-59)

100.    She further failed to substantiate any connection between the joining of Bermuda with the northeast territory and any impact on her status or compensation.

101.    Bolick admitted during deposition that her purportedly "delayed" promotion was actually implemented in April of 2002 and a significant raise awarded commensurate with that promotion, several months after her harassment and retaliation complaint to Lametta. (Bolick Dep. 265, 472, 479-80, 558)

102.   Bolick failed to introduce evidence to contradict the testimony of defense witnesses as to the standard timing of such promotions within ANAC. She could not dispute further that at the time of her promotion into that position, she was earning nearly $50,000 more in salary than she was earning just prior to her joining ANAC. As previously established, her claim that Bennett's office was assigned to her counterpart, was inaccurate. (*Id.* 558-63; Byler Dep. 44, 196).

103.   Finally, she raised only vague, generic, and unsubstantiated facts as to Byler's attitude toward her and pointed to Byler's alleged behavior at a specific marketing meeting as being particularly illustrative of the "cold shoulder" demeanor toward her. Again, on the contrary, Bolick could not identify any concrete, economic or other disadvantage as a direct result of Byler's purported attitude toward her.

104.   In short, especially because there was no effect on her status, position, or compensation, actions such as not getting a promotion when she thought she should; not getting the Bermuda territory or whatever territory she preferred; not getting her former superior's office space; and the "cold shoulder" by a superior, even if true, on their face, cannot constitute adverse actions indicative of retaliatory motive.

105.   Moreover, Bolick did not dispute that the plan for marketers in different regions, and the change over to a system where territories would be assigned to all members of the department, were concepts already discussed with her <u>during the initial weeks of her employment</u>, and thus, well before any complaints about Bennett. (Bolick Dep. 257-58, 436-37, 449-51).

106.   Bolick has not proffered any actual evidence that the reasons given for any other "actions", even if deemed "adverse", were connected to protected activity or otherwise motivated by retaliatory animus. Thus, proof of the requisite causal connection between the alleged adverse actions and her engagement in protected activity is absent.

107.    Plaintiff's only "evidence" of retaliation is the timing of the implementation of certain changes in her department, not even the timing of the actual decisions to make those changes. Thus, Plaintiff is left with one, final argument - that her salary was less than that of newly hired Vice Presidents.

108.    However, as previously established, Paintiff proffered no evidence whatsoever that the rationale given by Defendants as to how these salaries were set (i.e., background, skills, experience, and prior salaries), were connected with her internal complaints.

109.    Even assuming that Plaintiff could satisfy the burden of establishing the elements of a *prima facie* case of retaliation, Defendants can nevertheless establish non-retaliatory reasons for its decisions. Extensive testimony has been gleaned from defense witnesses for which Bolick has no evidence to contradict, and some of which she even admits; e.g., departmental changes were motivated by business reasons and articulated to her well before her complaints; hiring decisions were made known to her prior to any complaint to effectuate restructuring of the department; and the timing of her promotion was consistent with ANAC practice/policy. (*Id.* 235-37; Byler Dep. 44)

110.    Additionally, salaries of newly hired Vice Presidents were based on the Defendants' perception of their superior qualifications, experience, and prior salary history. As Defendants need only articulate, and not prove, these reasons are true at this procedural stage, they should be deemed to have met their burden.

111.    Bolick cannot produce concrete evidence from which a reasonable juror could conclude that retaliatory animus motivated Defendants' decisions that affected the entire Marketing Department. As previously established, ANAC based all decisions on legitimate, non-retaliatory business reasons. (Byler Dep. 40-42, 44-47, 195-97) Bolick has not proffered

any evidence to contradict those reasons, and she admitted most of these decisions were discussed with her prior to her internal complaints. (See also Byler Dep. 26)

112. For these reasons, and for those reasons already explored which establish her failure to make out a *prima facie* case, Bolick has failed to establish pretext, and therefore, her retaliation claims should be dismissed.

**K.    Plaintiff's Equal Pay Act Claim Cannot Withstand This Motion**

113. In the eighth count of the Complaint, Bolick alleges that she was paid less than similarly situated males performing substantially similar work. Specifically, she alleges that she and Duncan were paid less in starting salary than were the two male Vice Presidents, Roe and Alexander. (Complaint ¶ 75-erroneous reference to Senior Vice Presidents)

114. As previously asserted, Defendants have presented significant testimony and documents substantiating that the $7,000-$12,000 difference in Bolick's salary was based on the comparative skills, experience, and prior salary history of all three Vice Presidents of Marketing.

115. Plaintiff has failed to proffer any evidence to dispute the articulated rationale of ANAC. More specifically, Byler testified, and Bolick cannot dispute, that ANAC perceived the new Vice Presidents to have superior experience, skills sets, and higher salary history. (Byler Dep. 56-58, 61-65, 193-98, 217) In fact, Plaintiff joined ANAC at a time more competitive candidates were not available. (*Id.* 193-94) Her starting salary represented a salary increase for her of nearly $30,000 (*Id.* 195-96), and thus, Bolick simply cannot substantiate any claim that Defendants' articulated reasons for the slight salary differential are pretextual.

