IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **LEIGH BOLICK** | : | Civil Action No. 3:03CV165 (PCD) |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| vs. | : | |
| | : | |
| **ALEA GROUP HOLDINGS, LTD.** | : | |
| **et al.** | : | |
| **Defendants.** | : | **February 10, 2004** |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

### I. PRELIMINARY STATEMENT

Defendants, Alea Group Holdings, Ltd. ("AGH"), Alea North America Company ("ANAC") and Robert Byler, hereby respectfully submit their Memorandum of Law in Support of their Motion for Summary Judgment as to each and every cause of action contained in the Complaint of the Plaintiff, Leigh Bolick, a former Vice President of the Marketing Department of Defendant ANAC. At the time she filed the operative Complaint (Amended Complaint dated April 4, 2003 and hereinafter the "Complaint"), Bolick remained employed by ANAC while out on long-term disability. Her employment was not terminated by ANAC until July of 2003. The termination decision was made specifically because: (1) Bolick indicated that despite that she had already long exhausted all leave entitlement, she did not believe she would ever return to ANAC, or even to the insurance industry; and (2) facts were uncovered during the discovery process which revealed that Bolick had fraudulently misrepresented to ANAC that she was married so that she could obtain medical, dental and vision care insurance coverage for Mr. Bolick. Bolick seeks compensatory damages for emotional distress, punitive damages, and back pay from Defendants. Each and every cause of action should be dismissed for following reasons:

      a.    Even assuming Bolick's harassment allegations against Bennett are true, the conduct complained of was neither severe nor pervasive in nature and, thus, the allegations do not rise to level of an actionable hostile environment sexual harassment claim. Alternatively, even if the subject conduct is viewed as actionable, the claim should still be dismissed as a matter of law because there was no tangible employment action, and ANAC took prompt and appropriate action to prevent further harassment.

      b.    Bolick cannot establish a *prima facie* retaliation claim for two reasons: (i) she did not experience an adverse employment action (in fact, she was promoted after her internal complaints), and (ii) assuming that she did, she cannot show a causal connection between her sexual harassment complaint and the alleged adverse employment action.[1]

      c.    Bolick's claim that she was somehow guaranteed a bonus should be dismissed because, as she conceded during her own deposition, the bonus was not guaranteed and, on the contrary, was clearly discretionary. Moreover, the record is undisputed that no ANAC employees were awarded bonuses for 2001.

      d.    Finally, Bolick cannot dispute the record which establishes that ANAC properly set salaries of those persons with whom she compares herself, based on its view of their superior experience and the fact they had earned far higher salaries than she did prior to joining ANAC, thus vitiating her claim under the EPA. Moreover, to underscore the baseless nature of this

---

[1] Critical to note here, Bolick has never raised <u>any</u> claims related to the termination of her employment by ANAC.

claim, one of the three people whom she uses to compare her salary was female.[2]

## II.    THE COMPLAINT

The Complaint contains eight counts. The first and third count set forth causes of action for alleged hostile environment sexual harassment, in violation of the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. §§ 46a-60, *et seq.* ("CFEPA"), and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § Section 2000e-2(a) ("Title VII"), respectively.[3] The second and fourth counts set forth causes of action for retaliation, also in violation of the CFEPA and Title VII, respectively. The fifth count sets forth a cause of action for breach an implied in fact contract; the sixth for breach of the implied covenant of good faith and fair dealing; and the seventh for negligent misrepresentation. Counts five, six, and seven all relate to Bolick's claim to a bonus payment for calendar year 2001. Finally, the eighth count sets forth a cause of action for violation of the Equal Pay Act, 29 U.S.C. § 206(d) ("EPA").

