### III.    ARGUMENT:

### The Standard On A Motion For Summary Judgment

A moving party is entitled to summary judgment if the "pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any" demonstrate the absence of a genuine issue of material fact. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Beckman v. United States Postal Serv., 79 F. Supp.2d 394, 399 (S.D.N.Y. 2000). The movant's burden is satisfied if it can point to an absence of evidence to support an essential element of the non-moving party's claim. Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995); Celotex, 477 U.S. at 322-23; Jancewicz v. Southern New England Tel. Co., 54 F. Supp. 2d 134, 135 (D. Conn. 1999).

Defendants are entitled to judgment if a fair-minded jury could not return a verdict for the Plaintiff on the evidence presented. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). The non-moving party must provide "concrete evidence" upon which a reasonable juror could return a verdict in his or his favor. Id. at 256. A summary judgment motion "will not be defeated merely…on the basis of conjecture or surmise." Bernard v. New York City Health & Hosps. Corp., No. 93 Civ. 8593 (LAP), 1996 WL 457284, at *4 (S.D.N.Y. Aug. 14, 1996), quoting Goenaga, 51 F. 3d at 18. Moreover, summary judgment is appropriate in employment discrimination cases, including Title VII-based sexual harassment cases, despite that the employer's intent may be at issue. See, e.g., Weinstock v. Columbia University, 224 F.3d 33, 41 (2d Cir. 2000), cert. denied, 124 S.Ct. 53 (U.S. Oct. 6, 2003); Coraggio v. Time, Inc., No. 94 Civ. 5429, 1996 WL 139786, at *6 (S.D.N.Y. Mar. 28, 1996), aff'd mem., 108 F.3d 329 (2d Cir. 1997); Abdu-Brisson v. Delta Air Lines, 239 F.3d 456, 466 (2d Cir. 2001), cert. denied, 122 S.Ct. 460 (U.S. Oct. 29, 2001).

**A.    Plaintiff Cannot Prove Actionable Hostile Environment Sexual Harassment**

In Counts One and Three of the Complaint, Bolick alleges hostile environment sexual harassment by her then supervisor, Defendant Bennett, in violation of the CFEPA and Title VII.[9] In support of these causes of action, however, Bolick proffers only the factual allegations set forth above.  It bears emphasizing that Bolick conceded during her deposition that Bennett never asked her for sex, never made a sexual advance, never asked her out for a date, never touched her in a sexual way, and never even said in words that sex or actually taking drugs with her were on his mind.  (Bolick Dep. 295-97)  Therefore, based on the above-described conduct alone, Bolick concluded that Bennett's abusive behavior was part of a "control campaign" to "have sex with her" and to become his "drug buddy" on the road.  (*Id.* 308-14, 321-23, 357-60, 430).  She further claimed that Bennett's threat "to hit her" was part of the "sexual harassment".  (*Id.* 198-99)  Despite these unrealistic and unsubstantiated conclusions, and even if all the above allegations are deemed true, Bolick's claims of sexual harassment must fail as a matter of law.

i.    **Bolick Cannot Satisfy Her *Prima Facie* Burden**

To establish a *prima facie* case of hostile work environment sexual harassment under either the CFEPA or Title VII, Plaintiff must prove that she was subjected to unwelcome conduct because of her gender that was so extreme as to create an objective change in the terms and conditions of her employment.  Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998).  More specifically, she must demonstrate with competent evidence that her "workplace [was] permeated with 'discriminatory intimidation, ridicule, and insult' that [was] 'sufficiently severe or pervasive to alter the conditions of [her] employment.'"  Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (citations omitted).  See also Oncale, 523 U.S. at 78; Rider v. Town of

---

[9] Initially, it bears noting that the same legal standards are to be applied to each of these claims.  Specifically, in interpreting the provisions of the CFEPA, the courts are to be guided by the federal courts' interpretation of Title VII's provisions.  Levy v. Commission on Human Rights and Opportunities, 236 Conn. 96, 103 (1996).

Farmington and Bangham, 162 F. Supp. 2d 45 (D. Conn. 2001). For the workplace to be deemed a sexually hostile work environment:

> it must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so…. [Courts must] look [] at all the circumstances, 'including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'

Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998) (citations omitted).

Thus, in analyzing hostile work environment claims, courts must "filter out complaints attacking the ordinary tribulations of the workplace…." Faragher, 524 U.S. at 788 (citation omitted). "Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at 'discriminat[ion]…because of…sex.'" Oncale, 523 U.S. at 102. Significantly, "workplace harassment, even harassment between men and women, is [not] automatically discrimination because of sex merely because the words used have sexual content or connotations. 'The critical issue…is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.'" Id. (citing Harris, 510 U.S. at 25). Plaintiff's claims here must therefore be examined against these standards, and only evaluated with reference to the "social context in which [the] particular behavior occur[red] and [was] experienced by [plaintiff]." Oncale, 523 U.S. at 81.

In determining whether the atmosphere was sufficiently hostile, the Court must consider the totality of circumstances. See Brennan v. Metropolitan Opera Ass'n, 192 F.3d 310, 319 (2d Cir. 1999); Leson v. Ari of Connecticut, Inc., 51 F.Supp.2d 135 (D. Conn. 1999). Generally, "isolated remarks or occasional episodes of harassment will not merit relief under Title VII; in

order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive." Tomka v. Seiler Corp., 66 F.3d 1295, 1305 n.5 (2d Cir. 1995) (overruled on other grounds by Faragher). In short, a plaintiff must allege such rampant abuse that is sufficiently severe or pervasive. See Harris, 510 U.S. at 21; Tomka, 66 F.3d at 1305. As the Supreme Court has cautioned, Title VII is not a general civility code. Oncale, 523 U.S. at 102.

Critically important, the alleged conduct must be both objectively and subjectively offensive, such that a **reasonable** person would find the behavior hostile or abusive, and such that the Plaintiff herself did, in fact, perceive it to be so.[10] See Harris, 510 U.S. at 21-22. Even the fact that a plaintiff is "female and that she did not always receive the respect and help she desired does not create the inference that the treatment was motivated by discriminatory animus." Meckenberg v. New York City Off-Track Betting, 42 F.Supp.2d 359, 372 (S.D.N.Y. 1999). Consequently, claims of harassment or unfair treatment unrelated to a plaintiff's protected status should be excluded from the court's consideration of a plaintiff's hostile work environment claim. Shabat v. Blue Cross Blue Shield, 925 F.Supp. 977, 983 (W.D.N.Y. 1996), aff'd, 108 F.3d 1370 (2d. Cir. 1997) (noting that "[i]n any workplace, friction will sometimes occur, and people may lose their tempers or display some hostility towards their co-workers. Not every occurrence can be attributed to unlawful discrimination."). As the Courts have consistently recognized, "Title VII prohibits discrimination; it 'is not a shield against harsh treatment at the workplace.' Personal animosity is not the equivalent of sex discrimination and is not proscribed by Title VII." McCollum v. Bolger, 794 F.2d 602, 610 (11th Cir. 1986), cert. denied, 107 S. Ct. 883 (Jan. 12, 1987).

