## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

LEIGH BOLICK,                 :      CIVIL ACTION NO.
         Plaintiff        :      3:03CV165(PCD)
                             :

vs.                             :

ALEA GROUP HOLDINGS, LTD.,   :
ALEA NORTH AMERICA COMPANY,  :
JOHN J. BENNETT, AND         :
ROBERT D. BYLER,             :
         Defendants     :     March 3, 2004

## MEMORANDUM OF LAW IN OPPOSITION TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff submits this Memorandum of Law in Opposition to Defendant's

Motion for Summary Judgment dated February 10, 2004. Plaintiff further relies on the

attached Affidavits.

## I. PROCEDURAL HISTORY

Plaintiff filed this claim in eight counts alleging violation of Title VII of the Civil

Rights Act of 1964(Title VII), 42 U.S.C. §2000e et seq., and the Connecticut Fair

Employment Practices Act ("CFEPA"), Conn. Gen. Stat. §46a-60(a)(4), including sexual

harassment, hostile environment, and retaliation, and common law claims relating to the

corporate defendants' failure to pay a bonus. Plaintiff also brings a claim under the

Equal Pay Act, 29 U.S.C.§201 et seq.. Defendant now files a motion for summary

judgment as to all counts.

## II. FACTS

Plaintiff began her employment with Alea North America Company ( "ANAC"), a

subsidiary of Alea Group Holdings, Ltd. ("AGH")(Exh. 7 at 6) on October 10, 2000.(Exh.

8; Exh. 1 at 160) She was hired as an Assistant Vice President of Marketing for Alea Alternative Risk ("AAR"), a franchise of ANAC, located in Rocky Hill, Connecticut.(Exh. 1 at 152) ANAC is a reinsurance company. When Ms. Bolick began her employment, she reported to defendant John Bennett, Senior Vice President, Marketing, who had a law degree. She was hired as part of a "start up" and based on representations made to her by Mr. Bennett and Robert D. Byler, President and Chief Executive Officer of ANAC, Ms. Bolick had expectations that she would be part of the management team at Alea. (Exh. 1 at 100, 157-159; Exh. 2 at 564 ) She had a particular interest in learning about "captives", a type of insurance in which the purchaser retains an element of risk for themselves. (Exh. 7 at 60). She saw this job as an opportunity to get into this lucrative insurance market. (Exh. 4 at 19, Exh. 2 at 505-506)

### Conduct by Bennett

Almost immediately, Mr. Bennett behaved inappropriately with plaintiff in the office and on road trips. (Bolick 161, 167, Exh. 17) On her third day of employment, Mr. Bennett called her into his office and belittled her saying she knew nothing and that it would take forever for plaintiff to be able to go out on the road with him. (*Id*)

As their first road trip approached, Bennett repeatedly asked Ms. Bolick to be sure to bring her work out clothes so they could work out together. During the week of October 16, 2000, Mr. Bennett and Ms. Bolick went on their first marketing trip to San Francisco. Bennett told Ms. Bolick that "being a woman could be an issue" (Exh. 17 at 1) in dealing with clients. He asked if she did not bring her work out clothes because she did not want to be around him. After visiting a client, Bennett would call the clients

2

names and say things like "wasn't I nice to that jerk", "aren't I being nice, even though I hate these guys". He said he bet plaintiff didn't want to be around him. He accused plaintiff of having short term memory problems, and asked if she "smoked pot". After each agency visit, he would ask how she thought he did in the visit. As they walked down the street, he touched plaintiff's shoulder, putting his arm around her. (Exh. 2 at 317) He repeatedly stood too close, leaning right into her face or whispering in her ear. When Ms. Bolick moved away, he took offense. (Exh. 17 at 1; Exh. 2 at 318) Plaintiff was immediately concerned that she had moved across the country for this job and feared she might be fired. She began taking notes in order to document Bennett's behavior towards her. (Exh. 1 at 160-161)

On October 24, 2000, Mr. Bennett again berated Ms. Bolick in his office when she didn't answer a question the way he wanted. He said "what was all that discussion we had, you think I just did that for fun? You don't think you have to remember anything I say?"(Exh. 17 at 2) Bennett repeatedly belittled Bolick. She found Bennett's conduct demeaning (Exh. 1 at 16, Exh. 2 at 300-302, 310)

