## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

LEIGH BOLICK,                           :        CIVIL ACTION NO.
           Plaintiff               :        3:03CV165(PCD)

vs.                                     : -

                                        :
ALEA GROUP HOLDINGS, LTD.,              :
ALEA NORTH AMERICA COMPANY,             :
JOHN J. BENNETT, AND                    :
ROBERT D. BYLER,                        :
           Defendants             :        March 3, 2004

### LOCAL RULE 56(a)2 STATEMENT

1.    Admit

2.    Admit

3.    Admit

4.    Admit

5.    Admit

6.    Admit

7.    Admit

8.    Admit

9.    Admit

10.   Deny that bonus was "purely discretionary", admit the remainder. (Exh. B)

11.   Admit that the offer letter specifically provided that the bonus was not

      guaranteed and was based upon "overall group profit", including individual

      franchise results, and that Bolick confirmed her understanding of the terms of the

      offer letter, and acknowledged further that she was employed at will. Deny the

      remainder. (*Id.*)

12. Deny (Exh. 1 at 119-120, Exh. 2 at 410-415)

13. Admit

14. Admit

15. Admit                                   -

16. Admit that Bolick had numerous contacts in the Southeast and that her business

    and professional contacts were concentrated in this part of the country when she

    began her employment in October 2000.  Deny the remainder. (Exh. 2 at 478)

    (Exh. 3 at 30, 166, Exh. 9)

17. Admit

18. Admit

19. Admit that Bolick was expected to bring in prospective clients and accounts and

    help the underwriters in closing deals.  Deny the remainder. (Exh. 10)

20. Deny (Exh. 1 at 156, Exh. 2 at 520,521)

21. Admit

22. Admit

23. Admit

24. Admit

25. Admit that Bolick never alleged that Bennett requested that she take drugs with

    him.  Deny the remainder. (Exh. 1 at 211, Exh. 2 at 295-297)

26. Admit

27. Deny that Bolick inferred that Bennett wanted to have sex with her based "solely"

    on the above described conduct. (Exh. 1 at 163-177,198-203; Exh. 2 at 297,

2

300-306, 308-312, 315-324, 329-330, 332-345, 358-366, 416-428) Admit the remainder.

28.    Admit.

29.    Admit that during the week of November 6, 2000, Bolick complained to Byler about Bennett's conduct.

30.    Admit that in November, 2000, Bolick did not want Bennett fired and asked Byler to resolve the issue. Deny the remainder. (Exh. 1 at 243, 263)

31.    Admit that Byler was very positive with her during the meeting, that he asked if she wanted to go to human resources and she said "no", that she did not want Bennett to know that she complained, and that she could not and would not travel with him on an upcoming marketing trip. Deny the remainder. (Exh. 1 at 180-182; Exh. 3 at 22)

32.    Admit that Byler arranged that Bolick and Bennett would not travel together on that upcoming trip. Deny the remainder.(Exh. 1 at 184-185)

33.    Admit that Byler and Bolick had a couple of follow up conversations. Deny the remainder.(Exh. 1 at 183, 243-244; Exh. 2 at 370-371, 403-410).

34.    Admit that from November, 2000 through May, 2001, Bolick saw Bennett approximately twice a month in the office, and attended two conventions that he also attended. Deny the remainder.(Exh. 1 at 243-244; Exh. 2 at 360-362; Exh. 4 at 56).

35.    Admit that Bennett and Bolick did not travel together from November 2000 until December, 2001. Deny the remainder. (Exh. 4 at 82-83)

36.    Admit

37.    Admit

38.    Admit

39.    Admit

40.    Admit

41.    Admit

42.    Admit that the conversation concerned Bolick speaking to Byler.  Deny the

remainder. (Exh. 1 at 193)

43.    Admit

44.    Admit

45.    Admit

46.    Admit

47.    Admit

48.    Deny that no determinations were made as to the merit of Bolick's allegations,

admit the remainder(Exh. 4 at  53-55, 106)

49.    Admit that during part of the "investigation period", Bolick had been told she

could work from home due to her articulated stress and inability to concentrate in

the office. Deny the remainder. (Exh. 2 at 462-464, 469-470)

50.    Admit

51.    Admit

52.    Deny that they confirmed Bolick would return to her current position (Exh. 3 at

30; Exh. 5 at 105), admit the remainder.

