IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| LEIGH BOLICK | : | Civil Action No. 3:03CV165 (PCD) |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | |
| | : | |
| ALEA GROUP HOLDINGS, LTD. | : | |
| et al. | : | |
| Defendants. | : | MARCH 16, 2004 |

**REPLY TO PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

Defendants, Alea Group Holdings, Ltd. ("AGH"), Alea North America Company ("ANAC") and Robert Byler, hereby respectfully submit their Reply to Plaintiff's Memorandum of Law in Opposition to their Motion for Summary Judgment (hereinafter "Opposition Brief"). Summary judgment is clearly warranted, despite Bolick's attempts to suggest that such relief is not available in an employment case.[1] Initially, it must be emphasized that mischaracterizations of the record, citations to her own self-serving notes as "evidence", and erroneous references to Exhibits, pervade the Opposition Brief. Defendants simply cannot address every such mischaracterization given the page limits imposed under the Rules, but attempt to highlight the most significant in each argument herein.

### I. BOLICK'S QUID PRO QUO THEORY SHOULD BE REJECTED[2]

In her argument as to why this Court should maintain her sexual harassment claims, Bolick, for the first time, presents a theory of "quid pro quo and retaliation by Bennett". Initially, a reading of the operative Complaint reveals the novelty of Bolick's presentation of a quid pro quo claim now. Nevertheless, even if this Court finds that this theory is properly presented, Bolick still fails to sustain her burden. Coupled with a review of Bolick's own admissions set forth in the counter-

---

[1] Note more recent case law espousing the principle that summary judgment is appropriate in employment cases, Defendants' Memorandum of Law at 16.

[2] Defendants address her quid pro quo argument first, despite Plaintiff's order of the argument.

28121v1                                    -1-

statement pursuant to Rule 56(a)2, the undisputed evidence is that: (i) Bolick "infers" Bennett was making sexual advances, based only on behavior which was never sexually overt, and despite his failure to ever expressly make a sexual advance;[3] and (ii) Bolick admits the conduct on which she bases her sexual harassment claim was only that facially neutral conduct described by Defendants in their Statement of Undisputed Facts, paragraphs 21 through 26. (See also Defendants' Memorandum of Law in Support of Motion for Summary Judgment, hereinafter "MOL", at pages 5-6).

Noteworthy as well, Bolick never disputes the portrayal of this alleged conduct by Defendants' MOL, nor does she sufficiently describe how Bennett made her submission to these inferred sexual advances, explicitly or implicitly, a term or condition of her employment. Yet, allegations concerning required sexual submission are necessary to sustain a claim of quid pro quo sexual harassment.[4] See, e.g., Cook v. New York City Board of Education, 2003 U.S. Dist. Lexis 10350 (E.D.N.Y. 2003), aff'd, 2004 U.S. app. Lexis 1581(2d Cir. N.Y. Feb. 3, 2004)(*Unpublished*-- plaintiff must present evidence she was subjected to unwelcome sexual conduct, and that her reaction to that conduct was then used as a basis for decisions affecting the compensation, term, conditions or privileges of her employment. Strikingly similar to the facts of the instant case, Cook's purported evidence of quid pro quo was, following a supervisor's attempts to kiss her: exclusion from meetings; relocation of her office; an announcement that her job responsibilities were being reduced; and the hiring of a co-principal, which resulted in a diminution of her authority. Such conduct, even if true, was insufficient to sustain plaintiff's quid pro quo claim); Gigliotti v. Sprint Spectrum, 2001 WL 1717305 (N.D.N.Y. Dec. 7, 2001)(supervisor's inquiries regarding plaintiff's dating status insufficient to support quid pro quo claim); King v. Friend of a Farmer Corp., 2001 WL 849460

---

[3] (See Bolick 56(a)2 statement, paragraph 46, where she responds "Admit" to Defendants' Statement of Undisputed Facts that "Bolick continued to infer that Bennett's conduct signified that he wanted to have sex with her, although admittedly he never said he harbored that intention, nor had he ever expressly made any sexual advances or demands." E.g., Bolick Dep. at pp. 295-97, 351, 391).

