## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

LEIGH BOLICK,                        :
                                     :
                    Plaintiff,       :
                                     :       CIVIL ACTION NO.
        v.                           :       3:03 CV 165 (PCD)
                                     :
ALEA GROUP HOLDING, LTD., ALEA       :
NORTH AMERICA COMPANY, JOHN J.       :       FEBRUARY 12, 2004
BENNETT and ROBERT D. BYLER,         :
                                     :
                    Defendants.      :

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT BENNETT'S MOTION FOR SUMMARY JUDGMENT

Reed Smith LLP
599 Lexington Avenue, 29th Floor
New York, New York  10022
(212) 521-5400
Attorneys for Defendant
John Bennett

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................... 1

SUMMARY OF FACTS .............................................................................................. 2

POINT I ...................................................................................................................... 7
    SUMMARY JUDGMENT STANDARD ............................................................... 7

POINT II ..................................................................................................................... 8
    PLAINTIFF CANNOT ESTABLISH A *PRIMA FACIE* CASE FOR AIDING AND
    ABETTING RETAILATION.................................................................................. 8

        Plaintiff's November 9, 2000 Complaint Does Not Constitute ProtectedActivity ................ 10

        Plaintiff Cannot Establish That Bennett Knew About Her November 2000 Complaint ....... 13

        Plaintiff Cannot Establish That Bennett Took Part In Perpetrating An Actual Adverse
        Employment Action Against Her................................................................................ 15

        Plaintiff Cannot Establish A Causal Connection Between An Adverse  Employment Action
        And Any Protected Activity........................................................................................ 20

        Bennett Did Not Endorse or Otherwise Aid Any Employee In Retaliating Against
        Plaintiff.................................................................................................................... 22

        All Arguably Adverse Employment Decisions Were Made For Legitimate Business
        Reasons And Plaintiff Cannot Establish Pretext.......................................................... 23

POINT III .................................................................................................................. 24
    BENNETT SHOULD BE AWARDED FEES UNDER 28 U.S.C. § 1927 ............................. 24

CONCLUSION........................................................................................................... 26

NYUB-0209805.01-SVEYTSMA
February 12, 2004  6:28 PM

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| LEIGH BOLICK, | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION NO. |
| v. | : | 3:03 CV 165 (PCD) |
| ALEA GROUP HOLDING, LTD., ALEA NORTH AMERICA COMPANY, JOHN J. BENNETT and ROBERT D. BYLER, | : | FEBRUARY 12, 2004 |
| Defendants. | : | |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT BENNETT'S MOTION FOR SUMMARY JUDGMENT

### PRELIMINARY STATEMENT

Defendant John J. Bennett ("Bennett") is entitled to summary judgment on Plaintiff Leigh Bolick's ("Plaintiff") claim of aiding and abetting retaliation because Plaintiff cannot make out a *prima facie* case of retaliation, a necessary prerequisite for an aiding and abetting retaliation claim. Specifically, Plaintiff cannot demonstrate that she suffered an adverse employment action in retaliation for engaging in a protected activity. Moreover, even if Plaintiff could establish a claim for retaliation, she has not set forth any evidence to suggest that any of the alleged retaliatory conduct was ratified, endorsed or perpetrated by Bennett.

Furthermore, since the outset of this litigation, Plaintiff has known that she does not have a viable claim against Bennett. Bennett has repeatedly sought to have Plaintiff withdraw her claim against him. Plaintiff has refused. Consequently, Bennett requests that

Plaintiff be assessed the reasonable legal fees he has incurred in defending against Plaintiff's meritless claims.

## SUMMARY OF FACTS

In October 2000, Plaintiff began working for the Alea North America Company ("Alea") as an Assistant Vice President of Marketing. See Amended Complaint, dated April 4, 2003 ("Compl.") ¶ 7; Exhibit "A" (Bolick Dep.) at 112.[1] At this time, Plaintiff reported to Bennett, who held the position of Senior Vice President of Marketing. See Compl. ¶ 8. Bennett, in turn, reported to Defendant Robert D. Byler, Chief Executive Officer of Alea Alternate Risk ("Byler"). See Compl. ¶ 16. Prior to commencing her employment, Plaintiff requested that she be hired with the title of Vice President of Marketing. See Exhibit "A" (Bolick Dep.) at 112. Plaintiff's request was denied, and she was hired as an Assistant Vice President of Marketing. Id. The terms and conditions of Plaintiff's employment were stated in her offer letter, including the fact that the only person who could alter these terms and conditions was Dennis Purkiss. See Exhibit "B" (Employment Offer Letter).

During the weeks of October 16, 2000 and October 30, 2000, Plaintiff and Bennett went on two business trips together. See Compl. ¶ 10, 12. Plaintiff claims that during these business trips Bennett made certain allegedly offensive comments, including reminding her to bring workout clothes so that she could exercise in the health club in the hotel and discussing "drug parties." See Compl. ¶ 10-15.

