FILED

2004 MAR 26 A 11 32

U.S. DISTRICT COURT
NEW HAVEN, CONN.

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| LEIGH BOLICK, | : | CIVIL ACTION NO. |
| Plaintiff | : | 3:03CV165(PCD) |
| | : | |
| vs. | : | |
| | : | |
| ALEA GROUP HOLDINGS, LTD., | : | |
| ALEA NORTH AMERICA COMPANY, | : | |
| JOHN J. BENNETT, AND | : | |
| ROBERT D. BYLER, | : | |
| Defendants | : | March 8, 2004 |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT
JOHN J. BENNETT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff submits this Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment dated February 12, 2004. Plaintiff further relies on the attached Affidavits.

**I. PROCEDURAL HISTORY**

Plaintiff filed claims of sexual harassment and retaliation against John J. Bennett in this action. Bennett filed a Motion to Dismiss, which was granted in part. The remaining claims against Bennett are for (1) retaliation; and (2) aiding and abetting Alea in the commission of retaliatory acts, under the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. §46a-60(a)(4) and (5) respectively.[1]

---

[1] Defendant moves for summary judgment on the aiding and abetting claim only. Without waiving her right to claim that defendant has not moved for summary judgment on the retaliation claim, plaintiff includes her arguments in opposition to summary judgment on the retaliation claim herein.

## II. FACTS

Plaintiff began her employment with Alea North America Company ( "ANAC"), a subsidiary of Alea Group Holdings, Ltd. ("AGH")(Exh. 7 at 6) on October 10, 2000.(Exh. 8; Exh. 1 at 160) She was hired as an Assistant Vice President of Marketing for Alea Alternative Risk ("AAR"), a franchise of ANAC, located in Rocky Hill, Connecticut.(Exh. 1 at 152) ANAC is a reinsurance company. When Ms. Bolick began her employment, she reported to defendant John Bennett, Senior Vice President, Marketing, who had a law degree. She was hired as part of a "start up" and based on representations made to her by Mr. Bennett and Robert D. Byler, President and Chief Executive Officer of ANAC, Ms. Bolick had expectations that she would be part of the management team at Alea. (Exh. 1 at 100, 157-159; Exh. 2 at 564 ) She had a particular interest in learning about "captives", a type of insurance in which the purchaser retains an element of risk for themselves. (Exh. 7 at 60). She saw this job as an opportunity to get into this lucrative insurance market. (Exh. 4 at 19, Exh. 2 at 505-506)

**Conduct by Bennett**

Almost immediately, Mr. Bennett behaved inappropriately with plaintiff in the office and on road trips. (Exh. 1 at 161, 167, Exh. 17) On her third day of employment, Mr. Bennett called her into his office and belittled her saying she knew nothing and that it would take forever for plaintiff to be able to go out on the road with him. (*Id*)

2

As their first road trip approached, Bennett repeatedly asked Ms. Bolick to be sure to bring her work out clothes so they could work out together. During the week of October 16, 2000, Mr. Bennett and Ms. Bolick went on their first marketing trip to San Francisco. Bennett told Ms. Bolick that "being a woman could be an issue" (Exh. 17 at 1) in dealing with clients. He asked if she did not bring her work out clothes because she did not want to be around him. After visiting a client, Bennett would call the clients names and say things like "wasn't I nice to that jerk", "aren't I being nice, even though I hate these guys". He said he bet plaintiff didn't want to be around him. He accused plaintiff of having short term memory problems, and asked if she "smoked pot". After each agency visit, he would ask how she thought he did in the visit. As they walked down the street, he touched plaintiff's shoulder, putting his arm around her. (Exh. 2 at 317) He repeatedly stood too close, leaning right into her face or whispering in her ear. When Ms. Bolick moved away, he took offense. (Exh. 17 at 1; Exh. 2 at 318) Plaintiff was immediately concerned that she had moved across the country for this job and feared she might be fired. She began taking notes in order to document Bennett's behavior towards her. (Exh. 1 at 160-161)

On October 24, 2000, Mr. Bennett again berated Ms. Bolick in his office when she didn't answer a question the way he wanted. He said "what was all that discussion we had, you think I just did that for fun? You don't think you have to remember