116. Moreover, a closer look at the salaries of the Vice Presidents hired in early 2002 underscores the complete absence of discriminatory motivation by the company. (Biegen Affidavit, Exhibits 1-3)

117.    It is undisputed that Duncan, the female Vice President, was hired at the same starting compensation as were the males, and possibly with a starting compensation higher than that of Roe, depending on whether the expenses for which she was reimbursed fell at the minimum set of $25,000 or the maximum of $30,000[4]. The fact a female Vice President in the same job was hired at the same pay rate wholly contradicts any inference that gender played any role in the setting of compensation rates for the Vice Presidents.    Coupled with the uncontraverted evidence proffered by Defendants as to the considerations made in setting these salaries, it should apparent that Plaintiff cannot sustain her burden of proof as to Count 8 of her Complaint, warranting the entry of summary judgment.

**L.    Plaintiff's Claim for Breach of Implied Contract Cannot Be Sustained**

118.    In Count five of her Complaint, Plaintiff alleges that the Defendants' failure to pay her a bonus for year 2001, despite that no other ANAC employees were paid such a bonus for that year, breached an implied contract with her. (Complaint ¶ 62)

119.    The terms of that purported contract are undisputedly set forth in the offer letter issued to Bolick prior to the commencement of her hire. (Bolick Dep. 113-14, 566, Exhibit F)

120.    Bolick cites to no other basis for her allegations in this count, and, critically important, admitted in deposition that she understood the offer letter to mean bonuses were not guaranteed. (*Id.*) Indeed, a plain reading of the offer letter reveals that any bonus to be paid to Bolick was purely discretionary. (Exhibit F)

121.    The evidence cannot be disputed—no "contract" for any guaranteed bonus can be established by Bolick, and her claim in this regard must be dismissed.

---

[4] ANAC ultimately paid more than $30,000 for Duncan's relocation expenses (Biegen Aff. ¶ 4). Interesting further to note, Bolick told Byler she believed Duncan was "overqualified" for the position. (Bolick Dep. 518)

**M.  The Claim For Breach of the Implied Covenant of Good Faith
And Fair Dealing Likewise Fails**

122.   Count Six of Plaintiff's Complaint asserts that Defendants breached an implied covenant of good faith and fair dealing when they did not pay her a bonus for calendar year 2001.

123.   In the instant matter, Plaintiff's claim for breach of the covenant of good faith and fair dealing cause of action cannot be sustained: first, she cannot prove an implied contract to pay her a bonus exists.  Second, she has not even alleged a violation of any public policy in the alternative.   Moreover, she has not even attempted to proffer evidence that Defendants intentionally deprived her of a bonus.  Rather, she has merely restated her implied contract claim in this Count.

124.   As no contract was created, express or implied, to pay Bolick an automatic bonus, because no violation of public policy was alleged, and because Plaintiff cannot proffer evidence of bad faith by any Defendant, Plaintiff's claim sounding in breach of the covenant of good faith and fair dealing should be dismissed.

**N.  Plaintiff's Claim of Negligent Misrepresentation Regarding the Same Bonus
Must Also Be Dismissed**

125.   The factual underpinnings for Bolick's claim of negligent misrepresentation are identical to those factual allegations asserted in support of her claim for breach of implied contract.

126.   A critical element necessary to maintain her claim of negligent misrepresentation is missing; Bolick does not sufficiently identify a "false" statement made by Defendants which they allegedly knew was false when made.  (Complaint ¶ 69)

27760 v1

127.    Moreover, Bolick fails to sustain her burden of proving reasonable reliance on a false statement.

128.    For these reasons, and for those same reasons set forth above, this claim should fail as a matter of law

THE DEFENDANTS,
ALEA GROUP HOLDINGS, LTD.,
ALEA NORTH AMERICA COMPANY, AND
ROBERT D. BYLER

By: _____

Mary A. Gambardella
Federal Bar No. #ct05386
Epstein Becker & Green, P.C.
One Landmark Square, Suite 1800
Stamford, CT  06901-2601
(203) 348-3737
              and
Barry Asen
Federal Bar #ct24527
Counsel Pro Hac Vice
Epstein Becker & Green, P.C.
250 Park Avenue
New York, New York  10177
(212) 351-4500

## CERTIFICATION

The undersigned hereby certifies that a copy of the foregoing Statement of Undisputed Facts was mailed via regular mail, postage prepaid, to all counsel of record on the 10th day of February, 2004 as follows.

Barbara Gardner, Esq.
843 Main Street
Suite 1-4
Manchester, CT 06040
*Counsel for the Plaintiff*

Peter E. Gillespie, Esq.
46 Riverside Avenue
P.O. Box 3416
Westport, CT 06880
*Counsel for Defendant John Bennett*

David L. Weissman, Esq.
Saundra M. Yaklin, Esq.
ReedSmith LLP
559 Lexington Avenue, 29th FL.
New York, NY 10022
*Counsel Pro Hac Vice for Defendant John Bennett*

Mary A. Gambardella

27760 v1

-25-