## III.    FACTS

### A.    The Parties

Defendant ANAC is a reinsurance intermediary. (Byler Dep. 110; Bolick Dep. 153, 156-57) Defendant Byler, who is accused of retaliation against Bolick for her internal complaints, is the Chief Executive Officer of Alea Alternative Risk ("AAR"), an operating division of ANAC. (Complaint ¶ 16; Byler Dep. 31) Defendant Bennett, who is accused of sexual harassment and

---

[2] Even if this Court determines that Bolick can survive this Motion, Defendant AGH nevertheless respectfully requests that all causes of action be dismissed against it. Specifically, AGH is only the holding company of Defendant ANAC. ANAC was the Plaintiff's employer; Plaintiff performed services for and was paid solely by ANAC; reported to ANAC management; and all decisions of which she complains in this action were made and implemented by ANAC employees/management. Thus, she has asserted no factual bases for maintaining any cause of action against AGH, but rather, only conclusory claims of AGH's liability. Therefore, all claims against AGH should be dismissed. See, e.g., Zoldak v. Tacala, Inc., No. Civ. A 398 CV 1565 (CFD), 2000 WL 1576419 (D. Conn. Sept. 27, 2000); Brown v. Nationscredit Commercial Corp., No. 3:99-CV-592 (EBB), 2000 WL 887593 (D. Conn. June 26, 2000); Bragg v. Emmis Broadcasting Corp., No. 95 Civ. 10310 (DAB), 1998 WL 730339 (S.D.N.Y. Oct. 19, 1998); Duffy v. Drake Beam Morin, Harcourt General, Inc., No. 96 Civ. 5606 (MBM), 1998 WL 252063 (S.D.N.Y. May 19, 1998).

[3] The Title VII sexual harassment count was dismissed against Bennett.

retaliation, was AAR's Senior Vice President of Marketing and Bolick's supervisor. Bennett resigned from his employment with ANAC effective January 31 2002. (Byler Dep. 49) Defendant AGH is ANAC's parent company. (*Id.* Purkiss Dep. 5-6)[4]

Bolick is a high school graduate with two years of college credit, but never earned a college degree. (Bolick Dep. 83) Just prior to joining ANAC, Bolick was a Senior Underwriter for the Argonaut Insurance Company in Texas, earning between $72,000 and $73,000 per year. Her territory at Argonaut covered Texas, Oklahoma, Louisiana, Arkansas and Mississippi. (*Id.* 85-87) She had lived in Texas for approximately 20 years. (*Id.* 441) In September 2000, ANAC hired her as an Assistant Vice President. (*Id.* 108, 112)

**B.    The Terms of Bolick's September 2000 Hire**

After being referred to ANAC by an employment recruiter, Bolick submitted her resume to ANAC and was interviewed by Bennett and Byler, among others. (Bolick Dep. 84, 98, 100) Bennett advised Bolick that the position of Assistant Vice President of Marketing required approximately 40% travel, a requirement Bolick admitted did not cause her concern. (*Id.* 98-100) Bolick signed ANAC's September 19, 2000 offer letter, which confirmed that she was being hired as an Assistant Vice President at an annual salary of $100,000, and that she was eligible for insurance benefits, relocation expenses from Texas of up to $10,000, and a possible bonus, which was purely discretionary. (Bolick Dep. 108-09, 112-14 and Exhibit F) In fact, the offer letter specifically provided that the bonus was not guaranteed, but rather, was purely discretionary, considering "overall group profit". Bolick confirmed her understanding of the terms of the offer letter, and acknowledged further that she was employed at will. (*Id.* 113-17,

---

[4] Plaintiff makes no separate factual allegations against AGH, nor has she substantiated any claims against AGH. Indeed, the only conclusory allegation asserted is that Dennis Purkiss, an AGH employee, "participated" in the investigation of her internal complaints. (Complaint ¶ 28) Mr. Purkiss confirmed his "participation" was limited to merely being kept informed as events progressed. (Purkiss Dep. 62)

27652 v2                                            -4-

566; Exhibit F).[5] Bolick also understood the offer letter to be the only "representation" of the terms of her employment. (*Id.* 113, 116-19, 414) On October 10, 2000, Bolick started at ANAC's Rocky Hill office in Connecticut. (*Id.* 295) She reported directly to Bennett. (*Id.* 112, 157)