---

[10] Clearly, the natural inquiry is whether Bolick's perception of and reaction, or clear overreaction, to the alleged conduct was indeed reasonable, or a product of her emotionally charged history.

Clearly, then, Plaintiff here cannot establish the existence of a "hostile work environment" actionable under Title VII or the CFEPA. The underlying allegations relate to episodic, infrequent behavior, wholly unrelated to her gender or which otherwise she has not shown were specific to her gender. Indeed, Plaintiff herself admitted similar behavior by Bennett toward males in the office. (Bolick Dep. 312-14). In any event, courts have consistently dismissed cases involving even more egregious allegations, holding the offensive conduct to be insufficiently severe and pervasive to alter the terms and conditions of employment.

For example, in Quinn v. Green Tree Credit Corp., 159 F.3d 759 (2d Cir. 1998), plaintiff alleged she had been subjected to more than 30 separate incidents of sexual harassment. The incidents consisted primarily of sexual comments to her by her supervisor concerning his sexual prowess and her body parts, including that that she had been voted the "sleekest ass" in the office. Plaintiff also alleged that her supervisor had deliberately touched her breasts with paper. Nevertheless, the Second Circuit affirmed the lower court's grant of summary judgment, holding that plaintiff had not been subjected to sufficiently pervasive or severe abuse to alter the conditions of her employment. Similarly, in Brennan v. Metropolitan Opera Association, 192 F.3d 310 (2d Cir. 1999), plaintiff alleged that: (1) her boss consistently criticized her work, acting in a hostile, degrading, rude and demeaning manner toward her; (2) co-workers placed pictures of semi-clothed and nude men on company bulletin boards; and (3) another superior engaged in "lewd banter" when he said to her supervisor in her presence, "do you want to do it now?" and pointed to his crotch. Yet, the grant by the lower court of summary judgment was upheld because there was no indication that plaintiff's supervisor treated women more harshly

than men, and the one episode of lewd banter was insufficient to establish the existence of a pervasively hostile atmosphere.

A legion of recent district court decisions have underscored the Quinn and Brennan rationale, granting summary judgment where the subject conduct, much more egregious than that conduct alleged here by Bolick, was deemed not sufficiently severe or pervasive to be actionable. Illustrative are the decisions in Gerentine v. U.S., No. 00 Civ. 0813 (ISM), 2003 WL 255326 (S.D.N.Y. Feb. 4, 2003) (no reasonable person could consider main allegation that her supervisor invited her to stay at his house in a snow storm, followed by criticisms of her work, to be a sexual advance); Leson, 51 F.Supp.2d 135 (summary judgment granted on allegations that: (1) on occasion the plaintiff was called "love," "sweetie" or "honey,"; (2) she was told while she was getting a divorce that her ex-husband must be crazy; (3) she was told that a co-worker who helped her saw her as a "motherly figure"; (4) she participated with the alleged harasser at a training session in which two male employees were "in love" with one female employee; (5) at the training session, the alleged harasser touched her knees, forearms, head and shoulders; and (6) the alleged harasser told her that if she was going to be "so sensitive", after she told him to stop touching her and calling her "honey" or "love," she would "hit a glass ceiling."); Fermin v. Marriott Corp., No. 99 CV 3011 (JBW), 2002 WL 31528617 (E.D.N.Y Aug. 12, 2002) (summary judgment granted on allegations supervisor called plaintiff "sweetheart," "sweetie," "honey," or "baby," occasionally during her two-year tenure, and touched her on the shoulders in a non-erotic way); Smith v. American International Group, No. 01 Civ. 1652 (LAK)(FM), 2002 WL 745603 (S.D.N.Y. April 26, 2002) (summary judgment granted where plaintiff's supervisor pressed his body against her chair and her body while opening his legs as if they were dancing, and on another occasion entered her cubicle and talked to her "closer than he would usually.");

Feliciano v. Alpha Sector, Inc., No. 00 Civ. 9309 (AGS), 2002 WL 1492139 (S.D.N.Y. July 12,

2002) (supervisor's alleged actions of unwelcome romantic overtures toward plaintiff that

included compliments, requests for dates, an attempt to hug her, kissing her, and stating he

wanted to "lay with" her, and "constantly yelled" at her did not constitute actionable offenses

under Title VII); O'Dell v. Trans World Entertainment Corp., 153 F.Supp.2d 378 (S.D.N.Y.

2001), aff'd, 2000 WL 1560266 (2d. Cir. July 16, 2002) (summary judgment granted where

supervisor repeatedly asked plaintiff out on dates, made comments about her appearance, sent

her emails professing his love for her, called her at work and home, gave her gifts, invited her to

tour New York City with him, and played her a song that alluded to an extramarital affair that

she found offensive.); and Salvatore v. KLM Royal Dutch Airlines, No. 98 Civ. 2450 (LAP),

1999 WL 796172, at *11 (S.D.N.Y. Sept. 30, 1999) (allegations that plaintiff's supervisor

"brushed up against her on 'some occasions' " did not give rise to a claim for actionable sexual

harassment, nor did the allegations that a supervisor made unwanted embarrassing sexually

charged comments to plaintiff Rota and place her in fear that "he would become physical and hit

her").

Equally instructive are the decisions in Spina v. Our Lady of Mercy Medical Center, No.