On October 30, 2000, Bennett and Ms. Bolick traveled to Chicago together. During that trip, he made inappropriate comments to plaintiff. He called her a "cry baby" and said she looked like she was going to cry. He repeatedly asked her what her husband thought of her new job and boss. He asked her whether she brought her workout clothes and whether she and her husband had decided she shouldn't workout with him. (*Id* at 3) He spoke about cocaine parties (Exh. 2 at 325-327, 330)and asked plaintiff why she thought people wore tongue rings.(*Id* 334-335) Based on his tone,

3

plaintiff believed he was attempting to initiate a sexual conversation.(*Id*)

On October 31, 2000, Bennett and Ms. Bolick flew from Chicago to Seattle.  Mr. Bennett had three scotches and 2-3 glasses of wine on the plane.  He was reading a book that he said was about "the sexual exploits of the beautiful people of California."  At one point, he leaned his head on plaintiff's shoulder and spoke to her.  She kept backing away.  He was talking about sexual exploits and read a sexual quote from the book he was reading.  When she finally pushed him away, he became angry.(Exh. 2 at 338-343)  On that same flight, plaintiff asked for a day off at Thanksgiving.  He said he could give her time off if she did "something for him".  He suggested that if she would play cards for "money and fun", he would give her the time off.  Bennett tried to force plaintiff to eat the offered meal, when plaintiff told the attendant she didn't want it.  He later said this was an example of her lack of cooperation.  Once Bennett and Ms. Bolick landed in Seattle, on an Avis bus late at night, he sat, not on the seat, but on the metal ledge, right next to her, with his arm on the back of the seat touching her.  He leaned over into her face asking her to play cards with him.  Plaintiff kept moving away. (Exh. 17 at 4-5)

Every time they were on the road together, Bennett attempted to touch plaintiff and get too close to her.  This behavior was constant. (Exh. 1 at 200, Exh. 2 at 318-320, 426)  She would move away and tell him he was getting too close. (Exh. 2 at 320)  Bennett would ask Ms. Bolick out for drinks and dinner alone together. (Exh. 2 at 297)  On several occasions he tried to find out if she did drugs and talked about drugs. (Exh. 2 at 344)

4

wanted her in the loop in case Bennett started doing anything behind her back. Bennett then harassed Bolick for having a conversation with Lametta. ( Exh. 18 at D0023, Exh. 1 at 196)

Although Ms. Bolick did not travel with Mr. Bennett from November, 2000 to December 2001, his irrational, inconsistent, and abusive behavior toward her continued throughout 2001.  Mr. Bennett would be complimentary on one occasion and demeaning and abusive on another.  He attempted to isolate plaintiff from others in the office and became furious if she spoke to his boss, Byler, outside his presence.  He made inappropriate comments about her appearance, for example, commenting on her hair and weight.  Plaintiff never knew from day to day what to expect.  In May, Bennett and plaintiff had a heated discussion following a conversation plaintiff had with Byler. Plaintiff told Bennett that he was clearly "crossing the line" in terms of his behavior. (Exh. 17 at 11, 12; Exh. 1 at 244; Exh. 2 at 352-362, 384-388, 392, 599)

**Promises to Plaintiff**

Despite his abusive behavior toward plaintiff, Mr. Bennett indicated that Bolick had been doing a great job.  He told her that she would be getting a promotion to Vice President and a raise effective in or about August, 2001. (Exh. 4 at 37, Exh. 2 at 393-394; Exh. 6 at 43-44) He told her that Mr. Byler had verbally approved of this.(Exh. 2 at 399-400)

Bennett told plaintiff that he wanted her to be his "right hand man", "assistant manager of marketing", wanted plaintiff and he to grow the department, to put others in the field around the country, and he and plaintiff to handle captive business and run the

6

office. (Exh. 1 at 252, 255; Exh. 2 at 443-444, 449-450, 601-602) In late 2001, Byler also promised plaintiff that she would be involved in the management of marketing as the department grew. (Exh. 2 at 443-444, 564; Exh. 17 at 13) By all accounts, plaintiff was a good performer. In October, 2001, Byler stated that she had "embraced the marketing role", was "creating strong relationships", was "well organized" and was "instrumental in developing enhancements for our marketing MIS." (Exh. 9, Exh. 5 at 14). During this period of time there was a shortage of underwriters to "close deals" (Exh. 3 at 173-174). There was also a lack of product to sell because ANAC did not have "issuing paper"(Exh. 4, 83-84).