4

53.   Admit

54.   Deny that Bolick could not provide any specifics concerning the bases for her
      fear of Bennett, or provide any valid reason why she could not immediately
      return to work. (Exh. 2 at 460-461, Exh. 11; Exh. 12)  Admit the remainder.

55.   Admit (Exh. 3 at 113)

56.   Admit

57.   Admit

58.   Admit that Duncan spent 14 years with Tillinghast -Towers Perrin, the last three
      as a Senior Risk Management Consultant.  Deny the remainder. (Def. Exh. G/1)

59.   Admit

60.   Admit

61.   Deny that Roe earned more than $120,000 in 2001 (Def. Exh. G/2).  Admit the
      remainder.

62.   Deny that Alexander earned more than $130,000 per year as a Second VP at
      Discover Reinsurance Co. (Def. Exh. G/3) Admit the remainder.

63.   Admit

64.   Admit

65.   Deny (Exh. 6 at 32;Exh. 7 at 11, 34-37, Exh. 5 at 63, Exh. 1 at 233-236 Exh. 2 at
      396-401; Exh. 4 at 75; Exh. 8)

66.   Admit

67.   Admit

68.   Admit

69.  Deny that Bolick "focused on a particular marketing meeting". (Exh. 13) Admit the remainder.

70.  (a) Deny that being promoted in title and given a raise defeats the functional demotion assertion. (Exh. 1 at 232, 250,251; Exh. 2 at 558; Exh. 5 at 105, lines 13-16, Exh. 3 at 30) Admit the remainder. (b) Deny (Exh. 2 at 475-478, 513, 558; Exh. 10) (c) Deny (Exh. 14; Def. Exh. G/2 (d) Deny (Exh. 2 at 558-561) (e) Admit that Bolick acknowledged she had numerous contacts in the southeast region, especially in Texas where she had lived for 20 years before joining ANAC. Deny the remainder. (Exh. 3 at 30, 166;Exh. 4 at 18-19, Exh. 2 at 439) (f) Admit that assignment of regions did not affect Bolick's or the other Vice Presidents' compensation *while at Alea*. Deny the remainder (Exh. 4 at 18-19, Exh. 2 at 542-546); (g) Deny that she could not dispute that Bermuda was always considered part of the northeast. (Exh. 2 at 505) Admit the remainder. (h) Deny that "company practice" is to wait until April to implement promotions (Exh. 6 at 32;Exh. 7 at 11, 34-37, Exh. 5 at 63, Exh. 1 at 233-236 Exh. 2 at 396-401; Exh. 4 at 75; Exh. 8). Admit the remainder.

71.  Admit that Bolick got a promotion in April, 2002, accompanied by a raise in salary. Deny the remainder. (Exh. 6 at 32, Exh. 7 at 11, 34-37, Exh. 5 at 63, Exh. 1 at 233-236; Exh. 2 at 396-401, Exh. 8).

72.  Admit

73.  Admit

74.  Deny (Exh. 13)

75.    Deny (*Id.*)

76.    Deny (Exh. 15)

77.    Deny (Exh. 6 at 32; Exh. 7 at 11, 34-37;Exh. 5 at 63; Exh. 1 at 233-236; Exh. 2
       at 396-401; Exh. 8)

78.    Admit

79.    Deny that ANAC repeatedly articulated a desire to have Bolick continue as Vice
       President. (Exh. 2 at 490 ) Admit the remainder.