[4] Most courts addressing the quid pro quo theory cite to Kariban v. Columbia Univ., 14 F.3d 773 (2d Cir. 1994), cert. denied, 512 U.S. 1213 (1994), which sets forth the applicable standard.

28121v1                                    -2-

(S.D.N.Y. July 26, 2001)(quid pro quo is used to describe situations in which tangible employment benefits are withheld from an employee who refuses to submit to sexual demands). Query how the alleged conduct by Bennett passes muster here when the conduct described to these courts did not.[5] As throughout the Opposition Brief, Bolick attempts to mischaracterize testimony in the record to support this claim. For example, Bolick claims Bennett said, "what will you do for me" in response to her vacation request. (Opposition Brief at p. 23). She also alleges Bennett asked her to "play cards for money and fun", suggesting this was a sexual request. In contrast to what is argued in the Opposition Brief as a sexual advance, during her deposition and in her own notes of October 31, 2000 (Exh. 17 to the Opposition Brief, p. 4), Bolick admitted that Bennett was referring to playing cards in exchange for time off: "If I agree to play cards for money and fun he'll give me time off". She also admits in her notes that the proposed trade for extra vacation time was that she would do a brochure for him. (Exh. 17, p. 4; Bolick Dep. at pp. 350-51[6]) She presents no substantiation for her claim that Bennett's alleged request she play cards with him "for money and fun" was a sexual request.[7] These deceptive and spurious allegations, even if true, do not describe conduct which, even in the aggregate, rises to the level of being an actionable quid pro quo claim under Title VII or comparable state law.

---

[5] Additionally, rulings cited by Plaintiff in support of her quid pro quo claim actually underscore its lack of merit. For example, the Kariban court enforced the principles espoused above, principles Plaintiff cannot satisfy. Simply stated, the alleged conduct, even if true, does not rise to the level of sexual advances made a condition of employment in compliance with the standard set by Kariban. The Carrero court was presented with a supervisor's numerous attempts to touch plaintiff's knee and to kiss her neck. Plaintiff resisted, and the supervisor was told to stop. After her complaint, and when the behavior did not stop, the supervisor filed a probationary report against her. See also Plumb v. Abbott Laboratories, 60 F.Supp. 2d 642 (E. D. Mich. 1999)(supervisor made kissing sounds, sent love notes and made other flirtatious comments. While such conduct might be deemed by plaintiff to convey a sexual message, plaintiff failed to show these actions *rose to the level of an invitation to engage in sexual activity* with him. Also, co-workers dining together when traveling for business is commonplace and mere fact one is a man and the other a woman does not transform a business engagement into a romantic encounter.)

[6] References throughout this Reply to deposition testimony are already part of Defendants' exhibits to the MOL.

[7] More often than not, Bolick cites to her own notes for "admissions" by Bennett or Lametta, and not to their actual deposition testimony. See, e.g., Brink v. Union Carbide Corp., 2000 U.S. App. Lexis 7150 (unpublished-2d Cir. April 18, 2000)(self-serving statements, while admissible at trial, deemed insufficient to create triable issues).

## II. BOLICK'S HOSTILE ENVIRONMENT CLAIM SIMILARLY FAILS

In attempting to craft a claim of hostile environment sexual harassment, Bolick tackles the Defendants' arguments by again misrepresenting deposition testimony, and mischaracterizing the factual underpinnings of the judicial decisions on which she relies.

Initially, Bolick tries to describe Bennett's behavior as "constant". (Opposition Brief at p. 4). Yet, neither the operative Complaint nor her deposition testimony support this characterization. To the contrary, Bolick, repeatedly throughout her deposition, described only "facially neutral" conduct during three business trips and during in-office contacts with Bennett which occurred approximately twice each month. (Bolick Dep. at pp. 161-67, 171-72, 183, 186, 199-201, 243-44, 299-302, 315, 321, 323-28, 333-34, 336-44, 352, 360-63, 370-71, 418-24).