Plaintiff claims that she complained to Byler about Bennett's conduct on November 6, 2000. See Compl. ¶¶ 16-17; Exhibit "C" (Byler Dep.) at 16. Plaintiff's November 2000

---

[1] All exhibits are annexed hereto.

complaint to Byler consisted of allegations that Bennett (1) drank too much on the airplane during one of the trips, (2) talked about a decorator he knew who threw a drug party, (3) reminded Plaintiff to bring workout clothes for the health spa at the hotel, (4) stood "too close" to Plaintiff, (5) on one occasion, put his arm around Plaintiff's shoulders while walking, and (6) asked Plaintiff whether she had discussed him with her husband. See Compl. ¶ 17; Exhibit "C" (Byler Dep.) at 18-21. Plaintiff requested that Byler not tell Bennett that she complained to him, so Byler kept the meeting confidential. See Exhibit "A" (Bolick Dep.) at 181-182; Exhibit "C" (Byler Dep.) at 22, 24, 32, 182. There are no allegations or indications that Bennett knew about this complaint before Plaintiff commenced the instant action. In fact, Plaintiff herself testified that she did not know if Bennett was aware of her complaint to Byler. See Exhibit "A" (Bolick Dep.) at 391, 598.

In August 2001, Bennett recommended Plaintiff for a raise and a promotion to Vice President of Marketing. See Exhibit "D" (Bennett Dep.) at 36-37. Plaintiff received both a $15,000 raise and the promotion. See Exhibit "A" (Bolick Dep.) at 558.

After their October 2000 trips, Plaintiff and Bennett did not travel together until December 2001. See Compl. ¶ 18. During the eleven months between October 2000 and December 2001, Plaintiff and Bennett did not work together, traveled on alternate weeks and saw each other only rarely, as little as twice a month. See Exhibit "A" (Bolick Dep.) at 360-362. In December 2001, Bennett and Plaintiff went on another business trip, at which time Plaintiff again claims to have been offended by comments Bennett allegedly made. See Compl. ¶¶ 22-23.

Plaintiff also claims that on January 9, 2002, Bennett told her that another Vice President would be hired and that Plaintiff would no longer be his "right hand man." See Compl. ¶ 26. It is not disputed that Bennett did not have the authority to alter Plaintiff's job duties. See Exhibit "C" (Byler Dep.) at 222.

Plaintiff complained to Alea's Human Resources Department ("Human Resources") on January 10, 2002. See Compl. ¶ 27. Immediately upon receiving Plaintiff's complaint, Alea began an investigation. See Exhibit "E" (Lametta Dep.) at 33. Neither Bennett nor Plaintiff came to work during the investigation. See Exhibit "C" (Byler Dep.) at 201. Plaintiff voluntarily stayed home during this investigation because she felt uncomfortable with the situation. See id. at 86-87, 201. On January 31, 2002, while the investigation was pending and before any determination was made regarding Plaintiff's allegations, Bennett voluntarily resigned from Alea. See id. at 202. From the time Plaintiff complained to Human Resources until the depositions in the instant lawsuit, Plaintiff and Bennett have not been in contact with each other, nor have they seen each other. See Exhibit "A" (Bolick Dep.) at 594.

Plaintiff does not allege that Bennett was involved in any actions against her after she complained to Human Resources. Indeed, Plaintiff has testified that Bennett has not retaliated against her in any way after he left Alea's employ. See id. at 461.

In May and June of 2002, several months after Bennett left Alea, Plaintiff complained to Human Resources that she was being retaliated against by Defendant Byler. See Exhibit "C" (Byler Dep.) at 133. Specifically, Plaintiff complained about (1) a delay in her raise and promotion, the hiring of new vice presidents, (2) Byler's allegedly being rude to Plaintiff, (3)

-4-

Plaintiff's not getting Bennett's old office, (4) the way Alea split up responsibility based on territory, (5) not being sent to a conference, and (6) not receiving a bonus for the year 2001. See Exhibit "E" (Lametta Dep.) at 55-56; Compl. ¶ 39. Plaintiff does not allege that Bennett took part in any of these alleged retaliatory acts.

On July 15, 2003, Alea terminated Plaintiff's employment because Plaintiff had been on medical leave since September 16, 2002 and her leave time had expired on January 7, 2003, and it was discovered that Plaintiff had misrepresented her marital status to fraudulently obtain group medical and dental coverage for her ex-husband. See Exhibit "F" (Termination Letter).

Plaintiff commenced the instant action on January 24, 2003, alleging that Bennett aided and abetted discrimination/harassment and aided and abetted retaliation. See Complaint, dated January 24, 2003, ¶¶ 40-47. On May 1, 2003, Bennett moved this Court to dismiss all counts against him. See Motion to Dismiss Plaintiff's Complaint as to Defendant Bennett, dated May 1, 2003. On July 30, 2003, this Court dismissed all claims against Bennett, except for the single remaining claim of aiding and abetting retaliation. See Order of the Honorable Peter C. Dorsey on Bennett's Motion to Dismiss Counts One and Two of the Complaint, dated July 30, 2003.

Early in the litigation, Bennett told Plaintiff that there was no basis for her claim against him. See Affidavit of Cindy Schmitt Minniti, sworn to on February 12, 2004 ("Minniti Aff.") ¶ 4-5, submitted herewith. Bennett later asked Plaintiff to withdraw her claims against Bennett. When Plaintiff refused, Bennett informed her that he would seek

legal costs and fees if she did not release him from the case, as her claim against him has no merit. See id.

In October 2003, Plaintiff herself contacted Bennett directly and offered to drop her claim against him if he would testify in support of her claims against Alea. See Exhibit "D" (Bennett Dep.) at 92-94. Plaintiff told Bennett that if he did not give the demanded testimony and the case went forward, allegations would be revealed to his wife and employers, and that this would "ruin [his] life." See id. Despite this thinly veiled threat, Bennett told Plaintiff he could only tell the truth. See id.