3

anything I say?"(Exh. 17 at 2) Bennett repeatedly belittled Bolick. She found Bennett's conduct demeaning (Exh. 1 at 16, Exh. 2 at 300-302, 310)

On October 30, 2000, Bennett and Ms. Bolick traveled to Chicago together. During that trip, he made inappropriate comments to plaintiff. He called her a "cry baby" and said she looked like she was going to cry. He repeatedly asked her what her husband thought of her new job and boss. He asked her whether she brought her workout clothes and whether she and her husband had decided she shouldn't workout with him. (*Id* at 3) He spoke about cocaine parties (Exh. 2 at 325-327, 330)and asked plaintiff why she thought people wore tongue rings.(*Id* 334-335) Based on his tone, plaintiff believed he was attempting to initiate a sexual conversation.(*Id*)

On October 31, 2000, Bennett and Ms. Bolick flew from Chicago to Seattle. Mr. Bennett had three scotches and 2-3 glasses of wine on the plane. He was reading a book that he said was about "the sexual exploits of the beautiful people of California." At one point, he leaned his head on plaintiff's shoulder and spoke to her. She kept backing away. He was talking about sexual exploits and read a sexual quote from the book he was reading. When she finally pushed him away, he became angry.(Exh. 2 at 338-343) On that same flight, plaintiff asked for a day off at Thanksgiving. He said he could give her time off if she did "something for him". He suggested that if she would play cards for "money and fun", he would give her the time off. Bennett tried to force

4

plaintiff to eat the offered meal, when plaintiff told the attendant she didn't want it. He later said this was an example of her lack of cooperation. Once Bennett and Ms. Bolick landed in Seattle, on an Avis bus late at night, he sat, not on the seat, but on the metal ledge, right next to her, with his arm on the back of the seat touching her. He leaned over into her face asking her to play cards with him. Plaintiff kept moving away. (Exh. 17 at 4-5)

Every time they were on the road together, Bennett attempted to touch plaintiff and get too close to her. This behavior was constant. (Exh. 1 at 200, Exh. 2 at 318-320, 426) She would move away and tell him he was getting too close. (Exh. 2 at 320) Bennett would ask Ms. Bolick out for drinks and dinner alone together. (Exh. 2 at 297) On several occasions he tried to find out if she did drugs and talked about drugs. (Exh. 2 at 344)

### Initial Complaint to Byler and Lametta

Ms. Bolick determined that she needed to try to resolve the issue by speaking with Byler, CEO of ANAC, to whom Mr. Bennett reported. Mr. Byler and Ms. Bolick met outside the office during the week of November 6, 2000. (Exh. 3 at 16) She told him of the aggressive posturing, physical contact, sexual overtones and intimidation by Mr. Bennett. (Exh. 17 at 6, 27, Exh. 3 at 18-20, Exh. 18 at D0028) Ms. Bolick told Mr. Byler that (1) the behavior must stop, and (2) she did not want to travel with Bennett. Byler

agreed to both. He further agreed to handle the matter so that Mr. Bennett would not know that she had complained. (Exh. 17 at 7, Exh. 1 at 181-183) Mr. Byler, who had never had sexual harassment training himself(Exh. 3 at 17-18), did not report plaintiff's complaint to Human Resources at ANAC. (*Id.* at 24). Byler admitted that these were serious allegations (*Id* at 22) and that plaintiff was visibly upset when reporting Bennett's conduct (*Id* at 20). Nevertheless, Byler decided that Ms. Bolick would continue to report to Mr. Bennett.(*Id* at 23) Bolick continued to see Bennett regularly in the office. (Exh. 4 at 56, Exh. 1 at 244, Exh. 12 at D0130) She avoided him as much as possible (Exh. 1 at 244, Exh. 2 at 599) When Bennett did speak to her he was "ugly". According to plaintiff it was "very, very, very uncomfortable." (Exh. 2 at 372)

In early December, plaintiff met with Marti Lametta, Vice President and Director of Human Resources, when Ms. Lametta visited the Rocky Hill office, and told her that she had some "major issues" with Bennett, that she was working them out with Rob, but wanted her in the loop in case Bennett started taking any "negative actions" behind her back. Bennett then harassed Bolick for having a conversation with Lametta, and specifically asked her if plaintiff had told Lametta "all about our relationship" ( Exh. 18 at D0023, Exh. 1 at 196) .