**C.     Bolick's Job Duties and Responsibilities at ANAC**

While employed by ANAC, Bolick attempted to market insurance products. (Bolick Dep. 152-53) She traveled extensively, particularly in the midwest and southeast regions, including Texas, to market ANAC products. (*Id.* 439-41) Indeed, Bolick admits that based on her prior residence and places of employment, her business and professional contacts were concentrated in this part of the country. (*Id.* 160, 478) As Byler described, Bolick was expected to be willing to "take on more responsibility and authority" as the organization changed, and to therefore be someone who could "accept and deal with change…". (Byler Dep. 26) Bolick knew when she joined ANAC it was considered a "start-up" operation. (Bolick Dep. 159; Byler 26, 53-55) As a marketer, Bolick was expected to bring in prospective clients and accounts, then to work closely with the underwriters to write the business. Bolick, as the marketer, had the ultimate responsibility to "close" deals. (Byler Dep. 171-72) Bolick, nevertheless, could recall closing only one deal during her entire employment with ANAC. (Bolick Dep. 520-21)

**D.     Bolick's November 2000 Complaint to Byler Was Promptly Resolved**

According to Bolick, during her first week on the job in October 2000, Bennett was rude, yelled at her, and questioned whether she could do the job. (Bolick Dep. 161-67, 171-72, 299-302) She claimed also that Bennett told her she was "too cocky," and could not go on marketing calls by herself until she had a dry run in the office. He also allegedly told Bolick it was a

---

[5] "The performance factors driving the bonus amounts will be reviewed and possibly changed. There will be no bonus guarantees". (Exhibit F)

27652 v2                                          -5-

mistake to have hired her. (*Id.* 164-66; 172, 299, 315) On a business trip in October 2000, he allegedly: (1) put his arm around her shoulder while they walked down a street; (2) stood too close to her and whispered in her ear; and (3) asked if she had brought workout clothes for the hotel gym. (*Id.* 172-73, 315-21) Bolick knew that Bennett worked out in gyms both at home and on the road, and she could not recall whether Bennett whispered in her ear about a business or non-business matter. (*Id.* 172-73, 319-20) She also confirmed that none of the "close" talk was sexual in nature or content. (*Id.* 320) Bolick never alleged any overt sexual advances or requests to take drugs with him; indeed, Bolick admitted she did not even believe Bennett "ever did drugs". (*Id.* 211, 295-97, 328, 330, 391)

Also according to Bolick, during a second business trip in October 2000, Bennett allegedly: (1) put his head on her shoulder on an airplane; (2) read to her a sexually-oriented passage from a book; (3) asked her to play cards for fun and money; (4) asked if she had brought workout clothes; (5) tried to discuss cocaine parties and tongue rings with her; and (6) asked what her husband thought about their traveling together and if she and her husband "discussed" him. (*Id.* at 186, 201-02, 323-28, 333-34, 337-44) Based solely on this conduct, and although Bennett made no specific requests or demands of a sexual nature, Bolick inferred that he wanted to have sex with her. (*Id.* 175-77, 295-97, 351-91) She also thought he wanted a "drug buddy", yet in this regard as well, she did not allege any overt request to take drugs with him. (*Id.* 295-97, 328, 349-50, 391)

On November 6, 2000, she complained to Byler about Bennett's conduct. (*Id.* 177-79) Bolick told Byler specifically that she did not want Bennett to be fired, but asked Byler to resolve the issue. (*Id.* 263) By her own characterization, Byler was "very positive" in attitude with her during the meeting and asked if she wanted the Human Resources Department to

become involved. (*Id.* 180-81)  Bolick responded "no," and that she did not want Bennett to know that she complained, but also said that she did not want to travel with him on an upcoming marketing trip. (*Id.* 180, 184-85; Byler Dep. 178-79)  Byler agreed to her request, although Byler could have required an investigation by the Human Resources Department before acquiescing to Bolick's requests.  Thus, Byler immediately arranged that Bolick and Bennett would not travel together on that upcoming trip.  Byler also promised she would participate in an expedited course of training so she did not have to travel with Bennett. (Bolick Dep. 181-82; Byler Dep. 22-23, 179-82)  Byler and Bolick had several follow-up conversations. (Bolick Dep. 183)  Each time, she told Byler that she and Bennett were not traveling together, did not see much of each other, and that the situation was "acceptable." (*Id.* 183, 243-44, 370-71)

### E. Bolick's January 2002 Sexual Harassment Complaint Resulted In Bennett's Departure

During the year that followed, Bolick saw Bennett approximately twice each month in the office, and attended two conventions that he also attended. (Bolick Dep. 360-62)  They did not travel together, nor did Byler make Bennett aware of Bolick's complaint to him from November 2001, as Bolick had requested. (*Id.* 243, 351-52; Byler Dep. 22-24)