97 Civ. 4661 (RCC), 2003 WL 22434143 (S.D.N.Y. Oct. 23, 2003)(six incidents of harassment,

including compliments by supervisor regarding plaintiff's eyes and hair, comments that plaintiff

looked good in tight pants, referring to plaintiff as "bitch", leering at her, and yelling at her and

pointing his finger in her face, even in the aggregate, not sufficiently pervasive or severe to

create hostile environment); and Gregg v. New York State Dep't of Taxation & Finance, No, 97

Civ. 1408 (MBM), 1999 WL 225534, at *3*12 (S.D.N.Y. Apr. 19, 1999)(granting summary

judgment where plaintiff alleged inappropriate comments and four instances of offensive

touching, including a "pat[ ] on the behind"). See also Lee-Crespo v. Schering-Plough DelCarde, Inc., 354 F.3d 34 (1st Cir. 2003)("[b]ut a supervisor's unprofessional managerial approach and accompanying efforts to assert her authority are not the focus of discrimination laws." Where supervisor said plaintiff looked sexy in skirts, hugged her from behind, whispered in her ear, and made comments about her personal life, conduct not sufficient severe or pervasive to be actionable).

Bolick, based on the wealth of judicial precedent presented, clearly falls far short of sustaining her burden of proof here. She cannot demonstrate initially that most, if any, of the conduct by Bennett, even if true, was motivated by her gender or otherwise was sufficiently severe or pervasive. The best Bolick can do is to infer that, perhaps, Bennett had a personal dislike for her, or displayed a stern, abrasive, or even rude management style. Talking or leaning in too close for her liking, being verbally abusive toward her at work, calling her an "idiot", and even articulating a desire to strike her on one occasion, even if true, cannot, especially in view of the judicial precedent explored, be deemed tantamount to hostile environment sexual harassment. Murphy v. Board of Education of the Rochester School District, 273 F.Supp.2d 292 (W.D.N.Y. 2003) (in granting summary judgment, court held that difficult or stressful working conditions are not tantamount to a "hostile" work environment caused by acts of discrimination).

ii.    **Even If Bennett's Actions Were Tantamount to Sexual Harassment, Liability Cannot Be Imputed to Defendants**

Even if this Court deems the conduct of which Bolick complains to constitute hostile environment sexual harassment by Bennett, this claim must nevertheless be dismissed as no tangible employment action was taken against her and it is undisputed that (a) the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and (b) Plaintiff was unreasonable in taking advantage of the corrective opportunities provided by

ANAC. Faragher, 524 U.S. at 807; Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998); Hill v. The Children's Village, 196 F.Supp.2d 389 (S.D.N.Y. 2002). A "tangible employment action" is a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits. See, e.g., Hill, 196 F.Supp.2d at 396-97. Here, Bolick seems to proffer the following "tangible employment actions", echoing her allegations of adverse actions supporting her claims of retaliation:[11]

a.       a purported "delay" in her promotion from August of 2001 until April of 2002, based on a claimed promise by Bennett that she would be promoted sooner;

b.       an alleged promise by Bennett before his departure from the company that she would be the "#2 person" in Marketing", and she would further be involved with the hiring of the new people and assignment of territories. Bolick claims that she became the "low person" on the "totem pole" after the hire of the three new Vice Presidents;[12] (Bolick Dep. 252-53)

c.       she further alludes to her dissatisfaction with the assignment to her of territory which did not include Bermuda, and that she was not "put in charge" of captive business; and

d.       the starting salaries of the three new Vice Presidents (hired in January and February of 2002) were more than her salary at the time of her promotion to the position of Vice President in April, 2002.

(Complaint ¶ 41)

It is nevertheless undisputed by Plaintiff that she was given her promotion in April of 2002, with a significant, 15% raise, at the time ANAC typically effectuated promotions. (Bolick

---

[11] Specifically, Bolick does not distinguish whether between actions she deems retaliatory and tangible action as a result of her internal complaints. (Complaint ¶ 41)
[12] Query how Bolick can proffer a claim that she became the "low person" as compared to the three new Vice Presidents yet, at the same time, contend that her functions as a Vice President were substantially similar to their functions so as to maintain a cause of action for violation of the Equal Pay Act.

Dep. 237, 558)  Second, Bolick could not substantiate her inference that the salaries of the new Vice Presidents were connected with her claim of harassment, as opposed to being connected to Byler's legitimate view of their respective qualifications.  (Byler Dep. 56-58, 61-65, 193-98, 217 and discussion on pages 35-38, *supra*)

Moreover, the remaining allegations made by Plaintiff regarding "tangible employment action" do not pass muster under the "significant change" principles set forth by the courts in Faragher, Hill and others.  Specifically, the other business decisions of which Bolick complains [i.e., territory assignment, office space, participation in hiring of counterparts] did not involve hiring, promotion, firing, or reassignment with significantly different responsibilities.  See Arnold, 213 F.Supp.2d at 149; Lee-Crespo, 354 F.3d 34.  On the contrary, Bolick's position did not significantly differ in function after her internal complaints and, again, she was promoted well after her later complaint to Human Resources in January of 2002.  Her compensation increased as a result.  See also Ellerth, 524 U.S. at 761; Arnold, 213 F. Supp. 2d at 148; Gibson v. Crucible Materials Corp., 290 F.Supp.2d 292 (N.D.N.Y. 2003); Hill, 196 F.Supp.2d at 399-400.

It is equally undisputed that after Plaintiff's initial complaint to Defendant Byler on November 6, 2000 (demonstrating her knowledge of an appropriate route for her complaint established by ANAC), Byler immediately implemented steps, to which she agreed, which resulted in her having very limited interaction with Bennett during the following year.  Byler asked Bolick if she wanted to complain further at that time to Human Resources, and Bolick declined that invitation.  (Bolick Dep. 181-82, 238-39; Byler Dep. 22-23, 179-82)  Noteworthy, Plaintiff's request that she not be asked to accompany Bennett on business trips was granted in that same conversation with Byler.  Thereafter, Bolick was not asked to, nor did she, accompany

Bennett during that following year plus on any business trips. (Bolick Dep. 184-85, 403-05). She never complained to Byler again during that year, despite her demonstrated knowledge of her avenues of complaint within the company, and told him the situation was "acceptable". (*Id.* 183, 243-244, 370-71) During that interim year, she and Byler had brief conversations during which she indicated she could "deal with" Bennett in the office, and confirmed she had not been asked by Bennett to go on any trips with him. In short, Bolick now claims only that Byler should have handled Bennett's "behavioral issues" by, for example, administering a "drug test." (*Id.* 403-05) Bolick concedes at that time she did not request Bennett's termination. (*Id.* 263)