### Further Conduct by Bennett and Physical Threat

In December, 2001, Mr. Bennett decided that plaintiff and he needed to travel together again. (Exh. 4 at 82) He told plaintiff that he had set up a joint trip to Gold's gym with a client, so she would have to work out on this trip. (Exh. 17 at 14, Exh. 18 at D0013) They stayed at a hotel on the water. Mr. Bennett referred to what a romantic hotel it was. He wanted plaintiff to work out with him but she declined. Bennett and Ms. Bolick met and had drinks with one client and dinner with another. Mr. Bennet once again got too close to plaintiff when they were alone and attempted to touch her and put his arm around her. Plaintiff felt that he was attempting to create an intimate relationship with her. The following day, he instigated an argument with plaintiff and called her an "idiot" accusing her of not knowing the directions back to the hotel. He then said he was joking and she could not "take a joke". (Complaint ¶ 22-23; Exh. 1 199-200; Exh. 2 at 416-419,421-424, 426; Exh. 17 at 14)

7

Following this trip, on December 21, 2001, Mr. Bennett berated plaintiff for something he believed she had said to Mr. Byler. He stated "I'll fucking bury your ass, if you try to undermine me with Byler." As he sat down to speak to her, he raised his fist and said he was going to sit close enough to "hit you." Ms. Bolick was stunned and frightened by this encounter. (Complaint ¶25; Exh. 17 at 17-18; Exh. 1 at 189-190, 192-195) When she returned to her cubicle, she immediately sent plaintiff an e-mail referencing the physical threat and stating that if it happened again, she would advise Byler and Human Resources. (Exh. 11)  Plaintiff immediately left the office, taking some time off for the Christmas holdiay, returning in early January. (Exh. 1 at 196) Plaintiff feared that Bennett would retaliate against her as a result of the e-mail, but she hoped it would shock him into stopping his behavior so that she would not have to go to Human Resources (Exh. 1 at 197-198; Exh. 2 at 456-457).

### Quid Pro Quo and Retaliation by Bennett

Instead, Ms. Bolick's worst fears were realized when on January 9, 2002, Mr. Bennett told Ms. Bolick that they were about to hire another female Vice President, Sandra Duncan, and that he had decided that he and plaintiff did not get along.  He said he didn't know why this happened but that it seemed to have happened "that morning in Los Angeles".  He then told plaintiff that she would no longer be his assistant manager as Marketing grows, that she would no longer be handling any captive business, internet or marketing material, that she was no longer his "right hand man", and that she would market only individual account business in a regular territory. (Complaint ¶26)  Mr. Bennett essentially took away everything Ms. Bolick had been

8

promised when she left a secure job in Texas and joined Alea in October 2000. (Exh. 2 at 431-432)

### Plaintiff's Complaint to Human Resources

On January 10, 2002, plaintiff called Human Resources and arranged to meet with Marti Lametta, Vice President of Human Resources at ANAC.  Ms. Bolick reported everything that had occurred with Mr. Bennett since she began her employment, including the recent physical threat. (Exh. 17 at 21; Exh. 5 at 30-31) Ms. Bolick told Ms. Lametta that she was experiencing difficulty sleeping, eating, working and focusing. (*Id*) Ms. Lametta recalled that plaintiff was visibly upset, crying, nervous and stressed as she told the story.  Ms. Lametta found plaintiff's complaints credible. (*Id*) Ms. Lametta responded that this was clearly sexual harassment and that there were other reports of Bennett behaving inappropriately with women in the office.  For example, even though Bennett was married, he had asked women at the office to go out with him. (Exh. 5 at 49-50)  Ms. Lametta reassured plaintiff that her job was secure, that she wanted to get plaintiff's complaint "on the record" and that "this needed to be escalated to the top."(Exh. 17 at 21;Exh. 5 at 30-31) During the investigation, Bolick would report to Byler. (Exh. 18 at D0030.)