80.    Admit

81.    Admit that in Counts One and Threee of the Complaint, Bolick allege hostile
       environment sexual harassment by her then supervisor, Defendant Bennett, in
       violation of the CFEPA and Title VII.  Deny the remainder. (Complaint)

82.    Deny that Bennett never made a sexual advance or asked her out or touched
       her in a sexual way.  (Exh. 1 at 163-177,198-203; Exh. 2 at 297, 300-306, 308-
       312, 315-324, 329-330, 332-345, 358-366, 416-428) Admit the remainder.

83.    Deny (*Id.* 312-313)

84.    Deny (Exh. 3 at 17-24; Exh. 5 at 17-18)

85.    Deny (Complaint ¶ 41)

86.    Deny (*Id.*)

87.    Deny (*Id.*, Exh. 10)

88.    Admit that plaintiff was given a raise of slightly less than 15% and a promotion
       effective in April, 2002.  Deny the remainder. (Exh. 6 at 32; Exh. 7 at 11, 34-37;
       Exh. 5 at 63, Exh. 1 at 233-236; Exh. 2 at 396-401, 472; Exh. 8)

89.  Deny (Complaint ¶ 41, Exh. 3 at 40, 44, 92,165-66; Exh. 10)

90.  Deny that ANAC had an established route for sexual harassment complaints in
     November, 2000 and that Byler implemented steps which limited her interaction
     with Bennett. (Exh. 3 at 17-24, Exh. 5 at 17-18; Exh. 4 at 56) Admit the
     remainder.

91.  Admit that plaintiff's request that she not be asked to accompany Bennett on
     business trips was granted in that same conversation with Byler. Deny the
     remainder. (Exh. 3 at 179; Exh. 4 at 61, 82-83)

92.  Deny that Bolick never complained to Byler again during that year  (Exh. 2 at
     369). Admit the remainder.

93.  Admit that Bolick did not request Bennett's termination and that in January,
     2002, she complained to Human Resources.  Deny the remainder. (Complaint, ¶
     26-27, Exh. 1 at 198, 257; Exh. 2 at 473)

94.  Admit

95.  Deny (Exh. 2 at 463-473)

96.  Deny (Complaint ¶41, Exh. 1 at 185; Exh. 2 at 403, 473, 475, 492, 508, 542-546,
     553, 556-557, 565, 570, 580)

97.  Admit

98.  Deny (Exh. 3 at 44, 92, 165-166, 209; Exh. 10; Exh. 14; Exh. 9; Exh. 1 at 253;
     Exh. 2 at 514, 519-521)

99.  Deny (Exh. 4 at 18-19, 21, 23-24, Exh. 3 at 209, Exh. 2 at 505, 542-546, Exh. 7
     at 60-61)

100.   Deny (*Id*)

101.   Admit

102.   Deny (Exh. 1 at 233-236; Exh. 2 at 396-401, 558-561, Exh. 4 at 75; Exh. 6 at 32, Exh. 7 at 11, 34-37, Exh. 5 at 63; Exh. 8)

103.   Deny (Exh. 3 at 121, 126-127, 132-133; Exh. 1 at 269-270; Exh. 2 at 490-492, 504-506, 527-529)

104.   Deny (legal conclusion)

105.   Deny(Exh. 1 at 255-258 Exh. 2 at 443-450)

106.   Deny (legal conclusion)

107.   Admit that plaintiff's salary was less than the newly hired Vice Presidents, deny the remainder.( Complaint ¶41, Exh. 2 at 252, 556-557, Exh. 5 at 140-141)

108.   Deny (Exh. 3 at 44, 62, 64, 91-92, 165-166, 191, 195 209 Exh. 10; Exh. 14; Exh. 9; Exh. 1 at 253; Exh. 2 at 514, 519-521)

109.   Deny

110.   Deny(Exh. 10)

111.   Deny (Complaint ¶27, 29-34, 36-38, 41)

112.   Deny(legal conclusion)

113.   Admit

114.   Deny (Exh. 3 at 44, 92, 165-166, 209; Exh. 10; Exh. 14; Exh. 9; Exh. 1 at 253; Exh. 2 at 514, 519-521)

115.   Deny (*Id.*)

116.   Deny (legal conclusion)

9

117.  Deny (Exh. 3 at 44, 92-98, 165-166, 209; Exh. 10; Exh. 14; Exh. 9; Exh. 1 at

253, 514 Exh. 2 at 519-521)