Further, she claims for the first time that there were "other reports of Bennett behaving inappropriately with women in the office" (Opposition Brief at p. 9), another blatant distortion of the record. Indeed, the only reference to "other women" was a statement made by an administrative employee that a temporary receptionist told her she had been "asked out" by Bennett while that temporary employee worked at ANAC. (Lametta Dep. at pp. 49-51) This "report" was not made to Human Resources until well after the temporary receptionist had departed, and the investigation of Bolick's complaint about Bennett was already underway. (Id.).

Other deposition testimony of Lametta, the Vice President of Human Resources, is shamelessly mischaracterized. For example, in actually quoting from her own self-serving notes, Bolick implies that Lametta opined that Bennett's conduct "was clearly sexual harassment" (Opposition Brief at p. 9). Lametta's actual, sworn testimony was that no conclusions had been reached during her investigation of Bolick's complaint. (Lametta Dep. at p. 31). More specifically, she told Bolick that the allegations would be taken seriously and "taken further" via investigation. (Id.) Nevertheless, despite the numerous misrepresentations of the record (the above-described being

only examples), Bolick's harassment allegations against Bennett, even if true, clearly were neither severe nor pervasive in nature so as to rise to the level of an actionable hostile environment claim.

Second, while Bolick provides misleading descriptions of the facts presented to courts in decisions cited by her to substantiate her hostile environment claim, these judicial decisions actually support the Defendants' request for summary judgment. (MOL at pp. 17-23)  For example, she attempts to portray the denial of summary judgment in <u>Raniola v. Bratton</u>, 243 F.3d 610 (2d Cir. 2001) as being based on a similar fact pattern.  By emphasizing, for example, nonsexual conduct and "one threat of physical harm", she infers the case to be on point.  To the contrary, the <u>Raniola</u> court was faced with evidence of extreme, egregious <u>gender</u> based harassment occurring over a period of years, of pervasive, disparate treatment of women in general, coupled with overt sexual conduct which included the supervisor, a police captain, calling the plaintiff graphic, sexual names which this author opts not to even put into print.  He also wrote on the walls of the police station that plaintiff would perform sexual acts.  The "public threat" was a statement by the accused supervisor that he would shoot the plaintiff by "putting a hole in her", while referring to his gun.  The egregious and pervasive nature of the overtly sexual conduct, together with the gender based conduct, is on what the Second Circuit Court based its justifiable ruling, not the seemingly neutral conduct coupled with "one serious threat of harm" as Bolick contends.

Similarly, in <u>Holtz v. Rockefeller & Co., Inc.</u>, 258 F.3d 62 (2001), the alleged harassment included making <u>obscene leers</u> at plaintiff and trying to <u>look down her blouse and up her skirt</u>, for "months and months"—obviously overt and repeated sexual conduct.  <u>Id</u>. at 70-71.  In the same vein, all other judicial precedent relied on by Bolick, despite her characterizations, are strikingly distinguishable from the facts presented to this Court.  The type of conduct proffered here by Bolick,[8] irrespective of how she tries to characterize it as "constant", does not even approach the conduct

---

[8] See Defendants' Memorandum of Law at pp. 5-6.

28121v1                                          -5-

found not to be actionable by other courts. (MOL at pp. 19-23) Consequently, it is respectfully requested that Plaintiff's sexual harassment claims be dismissed.

### III. DEFENDANTS TOOK PROMPT, REMEDIAL ACTION

Defendants contend that the issues raised by Bolick in the Opposition Brief, pages 23 through 27, concerning the affirmative defense set forth in Faragher and Ellerth[9] have been sufficiently briefed to the Court. Only one principle needs to be highlighted here; that suggestion by Bolick that somehow Defendants did not comply with their obligations in response to her November 2000 complaint to Byler.