Plaintiff cannot establish her claim against Bennett for aiding and abetting retaliation. Accordingly, Bennett should be granted summary judgment. In addition, Plaintiff has pursued her claim against Bennett in bad faith, therefore Bennett should be awarded his legal fees.

-6-

## ARGUMENT

## POINT I

## SUMMARY JUDGMENT STANDARD

A motion for summary judgment must be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Although the moving party bears the initial burden of showing that there is no genuine issue of material fact, once that burden has been met, the non-moving party cannot rely on conclusory allegations or speculations, but must set forth "specific facts indicating that a genuine issue of fact exists" to defeat the motion for summary judgment. Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." Bickerstaff v. Vassar College, 196 F.3d 435, 452 (2d Cir. 1999), cert. denied, 530 U.S. 1242 (2000).

In discrimination cases, plaintiff has the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against her. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133 (2000). Accordingly, summary judgment in favor of defendant must be granted if, based on the evidence presented, no reasonable trier of fact could conclude that discrimination was a determinative factor in defendant's actions. Schnabel v. Abramson, 232 F.2d 83, 91 (2d Cir. 2000). Here, the undisputed evidence shows that Bennett did not aid or abet retaliation. There is no evidence whatsoever to support Plaintiff's

claims against Bennett.  Accordingly, Bennett is entitled to summary judgment under Federal Rule of Civil Procedure 56(b).

## POINT II

### PLAINTIFF CANNOT ESTABLISH A *PRIMA FACIE* CASE FOR AIDING AND ABETTING RETALIATION

Plaintiff has offered absolutely no evidence to establish a *prima facie* case of aiding and abetting retaliation against Bennett.  Accordingly, the single claim remaining against Bennett should be dismissed.

The Connecticut Fair Employment Practices Act ("CFEPA") § 46a-60(a)(5) provides that "[i]t shall be a discriminatory practice in violation of this section ... [f]or any person, whether an employer or employee or not, to aid, abet, incite, compel or coerce the doing of any act declared to be a discriminatory employment practice..." In order to state a claim for aiding and abetting retaliation under Connecticut law, Plaintiff must show that Bennett's actions "ratified, endorsed, and perpetrated" another employee's conduct.  See Tyszka v. Edward McMahon Agency, 188 F. Supp. 2d 186, 195 (D. Conn. 2001).  Specifically, Plaintiff must show that Bennett endorsed or otherwise aided another employee in retaliating against her.  At the outset, Plaintiff must establish a claim of retaliation and then she must establish that Bennett was involved in perpetrating this retaliation.

In order to show that Plaintiff was retaliated against, she must first meet the threshold test set forth in Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 270-272 (2001).  In Breeden, the Supreme Court held that in order for a sexual harassment complaint to be the basis of a retaliation claim, the underlying complaint of sexual harassment must be

-8-

"objectively" offensive. 532 U.S. at 270-272 (2001). In <u>Breeden</u>, plaintiff complained that she was sexually harassed when her supervisor and another employee made a sexually explicit joke. <u>Id.</u> She further complained that she was retaliated against for her complaint of sexual harassment. <u>See id.</u> at 269-270. The Supreme Court held that the plaintiff in <u>Breeden</u> could not maintain her retaliation claim because "no one could reasonably believe that the incident recounted above violated Title VII." <u>See id.</u> at 270.

Prior to determining if Plaintiff can establish a *prima facie* case, Plaintiff must prove that the conduct complained of (i.e. the underlying harassment) would objectively be viewed as sexual harassment by a reasonable person. <u>See id.</u> at 271. A reasonable person could not view the conduct Plaintiff complained about as sexual harassment. Even if it is assumed that everything in Plaintiff's complaint was true, when viewed either individually or collectively, a reasonable person could not find behavior, such as an employee: (1) on one occasion, drinking too much on an airplane; (2) engaging another employee in conversations regarding drugs; (3) reminding an employee to bring workout clothes so that she could use the health club at the hotel on a business trip; (4) standing "too close" while talking, although not saying anything of a sexual nature; (5) on one occasion, putting his arm around another employee's shoulders while walking; and/or (6) asking an employee whether she discussed him with her husband, to be sexual harassment. <u>See</u> Compl. ¶ 17; Exhibit "C" (Byler Dep.) at 18-21. Thus, under <u>Breeden</u>, Plaintiff cannot succeed on a retaliation claim stemming from such complaints.

Assuming that Plaintiff can survive the threshold test, she must establish a *prima facie* case of retaliation. Specifically, she must prove that (1) she participated in a protected activity; (2) the Defendant was aware that she participated in a protected activity; (3) she

-9-

suffered an adverse employment action; and (4) there is a causal connection between the protected activity and the adverse employment action. <u>Wanamaker v. Columbian Rope Co.</u>, 108 F.3d 462, 465 (2d Cir 1997); <u>Levy v. Comm. on Human Rights and Opportunities</u>, 236 Conn. 96, 103 (1996) (Connecticut looks to federal precedent in enforcing its own anti-discrimination statute); <u>Newtown v. Shell Oil Co.</u>, 52 F. Supp. 2d 366, 374 (D. Conn. 1999) (applying federal precedent to Connecticut retaliation claim).

Even if Plaintiff could establish a *prima facie* case, she would still be defeated if Defendants can "articulate a legitimate non-discriminatory reason" for their adverse employment actions and Plaintiff cannot show that the proffered reason is pretextual. <u>See</u> <u>McDonnell Douglas v. Green</u>, 411 U.S. 792 (1973); <u>Jetter v. Knothe Corp.</u>, 324 F.3d 73, 75-76 (2d Cir. 2003).