Although Ms. Bolick did not travel with Mr. Bennett from November, 2000 to December 2001, his irrational, inconsistent, and abusive behavior toward her continued

6

throughout 2001. Mr. Bennett would be complimentary on one occasion and demeaning and abusive on another. He attempted to isolate plaintiff from others in the office and became furious if she spoke to his boss, Byler, outside his presence. He made inappropriate comments about her appearance, for example, commenting on her hair and weight. Plaintiff never knew from day to day what to expect. Bennett left plaintiff out of important meetings, later saying that "he forgot" to tell her about it. When they were at conventions together, Bennett refused to help plaintiff set up the convention, meet with clients, or introduce her to people. In May, Bennett and plaintiff had a heated discussion following a conversation plaintiff had with Byler. Plaintiff told Bennett that he was clearly "crossing the line" in terms of his behavior. (Exh. 17 at 11, 12; Exh. 1 at 244; Exh. 2 at 352-365, 384-388, 392, 599, Exh. 18 at D0049, 56) Plaintiff believed that the abusiveness was, at least in part, retaliation for having gone to Byler about his behavior. (Id at 392)

**Promises to Plaintiff**

Despite his abusive behavior toward plaintiff, Mr. Bennett indicated that Bolick had been doing a great job. He told her that she would be getting a promotion to Vice President and a raise effective in or about August, 2001. (Exh. 4 at 37, Exh. 2 at 393-394; Exh. 6 at 43-44) He told her that Mr. Byler had verbally approved of this.(Exh. 2 at 399-400)

7

Bennett told plaintiff that he wanted her to be his "right hand man", "assistant manager of marketing", wanted plaintiff and he to grow the department, to put others in the field around the country, and he and plaintiff to handle captive business and run the office. (Exh. 1 at 252, 255; Exh. 2 at 443-444, 449-450, 601-602) In late 2001, Byler also promised plaintiff that she would be involved in the management of marketing as the department grew. (Exh. 2 at 443-444, 564; Exh. 17 at 13) Neither Lametta or Byler doubted that Bennett had made such promises to plaintiff. Byler told Goldberg and Lametta that he had "no doubt" that John promised Leigh there would be a "split" between captives and individual accounts. (Exh. 5 at 61; Exh. 16)

By all accounts, plaintiff was a good performer. In October, 2001, Byler stated that she had "embraced the marketing role", was "creating strong relationships", was "well organized" and was "instrumental in developing enhancements for our marketing MIS." (Exh. 9, Exh. 5 at 14). During this period of time there was a shortage of underwriters to "close deals" (Exh. 3 at 173-174). There was also a lack of product to sell because ANAC did not have "issuing paper"(Exh. 4, 83-84). Bennett continuously told plaintiff to "relax" about not closing any deals. (Exh. 12 at D0131)

**Further Conduct by Bennett and Physical Threat**

In December, 2001, Mr. Bennett decided that plaintiff and he needed to travel together again. (Exh. 4 at 82) He told plaintiff that he had set up a joint trip to Gold's

8

gym with a client, so she would have to work out on this trip. (Exh. 17 at 14, Exh. 18 at D0013) They stayed at a hotel on the water. Mr. Bennett referred to what a romantic hotel it was. He wanted plaintiff to work out with him but she declined. Bennett and Ms. Bolick met and had drinks with one client and dinner with another. Mr. Bennet once again got too close to plaintiff when they were alone and attempted to touch her and put his arm around her. Plaintiff felt that he was attempting to create an intimate relationship with her. The following day, he instigated an argument with plaintiff and called her an "idiot" accusing her of not knowing the directions back to the hotel. He then said he was joking and she could not "take a joke". (Complaint ¶ 22-23; Exh. 1 199-200; Exh. 2 at 416-419, 421-424, 426; Exh. 17 at 14)

Following this trip, on December 21, 2001, Mr. Bennett berated plaintiff for something he believed she had said to Mr. Byler. He stated "I'll fucking bury your ass, if you try to undermine me with Byler." As he sat down to speak to her, he raised his fist and said he was going to sit close enough to "hit you." Ms. Bolick was stunned and frightened by this encounter. (Complaint ¶25; Exh. 17 at 17-18; Exh. 1 at 189-190, 192-195) When Ms. Bolick returned to her cubicle, she immediately sent Bennett an e-mail referencing the physical threat and stating that if it happened again, she would advise Byler and Human Resources. (Exh. 11) The e-mail was not returned to plaintiff "undelivered". (Bolick Affidavit) Plaintiff immediately left the office, taking some time off

for the Christmas holiday, returning in early January. (Exh. 1 at 196) Plaintiff feared that Bennett would retaliate against her as a result of the e-mail, but she hoped it would shock him into stopping his behavior so that she would not have to go to Human Resources (Exh. 1 at 197-198; Exh. 2 at 456-457).