In December 2001, however, Bennett asked Bolick if she wanted to accompany him on a marketing trip to Los Angeles, and she said she would. (Bolick Dep. 415-18)  She also said his mood still varied; one day he was complimenting her, and the next he was telling her she was doing a terrible job. (*Id.* 244, 355-56, 391-393)  She never told Byler or Bennett she did not want to go on that trip. (*Id.* 416; Byler Dep. 180)  During the trip, Bennett allegedly told her that he and his wife had previously stayed at the hotel where they were staying, and that the hotel was "romantic". (Bolick Dep. 418-21)  Bolick also alleges that Bennett got "too close to her" when they were walking to a restaurant, put his arm around her shoulder, asked her to work out with

him again, and later called her an idiot for not knowing how to drive back to the hotel. (*Id.* 200, 421-24) Bolick conceded, however, that Bennett had called male employees idiots, as well, and had called one male employee a "fat ass". (*Id.* 312-13)

On December 21, 2001, after they returned from the trip and were sitting in his Rocky Hill office, Bennett allegedly moved closer to Bolick, raised his fist, and stated he was going to "sit close enough to hit her," because she had expressed reservations to Byler about hiring a candidate, Sandra Duncan, for a Marketing position. (*Id.* 189-93; Complaint ¶ 25; Lametta Dep. 109-11) Bolick responded by rebuking Bennett in an e-mail, and then she started a vacation. (Bolick Dep. 194-96, 453-57) Bolick viewed Bennett's alleged statement that he wanted to hit her as part of his "sexual harassment." (*Id.* 198-99) Bolick acknowledges that Bennett did not actually attempt to strike her. (*Id.* 193)

On January 10, 2002, which was several days after she returned from her vacation, Bolick complained to Byler and ANAC's Human Resources Department that Bennett had sexually harassed her. (*Id.* 195-98, 451-53) Bolick continued to infer that Bennett's conduct signified that he wanted to have sex with her, although admittedly he never said he harbored that intention, nor had he ever expressly made any sexual advances or demands. (*Id.* 295-97, 391) The Director and Vice President of Human Resources, Marti Lametta, commenced an investigation. (Lametta Dep. 32-33; Bolick Dep. 457-58, 462-63) Before ANAC's investigation into Bennett's conduct ended and any determinations were made as to the merit of Bolick's allegations, Bennett voluntarily resigned his employment with ANAC and received a severance package. (Byler Dep. 113, 203; Lametta Dep. 40, Purkiss Dep. 50-51) During the investigation period, Bolick had been told she could work from home, due to her articulated stress and inability to concentrate in the office. (Bolick Dep. 462-65; Byler Dep. 201) Bennett was

instructed to stay away from the office. (*Id.*) Thus, Bolick had no contact with Bennett literally from the instant she complained to Human Resources. (Byler Dep. 201-02)

During the first days of February, 2002, Lametta and Byler contacted Bolick at home to notify her that Bennett had left ANAC. (Bolick Dep. 231, 458-59) They confirmed that Bolick would be returning to her current position, with the same and possibly expanded responsibilities, while expressing their enthusiasm at her return. (*Id.* 465-69; Byler Dep. 88-90) Rather than returning that enthusiasm or even agreeing to a prompt return, Bolick expressed resistance. (Bolick Dep. 465-69; Byler Dep. 203-04) Byler and Lametta were stunned. (Byler Dep. 89, 203; Lametta Dep. 105-06) During deposition, Bolick explained her reaction by testifying that she remained "fearful" of Bennett, despite his absence from the workplace, and she was concerned because Lametta and Byler would not specify whether Bennett's employment had been voluntarily or involuntarily terminated. (Bolick Dep. 465-69, 230-32) Bolick, though, could not provide any specifics concerning the bases for her fear of the departed Bennett, or provide any valid reason why she could not immediately return to work. Indeed, Bolick did not return to the office until in or about late February/early March, and even then, continued to often work from home. (*Id.* 524-25, 547)[6]