It was not until January of 2002 that Bolick complained to Lametta of Human Resources. Bolick claimed that the timing of this complaint to Human Resources was triggered by Bennett's threat to "hit her" while they were discussing her interaction with Byler concerning a new hire. (*Id.* 195-98)  It is likewise undisputed that this complaint triggered an investigation, and the ultimate departure of Bennett by February 1, 2002. (*Id.* 451-52, 466-70)  It is also undisputed that from the date of that complaint to Lametta, Bolick had <u>no</u> <u>additional</u> <u>interaction</u> whatsoever with Bennett.  Rather than take advantage of these measures taken, it was Plaintiff who unilaterally opted not to return immediately to work, simply because she did not know the specifics of his departure. (*Id.* 465-70)

Thus, even if this Court deems the conduct of which Bolick complains to have created an actionable, hostile work environment, her claims should nevertheless be dismissed based on the absence of a tangible employment action, followed by Defendants' prompt, remedial action coupled with Plaintiff's failure to act on the corrective action by making additional complaints after November 6, 2002, and by promptly returning to work when she was notified of Bennett's

departure.[13]    Bolick's initial complaint of November 2000 was immediately addressed, and satisfied, and her later complaint in January of 2002 resulted in Bennett's leaving ANAC. Bolick has no entitlement to demand "drug testing" or any other particular method to deal with Bennett's "behavioral issues". Gonzalez, 262 F. Supp. 2d at 355. Moreover, the instant Bolick complained to Human Resources, she was separated from Bennett. This separation ultimately became permanent, as Bennett left the company before Bolick ever returned there. Bolick cannot therefore dispute that Defendants complied with their legal obligations, even if the subject conduct constituted hostile environment sexual harassment, obviating the Defendants' potential vicarious liability under the CFEPA or Title VII.    She should therefore not be permitted to impute liability to Defendants.

**B.    Bolick's Claims of Retaliation Similarly Fail By Operation of Law**

Retaliation claims are analyzed under the burden shifting rules established by the Supreme Court in McDonnell Douglas v. Green, 411 U.S. 792 (1973); see also Reeves v. Sanderson Plumbing Products Inc., 530 U.S. 133 (2000); Quinn, 159 F.3d at 764. In considering a motion for summary judgment, the plaintiff must first demonstrate a *prima facie* case of retaliation, after which the defendant has the burden of articulating a legitimate, non-retaliatory reason for the subject action. If the defendant meets its burden of production, the plaintiff must then demonstrate by competent evidence that there is sufficient proof for a reasonable jury to find the proffered legitimate reason is merely a pretext for impermissible retaliation. See Spadola v. New York City Transit Authority, 242 F.Supp.2d 284 (S.D.N.Y. 2003); Gurry v. Merck, No. 01 Civ. 5659 (RLC), 2003 WL 1878414 (S.D.N.Y. April 14, 2003).

---

[13] The Fifth Circuit has ruled that the fact an employer takes prompt remedial action negates vicarious liability without the required showing that plaintiff also acted unreasonably. Indest v. Freeman Decorating, Inc., 164 F.3d 258 (5th Cir. 1999). But see Moore v. Sam's Club, 55 F.Supp.2d 177 (S.D.N.Y. 1999). Also, as the Court in Indest opined, prompt remedial action may prevent a sexual harassment claim from ever "maturing" in the first place.

Noteworthy, the Supreme Court has held that in order for a sexual harassment complaint to be the basis for a retaliation claim, the underlying sexual harassment must have been "objectively offensive". See Clark County Sch. Dist. V. Breeden, 532 U.S. 268, 270-72 (2001). As in Breeden, Bolick cannot sustain her burden of proving that, as opposed to her subjective, unreasonable conclusions, that the conduct of which she complained actually violated Title VII, or, in the alternative, that a reasonable person, in good faith, could believe the conduct of which she complained constituted actionable sexual harassment. Thus, her retaliation claim should be outright rejected. Nevertheless, even if the three-prong rule of shifting burdens is applied, Bolick's retaliation claims still fail.

### i.    Plaintiff Cannot Establish A Prima Facie Case of Retaliation

To establish a prima facie case of retaliation, a plaintiff must prove: (1) participation in a protected activity known to the defendants; (2) adverse employment action; and (3) a causal connection between the protected activity and the adverse employment action. See Reed v. A.W. Lawrence & Co., Inc., 95 F.3d 1170, 1178 (2d Cir. 1996); Leson, 51 F.Supp.2d at 145. A causal connection can be established directly through evidence of retaliatory animus directed against the plaintiff by defendants, or indirectly by showing that the protected activity was followed closely by discriminatory treatment, or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct. Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 713 (2d Cir. 1996); Johnson v. Palma, 931 F.2d 203, 207 (2d Cir. 1991); DeCintio v. Westchester County Med. Ctr., 821 F.2d 111, 115 (2d Cir. 1987), cert. denied, 108 S. Ct. 455 (1987). While Defendants concede that Bolick's participated in arguably protected activity at

least as of her complaint to Human Resources[14], for those reasons set forth below, Defendants contend that Bolick cannot satisfy the other elements necessary to prove a *prima facie* case of retaliation.

### a.    Plaintiff Suffered No Adverse Employment Action[15]

To establish adverse employment action for purposes of her retaliation claim, a plaintiff must show that she suffered a "materially adverse change in the terms and conditions of employment." Torres v. Pisano, 116 F.3d 625, 640-41 (2d Cir. 1997) (citing, McKenney v. New York City Off-Track Betting Corp., 903 F.Supp. 619, 623 (S.D.N.Y. 1995)). Such significant changes in the status of employment may include "hiring, firing failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits…" and which, in most cases, inflicts direct economic harm  Leson, 51 F. Supp. 2d at 142, quoting Ellerth.   Plaintiff's subjective feelings of unhappiness or dissatisfaction cannot support an adverse employment action claim.  See, e.g., Garber v. New York City Police Dep't., No. 95 Civ. 2516,  1997 WL 525396, at *6 (S.D.N.Y. Aug. 22, 1997), aff'd mem., 157 F.3d 1346 (2d Cir. 1998); Leson, 51 F.Supp.2d at 142; Hunter v. Citibank, N.A., 862 F. Supp. 902, 908 (E.D.N.Y. 1994), aff'd mem., 60 F.3d 810 (2d Cir. 1995); Galabya v. New York City Bd. of Ed., 202 F.3d 636 (2d Cir. 2000).  See also Fayson v. Kaleida Health Inc. and Croston, No. 00 CV-0860 (ECSR), 2002 WL 31194559 (W.D.N.Y. Sept. 18, 2002 aff'd mem., 71 Fed. Appx. 875 (2d Cir. 2003) (retaliation claim dismissed since delayed salary increase, the purported retaliatory action, was based on non-discriminatory reasons.  Further, being subjected to less than desirable

---

[14] Defendants query whether assert Bolick's complaint to Byler in November 2000 even constituted "protected activity", as she did not herself even consider her complaint to be about "sexual harassment".  (Bolick Dep. 299-302)  See, e.g., Spadola v. New York City Transit Authority, 242 F. Supp.2d 284 (S.D.N.Y. 2003).