An investigation followed which included interviews with plaintiff, Byler and Bennett.  Dennis Purkiss, Chairman and CEO for AGH (Exh. 7 at 9) was involved in the the investigation. (Exh. 5 at 39) When confronted with the allegations, Bennett asked if there were any witnesses. (Exh. 17 at 22) Although Bennett denied the allegations, he

9

admitted that he may have told plaintiff "I'm going to murder you." (Exh. 12) Both

Bennett and Ms. Bolick were told not to come to work during the investigation. (*Id* 41;

Exh. 2 at 462-465) As the investigation progressed, Marti Lametta testified that "it was

becoming more credible for Leigh." (Exh. 5 at 54) Dennis Purkiss and Marti Lametta

met with Bennett and advised him that he could walk away and they would give him a

very generous deal. (Exh. 4 at 81) Mr. Bennett agreed to resign and was given a

severance package. (*Id*) Dennis Purkiss was the decision maker. (Exh. 1 at 146; Exh.

17 at 38) Despite the fact that Bennett was no longer employed by Alea, plaintiff feared

retaliation from him because the company would not share with her the circumstances

under which he left.  She had been receiving hang up phone calls at home. (*Id* at 43;

Exh. 1 at 230-231; Exh. 2 at 460-461)

Following plaintiff's complaint to Human Resources, Byler was demoted.  He was

no longer President and CEO of ANAC, retaining only his title as President and CEO of

AAR, a franchise of ANAC. (Exh. 3 at 108-110) Although he had succeeded in keeping

Bennett and plaintiff from traveling together, he had done nothing to address the

behavioral issues which had now affected Bolick's career and future with the company.

(Exh. 1 at 239, 262-263, 269-270) The fact that Byler had not reported the issue to

Human Resources in November, 2000 caused "concern" at the highest levels of

management ( Exh. 1 at 266; Exh. 5 at 44-46; Exh. 19 at 6). Yet, Byler does not recall

being counseled about retaliation, and Lametta testified that she did not counsel him

about retaliation. (Exh. 3 at 133, Exh. 5 at 55-56).

**Retaliation**

10

Ms. Bolick was told to come back to work around February 1, 2002 (Exh. 2 at 465) and did return to work soon after that. (Exh. 1 at 249; Exh. 3 at 113) During this time however, plaintiff began counseling and worked at home often. (Exh. 17 at 31, Exh. 2 at 459) She was experiencing increased anxiety over how she was being treated and her change in status at the office.   During the hiring process, plaintiff had been promised a part on the management team. (Exh. 1 at 252; Exh. 2 at 449, 564) Following her complaint to Human Resources, she was treated differently by Mr. Byler than before her complaint and differently than others in comparable positions in the office. Byler admits that he treated Bolick differently after her complaint (Exh. 3 at 132).

For example, she was not involved in the hiring of the new Vice Presidents. She was no longer treated as part of the management team as she had been prior to her complaint.  She was avoided and ignored by Byler.  Byler no longer spoke to plaintiff when she was in the office. (Exh. 2 at 491-492) Plaintiff's salary was less than the three new hires in the same position, despite her greater experience and tenure at Alea. (Exh. 10)  The males were paid more than the females doing the same job. (Exh. 3 at 91-92) Plaintiff was paid the least.[1] (Complaint ¶31, 33) Ms. Bolick was excluded from management meetings by Byler. (Exh. 2 at 491-492) The Northeast region, the most desirable territory, that plaintiff lived in, was being assigned to one of the new male hires, Jeff Alexander.  Plaintiff was assigned the Southeast, which meant that she

---

[1]In addition, the new male hires were paid sign on bonuses, and were designated as "Key Employees" in their offer letters.  As such they were offered equity in the company at the time they were hired.  The females, Ms. Bolick and Ms. Duncan, were not offered equity at the time they were hired. Byler testified that the criteria for offering somebody equity at the time they were hired was that they would be a "performer" and would have an "important impact for Alea". (Exh. 3 at 29-98)

11

would have to travel often.  This was contrary to the proposed plan to have people live in their territories to cut down on travel. (Exh. 5 at 60-61; Exh. 2 at 443-444,495, 508, Exh. 3 at 30)   Plaintiff was left in a cubicle, while Jeff Alexander was given John Bennett's former large office. (Exh. 2 at 558-561)