118.  Admit

119.  Admit that the offer letter with attached Remuneration Policy issued to Bolick

prior to the commencement of her hire sets forth the terms of that purported

contract. (Exh. 8)

120.  Deny(*Id.*)

121.  Deny (legal conclusion)

122.  Admit

123.  Deny (legal conclusion)

124.  Deny (legal conclusion)

125.  Admit

126.  Deny (Complaint, ¶42, 69)

127.  Deny (legal conclusion)

128.  Deny

### DISPUTED ISSUES OF MATERIAL FACT

1.  Bonuses were not purely discretionary, rather they were not "guaranteed",

meaning if neither the corporate, franchise, or individual goals were met there

would be no bonus. (Exh. 8)

2.  If either corporate, franchise, or individual results were realized, a bonus would

be paid. (*Id*)

3.  Alea Alternative Risk met their goals in 2001 for purposes of bonuses (Exh. 3 at

10

146)

4.    Plaintiff was hired as part of a "start up" and based on representations made to
her by Mr. Bennett and Robert D. Byler, President and Chief Executive Officer of
ANAC, Ms. Bolick had expectations that she would be part of the management
team at Alea. (Exh. 1 at 100, 157-159; Exh. 2 at 564 )

5.    Plaintiff had a particular interest in learning about "captives", a type of insurance
in which the purchaser retains an element of risk for themselves. (Exh. 7 at 60).
She saw this job as an opportunity to get into this lucrative insurance market.
(Exh. 4 at 19, Exh. 2 at 505-506)

6.    Although plaintiff had numerous contacts in the Southeast, in January, 2002,
after working for Alea for a year, she had contacts all over the country, and had
the most knowledge of captives as compared with her peers in the marketing
department (Exh. 3 at 165-166; Exh. 2 at 478)

7.    Although Bolick understood that she would be traveling 40% of the time initially,
she was told during her interview by Bennett that the travel schedule would
lighten up once additional marketers were hired. (Exh. 2 at 495)

8.    Alea's captive business was concentrated in the Northeast and Bermuda (Exh. 7
at 60-61; Exh. 2 at 505-506, 542)

9.    Every time they were on the road together, Bennett attempted to touch plaintiff
and get too close to her.  This behavior was constant. (Exh. 1 at 200, Exh. 2 at
318-320, 426)

10.   At the time of Bolick's complaint in November, 2000, there was no sexual

11

harassment policy at ANAC. Employees had not received sexual harassment training at ANAC, and no policy regarding a complaint procedure had been communicated to employees. (Exh. 2 at 408, Exh. 5 at 17-18, 44-45; Exh. 3 at 17)    -

11. Plaintiff reported to Byler the aggressive posturing, physical contact, sexual overtones and intimidation by Mr. Bennett. (Exh. 17 6, 27, Exh. 3 at 18-20) Ms. Bolick told Mr. Byler that (1) the behavior must stop, and (2) she did not want to travel with Bennett. Byler agreed to both. He further agreed to handle the matter so that Mr. Bennett would not know that she had complained. (Exh. 17 at 7, Exh. 1 at 181-183)

12. After plaintiff complained to Byler in November, 2000, she continued to report to Bennett and still saw him regularly. (Exh. 3 at 23; Exh. 4 at 56)

13. Although Ms. Bolick did not travel with Mr. Bennett from November, 2000 to December 2001, his irrational, inconsistent, and abusive behavior toward her continued throughout 2001. Mr. Bennett would be complimentary on one occasion and demeaning and abusive on another. He attempted to isolate plaintiff from others in the office and became furious if she spoke to his boss, Byler, outside his presence. He made inappropriate comments about her appearance, for example, commenting on her hair and weight. In May, Bennett and plaintiff had a heated discussion following a conversation plaintiff had with Byler. Plaintiff told Bennett that he was clearly "crossing the line" in terms of his behavior. (Exh. 17 at 11, 12; Exh. 1 at 244; Exh. 2 at 352-362, 384-388, 392,