Contrary to her suggestion, courts have consistently held that employers need not conduct their investigations in the method espoused by the employee; employers need to ensure remedial action. See, e.g., O'Dell v. Trans World Entertainment Corp., 153 F. Supp. 2d 378, 389-90 (S.D.N.Y. 2001)(a case cited in the Opposition Brief). Indeed, Plaintiff conceded during deposition that Byler fashioned an appropriate remedy, and it was a later event which triggered the complaint to Human Resources. (Bolick Dep. at pp. 180, 182, 184, 194-95, 197, 371) After the Human Resource complaint in 2002, Bennett left the company. (Bolick Dep. at pp. 451-53, 458)

### IV. BOLICK'S ATTEMPT TO MAINTAIN HER RETALIATION CLAIMS IS BASED ON MISCHARACTERIZATIONS OF THE RECORD

Mischaracterizations of the record likewise abound in support of her retaliation claims. Illustrative of the blatant misrepresentations presented by Bolick in this regard are as follows:

(a) Byler's responsibilities changed, independent of Bolick's internal complaint. He was not demoted because the company perceived any improper action on his part. (Byler Dep. at pp. 107-08; Purkiss Dep. at p. 48);

(b) Bolick's own testimony, and her admissions set forth in her Rule 56(a)2 Statement, establish her satisfaction with how Byler addressed her November 2000 complaint. Indeed, she told

---

[9] Burlington Indus. v. Ellerth, 524 U.S. 742 (1998); Faragher v. City of Boca Raton, 524 U.S. 775 (1998).

Byler thereafter that the situation had become acceptable. (MOL at pp. 25-26; Defendants' Undisputed Statement of Facts at ¶¶ 31, 32; see also Byler Dep. at pp. 178-82; Bolick Dep. at pp. 180-82, 184-85, 371, 407);

    (c) Both female Vice Presidents, Bolick and Duncan, were offered the same stock options during their ANAC employment. (Byler Dep. at pp. 98-99, 198-99; See Exh. I to Opposition Brief);

    (d) Bolick fails to proffer any evidence to contradict that the northeast region was just another territory and her compensation was wholly unaffected by her territory assignment. (See Bolick admission to ¶ 70(f) of Defendants' Undisputed Statement of Facts: "Admit that assignment of regions did not affect Bolick or other Vice Presidents' compensation…". See also Bolick Dep. at pp. 440-42, 497; Byler Dep. at pp. 208-09);

    (e) Bolick asserts that Roe actually earned $100,000 in his prior employment. However, Roe had earned $100,000 in base salary alone, and was paid a bonus in addition thereto. Also, during his employment prior to that immediately preceding employment, he had earned $125,000 as a Vice President with supervisory functions (Exh. G(2) to Defendants' MOL);

    (f) Bolick fails to challenge Byler's testimony that even though the promotion discussions occurred before her January 2002 complaint, Byler could have retracted the promotion, and yet did not do so. (Byler Dep. at p. 186);

    (g) Bolick's reference to evidence of the "<u>numerous</u> exceptions" to the April promotion policy refers to non-existent testimony. (Lametta and Purkiss recalled only <u>one</u> exception in London. Lametta Dep. at p. 63; Purkiss Dep. at pp. 34-35);

    (h) the investigation of her retaliation complaint did not support her version of Byler's behavior toward her during a marketing department meeting as she contends. (Lametta Dep. at pp. 90, 125-26; Byler Dep. at pp. 164-65; Bolick Dep. at p. 547; Bolick Exh. 15, investigation notes[10]);

---

[10] Duncan said both parties acted unprofessionally. The other two interviewees made even more negative comments about Bolick. See Exh. 15 to Opposition Brief.