Finally, even if Plaintiff were able to establish a *prima facie* case for retaliation, she still has not set forth one piece of evidence to show that Bennett in any way aided or endorsed such retaliation. Accordingly, her claim of aiding and abetting retaliation against Bennett cannot survive.

**A.   Plaintiff's November 9, 2000 Complaint Does Not Constitute Protected Activity.**

An indispensable element of a *prima facie* retaliation case is that an employee must establish that he or she participated in a protected activity. <u>See</u> <u>Wimmer v. Suffolk County Police Dep't</u>, 176 F.3d 125, 135 (2d Cir. 1999). As the Second Circuit made clear in <u>Wimmer</u>, there can be no retaliation claim where an act is done in response to an employee's "opposition [which] was not directed at an unlawful employment practice of his employer." <u>See</u> <u>id.</u>; <u>see also</u> <u>Cruz v. Coach Stores, Inc.</u>, 202 F.3d 560, 566 (2d Cir. 2000) ("The term

-10-

'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination.").

There are two incidents which Plaintiff could conceivably assert to be a "protected activity." The first is Plaintiff's complaint to Byler on November 6, 2000 about Bennett's conduct during the two October 2000 business trips. See Compl. ¶ 14. At this meeting Plaintiff complained that Bennett (1) drank too much on the airplane during one of the trips, (2) talked about a decorator he knew who threw a drug party[2], (3) reminded Plaintiff to bring workout clothes for the health spa at the hotel, (4) stood "too close" to Plaintiff, (5) on one occasion, put his arm around Plaintiff's shoulders while walking, and (6) asked Plaintiff whether she had discussed him with her husband. See Compl. ¶ 17; Exhibit "C" (Byler Dep.) at 18-21. Even if everything Plaintiff alleges is true, her November 2000 meeting with Byler does not constitute a protected activity.

Plaintiff brings her aiding and abetting retaliation claim under CFEPA § 46a-60, which clearly states that "'Sexual harassment' shall, for the purposes of this section, be defined as any unwelcome *sexual* advances or requests for *sexual* favors or any conduct of a *sexual* nature..." See CFEPA § 46a-60(a)(8) (emphasis added). In her November 2000 complaint to Byler, the only actions Plaintiff complained of were nonsexual in nature. Plaintiff never alleges that Bennett made any sexual requests or advances. See Exhibit "A" (Bolick Dep.) at 296-297. Rather, Plaintiff readily admits that Bennett never made any sexual demands, nor did he ever say that he wanted to be intimate with her. Id.

_____

2 While discussions of drug use would not constitute illegal harassment, it is worth noting that Plaintiff admits that she has no knowledge of Bennett actually doing drugs, and that Bennett never asked her to do drugs with him. See Exhibit "A" (Bolick Dep.) at 328, 330.

-11-

Notably, Plaintiff herself admits that at the time she complained to Byler she *did not* think that she was being sexually harassed. See id. at 304-321. Specifically, Plaintiff's complaint regarding Bennett's reminder to bring workout clothes cannot be a complaint of sexual harassment, because Plaintiff admits that she did not view this reminder as sexual harassment. See id. at 304. Plaintiff further testified that she knew Bennett worked out on other business trips. See id. at 173. Plaintiff's next complaint that Bennett stood "too close" to her also cannot be a complaint of sexual harassment. Plaintiff admits that she does not recall Bennett saying or doing anything of a sexual nature when he stood "too close" to her. See id. at 320. The remaining four complained of acts - talking about a drug party, drinking on the plane, putting his arm on her shoulder while walking, and asking whether she discussed him with her husband - are similarly nonsexual in nature. In short, there is absolutely nothing demonstrated or alleged to suggest any sexual impropriety on Bennett's part, a necessary element for the complaint to be considered a protected activity.

In order for Plaintiff to establish that she participated in a protected activity, she must demonstrate that "she possessed a 'good faith, reasonable belief that the [complained of] employment practice was unlawful' under the statute." Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., 126 F.3d 276, 292 (2d Cir. 1998); see also Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons, 842 F.2d 590, 595 (2d Cir. 1988) ("To prove that he engaged in protected activity, ... the plaintiff must demonstrate a good faith, reasonable belief that the underlying challenged actions of the employer violated the law."). The reasonableness of Plaintiff's belief is to be assessed in light of the "totality of the circumstances." See Galdieri-Ambrosini, 126 F.3d at 292. In Galdieri-Ambrosini, the Second Circuit held that even where a plaintiff "genuinely believed herself to be the victim of discrimination on the basis of her

-12-

gender," a complaint based on this genuine belief is not protected activity if the belief is not reasonable. Id. In the instant case, Plaintiff cannot argue that she had a reasonable belief that her complaints were regarding a violation of CFEPA § 46a-60 because Plaintiff *admits* that she did not believe that she had been sexually harassed at the time she complained to Byler. See Exhibit "A" (Bolick Dep.) at 320. Since Plaintiff's November 2000 complaint did not allege sexual harassment, or any other "statutorily prohibited discrimination," this complaint cannot constitute a protected activity.

Even if Plaintiff were to argue, contrary to her testimony, that at the time she complained to Byler, she believed she was being sexually harassed, her complaint would still not constitute protected activity because, as discussed on pages 9-10 above, such a belief is not objectively reasonable. Accordingly, Plaintiff's November 2000 complaint to Byler cannot, as a matter of law, constitute a protected activity.