**Retaliation by Bennett**

Instead, Ms. Bolick's worst fears were realized when on January 9, 2002, Mr. Bennett told Ms. Bolick that they were about to hire another female Vice President, Sandra Duncan, and that he had decided that he and plaintiff did not get along. He said he didn't know why this happened but that it seemed to have happened "that morning in Los Angeles". He then told plaintiff that she would no longer be his assistant manager as Marketing grows, that she would no longer be handling any captive business, internet or marketing material, that she was no longer his "right hand man", and that she would market only individual account business in a regular territory. (Complaint ¶26) Mr. Bennett essentially took away everything Ms. Bolick had been promised when she left a secure job in Texas and joined Alea in October 2000. (Exh. 2 at 431-432)

**Plaintiff's Complaint to Human Resources**

On January 10, 2002, plaintiff called Human Resources and arranged to meet with Marti Lametta, Vice President of Human Resources at ANAC. Ms. Bolick reported

10

everything that had occurred with Mr. Bennett since she began her employment, including the recent physical threat. (Exh. 17 at 21; Exh. 5 at 30-31) Ms. Bolick told Ms. Lametta that she was experiencing difficulty sleeping, eating, working and focusing. (*Id*) Ms. Lametta recalled that plaintiff was visibly upset, crying, nervous and stressed as she told the story. Ms. Lametta found plaintiff's complaints credible. (*Id*) Ms. Lametta responded that this was clearly sexual harassment and that there were other reports of Bennett behaving inappropriately with women in the office. For example, even though Bennett was married, he had asked women at the office to go out with him. (Exh. 5 at 49-50, Exh. 18 at D0091) Ms. Lametta reassured plaintiff that her job was secure, that she wanted to get plaintiff's complaint "on the record" and that "this needed to be escalated to the top."(Exh. 17 at 21;Exh. 5 at 30-31) During the investigation, Bolick would report to Byler. (Exh. 18 at D0030.)

An investigation followed which included interviews with plaintiff, Byler and Bennett. When confronted with the allegations, Bennett asked if there were any witnesses. (Exh. 17 at 22) When confronted with the December 21st e-mail, Bennett asked "can Leigh prove (I) read it?" (Exh. 18 at D0086) Although Bennett denied the allegations, he admitted that he may have told plaintiff "I'm going to murder you." (Exh. 12 at D0127) He then made statements critical of Bolick designed to undermine plaintiff's standing with Byler. For example, he said that plaintiff had difficulty getting

11

along with the underwriters (Exh. 12 at D0133, Exh. 18 at D0034), that she had been critical of Vance Sawamurra, Byler and the company (Id) and that her criticism of management had "increased in the last quarter"(Exh. 18 at D0077), that she was too aggressive and "rubs clients the wrong way"(Id at D0029, D0083), that she never closed any deals.(Id at D0077) Both Bennett and Ms. Bolick were told not to come to work during the investigation. (Id 41; Exh. 2 at 462-465) As the investigation progressed, Marti Lametta testified that "it was becoming more credible for Leigh." (Exh. 5 at 54) Dennis Purkiss and Marti Lametta met with Bennett and advised him that he could walk away and they would give him a very generous deal. (Exh. 4 at 81) Mr. Bennett agreed to resign and was given a severance package. (Id)

**Retaliation**

Ms. Bolick was told to come back to work around February 1, 2002 (Exh. 2 at 465) and did return to work soon after that. (Exh. 1 at 249; Exh. 3 at 113) During this time however, plaintiff began counseling and worked at home often. (Exh. 17 at 31, Exh. 2 at 459) She was experiencing increased anxiety over how she was being treated and her change in status at the office. During the hiring process, plaintiff had been promised a part on the management team. (Exh. 1 at 252; Exh. 2 at 449, 564) After Bennett's threats and criticisms of Bolick, she was treated differently by Byler than before her complaint and differently than others in comparable positions in the office.