F. **ANAC Promoted Bolick To Vice President and Hired Other Vice Presidents**

From the time that she had been hired, Bolick was aware that ANAC planned to divide the Marketing Department into regions and hire a marketer for each region. (Bolick Dep. 258, 432-33, 436-37, 557-58) Thus, consistent with those discussions, in January 2002, ANAC hired Sandra Duncan as the Marketing Vice President for the Midwest Region at an annual salary of $125,000 and paid more than $40,000 in relocation expenses. (Exhibit G, Biegen Aff. ¶ 4 and

---

[6] The exact date of her return to work is difficult to determine as Bolick continued to work extensive amounts of time from home. (Lametta Dep. 118-19)

27652 v2                               -9-

Ex. 1 thereto) Duncan possessed a MBA Degree in Management and Economics, having graduated from American International College summa cum laude. (*Id.*) Prior to joining ANAC, she had been the Manager of Client Services for Risk Enterprise Management and had spent approximately 15 years with the highly-regarded firm of Tillinghast-Towers Perrin, the last three as a Senior Risk Management Consultant. (*Id.*) When Duncan left Risk Enterprise Management as part of a reduction-in-force, her annual salary was $120,000. (*Id.*) Bolick acknowledged there could be areas where Duncan was more experienced than she. (Bolick Dep. 519)

In February 2002, ANAC hired Scott Roe as the Marketing Vice President for its West Region at an annual $130,000 salary, plus a one-time $20,000 signing bonus. (Biegen Aff. and Ex. 2) Prior to joining ANAC, Roe attained a BA in Finance and an MBA in Finance, and had worked as a Vice President for Aon Risk Services and a Senior Sales Consultant at Broadwing Technology Solutions. (*Id.*) He earned more than $120,000 in 2001. (*Id.*) Also, in February 2002, ANAC hired Jeffrey Alexander at an annual $130,000 salary as the Marketing Vice President for its northeast region, including Bermuda. (Byler Dep. 56, 156-58, 197-98; Biegen Aff. and Ex. 3) He also received a one-time $25,000 signing bonus. (Biegen Aff. and Ex. 3) Alexander had obtained a B.S. in Business Administration at Villanova University. (*Id.*) He earned more than $130,000 per year as a Second Vice President at Discover Reinsurance Company in Farmington, Connecticut, and had spent his entire career in the insurance industry. (*Id.*) Bolick admitted she did not know if Alexander had "more" contacts than she in the northeast region, the region she preferred be assigned to her, or if he was otherwise a "better fit" to service that territory. (Bolick Dep. 448, 474, 477-78). Bolick knew that Alexander also lived in Connecticut. (*Id.* 438)

On April 1, 2002, Bolick was promoted to Vice President and received a 15%, or $15,000 raise, bringing her annual salary to $118,000 per year.[7] (Bolick Dep. 265, 472, 479-80) The timing of the implementation of this promotion was consistent with ANAC's longstanding policy and practice whereby raises are given and promotions implemented for incumbent employees on April 1 of each year. (*Id.* 235-37; Byler Dep. 44) Bolick served as the Marketing Vice President for the southeast region, which included Texas where, as previously described, she had significant business contacts and where she had lived and worked for 20 years. (Bolick Dep. 439-41, 447-48, 478; Exhibit H)

G.  **Bolick's May 2002 Retaliation Claim Against Byler Found To Be Meritless**

On May 31, 2002, Bolick complained to Byler that she believed he had been retaliating against her for previously complaining about Bennett. (Bolick Dep. 547; Complaint ¶ 39) Her specific contentions are set forth in the Complaint as follows:

> As a result of plaintiff's complaint of sexual harassment and the retaliatory conduct of the Defendants, she experienced the following: plaintiff was functionally demoted within the department, and was paid less than less experienced new hires. The physical office of the Senior Vice President, John Bennett, who left the company, was given to the newest, least experienced male marketing staff member, while plaintiff was in a cubicle. This same individual was given the most desirable territory that had been promised to Ms. Bolick. The career path that was laid out for plaintiff when she was hired, including being part of the management team, was no longer available.