[15] As previously noted, the Complaint was filed long before the termination of Bolick's employment.  Bolick never amended the Complaint to allege this termination was motivated by an intent to retaliate.  Thus, she has not challenged the reasons given by Defendants for such termination, and consequently, cannot argue here that the termination constitutes an "adverse action" which is part of her claims now.

office equipment and space did not constitute adverse employment action, nor did her transfer as her employer frequently transferred its personnel between locations); Van Zant, 80 F.3d at 712 & n.3 (supervisor's occasional "nastiness" to which other employees were subjected not sufficient for retaliation claim).

Bolick alleges the following purported "adverse" actions by Defendants: (a) three newly hired Vice Presidents in her department were paid more in salary than she even after being promoted into the Vice President position, and a claimed promise she would be placed in charge of the "captive unit" of the department; (b) the assignment of territory to members of the Marketing Department, and that she was not assigned Bermuda as part of her territory; (c) a delay in her promotion to the position of Vice President; and (d) not being given Bennett's office. (Bolick Dep. 237-38, 252-56, 402, 473-74, 491-92, 508-09)   She also claims Byler gave her the "cold shoulder" after her complaint about Bennett. (Id. 265-66, 504-05, 557-60)

At the same time, however, Bolick failed to contradict, with evidence, the testimony provided by Byler as to the bases for the salaries of the three new Vice Presidents. (Byler Dep. 56-65; Bolick Dep. 237, 265, 393-94, 472-73). Second, Bolick failed to establish that the assignment of territories or whether she would be "in charge" of captive business or the "#2 person" had any impact whatsoever on her compensation---i.e., she earned the same amount irrespective of her territory. (Bolick Dep. 497, 539-43) She has not contradicted Byler's testimony that all marketers were involved in "captive business", and each would be in charge of their assigned region or territory. (Byler Dep. 156-59) She further failed to substantiate any connection between the joining of Bermuda with the northeast territory and any impact on her status or compensation.

Third, Bolick admitted during deposition that her purportedly "delayed" promotion was actually implemented in April of 2002 and a significant raise awarded commensurate with that

promotion, several months <u>after</u> her harassment and retaliation complaint to Lametta. (Bolick Dep. 265, 472, 479-80, 558) Bolick failed to introduce evidence to contradict the testimony of defense witnesses as to the standard timing of such promotions within ANAC (Byler Dep. 44; Purkiss Dep. 34). She could not dispute further that at the time of her promotion into that position, she was earning nearly $30,000 more in salary than she was earning just prior to her joining ANAC (Byler Dep. 196). As previously established, her claim that Bennett's office was assigned to her counterpart, was inaccurate. (Bolick Dep. 558-63). Finally, she raised only vague, generic, and unsubstantiated facts as to Byler's attitude toward her and pointed to Byler's alleged behavior at a specific marketing meeting as being particularly illustrative of the "cold shoulder" demeanor toward her. Again, on the contrary, Bolick could not identify any concrete, economic or other disadvantage as a direct result of Byler's purported attitude toward her.

In short, **especially because there was no effect on her status, position, or compensation**, actions such as not getting a promotion when she thought she should; not getting the Bermuda territory or whatever territory she preferred; not getting her former superior's office space; and the "cold shoulder" by a superior, even if true, on their face, cannot constitute adverse actions indicative of retaliatory motive. As courts have held, an "employee's mere dissatisfaction with the pace of his career plan based on his subjective assessment of his own performance is not enough to make out a prima facie case [of discrimination]…" <u>Shabat v. Blue Cross Blue Shield of the Rochester Area</u>, 925 F.Supp. 977, 982 (W.D.N.Y. 1996), <u>aff'd mem.</u>,108 F.3d 1370 (2d Cir. 1997). The <u>Shabat</u> court's analysis in a national origin discrimination claim should be no less applicable to the instant retaliation claim. <u>See also</u> <u>DeMars v. O'Flynn</u>, 287 F.Supp.2d 230 (W.D.N.Y. 2003)(to be "adverse", employer action must cause a materially adverse change in terms and conditions of employment); <u>Williams-Velasquez v. The Guardian Life Insurance Co</u>., No. 99 Civ. 738 (LTS)

(JCF), 2003 WL 22038567 (S.D.N.Y. Aug. 29, 2003) (dissatisfaction with work space assignment not adverse action); Arnold, 213 F.Supp.2d at 150 ("cold shoulder" and "subjective feelings" of plaintiff that he was the victim of adverse employment action insufficient).

### b. Bolick Also Fails to Establish the Requisite Causal Connection

Bolick did not dispute that the plan for marketers in different regions, and the change over to a system where territories would be assigned to all members of the department, were concepts already discussed with her during the initial weeks of her employment, and thus, well before any complaints about Bennett. (Bolick Dep. 257-58, 436-37, 449-51). Moreover, even after her complaint to Human Resources in January of 2002, she was promoted in April, the month in which ANAC typically made promotions of current employees (Byler Dep. 44; Lametta Dep. 125; Exhibit J), and granted a substantial raise. Finally, Bolick has not proffered any actual evidence that the reasons given for any other "actions", even if deemed "adverse", were connected to protected activity or otherwise motivated by retaliatory animus. Thus, proof of the requisite causal connection between the alleged adverse actions and her engagement in protected activity is blatantly absent.

The record in this case is void of any direct evidence to allow a reasonable trier of fact to determine that retaliatory animus was directed against the Plaintiff, and equally void of any indirect evidence of disparate treatment, or that similarly situated employees who engaged in similar conduct were treated in a dissimilar manner than Plaintiff. See Van Zant, 80 F.3d at 713; Johnson, 931 F.2d at 207; DeCintio, 821 F.2d at 115. See also Spadola, 242 F.Supp.2d 284 (summary judgment granted on claim of retaliation under Title VII for plaintiff's threat to file a sexual harassment charge against a female supervisor, since, among other reasons, plaintiff failed to establish the requisite causal connection between the protected activity and the adverse

employment action); <u>Morales v. Human Rights Div.</u>, 878 F.Supp. 653, 659 (S.D.N.Y. 1995) ("an employer's knowledge of the filing of a prior complaint of discrimination, without more, is insufficient to prove a retaliatory motive").