In February, plaintiff asked Byler to make her title change to Vice President immediate because there were three new Vice Presidents in the Marketing Department who had come or were coming on board.   Given that plaintiff had been at the company for over a year and would be doing the exact same job as these new Vice Presidents, (Exh. 3 at 91-92) plaintiff believed that remaining an Assistant Vice President for two months would put her in a negative light with the new hires.  Plaintiff also requested if her business cards could at least be changed to Vice President for an important upcoming conference in March so that she would not be seen as low person on the totem pole to both the new Vice Presidents and the customers, which would affect her professional reputation.  Byler refused to do so. (Exh. 1 at 251; Exh. 3 at 137, 142-144; Exh. 2 at 475, 482-491; Exh. 16) Although plaintiff eventually got her promotion and raise in April, 2002, this had been in place long before she complained to Human Resources in January, 2002. (Exh. 2 at 472; Exh. 6 at 43; Exh. 16) The company had made numerous exceptions to the alleged policy of promotions only occurring in April. For example, a male employee in the London office of AGH had been given a promotion and raise in order to keep him from jumping to another company.  (Exh. 7 at 34-35)Title changes were routinely given at various times not only in April. (Exh. 5 at 63; Exh. 6 at 32).

12

In March, 2002, plaintiff requested permission to go to a conference and Mr. Byler refused saying it was "over your head", even after plaintiff offered to pay for it and take vacation time to attend. (Complaint ¶34; Exh. 2 at 522-523)

Byler was following through on Bennett's threats of January 9, 2002. ( Exh. 2 at 433-434, 436-437, 443-446, 491-492). Plaintiff was having difficulty functioning both in and outside the office. (Exh. 1 at 249)

At an April 10, 2002, marketing meeting, the first time the new hires and others got together, Mr. Byler berated Ms. Bolick and humiliated her in front of those present. It was so blatant that others at the meeting commented to her that it was apparent to them as well.   According to Sandra Duncan, one of the new marketing Vice Presidents, Byler was visibly agitated with plaintiff, objected to everything she said and cut her off when she attempted to speak. (Exh. 15; Exh. 2 at 527-529)

In May, 2002, Mr. Byler assigned the Bermuda territory to Jeff Alexander, who had already been assigned the Northeast territory.  Captive business was concentrated in the Northeast and Bermuda (Exh. 7 at 60-61) Alexander was not familiar with clients in the captive sector and had little or no marketing background as compared to plaintiff. Byler admits that plaintiff and Bennett had done the majority of Bermuda marketing before January, 2002, and that next to Byler, plaintiff had the most contacts in the captive market (Exh. 3 at 165-166, 209).  Being shut out of this part of the business would affect plaintiff's career opportunities in the future.(Exh. 2 at 542-543)

Prior to January 9, 2002, Bennett told plaintiff that she would be his assistant manager in charge of captive business.(Complaint ¶ 37; Exh. 1 at 255; Exh. 2 at 449-

13

450 ). Likewise, Byler had always represented that Bolick would be involved in the management of the department as it grew. (Exh. 2 at 564).

**Retaliation Complaint**

In May, 2002, Ms. Bolick complained to Mr. Byler that she believed he was retaliating against her for her complaint of sexual harassment. (Exh. 19) Byler advised Leonard Goldberg, who was recently appointed Chairman and CEO of ANAC. Goldberg called plaintiff and arranged a meeting for June 6, 2002 to discuss plaintiff's concerns. Prior to the meeting, Goldberg had a "plan" as to how the investigation would proceed . (Exh. 6 at 59-60) According to Marti Lametta's notes from a discussion with Byler on June 3, the "plan" was to "call her on the inadequacies", "have the discussion on the relationship" and "reject assignment to Bermuda". The notes then indicate "legitimate nondiscriminatory reason to *end the relationship* to overcome the challenge of discrimination". Finally the notes say "make points about her unprofessionalism". (Exh. 18 D0112-0113) Plaintiff met with Goldberg and Lametta on June 6. Plaintiff told Goldberg and Lametta that given everything that had occurred, Bolick did not believe Byler could work with her. She stated that she hoped they had options for her - perhaps elsewhere in the company. Goldberg refused on the spot to transfer plaintiff to another position in the company. (Exh. 2 at 548 - 549) Thereafter when asked by Ms. Lametta and Goldberg for her thoughts on how she and Byler could continue to work together, plaintiff requested that she be considered for Bennett's job, as she had been doing a good part of his job while he was there.(Exh. 13, 16, Exh. 1 245-246) The "investigation" of plaintiff's complaint consisted solely of interviews of

14

those in attendance at the April marketing meeting. (Exh. 15) Plaintiff was then notified by Goldberg that he did not believe that she had been retaliated against, despite the fact that at least one witness at the April marketing meeting had confirmed that Byler was visibly agitated with plaintiff, objected to everything she said, and cut her off when she attempted to speak. (Exh. 15; Exh. 2 at 527-529, Exh. 13; Exh. 19) Although plaintiff continued to work as best she could, she was having a difficult time. (Exh. 2 at 548)