12

599)

14.    Bennett told plaintiff that she would be getting a promotion to Vice President and
a raise effective in or about August, 2001. (Exh. 4 at 37, Exh. 2 at 393-394; Exh.
6 at 43-44) He told her that Mr. Byler had verbally approved of this.(Exh. 2 at
399-400)

15.    Bennett told plaintiff that he wanted her to be his "right hand man", "assistant
manager of marketing", wanted plaintiff and he to grow the department, to put
others in the field around the country, and he and plaintiff to handle captive
business and run the office. (Exh. 1 at 252, 255; Exh. 2 at 443-444, 449-450,
601-602) In late 2001, Byler also promised plaintiff that she would be involved in
the management of marketing as the department grew. (Exh. 2 at 443-444, 564;
Exh. 17 at 13)

16.    By all accounts, plaintiff was a good performer.  (Exh. 9, Exh. 5 at 14).

17.    The underwriters had the ultimate responsibility to close deals.  Marketers were
expected to "help" close deals.(Exh. 10)

18.    From October, 2000 until January, 2002, there was not sufficient staff in the
underwriting department to handle all the deals that the marketers, Bolick and
Bennett, were bringing in. (Exh. 3 at 173)

19.    There was a lack of product available to sell, that is, Alea did not have the
"issuing paper", which affected the ability to close deals. (Exh. 4 at 83)

20.    In December, 2001, Mr. Bennett decided that plaintiff and he needed to travel
together again. (Exh. 4 at 82) He told plaintiff that he had set up a joint trip to

13

Gold's gym with a client, so she would have to work out on this trip. (Exh. 17 at 14, Exh. 18 at D0013) They stayed at a hotel on the water. Mr. Bennett referred to what a romantic hotel it was. He wanted plaintiff to work out with him but she declined. Bennett and Ms. Bolick met and had drinks with one client and dinner with another. Mr. Bennet once again got too close to plaintiff when they were alone and attempted to touch her and put his arm around her. Plaintiff felt that he was attempting to create an intimate relationship with her. The following day, he instigated an argument with plaintiff and called her an "idiot" accusing her of not knowing the directions back to the hotel. He then said he was joking and she could not "take a joke". (Complaint ¶ 22-23; Exh. 1 199-200; Exh. 2 at 416-419,421-424, 426; Exh. 17 at 14)

21. Following this trip, on December 21, 2001, Mr. Bennett berated plaintiff or something he believed she had said to Mr. Byler. He stated "I'll fucking bury your ass, if you try to undermine me with Byler." As he sat down to speak to her, he raised his fist and said he was going to sit close enough to "hit you." Ms. Bolick was stunned and frightened by this encounter. (Complaint ¶25; Exh. 17 at 17-18; Exh. 1 at 189-190, 192-195)

22. After being physically threatened and sworn at by Bennett, plaintiff immediately sent Bennett an e-mail referencing the physical threat and stating that if it happened again, she would advise Byler and Human Resources. (Exh. 11) Plaintiff immediately left the office, taking some time off for the Christmas holdiay, returning in early January. (Exh. 1 at 196) Plaintiff feared that Bennett

14

would retaliate against her as a result of the e-mail, but she hoped it would shock him into stopping his behavior so that she would not have to go to Human Resources (Exh. 1 at 197-198; Exh. 2 at 456-457).