(i) her perception of the prior experience and qualifications of her Vice President counterparts has no basis in evidence, and is solely based on her unilateral opinion that because she was at ANAC longer, she should have been in a superior position. (Bolick Dep. at p. 558; Byler Dep. at pp. 56-58, 61-65, 193-98, 217; Beigen Aff., Exh. G to Defendants' MOL)[11];

(j) the Lametta reference to "end the relationship" as contained in an investigation note referred to *the reporting* relationship between Bolick and Byler due to Bolick's retaliation complaint; not to the employment relationship between Bolick and ANAC. (Bolick Exh. 18, Lametta notes at D0112-D0113) Moreover, it is critical to point out that ANAC did not terminate Bolick's employment relationship at that time;

(k) her initial claim that she was "functionally" demoted has now evolved into a claim she was "demoted", yet she provides no additional support therefor. Again, the evidence establishes she was promoted. (Bolick Dep. at pp. 258, 265, 432-33, 436-37, 472, 479, 557-58; Byler Dep. at p. 26, 208-09; 211; MOL at pp. 9-11; Exh. I); and

(l) she alleges her "salary continuation" was somehow "interrupted" or used as an "adverse action", yet proffers no evidence whatsoever to support any claim that despite the initial, internal confusion over policy in the company, Bolick received all salary continuation to which she was entitled. (Bolick Dep. at pp. 579-80; Lametta Dep. at pp. 138-41)

Again, these mischaracterizations are not the only ones—indeed, Bolick's entire effort to keep her claims alive relies on mischaracterizations and erroneous record cites. The record conclusively confirms that her position, compensation, and functions actually improved with her April 2002 promotion. Bolick claimed the "adverse actions" include her wanting an office instead of the cubicle she <u>always</u> occupied[12], and her assertion that she was not <u>elevated</u> in status, function

---

[11] Bolick's reference to her Exh. 10 simply refers to a document created by ANAC to market to clients, to sell its talent and services, and thus, is not evidence she is "more qualified".
[12] See Bolick Dep. at pp. 558-63 regarding the office space issues, including her admission that the other Vice Presidents had cubicles.

and[13] compensation over the other Vice Presidents. (See Defendants' MOL at pp. 29-33 for their discussion on the claimed adverse actions)  Irrespective of how she tries to downplay them now, these assertions underscore the absurdity of her claim of adverse action.  If one ignores the "red herring" language and recasting in her Opposition Brief, it is obvious that Bolick is actually suggesting she should have been placed into a <u>better position</u> after her complaint[14].  In fact, that is precisely what she told Lametta and CEO Goldberg during the investigation into her retaliation claims.  (Lametta Dep. at p. 99; Goldberg Dep. at pp. 49-50; Exh. J to Defendants' MOL)  Such an argument defies the applicable case law, and thus, should be flatly rejected by the Court.

### V.  BOLICK'S "UNDERSTANDING" OF THE BONUS POLICY CONTRADICTS THE RECORD

Bolick's purported understanding of ANAC's bonus program contradicts the evidence.  She contends that because the franchise of which she was a part had met its goals, its members should have been paid a bonus.  Bolick painstakingly describes her baseless opinion as to how the bonus program should have operated, but this description contradicts the company's own documents which establish that no employee in the <u>group</u> was entitled to be considered for a bonus unless all conditions prescribed therein had been met.  One of these conditions was that the entire <u>group</u> show a profit.  (Exh. F to Defendants' MOL; See also Purkiss Dep. at pp. 27-33; Byler Dep. at pp. 145-50)  It bears repeating that Bolick conceded during her deposition that the offer letter and attached Remuneration Policy were the sole bases for her "understanding" of bonus eligibility. (Bolick Dep. at pp. 113-14, 566).[15]    Consequently, her attempt to maintain any contract-based causes of action fails as a matter of law.

---

[13] Illustrative of additional erroneous record cites:  Bolick alleges Bennett "harassed" her for having a conversation with Lametta, citing to her Exh. 18, D0023 and Exh. 1 at 196.  Exh. 1 at 196 refers to testimony where no mention is made of harassment for speaking with Lametta.

[14] Such as requesting Bennett's position.  (Bolick Dep. at pp. 549-51: "I could be running the department"; Exh. J to Defendants' MOL).