Plaintiff also complained to Human Resources on January 10, 2002. See Compl. ¶ 27. For purposes of this motion, Bennett does not contest that this complaint to Human Resources constitutes a protected activity.

**B.    Plaintiff Cannot Establish That Bennett Knew About Her November 2000 Complaint.**

Even if Plaintiff could establish that the November 2000 complaint to Byler was a protected activity, Plaintiff must then demonstrate that Bennett knew about this protected activity. See Collins v. N.Y. City Transit Auth., 305 F.3d 113, 118 (2d Cir. 2002) ("To make out a prima facie case of retaliation, an employee must show that the employee was engaged in protected activity [and] that the employer was aware of that activity..."); Legnani v. Alitalia Linee Aeree Italiane, S.P.A., 1999 U.S. App. LEXIS 3832 (March 9, 1999 2d Cir.)

-13-

(Demotion could not be retaliation if demoting supervisor did not know of the protected activity); Montanile v. National Broadcast Co., 211 F. Supp. 2d 481, 488 (S.D.N.Y. 2002) (Retaliation claim dismissed where supervisor did not know of complaint when she terminated plaintiff).

Assuming that the November 2000 complaint constituted a protected activity, Plaintiff would still fail to state a claim for aiding and abetting retaliation because Plaintiff never alleges, nor is there any evidence to suggest, that Bennett knew of this complaint. On the contrary, Plaintiff testified that she had no evidence to indicate that Bennett was aware of her initial complaint to Byler. See Exhibit "A" (Bolick Dep.) at 391, 598. Indeed, Bennett's uncontraverted testimony confirms that he was unaware of Plaintiff's November 2000 complaint to Byler. See Exhibit "D" (Bennett Dep.) at 55. Thus, for the period of time for which Plaintiff alleges Bennett retaliated against her, Bennett did not know that Plaintiff complained about him.

While Bennett did know about Plaintiff's January 2002 complaint, Bennett did not return to work after learning of this complaint. See Exhibit "C" (Byler Dep.) at 202. Bennett stayed home during the investigation and resigned from Alea while the investigation was pending. See id. Plaintiff testified that Bennett was not involved in any retaliation against her after he resigned from Alea. See Exhibit "A" (Bolick Dep.) at 461. Accordingly, Bennett's knowledge of the January 10, 2002 complaint is of no consequence, since Plaintiff herself has stated that Bennett took no part in retaliating against her after this date. See id.

-14-

**C.    Plaintiff Cannot Establish That Bennett Took Part In Perpetrating An Actual Adverse Employment Action Against Her.**

Plaintiff cannot establish that Bennett was involved in subjecting her to an actual adverse employment action.  In determining whether an adverse action has occurred, the Second Circuit has recognized that "not every unpleasant matter ... creates a cause of action" for retaliation.  See Wanamaker, 108 F.3d 466; see also Brown v. Coach Stores, Inc., 163 F.3d 706, 710 (2d Cir. 1998); Valentine v. Standard & Poor's, 50 F. Supp. 2d 262, 284 (S.D.N.Y.1999) ("[N]ot everything that makes an employee unhappy is an actionable adverse action.").

The same holds true for retaliation under the CFEPA.  See Distasi v. Sikorsky Aircraft Corp., 1999 U.S. Dist. LEXIS 18941 at *13 (Nov. 29, 1999 D. Conn.) ("Mere utterances which engender hurt feelings are not covered by the antidiscrimination statutes ... The fact that [a defendant engaged in] cursing at Plaintiff, giving him extra work assignments, and threatening to send him back to O'Connell's supervision [is] insufficient to bring the case under the retaliation doctrines of ... Section 46a-60(a)(4).").

An adverse employment action occurs when a plaintiff sustains "a materially adverse change" in the terms and conditions of employment.  Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000).  A "materially adverse change" might occur in the context of "a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation."  Galabya, 202 F.3d at 640.  Plaintiff did not suffer an adverse employment action.

-15-

Plaintiff has not alleged, nor can she prove, that Bennett took any adverse action toward her or that he aided or abetted anyone else in taking any adverse action toward her. On the contrary, after Plaintiff complained to Byler about Bennett, Bennett recommended Plaintiff for a raise and a promotion, both of which Plaintiff received.  See Exhibit "A" (Bolick Dep.) at 558; Exhibit "D" (Bennett Dep.) at 37.

Plaintiff's January 10, 2002 complaint to Human Resources, made just before Bennett left Alea, is the only protected activity that Plaintiff engaged in during Bennett's employment.  Plaintiff does not allege that Bennett took any actions against her or aided anyone else in taking any actions against her after she made this complaint.  In fact, Plaintiff clearly testified that Bennett *did not retaliate* against her after he left the Company:

> **Question**:  Do you allege that [Bennett] retaliated against you, after he left the company?
>
> **Answer**:  Not after he left the company.

See Exhibit "A" (Bolick Dep.) at 461.

While it is unclear which allegedly retaliatory acts Plaintiff feels Bennett participated in, her claim against Bennett fails under any of the alleged acts.

### 1.    Alleged Delay In Raise and Promotion

Plaintiff was promoted to Vice President of Marketing in April 2002.  See Compl. ¶ 33.  Along with her promotion, she received a $15,000 raise.  See Exhibit "A" (Bolick Dep.) at 558.  To the extent that Plaintiff is claiming that she did not timely receive her raise and promotion in retaliation for complaining about Bennett, Plaintiff cannot succeed with this claim against Bennett.  Plaintiff testified that Bennett did not have decision making

-16-

authority with respect to the terms of her employment.  See id. at 415.  Indeed, Plaintiff's

employment offer letter clearly states that the only person who could change the terms and

conditions of Plaintiff's employment was Dennis Purkiss.  See Exhibit "B" (Employment

Offer Letter).