12

Byler admits that he treated Bolick differently after her complaint (Exh. 3 at 132).

For example, she was not involved in the hiring of the new Vice Presidents. She was no longer treated as part of the management team as she had been prior to her complaint. She was avoided and ignored by Byler. Byler no longer spoke to plaintiff when she was in the office. (Exh. 2 at 491-492) Plaintiff's salary was less than the three new hires in the same position, despite her greater experience and tenure at Alea. (Exh. 10) The males were paid more than the females doing the same job. (Exh. 3 at 91-92) Plaintiff was paid the least.[2] (Complaint ¶31, 33) Ms. Bolick was excluded from management meetings by Byler. (Exh. 2 at 491-492) The Northeast region, the most desirable territory, that plaintiff lived in, was being assigned to one of the new male hires, Jeff Alexander. Plaintiff was assigned the Southeast, which meant that she would have to travel often. This was contrary to the proposed plan to have people live in their territories to cut down on travel. (Exh. 5 at 60-61; Exh. 2 at 443-444,495, 508, Exh. 3 at 30)

Specifically, Marti Lametta testified:

Q: And did you have any knowledge of what the organizational plan was in the marketing department at that time?

---

[2] In addition, the new male hires were paid sign on bonuses, and were designated as "Key Employees" in their offer letters. As such they were offered equity in the company at the time they were hired. The females, Ms. Bolick and Ms. Duncan, were not offered equity at the time they were hired. Byler testified that the criteria for offering somebody equity at the time they were hired was that they would be a "performer" and would have an "important impact for Alea". (Exh. 3 at 29-98)

> A: My recollection of the marketing department and conversations with Rob was that after September 11th we couldn't find employees who were willing to travel 95 percent of the time, which this position required. I'm not sure if that's a correct percentage, but it was a high percentage, and that they were going to have to reorganize and restructure somehow to put the US into regions **to have people in those regions instead of flying and traveling** because it was difficult to recruit people at that time.

Exh. 5 at 60-61.

Byler was following through on Bennett's threats of January 9, 2002. ( Exh. 2 at 433-434, 436-437, 443-446, 491-492). Plaintiff was having difficulty functioning both in and outside the office. (Exh. 1 at 249)

In May, 2002, Mr. Byler assigned the Bermuda territory to Jeff Alexander, who had already been assigned the Northeast territory. Captive business was concentrated in the Northeast and Bermuda (Exh. 7 at 60-61) Alexander was not familiar with clients in the captive sector and had little or no marketing background as compared to plaintiff. Byler admits that plaintiff and Bennett had done the majority of Bermuda marketing before January, 2002, and that next to Byler, plaintiff had the most contacts in the captive market (Exh. 3 at 165-166, 209). Being shut out of this part of the business would affect plaintiff's career opportunities in the future.(Exh. 2 at 542-543)

Prior to January 9, 2002, Bennett told plaintiff that she would be his assistant manager in charge of captive business.(Complaint ¶ 37; Exh. 1 at 255; Exh. 2 at 449-450 ). Likewise, Byler had always represented that Bolick would be involved in the

14

management of the department as it grew. (Exh. 2 at 564).

Byler used the information from Bennett that plaintiff "did not get along with the underwriters" in refusing to consider plaintiff for Bennett's position, when she requested it in June, 2002. (Exh. 3 at 59-60)

**Retaliation Complaint**

In May, 2002, Ms. Bolick complained to Mr. Byler that she believed he was retaliating against her for her complaint of sexual harassment. (Exh. 19) Byler advised Leonard Goldberg, who was recently appointed Chairman and CEO of ANAC. Goldberg called plaintiff and arranged a meeting for June 6, 2002 to discuss plaintiff's concerns. Prior to the meeting, Goldberg had a "plan" as to how the investigation would proceed . (Exh. 6 at 59-60) According to Marti Lametta's notes from a discussion with Byler on June 3, the "plan" was to "call her on the inadequacies", "have the discussion on the relationship" and "reject assignment to Bermuda". The notes then indicate "legitimate nondiscriminatory reason to **end the relationship** to overcome the challenge of discrimination". Finally the notes say "make points about her unprofessionalism". (Exh. 18 D0112-0113) Plaintiff met with Goldberg and Lametta on June 6. Plaintiff told Goldberg and Lametta that given everything that had occurred, Bolick did not believe Byler could work with her. She stated that she hoped they had options for her - perhaps elsewhere in the company. Goldberg refused on the spot to