(Complaint ¶ 41) In addition to the allegations of the Complaint, Bolick also claimed during deposition that Byler had been "giving her the cold shoulder", and focused on a particular marketing meeting. She alleged during that meeting Byler was rude, abrasive, and acted in a generally inappropriate manner toward her. (Bolick Dep. 265-68, 527-28)

Bolick expanded on these allegations at her deposition as follows:

---

[7] She also received a raise in April of 2003 in the amount of $3,450 per year in anticipation of her return to work. (Exhibit I)

27652 v2                                -11-

As to the "functional demotion" assertion, Bolick conceded that after she complained to Byler about Bennett, she was actually <u>promoted</u> to Vice President and given a $15,000 raise. (Bolick Dep. 265, 558) As to being "paid less than the less experienced new hires," Bolick testified that she meant the newly hired Vice Presidents had less experience <u>at ANAC</u>, and not less career experience. (*Id.* 513, 558) Moreover, Bolick could not proffer any evidence to contradict that Duncan, Roe and Alexander actually had superior experience to her to perform their marketing functions, or to contradict that each earned $120,000 or more before joining ANAC, compared to the $72,000 to $73,000 that she earned prior to her hire. (*Id.* 85-86, 448, 476-78, 519; Byler Dep. 56-58, 61-65, 193-98, 217; Biegen Aff. and Exhibits 1-3 thereto)

As to Alexander being given Bennett's former office, Bolick testified, <u>contrary</u> to the Complaint, that she, Duncan and Roe all had cubicles, and that she and Alexander both moved into offices of about the same size in September 2002. (Bolick Dep. 558-63) Moreover, Bennett's office was actually shared by several employees after his departure, as opposed to being "assigned" to Alexander. (*Id.* 558-61).

As to being assigned the southeast region rather than the northeast region, Bolick acknowledged that she had numerous contacts in the southeast region, especially in Texas where she had lived for 20 years before joining ANAC. (*Id.* 440-42) She further testified that before Alexander was hired, she spent significant time marketing for ANAC in the southeast region and very little exposure to the northeast region. Thus, her only nexus with the northeast was her recent relocation to Connecticut. (*Id.* 439-40) Bolick also conceded that the assignment of regions did not affect her and the other Vice Presidents' compensation or status in any way. (Bolick Dep. 497; Byler Dep. 208-09) Bolick complained further that she was not assigned Bermuda as part of her territory. Yet, she agreed that she had never before closed a deal in

Bermuda, and could not dispute that Bermuda was never promised to her by Byler as part of her territory. (*Id.* 541, 543, 564)

As to Bolick's generic allegation that she was no longer on her desired "career path", she testified that she had been promised a promotion to Vice President two months before she complained about retaliation. (*Id.* 479-80, 558) Consequently, she believed her promotion was being delayed, despite the company practice of waiting until April to implement that promotion. (*Id.* 238) It bears repeating that the promotion did go into effect, in accordance with ANAC standard policy and practice, in April of 2002, accompanied by a substantial raise in salary. (*Id.* 235-37; Byler Dep. 44; Purkiss Dep. 34)

Finally, as to the vague allegation that Byler was giving her the "cold shoulder", Bolick claimed that he was not paying attention to her, avoiding her, and at the meeting referred to above, was particularly abrasive in front of the other members of the Marking Department. (Bolick Dep. 265-68, 527-28)

Lametta and Leonard Goldberg, ANAC's Chairman, CEO and President, conducted an investigation into Bolick's claim that Byler had acted inappropriately toward her during a Marketing Department meeting. (Bolick Dep. 547-48; Goldberg Dep. 38-43; Exhibit J) Before they formed any conclusions, and after Bolick told them she did not believe she could work again with Byler, Bolick told them that her complaint could be resolved by promoting her into Bennett's former Senior Vice President position, which was vacant, thereby increasing her compensation, and installing her as the supervisor of the three other Marketing Vice Presidents. (Bolick Dep. 549-51) Interestingly, such a promotion would then compel Bolick to work even more closely with Byler, as the Senior Vice President reported directly to him. (Lametta Dep. 99-101, 126-27)