It cannot be emphasized enough that ANAC's grant of a promotion after her internal complaints (and after Bennett's departure from the company), coupled with a substantial 15% raise in salary, underscore the disingenuous nature of her complaint of retaliation.  It bears repeating here that by April of 2002, after both of her internal complaints, Plaintiff was earning approximately $50,000 more in salary than she was just prior to joining ANAC.  Plaintiff's only so-called "evidence" of retaliation is the timing of the implementation of certain changes in her department, not even the timing of the actual decisions to make those changes.  Thus, Plaintiff is left with one, final argument - that her salary was less than that of newly hired Vice Presidents. As more specifically set forth in Section C, here again, Plaintiff's claim misses the mark.  Simply stated, Plaintiff proffered no evidence whatsoever that the rationale given by Defendants as to how these salaries were set (i.e., background, skills, experience, and prior salaries), were connected with her internal complaints.

### ii.  Defendants Have Articulated Legitimate, Non-Retaliatory Reasons for The Subject Decisions

Even assuming that Plaintiff could satisfy the burden of establishing the elements of a *prima facie* case of retaliation, Defendants can nevertheless establish non-retaliatory reasons for its decisions.  Extensive testimony has been gleaned from defense witnesses for which Bolick has no evidence to contradict, and some of which she even admits; e.g., departmental changes were motivated by business reasons and articulated to her well before her complaints; hiring decisions were made known to her prior to any complaint to effectuate restructuring of the

department; and the timing of her promotion was consistent with ANAC practice/policy.  (Bolick Dep. 235-37; Byler Dep. 44)

Additionally, salaries of newly hired Vice Presidents were based on the Defendants' perception of their superior qualifications, experience, and prior salary history.  As Defendants need only articulate, and not prove, these reasons are true at this procedural stage, they should be deemed to have met their burden.  See, e.g., Demars, 287 F. Supp.2d 230, citing, McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) and its progeny.

### iii  Plaintiff is Unable to Prove Pretext For Retaliation

To defeat this Motion, Bolick must, but cannot, produce concrete evidence from which a reasonable juror could conclude that retaliatory animus motivated Defendants' decisions that affected the entire Marketing Department.  As previously established, ANAC based all decisions on legitimate, non-retaliatory business reasons. (Byler Dep. 40-42, 44-47, 195-97)  Bolick has not proffered any evidence to contradict those reasons, and she admitted most of these decisions were discussed with her prior to her internal complaints.  (See also Byler Dep. 26)  Rather, in purely conclusory fashion, and contradictory to her own admissions concerning the timing of these decisions, she asserts an unsubstantiated and unsupportable belief that all changes were retaliatory.  Such a lack of evidence underscores the justification for the entry of summary judgment on her retaliation claims. Spadola, 242 F.Supp.2d at 296; Gurry v. Merck & Co., No. 1 Civ. 5659 (RLC), 2003 WL 1878414 (S.D.N.Y. April 14, 2003). See also Williams-Velasquez, No. 99 Civ. 738 (LTS) (JCF), 2003 WL 22038567 (retaliation claims based on assignments dismissed where plaintiff offered no evidence that projects were assigned "on any basis other than an analyst's experience and expertise"); DeMars, 287 F.Supp.2d at 245-46 (reassignment to different shift and different location not adverse action and plaintiff's bald assertions of

differential treatment without evidence fails to satisfy her burden at the pretext stage). For all these reasons, and for those reasons already explored which establish her failure to make out a *prima facie* case, Bolick has failed to establish pretext, and therefore, her retaliation claims should be dismissed.

**C.    Plaintiff's Equal Pay Act Claim Cannot Withstand This Motion**

In the eighth count of the Complaint, Bolick alleges that she was paid less than similarly situated males performing substantially similar work. Specifically, she alleges that she and Duncan were paid less in starting salary than were the two male Vice Presidents, Roe and Alexander. (Complaint ¶ 25)[16]

The Equal Pay Act ("EPA") prohibits employers from paying lower wages to employees based on gender for "equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to…a differential based on any other factor other than sex." 29 U.S.C.A. § 206(d)(1). Thus, a plaintiff bears the threshold burden of proving she was paid differently than her male counterparts "for equal work on jobs the performance of which requires equal skill, effort and responsibility, and which are performed under similar working conditions." Corning Glass Works v. Brennan, 417 U.S. 188, 195 (1974); Wolper v. McGraw-Hill, Inc., No. 94 Civ. 0976 (WK) 1997 WL 252032 (S.D.N.Y., May 13, 1997). The burden then shifts to the employer to demonstrate that there is a legitimate reason for the discrepancy in pay. Id. The defendant can satisfy this burden by showing that compensation decisions were made pursuant to "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of

---

[16] Paragraph 25 actually alleges that female Senior Vice Presidents of Marketing were paid less than the males. Plaintiff further alleges she was one of the Senior Vice Presidents. Thus, the reference to Senior Vice Presidents must be an error; Plaintiff was never a Senior Vice President, but a Vice President. Further, the likelihood this reference is an error is underscored by her consistent references to three other Vice Presidents during deposition and earlier in the Complaint as comparators.

production; or (iv) a differential based on a any other factor other than sex." Id. (citation omitted). Upon this showing, the burden shifts back to plaintiff to establish by a preponderance of the evidence that the reason for the disparity asserted by the employer is only a pretext. Id.

As previously asserted, Defendants have presented significant testimony and documents substantiating that the $7,000-$12,000 difference in Bolick's salary was based on the comparative skills, experience, and prior salary history of all three Vice Presidents of Marketing. Despite her conclusory allegations, Plaintiff has failed to proffer any evidence to dispute the articulated rationale of ANAC. More specifically, Byler testified, and Bolick cannot dispute, that ANAC perceived the new Vice Presidents to have superior experience, skills sets, and higher salary history. (Byler Dep. 56-58, 61-65, 193-98, 217) In fact, Plaintiff joined ANAC at a time more competitive candidates were not available. (Byler Dep. 193-94) Her starting salary represented a salary increase for her of nearly $30,000 (Byler Dep. 196), and thus, Bolick simply cannot substantiate any claim that Defendants' articulated reasons for the slight salary differential are pretextual.