### CHRO Complaint, Plaintiff Unable to Work, Further Retaliation

In June, 2002, plaintiff filed a complaint with the Commission on Human Rights and Opportunities claiming sexual harassment, discrimination, and retaliation. In September, 2002, as a result of the conduct of defendants, plaintiff became ill and unable to work. (Exh. 1 at 76-79) She applied for and was granted disability under the company's long term disability policy. ANAC also had a wage continuation policy whereby employees are paid thirteen weeks of their salary. Defendant attempted to shortchange plaintiff advising her that she was only entitled to six weeks of wage continuation and withholding the wage payments for several weeks. Eventually, plaintiff was paid for thirteen weeks. Plaintiff is suffering from post traumatic stress disorder. Plaintiff has been and continues to collect disability and is unable to work. (Exh. 2 at 576-580) Defendant eventually terminated plaintiff's employment in July, 2003, due to her inability to return to work and have not replaced her. (Exh. 3 at 166) Scott Roe has been made Senior Vice President of Marketing, the job that Bennett held. (Exh. 3 at 56).

15

### Bonus Claim

Defendant Alea failed to pay plaintiff's bonus for the year 2001 in accordance with the policy and promise set forth in plaintiff's offer letter dated September 19, 2000. (Complaint ¶42; Exh. 8) AAR earned a profit in 2001(Exh. 3 at 146), and, therefore plaintiff should have been paid a bonus in accordance with the remuneration policy attached to her offer letter.(Exh. 8) Plaintiff never received a different policy or change to the Renumeration Approach attached to her letter. (Affidavit of Leigh Bolick) The undated "Remuneration Philosophy" attached to plaintiff's offer letter in Defendant's Exhibit F was not attached to plaintiff's offer letter nor did she ever receive it prior to discovery in this case. *Id.*

### Liability of AGH

It was Ms. Bolick's understanding that Dennis Purkiss, CEO of AGH, made the final decisions regarding employment matters.  This understanding was based, at least in part, on discussions plaintiff had with Marti Lametta, VP and Director of Human Resources for ANAC (Exh. 8, Exh. 1 at 145-150; Exh. 2 at 458).  Mr. Purkiss testified that he was a common manager as to the various operating companies and franchises, and that most other functions, including human resources, are centralized, including the promulgation of personnel policies. (Exh. 7 at 16-19).


### III. LEGAL ARGUMENT

### Summary Judgment Standard

A motion for summary judgment may not be granted unless the court determines

16

that there are no genuine issues of material fact to be tried and that the facts as to

which there is no issue warrant judgment for the moving party as a matter of law. Quinn

v. Green Tree Credit Corp., 159 F.3d 759, 764-65 (2d Cir. 1998). "If there is any

evidence in the record from which a reasonable inference can be drawn in favor of the

nonmoving party on a material issue of fact, summary judgment is improper." Anderson

v. Liberty Lobby, Inc., 106 S.Ct. 2505,2510-11(1986)(emphasis added). The court must

review all of the evidence in the record drawing all reasonable inferences in favor of the

nonmoving party, but making no credibility determinations or weighing any evidence.

Although the court should review the record as a whole, it must disregard all evidence

favorable to the moving party that the jury is not required to believe. Reeves v.

Sanderson Plumbing Products, Inc., 120 S.Ct. 2097 (2000)(citations omitted).

"In employment discrimination cases, where liability often turns on the issue of

intent, courts should approach a motion for summary judgment with special caution."

See Gallo v. Prudential Residential Servs. Ltd. Partnership, 22 F.3d 1219, 1224 (2d Cir.

1994). "Because employers rarely leave direct evidence of discriminatory intent, the

court must scrutinize all of the available evidence in search of circumstantial proof to

rebut the employer's explanation for its actions." See Hollander v. American Cyanamid

Co.. 895 F.2d 80, 85 (2d Cir. 1990).