23.   Instead, Ms. Bolick's worst fears were realized when on January 9, 2002, Mr. Bennett told Ms. Bolick that they were about to hire another female Vice President, Sandra Duncan, and that he had decided that he and plaintiff did not get along.  He said he didn't know why this happened but that it seemed to have happened "that morning in Los Angeles".  He then told plaintiff that she would no longer be his assistant manager as Marketing grows, that she would no longer be handling any captive business, internet or marketing material, that she was no longer his "right hand man", and that she would market only individual account business in a regular territory. (Complaint ¶26)  Mr. Bennett essentially took away everything Ms. Bolick had been promised when she left a secure job in Texas and joined Alea in October 2000. (Exh. 2 at 431-432)

24.   Ms. Bolick told Ms. Lametta that she was experiencing difficulty sleeping, eating, working and focusing. (*Id*)  Ms. Lametta recalled that plaintiff was visibly upset, crying, nervous and stressed as she told the story.  Ms. Lametta found plaintiff's complaints credible. (*Id*) Ms. Lametta responded that this was clearly sexual harassment and that there were other reports of Bennett behaving inappropriately with women in the office.  For example, even though Bennett was married, he had asked women at the office to go out with him. (Exh. 5 at 49-50)  Ms. Lametta reassured plaintiff that her job was secure, that she wanted to get

15

plaintiff's complaint "on the record" and that "this needed to be escalated to the top."(Exh. 17 at 21;Exh. 5 at 30-31)

25.  Ms. Bolick was told to come back to work around February 1, 2002 (Exh. 2 at 465) and did return to work soon after that. (Exh. 1 at 249; Exh. 3 at 113) During this time however, plaintiff began counseling and worked at home often. (Exh. 17 at 31, Exh. 2 at 459) She was experiencing increased anxiety over how she was being treated and her change in status at the office.   During the hiring process, plaintiff had been promised a part on the management team. (Exh. 1 at 252; Exh. 2 at 449, 564) Following her complaint to Human Resources, she was treated differently by Mr. Byler than before her complaint and differently than others in comparable positions in the office.

26.   When confronted with the allegations, Bennett asked if there were any witnesses. (Exh. 17 at 22)

27.  Mr. Bennett agreed to resign after being given an ultimatum by Dennis Purkiss. Specifically Purkiss told Bennett that they would need to take the investigation further by going to his previous employoers.  Bennett agreed to resign and was given a severance package. (*Id*) Dennis Purkiss was the decision maker. (Exh. 1 at 146; Exh. 17 at 38)

28.  Following plaintiff's complaint to Human Resources, Byler was demoted.  He was no longer President and CEO of ANAC, retaining only his title as President and CEO of AAR, a franchise of ANAC. (Exh. 3 at 108-110) Although he had succeeded in keeping Bennett and plaintiff from traveling together, he had done

nothing to address the behavioral issues which had now affected Bolick's career

and future with the company. (Exh. 1 at 239, 262-263, 269-270) The fact that

Byler had not reported the issue to Human Resources in November, 2000

caused "concern" at the highest levels of management ( Exh. 1 at 266; Exh. 5 at

44-46; Exh. 19 at 6).

29.    Plaintiff was not involved in the hiring of the new Vice Presidents, with the

exception of Sandra Duncan. She was no longer treated as part of the

management team as she had been prior to her complaint.  She was avoided

and ignored by Byler.  Byler no longer spoke to plaintiff when she was in the

office. (Exh. 2 at 491-492) Plaintiff's salary was less than the three new hires in

the same position, despite her greater experience and tenure at Alea. (Exh. 10)

The males were paid more than the females doing the same job. (Exh. 3 at 91-

92)

30.    Ms. Bolick was excluded from management meetings by Byler. (Exh. 2 at 491-

492) The Northeast region, the most desirable territory, that plaintiff lived in, was

being assigned to one of the new male hires, Jeff Alexander.  Plaintiff was

assigned the Southeast, which meant that she would have to travel often.  This

was contrary to the proposed plan to have people live in their territories to cut

down on travel. (Exh. 5 at 60-61; Exh. 2 at 443-444,495, 508, Exh. 3 at 80)

Plaintiff was left in a cubicle, while Jeff Alexander was given John Bennett's

former large office. (Exh. 2 at 558-561)