[15] She also cannot contradict testimony by defense witnesses that the group failed to show a profit for 2001, and that no ANAC employees received a bonus.  (Bolick Dep. at pp. 113-14; Lametta Dep. at p. 96; Byler Dep. at pp. 145-50; Purkiss Dep. at pp. 27-33; Goldberg Dep. at p. 35)

## VI.   BOLICK'S EQUAL PAY ACT CLAIM IS BASED ON SPECULATION

Bolick's argument that ANAC violated the Equal Pay Act revolves around her personal opinion of her qualifications versus those of her counterparts, and her misrepresentations concerning the backgrounds of her counterparts. Although she claims it "strains credulity" to accept Byler's testimony as to his perception of their comparable skills, she provides no substantiation for why Byler's sworn testimony would be inadmissible or incredible. A reading of the Opposition Brief reveals that Bolick simply has no evidence to support her Equal Pay Act claim. All she offers is the fact that she had already been at ANAC for approximately one year before other Vice Presidents were hired, but ignores that she was not a college graduate and she had earned $30,000 less prior to her hire at ANAC.[16] (Bolick Dep. at pp. 83, 85-87) The Defendants, on the other hand, presented substantial evidence to refute her allegations. (Defendants' MOL at pp. 9-13, 30-31) Accordingly, her claim under the EPA should be dismissed.

## VII.   BOLICK DISTORTS TESTIMONY TO MAINTAIN HER CLAIMS AGAINST AGH

Finally, contradictory to Bolick's assertions, Purkiss did not provide any record of his having participated sufficiently in the events which are the subject of this suit to support any cause of action against AGH. (Purkiss Dep. at p. 62, confirming his "participation" was limited to merely being kept informed. See also Lametta Dep. at p. 101) Thus, it bears repeating that Plaintiff has failed to assert any factual bases for maintaining any cause of action against AGH, but rather, proffers only conclusory arguments as to AGH's liability.

---

[16] She makes the major concession that payment of Ms. Duncan's relocation expenses "cancels out the inequity with respect to the sign-on bonus", but cautions that these expenses do not "affect salary going forward". Yet, in fact, sign-on bonuses are one-time payments that likewise do not affect salary going forward, and Bolick also conveniently fails to mention those relocation expenses paid on her behalf upon her hire. (Bolick Dep. at pp. 108-09, 112-14; and Exh. F to Defendants' MOL)

## CONCLUSION

For the foregoing reasons, along with those reasons set forth in Defendants' initial Memorandum of Law in Support of their Motion for Summary Judgment, it is respectfully requested the Summary Judgment be granted as to the Complaint in its entirety.

**THE DEFENDANTS,
ALEA GROUP HOLDINGS, LTD.,
ALEA NORTH AMERICA COMPANY, AND
ROBERT D. BYLER**


By:_____
    Mary A. Gambardella
    Federal Bar No. #ct05386
    Epstein Becker & Green, P.C.
    One Landmark Square, Suite 1800
    Stamford, CT  06901-2601
    (203) 348-3737
            and
    Barry Asen
    Federal Bar #ct24527
    Counsel Pro Hac Vice
    Epstein Becker & Green, P.C.
    250 Park Avenue
    New York, New York  10177
    (212) 351-4500

## **CERTIFICATION**

The undersigned hereby certifies that a copy of the foregoing Reply to Plaintiff's Opposition to Defendants' Motion for Summary Judgment was mailed via regular mail, postage prepaid, to all counsel of record on the 16th day of March, 2004 as follows.

>Barbara Gardner, Esq.
>843 Main Street
>Suite 1-4
>Manchester, CT  06040
>*Counsel for the Plaintiff*
>
>Peter E. Gillespie, Esq.
>46 Riverside Avenue
>P.O. Box 3416
>Westport, CT 06880
>*Counsel for Defendant John Bennett*
>
>David L. Weissman, Esq.
>Saundra M. Yaklin, Esq.
>ReedSmith LLP
>559 Lexington Avenue, 29th FL.
>New York, NY 10022
>*Counsel Pro Hac Vice for Defendant John Bennett*

_____
Mary A. Gambardella