Moreover, Plaintiff does not allege that Bennett aided or encouraged the alleged delay

in approving her raise.  In fact, Plaintiff admitted that she believed Bennett did not even

know about this delay:

> **Question**: Okay.  You're alleging, I take it, that your not getting a raise in August was retaliation by John Bennett against you, is that your allegation?
>
> **Answer**:  No, not particularly, because I don't think he knew I wasn't getting it.

See Exhibit "A" (Bolick Dep.) at 402.

Even if Plaintiff were to incorrectly claim that Bennett was somehow responsible for

the alleged delay in her promotion and raise, a claim for which there is no evidence

whatsoever, such a delay is not an adverse employment action.  A mere allegation that a

plaintiff should have gotten a promotion sooner is not enough to establish an adverse

employment action, particularly where the plaintiff actually received the promotion.  See

Shabat v. Blue Cross Blue Shield of the Rochester Area, 925 F. Supp. 977, 987-88

(W.D.N.Y. 1996).  Notably, Plaintiff was complaining about not having a Vice President title

long before her complaint about Bennett, and even before she was hired by Alea.  See

Exhibit "A" (Bolick Dep.) at 112.  There is no evidence to support a claim that Bennett was

in any way responsible for any delay in Plaintiff's promotion.  To the contrary, the evidence

shows that Bennett recommended Plaintiff for the raise and promotion in August, very early

-17-

in the process.  See Exhibit "D" (Bennett Dep.) at 36-37; Exhibit "G" (Purkiss Dep.) at 34-38.  According to Alea's policy, all promotions and raises are given on April 1st of each year.  See id. at 34.  Pursuant to Alea's policy, Plaintiff received her promotion and raise on April 1, 2002.

2.     Hiring of New Vice Presidents

To the extent Plaintiff alleges that Alea's hiring of new Vice Presidents without her interviewing them was a retaliatory act, this claim also fails.  Plaintiff admits that she knew Alea was going to hire additional employees *before* her January 10, 2002 complaint to Human Resources.  See Exhibit "A" (Bolick Dep.) at 432.  In fact, Plaintiff interviewed Sandra Duncan, a candidate for a Vice President position, prior to her complaint to Human Resources.  See Exhibit "C" (Byler Dep.) at 185; Exhibit "A" (Bolick Dep.) at 433.  Indeed, Plaintiff knew before she was hired that Alea was a "start-up" company and that new personnel would be hired on all levels.  See Exhibit "A" (Bolick Dep.) at 157-158.  Plaintiff admits that hiring these individuals was not in itself retaliatory.  See id. at 434.  Rather, Plaintiff's concern seems to be that Jeffrey Alexander and Scott Roe were hired as Vice Presidents in Marketing, without her having the opportunity to interview them.  However, Plaintiff does not dispute that these individuals were interviewed at a time when Plaintiff, at her own request, was not working.  See Exhibit "C" (Byler Dep.) at 83, 201.  Plaintiff also cannot dispute that Alea had a legitimate business interest in continuing its recruiting and growth despite Plaintiff's absence from the office.  Furthermore, Plaintiff admits that when she was present in the office, she was given the opportunity to interview candidates.  See Exhibit "A" (Bolick Dep.) at 433.

-18-

In any event, this claim cannot be deemed retaliation involving Bennett, because he was not even employed by Alea when Jeffrey Alexander and Scott Roe were hired. <u>See</u> Exhibit "C" (Byler Dep.) at 56; Exhibit "A" (Bolick Dep.) at 486. Scott Roe was hired in April 2002 and Jeffrey Alexander was hired in March 2002. <u>See</u> Exhibit "C" (Byler Dep.) at 56; Exhibit "A" (Bolick Dep.) at 486. Bennett resigned on January 31, 2002, two to three months before these individuals were hired. <u>See</u> Exhibit "C" (Byler Dep.) at 113. Plaintiff cannot prove that the hiring of Scott Roe and Jeffrey Alexander without her interviewing them is retaliation attributable to Bennett.

3.    <u>Bennett's January 9, 2002 Comments</u>

Plaintiff complains that, on January 9, 2002, Bennett allegedly informed her that another Vice President was going to be hired and that Plaintiff would not be performing certain duties. <u>See</u> Compl. ¶ 26. Specifically, Plaintiff complains that Bennett stated that Plaintiff would no longer be his "right hand man." <u>See</u> <u>id.</u> As stated above, Plaintiff knew that new Vice Presidents would be hired throughout her employment. <u>See</u> Exhibit "A" (Bolick Dep.) at 157-159. In fact, Plaintiff interviewed Sandra Duncan for a Vice President position in December 2001, before this alleged comment by Bennett. <u>See</u> Exhibit "C" (Byler Dep.) at 185; Exhibit "A" (Bolick Dep.) at 433. In addition, as Plaintiff knew, Bennett had no control over assignment of Plaintiff's duties. <u>See</u> Exhibit "C" (Byler Dep.) at 222; Exhibit "B" (Employment Offer Letter). Bennett's comment cannot constitute actionable retaliation because Bennett did not take any actual action or ask anybody else to take any action. Indeed, Byler has specifically testified that Bennett never asked him to take away any of Plaintiff's job responsibilities. <u>See</u> Exhibit "C" (Byler Dep.) at 210-211. In fact, Plaintiff

-19-

*never* suffered any diminution in job responsibilities, but rather was promoted to the position of Vice President. See id. at 208.