15

transfer plaintiff to another position in the company. (Exh. 2 at 548 - 549) Thereafter when asked by Ms. Lametta and Goldberg for her thoughts on how she and Byler could continue to work together, plaintiff requested that she be considered for Bennett's job, as she had been doing a good part of his job while he was there.(Exh. 13, 16, Exh. 1 245-246) The "investigation" of plaintiff's complaint consisted solely of interviews of those in attendance at the April marketing meeting. (Exh. 15) Plaintiff was then notified by Goldberg that he did not believe that she had been retaliated against, despite the fact that at least one witness at the April marketing meeting had confirmed that Byler was visibly agitated with plaintiff, objected to everything she said, and cut her off when she attempted to speak. (Exh. 15; Exh. 2 at 527-529, Exh. 13; Exh. 19) Although plaintiff continued to work as best she could, she was having a difficult time. (Exh. 2 at 548).

### CHRO Complaint, Plaintiff Unable to Work

In September, 2002, as a result of the conduct of defendants, plaintiff became ill and unable to work. (Exh. 1 at 76-79) She applied for and was granted disability under the company's long term disability policy. Plaintiff is suffering from post traumatic stress disorder. Plaintiff has been and continues to collect disability and is unable to work. (Exh. 2 at 576-580) Defendant eventually terminated plaintiff's employment in July, 2003, due to her inability to return to work and have not replaced her. (Exh. 3 at

16

166) Scott Roe has been made Senior Vice President of Marketing, the job that Bennett held. (Exh. 3 at 56).

### III. LEGAL ARGUMENT

**Summary Judgment Standard**

A motion for summary judgment may not be granted unless the court determines that there are no genuine issues of material fact to be tried and that the facts as to which there is no issue warrant judgment for the moving party as a matter of law. Quinn v. Green Tree Credit Corp., 159 F.3d 759, 764-65 (2d Cir. 1998). "If there is *any* evidence in the record from which a reasonable inference can be drawn in favor of the nonmoving party on a material issue of fact, summary judgment is improper." Anderson v. Liberty Lobby, Inc., 106 S.Ct. 2505, 2510-11(1986)(emphasis added). The court must review all of the evidence in the record drawing all reasonable inferences in favor of the nonmoving party, but making no credibility determinations or weighing any evidence. Although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. Reeves v. Sanderson Plumbing Products, Inc., 120 S.Ct. 2097 (2000)(citations omitted).

"In employment discrimination cases, where liability often turns on the issue of intent, courts should approach a motion for summary judgment with special caution." See Gallo v. Prudential Residential Servs. Ltd. Partnership, 22 F.3d 1219, 1224 (2d Cir.

17

declared to be a discriminatory employment practice **or attempt to do so.** Conn. Gen. Stat. 46a-60 (4) and (5).

Connecticut courts generally look to interpretations of federal anti-discrimination laws to interpret CFEPA. Levy v. Comm. on Human Rights and Opportunities, 236 Conn. 96, 103 (1996); Newtown v. Shell Oil Co., 52 F.Supp. 2d 366, 374 (D.Conn. 1999).

### 1. Prima Facie Case

In order to establish a prima facie case of retaliation under Title VII and CFEPA, plaintiff must show by a preponderance of the evidence (1) participation in a protected activity known to the defendant; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action. Cifra v. General Electric Co., 252 F.3d 205, 216 (2d Cir. 2001); See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802.

As to the third element, plaintiff need only show that a retaliatory motive played a part in the adverse employment action, whether or not it was the sole cause, and even if valid objective reasons for the adverse action exist. Sumner v. U.S. Postal Service, 899 F.2d 203, 208-209 (2d Cir. 1990); Quinn v. Green Tree Credit Corp., 159 F.3d 759, 769 (2d Cir. 1998); Gallagher v. Delaney, 139 F.3d 338, 349 (2d Cir. 1998); Reed v. A.W. Lawrence & Co., 95 F.3d 1170 (2d Cir. 1996).