After the investigation, which primarily included interviews with a number of participants who attended the subject marketing meeting, it was determined that Bolick's allegations could not be substantiated. In fact, the attendees interviewed stated that Byler had not acted "inappropriately", and some even opined that Bolick did not consistently behave in an appropriate manner toward Byler and her other superiors. (Lametta Dep. 90, 125-26; Bolick Dep. 547; Byler Dep. 164-65) With respect to the claim regarding her promotion, Bolick was reminded that her promotion was not "delayed", but was implemented in accordance with ANAC standard policy (Bolick Dep. 235-37; Byler Dep. 44; Exhibit J). Finally, with respect to Bolick's suggestion that she be moved into Bennett's spot, thus obtaining an "instant" promotion, Lametta and Goldberg advised Bolick that she was well suited to continue in her position as Vice President. (Byler Dep. 186-88; Lametta Dep. 126-27; Exhibit J) Goldberg and Lametta thus underscored ANAC's desire to have Bolick remain in her position, performing her functions, and participating in ANAC's growth and anticipated prosperity. (Bolick Depo. 552; Exhibit J)

H. **Bolick Takes A Leave and Was Ultimately Terminated**

Despite ANAC's repeatedly articulated desire to have Bolick continue as a Vice President, on September 17, 2002, Bolick stopped working and commenced a disability leave, claiming stress and anxiety from the events at ANAC prevented her from working. (Bolick Dep. 6-7, 13-14, 548, 554-55, 568-69, 602) Bolick alleged that the events at ANAC caused this stress; however, notably, during the years prior to her joining ANAC, Bolick endured: (i) an acrimonious divorce from her first husband, Dennis Saiz; (ii) arrest and conviction for assaulting Saiz, and spent a night in jail incident to that arrest; (iii) the loss of custody of her son as a result of his own petition to the Texas court to live with his father in Texas; and (iv) marriage, divorce and remarriage to Thomas Bolick. (*Id.* 6, 17, 19-29, 34-39, 44-46, 124-29) See also excerpts of notes of her treating psychologist, Dr. Kagel, Exhibit K. Dr. Kagel suggests that these prior

stressors in Bolick's life, and including her reaction to 9/11, were the reasons for her claimed reaction to work events, and thus, to her claimed "disability". Bolick disavowed the accuracy of these notes. (Bolick Dep. 246-48)

Bolick never returned to work, yet ANAC continued to keep Bolick as an employee for approximately ten months, and thus, for a number of months even beyond her exhaustion of all statutorily guaranteed leave time. Eventually, on July 15, 2003, however, ANAC terminated Bolick's employment. As previously noted, Bolick, as of the date of her deposition on July 8, 2003, still was unable to advise ANAC if and when she would ever be able to return from work. (Bolick Dep. 13-14) Moreover, also as previously noted, it was revealed during discovery in this action that Bolick had fraudulently obtained group health benefits for herself and for Thomas Bolick, representing that he was her spouse. (Bolick Dep. 122-26; Exhibit L)[8] Noteworthy again, the Complaint has never been amended to reflect this termination or to otherwise assert the termination constituted "adverse employment action" or part of any claimed retaliation.

Based on these undisputed material facts, and based on the applicable judicial precedent, moving Defendants respectfully request that summary judgment be granted in their favor as to each and every cause of action contained in the Complaint.

---

[8] Unknown at that time to ANAC, the Bolicks had been granted a divorce in Texas in August of 2000 consequent to a Petition, which both signed under oath, that the marriage had "become insupportable because of…discord…". (*Id.* 24-26; Exhibit M) The claim of "discord" was a fabrication; in fact, they had affirmatively decided they needed to avoid IRS collection efforts against Plaintiff by divorcing. (Bolick Dep. 24, 26-28, 55-57). Incredulously, Bolick claims that, at a dinner the same day they divorced, they "remarried" under "Texas common law" by promising to live together and love each other (*Id.* 49-50, 126-29). Then, to avoid the clear implication of her filing tax returns as "single," but simultaneously representing to ANAC she was married to obtain health insurance for her purported spouse, Bolick testified: "I was married under Texas common law. By the federal standards, I was single." (*Id.* 279) She and Thomas remarried in Massachusetts before a justice of the peace on September 24, 2002. (*Id.* 20, 22-24) The inescapable conclusion was that Bolick had fraudulently obtained medical, dental and vision coverage through ANAC for Thom Bolick. (Bolick Dep. 19-29, 123-29)