Moreover, a closer look at the salaries of the Vice Presidents hired in early 2002 underscores the complete absence of discriminatory motivation by the company. Contrary to Plaintiff's contention, the record reflects the following: (a) Duncan was hired effective January 18, 2002 with a starting salary of $125,000 per year, and a commitment by ANAC to pay her relocation expenses of a minimum of $25,000 and a maximum of $30,000. Thus, her potential starting compensation was between $150,000 and $155,000; (b) Roe was hired effective February 2002 with a starting salary of $130,000 and a one time sign-on bonus of $20,000. Thus, his starting compensation was $150,000; and (c) Alexander was hired effective early March of 2002, with a starting salary of

$130,000 and a one time sign-on bonus of $25,000. Thus, his starting compensation was $155,000. (Biegen Aff. and Exhibits 1-3 thereto)

In short, it is undisputed that Duncan, the female Vice President, was hired at the same overall starting compensation as were the males, and possibly with a starting compensation higher than that of Roe, depending on whether the expenses for which she was reimbursed fell at the minimum set of $25,000 or the maximum of $30,000[17]. The fact a female Vice President in the same job was hired at the same pay rate wholly contradicts any inference that gender played any role in the setting of compensation rates for the Vice Presidents. Coupled with the uncontraverted evidence proffered by Defendants as to the considerations made in setting these salaries, it should apparent that Plaintiff cannot sustain her burden of proof as to Count 8 of her Complaint, warranting the entry of summary judgment. Wolper, 1997 WL 252032; Fayson, 2002 WL 31194559; Victory v. Hewlett-Packard Co., 34 F.Supp.2d 809 (E.D.N.Y. 1999).

Illustrative of these principles, in Graham v. Texasgulf, 662 F.Supp 1451, 1464 (D. Conn. 1987), aff'd. mem., 842 F.2d 1287 (2d Civ. 1988) the court dismissed sex discrimination and Equal Pay Act claims, finding that the employer demonstrated that the pay disparity was based on factors other than sex. Critically, while plaintiff's salary did "lag behind" that of her male colleagues, prior to her hire, plaintiff's experience prior to her hire also "lagged behind" that of the others. The differences in background were deemed to constitute legitimate, nondiscriminatory reasons for the differences in pay among the plaintiff's counterparts. See also Fordenr v. Bristol Myers Squib, 63 Fed. Appx. 14 (2d Cir. 2003)(where plaintiff failed to present sufficient evidence to rebut employer's explanation for pay differential---i.e., experience, background and performance---summary judgment granted on EPA claim); Strag v. Bd. of

---

[17] Again, ANAC ultimately paid more than $40,000 for Duncan's relocation expenses (Biegen Aff. ¶ 4). Interesting further to note, Bolick told Byler she believed Duncan was "overqualified" for the position. (Bolick Dep. 518)

Trustees, Craven Community College, 55 F.3d 943 (4th Cir. 1995)(plaintiff failed to satisfactorily refute reason given by college for higher salary paid to male teacher, which included his salary prior to coming to the college). Cf. Walter v. KFGO Radio, 518 F. Supp. 1309 (D.N.D. 1981) (legitimate reasons for pay differential include where employer establishes higher salary necessary to hire best qualified candidate, market place value, background, and salary demand of that candidate); Cooper v. Southern Co., 213 F.R.D. 683 (2003) ("plaintiff's own opinion about…differences in qualifications does not give rise to a material dispute. Plaintiff has provided no evidence to establish that defendants did not actually value the education and professional experiences of the other analysts more than plaintiff's. Plaintiff cannot establish pretext merely by suggesting that in her judgment, the other analysts were not as qualified as she"); Howard v. Community Action Organization of Erie County, Inc., No. 01-CV-0784E (F) 2003 WL 21383271 (W.D.N.Y. May 30, 2003)(failure of plaintiff to proffer evidence to refute employer explanation for pay disparity, i.e., that the experience of her counterparts accounted for that disparity, warranted entry of summary judgment on EPA claim). Bolick similarly fails to sustain her burden of proof here, and therefore, her EPA claim must be dismissed.

### D. Plaintiff's Claim for Breach of Implied Contract Cannot Be Sustained

In Count five of her Complaint, Plaintiff alleges that the Defendants' failure to pay her a bonus for year 2001, despite that no other ANAC employees were paid such a bonus for that year, breached an implied contract with her. (Complaint ¶ 62) The terms of that purported contract are undisputedly set forth in the offer letter issued to Bolick prior to the commencement of her hire. (Bolick Dep. 111-14, 566-67, Exhibit F) Bolick cites to no other basis for her allegations in this count, and, critically important, admitted in deposition that she understood the offer letter to mean bonuses were not guaranteed. (Id.) Indeed, a plain reading of the offer letter reveals that any bonus to be paid to Bolick was purely discretionary. (Exhibit F)

The evidence cannot be disputed—no "contract" for any guaranteed bonus can be established by Bolick, and her claim in this regard must be dismissed.  See Ferrand v. Credit Lyonnais, No. 02 Civ. 5191 (VM), 2003 WL 22251313 (S.D.N.Y. Sept. 30, 2003)(implied contract claim for guaranteed bonus precluded where explicit bonus policy provided only for discretionary bonus)  As the court also held in Chem-Tek, Inc. v. General Motors Corp., 816 F. Supp. 123, 131 (D. Conn. 1993),  a contract must be construed to effectuate the intent of the parties, which is "determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction . . . The intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract . . . ." Pesino v. Atlantic Bank of New York, 244 Conn. 85, 91-92 (1998)(citations omitted).   "Contract implied in fact, like an express contract, depends on actual agreement." Coelho v. Posi-Seal Int'l, Inc., 208 Conn. 106, 111-12 (1988).   "A contractual promise cannot be created by plucking out phrases out of context; there must be a meeting of minds between the parties . . . In order to support contractual liability, the defendants' representations must be sufficiently definite to manifest a present intention on the part of the defendants to undertake immediate contractual obligations to the plaintiff." Burnham v. Karl & Gelb, P.C., 50 Conn. App. 385, 389 (1998).   See also Mendillo v. Kissel, No. CV 04098775, 2001 WL 1615208 (Conn. Super. Nov. 28, 2001-unpublished) (implied contract claim related to bonus entitlement fails where employment agreement was clearly for discretionary bonus). Cf. Christensen v. Bic Corp., 18 Conn. App. 451 (Conn. App. 1989)(implied contract claim related to bonus fails because plaintiff could not establish actual contractual bonus

guarantee, and failed to produce evidence of a single employee who received a bonus under similar circumstance).