When applying the *McDonnell Douglas* burden-shifting analysis in ruling on a

motion for summary judgment in a Title VII case, the court must remain cognizant that

> employment discrimination is often accomplished by discreet manipulations and
> hidden under a veil of self-declared innocence. An employer who discriminates
> is unlikely to leave a 'smoking gun', such as a notation in an employee's

17

personnel file, attesting to a discriminatory intent. A victim of discrimination is therefore seldom able to prove his or her claim by direct evidence and is usually constrained to rely on the cumulative weight of circumstantial evidence. Consequently, in a Title VII action, where a defendant's intent and state of mind are placed in issue, summary judgment is ordinarily inappropriate.

Rosen v. Thornburgh, 928 F.2d 528, 533 (2d Cir. 1991).

**A.    Sexual Harrasment**

Title VII provides, in relevant part, that "it shall be unlawful for an employer... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of the individual's race, color, religion, sex, or national origin." 42 U.S.C. §2000e-2(a)(1).[2] The Supreme Court has interpreted Title VII to reach among other conduct, "requiring people to work in a discriminatorily hostile or abusive environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 23, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993).

**1.    Hostile Environment**

In order to establish a sex-based hostile work environment under Title VII, a plaintiff must demonstrate that the conduct occurred because of her sex. Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998); Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001). Generally speaking, this analysis is fact-specific and, therefore, is best left for trial. Hayut v. State Univ. of NY, 352 F.3d 733 (2003).

The Supreme Court has stated that "whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances. These may

---

[2]Plaintiff's state law Fair Employment Practices Act claims are governed by the same standards applicable to her Title VII claims. See Miko v. CHRO, 220 Conn. 192, 204 (1991); Levy v. CHRO, 236 Conn. 96, 107-108 (1996).

18

F.3d 426, 439 (2d Cir. 1999).

A sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim did in fact perceive to be so.  <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 777 (1998).  While a mild, isolated incident does not make a work environment hostile, the test is whether "the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse." <u>Torres v. Pisano</u>, 116 F.3d 625, 632 (2d Cir.1997).  "The fact that the law requires harassment to be severe or pervasive before it can be actionable does not mean that employers are free from liability in all but the most egregious of cases." <i>Id.</i> 116 F.3d at 631.  <i>Cf.</i> <u>Harris,</u> 510 U.S. at 22 (employee's psychological well-being need not be affected in order to find a hostile work environment).

There is no requirement that a sex-based hostile work environment claim can be supported only by overtly sexual incidents.  "There is little question that incidents that are facially sex-neutral may sometimes be used to establish a course of sex-based discrimination - for example, where the same individual is accused of multiple acts of harassment, some overtly sexual and some not." <u>Alfano v. Costello</u>, 294 F.3d 365 (2d Cir. 2001); <u>Raniola v. Bratton,</u> 243 F.3d 610, 622-623 (2d Cir. 2001) (triable issue where the plaintiff demonstrated that she was subjected to offensive sex-based remarks, disproportionately burdensome work assignments, workplace sabotage, and one serious public threat of physical harm).

The question of whether a work environment is sufficiently hostile to violate Title VII is one of fact.  See <u>Schwapp v. Town of Avon</u>, 118 F.3d 106, 112(2d Cir. 2000).  Summary judgment is appropriate only if it can "be concluded as a matter of law that no rational juror could view the defendant's conduct as ... an intolerable alteration of the plaintiff's working conditions." <u>Howley v. Town of Stratford</u>, 217 F.3d 141, 154 (2d Cir.

20

2000); <u>Brennan v. Met. Opera Ass'n, Inc.,</u> 192 F.3d 310, 319 (2d Cir. 1999).

In <u>Holtz v. Rockefeller & Co., Inc.</u>, 258 F.3d 62 (2001), the plaintiff complained that she was sexually harassed by her supervisor when he grabbed her hand "constantly" or "daily" touching it "every time she would try to hand him a paper." She also testified that he "used to touch her hair a lot" that he made "obscene leers at her" and that he tried to peer down her blouse and up her skirt. Plaintiff further alleged that her boss made remarks insinuating that she was involved with married men. This conduct allegedly was ongoing over "months and months" and that "it was almost impossible for her to do her work without getting upset" when the harassment occurred. In reversing summary judgment the Second Circuit said that if a rational jury to credit plaintiff's version of events, it could find that the supervisor's conduct crossed the line between "boorish and inappropriate" behavior and actionable harassment. Although the court noted that the line is indistinct, its haziness counseled against summary judgment. "An article III judge is not a hierophant of social graces. Evaluation of ambiguous acts such as those revealed by the potential evidence in this case presents an issue for the jury." at 75 citing <u>Gallagher v. Delaney</u>, 139 F.3d 338, 347 (2d Cir. 1997). See also <u>Richardson v. Metro. Dist. Comm</u>, 2003 U.S. Dist. LEXIS 12757 (D.Conn. 2003) (summary judgment denied in hostile environment case where supervisor belittled plaintiff, verbally abused her, and repeatedly swore at her.)