31.    In February, plaintiff asked Byler to make her title change to Vice President

17

immediate because there were three new Vice Presidents in the Marketing Department who had come or were coming on board. Given that plaintiff had been at the company for over a year and would be doing the exact same job as these new Vice Presidents, (Exh. 3 at 91-92) plaintiff believed that remaining an Assistant Vice President for two months would put her in a negative light with the new hires. Plaintiff also requested if her business cards could at least be changed to Vice President for an important upcoming conference in March so that she would not be seen as low person on the totem pole to both the new Vice Presidents and the customers, which would affect her professional reputation. Byler refused to do so. (Exh. 1 at 251; Exh. 3 at 137, 142-144; Exh. 2 at 475, 482-491; Exh. 16)

32. Although plaintiff eventually got her promotion and raise in April, 2002, this had been in place long before she complained to Human Resources in January, 2002. (Exh. 2 at 472; Exh. 6 at 43; Exh. 16)

33. The company had made numerous exceptions to the alleged policy of promotions only occurring in April. For example, a male employee in the London office of AGH had been given a promotion and raise in order to keep him from jumping to another company. (Exh. 7 at 34-35)Title changes were routinely given at various times not only in April. (Exh. 5 at 63; Exh. 6 at 32). The Remuneration Approach document attached to plaintiff's offer letter allowed other exceptions to annual increases on a specific date. (Exh. 8)

34. Byler followed through on Bennett's threats of January 9, 2002. ( Exh. 2 at 433-

18

434, 436-437, 443-446, 491-492).

35.   In early 2002, plaintiff was having difficulty functioning both in and outside the office. (Exh. 1 at 249)

36.   At an April 10, 2002, marketing meeting, the first time the new hires and others got together, Mr. Byler berated Ms. Bolick and humiliated her in front of those present. It was so blatant that others at the meeting commented to her that it was apparent to them as well.   According to Sandra Duncan, one of the new marketing Vice Presidents, Byler was visibly agitated with plaintiff, objected to everything she said and cut her off when she attempted to speak. (Exh. 15; Exh. 2 at 527-529)

37.   In May, 2002, Mr. Byler assigned the Bermuda territory to Jeff Alexander, who had already been assigned the Northeast territory. Captive business was concentrated in the Northeast and Bermuda (Exh. 7 at 60-61) Alexander was not familiar with clients in the captive sector and had little or no marketing background as compared to plaintiff.

38.   Byler admits that plaintiff and Bennett had done the majority of Bermuda marketing before January, 2002, and that next to Byler, plaintiff had the most contacts in the captive market (Exh. 3 at 165-166, 209).

39.   Being shut out of this part of the business would affect plaintiff's career opportunities in the future.(Exh. 2 at 542-543)

40.   Prior to January 9, 2002, Bennett told plaintiff that she would be his assistant manager in charge of captive business.(Complaint ¶ 37; Exh. 1 at 255; Exh. 2 at

19

449-450 ).  Likewise, Byler had always represented that Bolick would be involved

in the management of the department as it grew. (Exh. 2 at 564).

41.    Prior to the meeting to discuss plaintiff's retaliation complaint, Goldberg had a

"plan" as to how the investigation would proceed . (Exh. 6 at 59-60) According to

Marti Lametta's notes from a discussion with Byler on June 3, the "plan" was to

"call her on the inadequacies", "have the discussion on the relationship" and

"reject assignment to Bermuda".  The notes then indicate "legitimate

nondiscriminatory reason to *end the relationship* to overcome the challenge of

discrimination".  Finally the notes say "make points about her unprofessionalism".

(Exh. 18 D0112-0113)

42.    Plaintiff met with Goldberg and Lametta on June 6.  Plaintiff told Goldberg and

Lametta that given everything that had occurred, Bolick did not believe Byler

could work with her.  She stated that she hoped they had options for her -

perhaps elsewhere in the company. Goldberg refused on the spot to transfer

plaintiff to another position in the company. (Exh. 2 at 548 - 549)

43.    Thereafter when asked by Ms. Lametta and Goldberg for her thoughts on how

she and Byler could continue to work together, plaintiff requested that she be

considered for Bennett's job, as she had been doing a good part of his job while

he was there.(Exh. 13, 16, Exh. 1 245-246)