Finally, the alleged statement regarding the new Vice Presidents cannot be retaliation for Plaintiff's complaint to Alea since it predates the complaint. See Compl. ¶¶ 26-27.

### 4.    Plaintiff's Additional Complaints

All of Plaintiff's additional complaints, including her complaint that she was not given Bennett's office after Bennett left the company, did not receive a bonus for the year 2001, was not sent to a certain conference, and Alea's transition to a territory-based marketing approach, do not involve Bennett. See Compl. ¶¶ 31, 34, 41. All of these alleged actions occurred after Bennett left Alea, and there is nothing alleged or demonstrated to suggest that Bennett had anything to do with any of these decisions. Moreover, none of these alleged actions are changes to the terms and conditions of Plaintiff's employment, and therefore cannot rise to the level of adverse employment actions. As such, none of Plaintiff's remaining allegations can possibly support a claim that Bennett aided and abetted retaliation.

### D.    Plaintiff Cannot Establish A Causal Connection Between An Adverse Employment Action And Any Protected Activity.

Next, Plaintiff must establish a causal connection between the protected activity and the adverse employment action. See Tomka v. Seiler Corp., 66 F.3d 1295, 1308 (2d Cir. 1995) ("In order to make out a prima facie case of retaliation, a plaintiff must show ... a causal connection between the protected activity and the adverse employment action."). The Second Circuit has held that "[p]roof of a causal connection can be established 'directly through evidence of retaliatory animus directed against the plaintiff,' or 'indirectly by

-20-

showing that the protected activity was followed closely by the discriminatory treatment.'"

Richardson v. New York State Dep't of Correctional Serv., 180 F.3d 426, 447 (2d Cir. 1999).

In the instant matter, Plaintiff has not set forth any evidence to suggest that any Defendant acted with retaliatory animus. Therefore, in order to prove the causal connection element of her *prima facie* case, Plaintiff must establish that the protected activity was followed closely by the adverse employment action. In this case, Plaintiff's protected activity occurred on January 10, 2002. See Compl. ¶ 24. Plaintiff does not allege any adverse employment action involving Bennett after January 10, 2002. In fact, Bennett resigned on January 31, 2002 and Plaintiff admits that he did not retaliate against her after he left Alea's employ. See Exhibit "C" (Bolick Dep.) at 416. Accordingly, Plaintiff cannot establish this element of her *prima facie* case.

If this Court were to find that Plaintiff's complaint to Byler in November 2000 was a protected activity, Plaintiff still could not establish that any alleged adverse employment actions attributed to Bennett were casually connected. This is especially true because Bennett was not aware of Plaintiff's November 2000 complaint. See Exhibit "D" (Bennett Dep.) at 55-56. Plaintiff cannot show that any actions taken by Bennett were in response to a complaint of which he had no knowledge.

In addition, none of the adverse actions Plaintiff complains of were close in time to her November 2000 complaint. The alleged adverse employment actions - that she did not timely receive her promotion, the hiring of new Vice Presidents, and Bennett's comment about hiring new Vice Presidents – occurred, at the earliest, nine months after she made her complaint, and at the latest, seventeen months after her complaint. The intervening period

-21-

between Plaintiff's alleged protected activity and the alleged retaliation is too temporally remote to support a retaliation claim. Although there is no bright line distinction for how close in time an adverse action must be to the protected activity, courts have held far less time to be insufficient. See, e.g., Breeden, 532 U.S. at 273 (citing with approval cases dismissing retaliation claims where there were three and four month periods between protected activity and adverse employment action, noting the temporal proximity must be "very close"); Hollander v. American Cyanamid Co., 895 F.2d 80, 85 (2d Cir. 1990) (period of three months between the protected act and the adverse act is insufficient to make out a *prima facie* case); Cooper v. Morgenthau, 2001 U.S. Dist. LEXIS 10904 at *26 (S.D.N.Y. July 31, 2001) (dismissing retaliation claim where adverse action occurred seven months after protected activity). The actions Plaintiff complains of, even if they are assumed to be adverse, are too remote in time to establish a causal connection. Plaintiff has offered no evidence to support this final element of a *prima facie* retaliation case, and accordingly her claim against Bennett necessarily fails.

### E.    Bennett Did Not Endorse or Otherwise Aid Any Employee In Retaliating Against Plaintiff.

Plaintiff does not allege, nor has she set forth any evidence to support a claim that Bennett, "ratified, endorsed [or] perpetrated" any alleged retaliation, as she must do to prevail on her claim against him. Tyszka, 188 F. Supp. 2d at 195. See CFEPA § 46a-60(a)(5). As set forth more fully above, Bennett was not employed when the two Vice Presidents were hired. Moreover, he did not have the authority to alter the terms and conditions of Plaintiff's employment. See Exhibit "C" (Byler Dep.) at 222. The uncontraverted testimony has been that Bennett *never* recommended or requested that Plaintiff's job duties be altered or reduced. See id. at 210-211. In fact, Bennett and Byler

-22-

have not spoken with each other since Bennett resigned from Alea. See id. at 83. Plaintiff has not offered any evidence to suggest that any of the alleged retaliatory actions were done at the behest of Bennett. Clearly, Plaintiff cannot prevail on her claim that Bennett aided and abetted retaliation, and this claim should be dismissed.