Thus, even though the facts alleged in the Complaint are to be construed in favor of the Plaintiff, it is apparent that the Plaintiff fails to sufficiently establish the existence of an implied contract for an automatic or guaranteed bonus.  Further, she failed to otherwise substantiate with any evidence that Defendants made any definite representations to her specifically indicating an intention to enter into a contract to pay a bonus for 2001– especially given the fact <u>no</u> ANAC employees received a bonus.  Consequently, Plaintiff cannot sustain her burden here, and therefore, this cause of action should be summarily dismissed.

### E.  The Claim For Breach of the Implied Covenant of Good Faith <u>And Fair Dealing Likewise Fails</u>

Count Six of Plaintiff's Complaint asserts that Defendants breached an implied covenant of good faith and fair dealing when they did not pay her a bonus for calendar year 2001.  A cause of action for breach of the covenant of good faith and fair dealing exists only when a contract has been proven to exist under which the parties expected to receive certain benefits.  Franco, M.D. v. Yale University, 238 F. Supp. 2d 449 (D.Conn. 2002).  Further, the Plaintiff must prove the Defendants engaged in conduct that injured her right to some or all of the subject benefit which, while engaging in such conduct, in bad faith, knew Plaintiff reasonably expected to receive that benefit. <u>Franco,</u> 238 F. Supp. 2d at 455-56.

In the instant matter, Plaintiff's claim for breach of the covenant of good faith and fair dealing cause of action cannot be sustained: first, she cannot prove an implied contract to pay her a bonus exists.  Second, she has not sufficiently alleged or established bad faith on the part of any Defendant in not paying her a 2001 bonus.  She has not even attempted to proffer evidence that Defendants intentionally deprived her of a bonus.  Rather, she has merely restated her

implied contract claim in this Count.  The Supreme Court of Connecticut "has recognized the covenant of good faith and fair dealing as a rule of contract construction, the covenant is widely misused and pled as a separate cause of action which generally does nothing more than restate a breach of contract claim."  Casper v. Combustion Engineering, Inc., No. CV97-0570516S, 1998 WL 389215, at *7 (Unpublished-Conn. Super. June 23, 1998).

As set forth above, no contract was created, express or implied, to pay Bolick an automatic bonus.  Because there was no contract, and because, in any event, Plaintiff cannot proffer evidence of bad faith by any Defendant, Plaintiff's claim sounding in breach of the covenant of good faith and fair dealing should be dismissed.

### F.  Plaintiff's Claim of Negligent Misrepresentation Regarding the Same Bonus Must Also Be Dismissed

In order to establish a claim for negligent misrepresentation, Plaintiff must show that Defendants: (1) made a misrepresentation of a present fact to Plaintiff; (2) they knew or should have known it was false at the time the statement was made; and (3) the Plaintiff reasonably relied on the statement to her detriment.  Johnson v. Chesebrough-Ponds USA Co., 918 F. Supp. 543, 548 (D. Conn. 1996), aff'd mem., 104 F.3d 355 (2d Cir. 1996).  Each element must be shown by clear and satisfactory evidence.  Id. Courts have consistently held that in order to constitute a misrepresentation, the purported information must constitute more than a mere possibility. Id.

Initially, it should be noted that the factual underpinnings for Bolick's claim of negligent misrepresentation are identical to those factual allegations asserted in support of her claim for breach of implied contract.  In this regard, a critical element necessary to maintain her claim of negligent misrepresentation is missing; Bolick does not sufficiently identify a "false" statement made by Defendants which they allegedly knew was false when made.  Myers v. Bunker Ramo

Corp., No. B-90-506 (JAC), 1992 WL 88166 (D. Conn. Jan. 21, 1992), aff'd mem,. 979 F.2d 846

(2d Cir. 1992) (negligent misrepresentation claim regarding compensation dismissed where

plaintiff failed to produce evidence of false representations at time written contract made

referring to that compensation).  It simply cannot be disputed that the only "representation" made

to Bolick concerning any bonus eligibility was made in the offer letter, and Bolick herself does

not even contend to the contrary.  (Bolick Dep. 113-14, 566)  That offer letter references only a

purely, discretionary bonus.  Bolick also does not contradict, because she cannot, that no ANAC

employees were paid 2001 bonuses.  (Byler Dep. 145-46, 207)  Therefore, not only does Bolick

fail to establish a misrepresentation of fact known to be false when made, she also fails to

establish any reasonable reliance to her detriment.  For these reasons, and for those same reasons

set forth above, this claims should fail as a matter of law.

## IV.    CONCLUSION

Defendants have unequivocally established that even if the allegations contained in

Plaintiff's Complaint and her deposition testimony are taken as true, no genuine issues of

material fact exist as to any of her causes of action, and accordingly, Defendants respectfully

request that their Motion for Summary Judgment be granted in its entirety.

THE DEFENDANTS,
ALEA GROUP HOLDINGS, LTD.,
ALEA NORTH AMERICA COMPANY, AND
ROBERT D. BYLER

By:＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿
        Mary A. Gambardella
        Federal Bar No. #ct05386
        Epstein Becker & Green, P.C.
        One Landmark Square, Suite 1800
        Stamford, CT  06901-2601
        (203) 348-3737
                        and
        Barry Asen
        Federal Bar #ct24527
        Counsel Pro Hac Vice
        Epstein Becker & Green, P.C.
        250 Park Avenue
        New York, New York  10177
        (212) 351-4500

27652 v2                         -43-

## CERTIFICATION

The undersigned hereby certifies that a copy of the foregoing Memorandum of Law, and all Exhibits thereto, were sent to all counsel of record via regular mail, postage prepaid, on the 10th day of February, 2004 as follows.

Barbara Gardner, Esq.
843 Main Street
Suite 1-4
Manchester, CT  06040
*Counsel for the Plaintiff*

Peter E. Gillespie, Esq.
46 Riverside Avenue
P.O. Box 3416
Westport, CT 06880
*Counsel for Defendant John Bennett*

David L. Weissman, Esq.
Cindy Schmidt Minitti, Esq.
ReedSmith LLP
559 Lexington Avenue, 29th FL.
New York, NY 10022
*Counsel Pro Hac Vice for Defendant John Bennett*

_____
Mary A. Gambardella