In this case, there is evidence that Bennett verbally abused and belittled plaintiff, yelled at her often, swore at her, and called her names like "idiot" and "stupid". While on the road together, Bennett asked plaintiff if she did drugs and talked about "cocaine parties", he talked about tongue rings, read sexual quotes from a book, constantly tried to put his arm around her and get too close to her. When she asked for a day off, he attempted to trade favors by saying she could have the day off if she "did something for him", he suggested playing cards for "money and fun", attempted to isolate her from

21

others in the office, made comments about her hair and weight.  The culmination of Bennett's outrageous conduct was his physical threat whereby he stated, "I'll fucking bury your ass" and "let me sit close enough to hit you".  After plaintiff complained that she would report his conduct, he became angry and threatened to take away the responsibilities of her job that he knew were most important to plaintiff, including assisting with management of the department, and assign her to a territory handling individual as opposed to captive accounts.

Defendant suggests that plaintiff overreacted to Bennett's conduct despite admissions from Lametta that this was clearly sexual harassment, and despite the fact that defendant paid Bennett to leave the company.  In plaintiff's view there is no question that Bennett engaged in physically threatening, humiliating, abusive and pervasive conduct that created a hostile environment in clear violation of Title VII. Reasonable jurors may well disagree about whether these incidents would negatively alter the working conditions of a reasonable employee.  It is that potential for disagreement that renders summary judgment inappropriate." Richardson 180 F.3d at 439.

### 2. Quid Pro Quo

Quid pro quo harassment occurs when "submission to or rejection of unwelcome sexual conduct by an individual is used as the basis for employment decisions affecting such individual." Carrero v. New York City Hous. Auth., 890 F.2d 569, 577 (2d Cir. 1989).  Accordingly, to establish a *prima facie* case of quid pro quo harassment, a plaintiff must present evidence that she was subject to unwelcome sexual conduct, and that her reaction to that conduct was then used as the basis for decisions affecting the compensation, terms, conditions or privileges of her employment. Karibian v. Columbia University, 14 F.3d 773 (2d Cir. 1994).  Because the quid pro quo harasser, by definition, wields the employer's authority to alter the terms and conditions of

employment - either actually or apparently - the law imposes strict liability on the employer for quid pro quo harassment. *Id* at 777. Kotcher v. Rosa & Sullivan Appliance Center, Inc., 957 F.2d 59, 62 (2d Cir. 1992); Carrero, 890 F.2d at 579. There is no requirement that plaintiff present evidence of actual, rather than threatened, economic loss in order to state a valid claim of quid pro quo sexual harassment. There is nothing in the language of Title VII or the EEOC Guidelines to support such a requirement. Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 64 (1986) ("The language of Title VII is not limited to 'economic' or 'tangible' discrimination.") The relevant inquiry is whether the supervisor has linked tangible job benefits to the acceptance or rejection of sexual advances. "Once an employer conditions any terms of employment upon the employee's submitting to unwelcome sexual advances, a quid pro quo claim is made out. Karibian, at 779.

In this case, while on a plane on a marketing trip in October 2000, plaintiff asked for vacation time - clearly a job benefit. In response, Bennett replied "What will you do for me". He then suggested that they play cards for "money and fun." After another trip together in December, 2001, where plaintiff once again rejected his advances, Bennett threatened to "fucking bury (plaintiff's) ass" if she undermines his authority by talking to Byler. He simultaneously raises his fist and threatens to strike her. When plaintiff then threatens to report this outrageous conduct to Byler and Human Resources, Bennett delivers the classic quid pro quo blow by threatening to remove plaintiff's managerial responsibilities and move her to a remote territory. Clearly a reasonable jury could find that plaintiff has put forth sufficient evidence to support a quid pro quo claim.

### 3. Employer is Vicariously Liable

Once sex discrimination is assumed, principles of agency law, and not the labels "quid pro quo" and "hostile work environment" are controlling on the question of an employer's vicarious liability.

23