44.    The "investigation" of plaintiff's complaint consisted solely of interviews of those

in attendance at the April marketing meeting. (Exh. 15)

45.    Although plaintiff continued to work as best she could in June, 2002, she was

20

having a difficult time. (Exh. 2 at 548)

46.    In September, 2002, as a result of the conduct of defendants, plaintiff became ill and unable to work. (Exh. 1 at 76-79)

47.    ANAC also had a wage continuation policy whereby employees are paid thirteen weeks of their salary. Defendant attempted to shortchange plaintiff advising her that she was only entitled to six weeks of wage continuation and withholding the wage payments for six weeks. (Bolick Affidavit)

48.    Plaintiff is suffering from post traumatic stress disorder. Plaintiff has been and continues to collect disability and is unable to work. (Exh. 2 at 576-580)

49.    Defendant eventually terminated plaintiff's employment in July, 2003, due to her inability to return to work and have not replaced her. (Exh. 3 at 166)

50.    Defendant Alea failed to pay plaintiff's bonus for the year 2001 in accordance with the policy and promise set forth in plaintiff's offer letter dated September 19, 2000.(Complaint ¶42; Exh. 8)

51.    AAR earned a profit in 2001(Exh. 3 at 146), and, therefore plaintiff should have been paid a bonus in accordance with the remuneration policy attached to her offer letter.(Exh. 8)

52.    Plaintiff never received a different policy or change to the Remuneration Approach attached to her letter. (Affidavit of Leigh Bolick)

53.    The undated "Remuneration Philosophy" attached to plaintiff's offer letter in Defendant's Exhibit F was not attached to plaintiff's offer letter nor did she ever receive it prior to discovery in this case. *Id.*

21

54. It was Ms. Bolick's understanding that Dennis Purkiss, CEO of AGH, made the final decisions regarding employment matters. This understanding was based, at least in part, on discussions plaintiff had with Marti Lametta, VP and Director of Human Resources for ANAC (Exh. 8, Exh. 1 at 145-150; Exh. 2 at 458).

55. Mr. Purkiss testified that he was a common manager as to the various operating companies and franchises, and that most other functions, including human resources, are centralized, including the promulgation of personnel policies. (Exh. 7 at 16-19).

56. Bennett called other employees names, but plaintiff has no knowledge that he did so to their face.(Exh. 2 at 312-313)

57. Bennett engaged in unwelcome physical and verbal conduct of a sexual nature.

58. Roe's salary at his previous position was $100,000. (Def. Exh. G/2)

59. Only Bolick and Alexander were based in Rocky Hill. Duncan and Roe lived and worked in their territories. Between January, 2002 and August, 2002, Alexander was in an office, Bennett's old office, and plaintiff was in a cubicle.

60. Plaintiff's promotion and raise were put in place, although not effective, long before Bolick reported to Human Resources that Bennett had sexually harassed her. (Exh. 2 at 472; Exh. 16)

61. Byler admits that he has "no doubt" that Bennett promised Bolick that they would market captives separately (Exh. 16)

62. Plaintiff's experience, skills, and salary history when compared with the three new Vice Presidents and their experience, skills, and salary history does not

justify a differential in salary for the same job. (Def. Exh. F and G)

THE PLAINTIFF, LEIGH BOLICK

Barbara E. Gardner
CT07623
843 Main St., Suite 1-4
Manchester, CT 06040
(860)643-5543
(860)645-9554(fax)
Bg@bgardnerlaw.com

23

## CERTIFICATION OF SERVICE

I hereby certify that a copy of the foregoing was mailed, first class, postage prepaid, to the following counsel of record on this 3rd day of March, 2004:

Mary A. Gambardella
Epstein Becker & Green, P.C.
One Landmark Square, Suite 1800
Stamford, CT 06901-2601


Saundra M. Yaklin
Reed Smith, LLP
599 Lexington Ave.
29th Floor
New York, NY 10022


Barbara E. Gardner