**F.    All Arguably Adverse Employment Decisions Were Made For Legitimate Business Reasons And Plaintiff Cannot Establish Pretext.**

Finally, even if Plaintiff could establish a *prima facie* case of retaliation and if she could additionally establish that Bennett somehow coerced this retaliation, her claim against Bennett would still fail since, as noted above, Alea had legitimate business reasons for all the actions Plaintiff now complains. Specifically, Alea had a policy in place, applicable to all employees, stating that raises and promotions were to be made in April. See Exhibit "G" (Purkiss Dep.) at 34. Regardless of how early Bennett recommended Plaintiff for a raise and promotion, Alea's non-discriminatory policy was to implement all proposed raises and promotions in April. Id. Additionally, Alea was a "start-up" company. Plaintiff knew at the time she was hired that other employees would be hired as the company grew. See Exhibit "A" (Bolick Dep.) at 157-159. Alea hired other employees for business reasons, which were known to Plaintiff as early as her hiring. Id. Alea had legitimate nondiscriminatory reasons for all of the complained about actions, and Plaintiff cannot establish, nor does she even allege, that they are pretextual.

-23-

## POINT III

### BENNETT SHOULD BE
### AWARDED FEES UNDER 28 U.S.C. § 1927

28 U.S.C. § 1927 provides that "[a]ny attorney … who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."

At the outset of this litigation, Bennett outlined the shortcomings of Plaintiff's aiding and abetting retaliation claim against him. See Motion to Dismiss Plaintiff's Complaint as to Defendant Bennett, dated May 1, 2003. In Bennett's Motion to Dismiss, there was a thorough discussion of the standard needed to establish a *prima facie* case for the claim against him, as well as the lack of evidence to support such a claim. See id. As of date of the Motion to Dismiss and this Court's decision thereon, Plaintiff was aware that she could not possibly prevail on an aiding and abetting retaliation claim against Bennett. Moreover, as the evidence was presented through discovery, it became apparent that there was no viable cause of action against Bennett. Throughout the litigation, Bennett asked Plaintiff to release him from the case, explaining that Plaintiff's claims against him were completely meritless. See Minniti Aff. ¶ 4-5. Bennett further advised Plaintiff that he would seek attorneys' fees and costs if she insisted on maintaining this meritless claim against him. See id. Plaintiff refused to release Bennett from this litigation. See id.

Plaintiff does not allege *any* facts to support her claim against Bennett, as such there is no good faith reason for Plaintiff to have maintained this action against him. Bennett is sued in his individual capacity and has been represented throughout this litigation by his own

-24-

attorney.  Plaintiff's steadfast refusal to release Bennett from this case, especially after the evidence showed that there was no merit to any claim against him, has unnecessarily multiplied this proceeding.  As a result, Bennett should be awarded costs and legal fees.

Furthermore, Plaintiff herself contacted Bennett directly prior to his deposition in this action and offered to release Bennett from the case if he would give testimony in support of Plaintiff's case against Alea.  See Exhibit "D" (Bennett Dep.) at 92-94.  Plaintiff threatened that if Bennett did not comply with her "request," allegations would be revealed to his wife and current employers and his life would be "ruined."  See id.  Bennett told Plaintiff he could only tell the truth.  See id.  Plaintiff's thinly veiled threat in an attempt to coerce Bennett into giving favorable testimony, is evidence of her bad faith.

Where litigation is conducted in bad faith, the Second Circuit imposes fees resulting from the bad faith pleadings against the pleading party's attorney.  See 60 E. 80th St. Equities, Inc. v. Sapir, 218 F.3d 109 (2d Cir. 2000).  Thus, Plaintiff should be assessed all legal fees that Bennett unnecessarily has had to expend in litigating this meritless claim.

-25-

## CONCLUSION

For the foregoing reasons, Bennett respectfully requests that the Court grant his Motion for Summary Judgment and dismiss Plaintiff's claims against him in their entirety, together with costs, fees and such other and further relief as the Court may deem just and proper.

Dated: New York, New York
       February 12, 2004

                          Respectfully submitted,

                          *Cindy Schmitt Minniti*

                          David L. Weissman ct24702
                          Cindy Schmitt Minniti ct25495
                      **REEDSMITH LLP**
                      599 Lexington Avenue, 29th Fl.
                      New York, NY 10022
                      P: (212) 521-5436
                      F: (212) 521-5450
                      cminniti@reedsmith.com

                      *Attorneys Pro Hac Vice for*
                      *Defendant John J. Bennett*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Notice of Motion for Summary Judgment, dated February 12, 2004, Affidavit of Cindy Schmitt Minniti in Support of Defendant John J. Bennett's Motion For Summary Judgment, sworn to on February 12, 2004, Defendant John J. Bennett's Local Rule 56(a)1 Statement of Undisputed Facts, dated February 12, 2004 and the accompanying Memorandum of Law in Support of Defendant Bennett's Motion for Summary Judgment, dated February 12, 2004, with exhibits, have been served via overnight mail, postage prepaid, this 12th day of February, 2004, on the following counsel of record:

Barbara E. Gardner, Esq.
843 Main Street,  Suite 1-4
Manchester, CT 06040

Mary A. Gambardella, Esq.
Epstein, Becker & Green
0ne Landmark Square – Suite 1800
Stamford, CT 06901

Peter Gillespie
46 Riverside Avenue
P. O. Box 3416
Westport, CT 06880

*Cindy Schmitt Minniti*
Cindy Schmitt Minniti (ct2549)