As will be further discussed below, plaintiff has adduced sufficient evidence from which a jury could find in plaintiff's favor as to each of the elements of her claim.

### a. **Deminimis Burden**

The plaintiff's burden at this stage is not onerous. Chambers v. TRM Copy Centers Corp., 43 F.3d 289, 37 (2d Cir. 1994). In determining whether the plaintiff has met the deminimis initial burden, the function of this Court on a summary judgment motion is to determine whether the proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a discriminatory motive. See Donahue v. Windsor Locks Board of Fire Commissioners, 834 F.2d 54, 58 (2d Cir. 1987).

### b. **Burden Shifting and Pretext**

Once plaintiff establishes a prima facie case, the burden of production shifts to the employer to articulate a legitimate, clear, specific and nondiscriminatory reason for the adverse employment action. See Gallo, 22 F.3d at 1226. If the defendant satisfies this burden, the plaintiff has the ultimate burden to prove that the employer's reason was merely a pretext for discrimination.

For summary judgment purposes, unless an employer has come forward with evidence of a dispositive nondiscriminatory reason for the adverse action as to which there is no genuine issue and which no rational trier of fact could reject, any conflict between the employee's evidence establishing the prima facie case and the employer's

20

evidence of a non-discriminatory reason reflects a question of fact to be resolved by the fact-finder. Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 293(2d Cir. 1995).

The factfinder's disbelief of the reasons put forward by the defendant, together with the elements of the prima facie case, may suffice to show intentional discrimination. This is because rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination.

> In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision.

Reeves, 530 U.S. 133, 136 (2000)(citations omitted). See also St. Mary's Honor Center v. Hicks, 509 U.S. 502, 511 (1993).

As stated above, plaintiff can establish her retaliation claim by showing that the alleged legitimate business reasons were not the only reason for the alleged adverse actions and that her engaging in protected activity made a difference. Montana, 859 F.2d at 105 citing Hagelthorn v. Kennecott Corp. 710 F.2d 76, 82 (2d Cir. 1983). Even if, for example, the restructuring of the marketing department was legitimate following Bennett's departure, a claim that the employer. aided and abetted by Bennett, has subjected the plaintiff to discrimination as an individual does not require the plaintiff to prove that the restructuring as a whole was pretextual. "In such circumstances, a

21

plaintiff defending a motion for summary judgment need demonstrate only that a genuine issue exists as to whether, despite the employer's ostensible rationale and overall operations, intentional discrimination is the persuasive explanation for the plaintiff's treatment." Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 204(2d Cir. 1995). Title VII allows a cause of action against business decisions that merge with discrimination. See Montana v. First Federal Savings and Loan, 869 F.2d 100 (2d Cir. 1989) (summary judgment reversed where in structural reorganization case, plaintiff put forth sufficient evidence that discharge occurred under circumstances giving rise to an inference of discrimination, including failure to offer plaintiff alternative available positions); Meiri v. Dacon, 759 F.2d 989, 995 (2d Cir. 1985)(courts must refrain from second guessing decision making processes, but must allow employees to show that employer acted in an illegitimate or arbitrary manner).

As further discussed below, In this case, there are numerous genuine issues of material fact in dispute as to whether defendant's stated reasons for adverse actions disadvantaging plaintiff were pretextual, and, thus, whether her opposing discriminatory practices and making complaints were a factor in the adverse actions.

### 2. Plaintiff Engaged in Protected Activity

There is evidence from which a jury could find that plaintiff engaged in protected activity known to defendant Bennett when she made a complaint against her supervisor

Bennett for sexual harassment. She first reported her complaint to (1) Byler in November, 2000; (2) to Marti Lametta, Vice President, Human Resources, in December, 2000; (3) to Bennett each and every time she resisted his sexual advances and in December 2001 by e-mail (Exh. 11); and (4) in January, 2002 to Human Resources.

Plaintiff repeatedly advised Bennett that he was "getting too close" and "crossing the line" in terms of his behavior in 2000 through 2001. As for the e-mail, plaintiff specifically quotes Bennett's verbal and physical threats and states "Understand that the next time you decide to talk to me like that, Rob and HR will be involved immediately."

Title VII's anti-retaliation provision is broadly drawn. Opposition to a Title VII violation need not rise to the level of a formal complaint in order to receive statutory protection. Cruz v. Coach Stores, 202 F.3d 560, 566 (2d Cir. 2000).

Although the Second Circuit has not ruled on whether resisting a supervisor's sexual advances constitutes "protected activity" for purposes of establishing retaliation, see Fitzgerald v. Henderson, 251 F.3d 345, 366 (2d Cir. 2001)("We need not rule on the district court's view that rejection of sexual advances is not a protected activity under Title VII..."), several district courts in this circuit have so held. See Little v. NBC, 210 F.Supp. 2d 330, 387 (S.D.N.Y. 2002); Burrell v. CUNY, 894 F.Supp. 750,

23

761(S.D.N.Y. 1995), and a majority of courts in other districts have so held. Black v. City & County of Honolulu, 112 F.Supp. 2d 1041, 1048 (D.Hi.2000); Fleming v. South Carolina Dept. of Corrections, 952 F.Supp. 283, 288 (D.S.C. 1996); Farrell v. Planters Lifesavers Co., 22 F.Supp. 2d 372, 392 (D.N.J. 1998), aff'd in part, reversed in part on other grounds, 206 F.3d 271 (3rd Cir. 2000); Boyd v. James S. Hayes Living Health Care Agency, Inc., 671 F.Supp. 1155, 1167 (W.D. Tenn. 1987); EEOC v. Domino's Pizza, 909 F.Supp. 1529, 1533 (M.D. Fla. 1995).

There is sufficient evidence from which a jury could conclude that plaintiff engaged in protected activity.

### a. Good Faith Belief

Plaintiff need only demonstrate that she had a good faith, reasonable belief that the underlying challenged actions of the employer violated the law. Quinn v. Green Tree Credit Corp., 159 F.3d 759, 769(1998). Plaintiff specifically disputes defendant's contention that at the time of her complaint to Byler, she did not know she was being sexually harassed. First, this is not the standard for protected activity, and, second, the evidence is undisputed that plaintiff's complaint included descriptions of aggressive behavior with sexual innuendo (Exh.18 at D0028). Likewise, there is evidence from which a jury could find that the conduct to which Bolick was subjected is "objectively offensive", although contrary to defendant's assertions, there is no such threshold test

24

in <u>Clark County School District v. Breeden</u>, 532 U.S. 268, 270 (2001).

### b. Protected Activity was Known to Bennett

There is evidence from which a jury could find that Bennett knew about the complaints made by plaintiff in 2000. Following plaintiff's complaint to Byler and Lametta in 2000, Bennett was informed that he and Bolick would not be traveling together anymore. Since he was the Senior Vice President of Marketing, this directive from Byler would have at least caused him concern that plaintiff may have reported his behavior. He saw Ms. Bolick talking with Ms. Lametta in December, 2000. For weeks thereafter he harassed plaintiff and specifically asked her "did you tell her about our relationship?" During that following year and particularly for the first six months, Bennett was very angry with plaintiff, did not assist her in preparing for conferences, did not introduce her to people she should have met, did not tell her about management meetings that she should have attended, and did not speak with her, unless to yell at her. If she spoke with Byler, he became furious.

A jury could conclude, given the foregoing circumstantial evidence that Bennett knew that plaintiff had reported his behavior. They are not required to believe Bennett's denials that he had knowledge, or Byler's statements that he never told Bennett. See <u>Treglia v. Town of Manlius</u>, 313 F.3d 713, 721 (2d Cir.)(while the decision-maker denies making the retaliatory statement, this is an issue of credibility for the jury.) <u>Gordon v.</u>

25

NYC Bd. of Ed., 232 F.3d 111 (2d Cir. 2000)(a jury can find retaliation even if the agent denies direct knowledge of a plaintiff's protected activities, so long as the jury finds that ... an agent is acting explicitly or implicitly upon the orders of a superior who has the requisite knowledge). Likewise the jury is not required to believe that Bennett never read the e-mail in which plaintiff complained of his behavior and threatened to go to Human Resources if he did not stop.

Finally, Bennett was clearly aware that plaintiff had repeatedly rebuffed his sexual advances and rebuked him for his attempts to intimidate her. Thus whether or not Bennett had knowledge of plaintiff's protected activities is a question of fact for the jury.

### 3. Plaintiff Suffered Adverse Employment Actions

Plaintiff is claiming that she experienced numerous adverse employment actions at the hands of Bennett following her complaints about his behavior beginning in November, 2000.

Adverse employment actions are materially adverse changes in the terms, privileges, duration, and conditions of employment. Treglia v. Town of Manlius, 313 F.3d 713, 720 (2d Cir.). Adverse actions are considered material if they are of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse. Torres v. Pisano, 116 F.3d 625, 632 (2d Cir.

26

1997)(emphasis added). Adverse employment actions are not limited to "pecuniary emoluments." Preda v. Nissho Iwai Am. Corp., 128 F.3d 789, 791 (2d Cir. 1997). Claims of discriminatory failure to promote fall within the core activities encompassed by the term "adverse actions". Morris v. Lindau, 196 F.3d 102, 110 (2d Cir. 1999). Adverse employment actions include demotions. *Id.* An internal transfer can be an adverse employment action if "accompanied by a negative change in the terms and conditions of employment." *Id.* at 113. In addition, plaintiff may show that "(1)using an objective standard; (2) the total circumstances of her working environment changed to become unreasonably inferior and adverse when compared to a typical or normal, not ideal or model, workplace." Phillips v. Bowen, 278 F.3d 103, 109 (2d Cir. 2002). An example of a materially adverse change includes significantly diminished material responsibilities. Terry v. Ashcroft, 336 F.3d 128, 138 (2003); DelaCruz v. NYC Human Res. Admin. Dept. of Soc. Svs, 82 F.3d 16, 21 (2d Cir. 1996)(plaintiff showed adverse employment action where even though transferred to job with same rank and pay, the new position was arguably less prestigious or entailed diminished responsibilities.)

Less flagrant reprisals by employers may also be adverse. Richardson v. New York State Dep't of Corr. Serv., 180 F.3d 426, 446 (2d Cir. 1999). As there are no bright line rules, courts must pore over each case to determine whether the challenged employment action reaches the level of adverse. Wanamaker v. Columbian Rope Co.,

27

108 F.3d 462, 466 (2d Cir. 1997).

In this case, plaintiff alleges the following adverse employment actions occurred after she engaged in protected activity and attributes them to Bennett directly or avers that he aided and abetted in the discriminatory conduct:

1) raised his fist and physically threatened to hit her
2) verbally threatened to "fucking bury (plaintiff's) ass" if she "undermined" Bennett by speaking with Byler.
3) engaged in a pattern of retaliatory acts when he did not speak with her except to belittle her, did not invite her to meetings and thus did not "train" her properly, refused to assist her in setting up for conventions or introducing her to the appropriate people at those conventions, attempted to isolate her from others in the office.
4) told Byler and others during investigation of plaintiff's complaint that plaintiff was overly agressive and "rubbed clients the wrong way", had "difficulty getting along with the underwriters", that she was critical of Byler, Vance Sawamurra, and the company, none of which was true.
5) plaintiff's promotion was unreasonably delayed causing lost use of increased wages, humiliation and damage to her reputation;[3]
6) she was demoted in that her managerial responsibilities were taken from her and the opportunity to do captive business was taken from her as Bennett stated would happen on January 9, 2002;
7) she was assigned to a remote territory, the Southeast, when she lived in the Northeast, which would require her to travel more frequently.
8) she was paid less than the three new Vice Presidents who were doing the same job, even though she had greater experience, and seniority at the company;
9) the Bermuda territory, which, along with the Northeast, contained the vast majority of captive business, was assigned to the newest and least experienced new male hire.

---

[3] Although plaintiff testified that Bennett "didn't know she wasn't getting" the raise, this was in August 2001. By the time Bennett threatened to reduce plaintiff's job responsibilities in January and criticized her performance on his way out the door, he had told plaintiff her raise wasn't coming until April, 2002. (Exh. 17)

28

10) defendant refused to transfer plaintiff to another department

The lost use of wages for a period of time is by itself, an economic injury that can qualify as a tangible employment action. Jin 310 F.3d at 100.; Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 223-224(2d Cir. 2001)(employee established adverse employment action for ADA retaliation claim by showing she was suspended without pay for one week, even though she was later reimbursed.) In this case, plaintiff lost approximately two months differential in pay when defendant failed to promote her at the time the new Vice Presidents came on board.

Bennett's own testimony supports plaintiff's claim that Bennett's treatment of her following her complaints in 2000 and rejection of his advances could constitute an adverse employment action:

> Q: What did you tell Leigh about the opportunities that would be available if she came to Alea? How did you sell her on the job?
> A: I remember what the primary sale was, had to do with contact, just not with Leigh, but with anybody, and I made this sale continually, that if somebody stayed with me, within a year they would know all the alternative market players around the country and could really write their own ticket after that. So if they stayed with me a relatively short time, they would know the alternative market business, would know the sources of that business, would be able to have their own book of ten-million plus business and really could write their own career ticket from that point.

Exh. 4 at 17-18. Bennett's own words underscore the fact that by refusing to properly train her in the alternative risk field, refusing to introduce her to people, excluding her

29

from meetings, threatening to reduce her job responsibilities and opportunities at Alea (by providing Byler with ammunition to carry out Bennett's January 9 threats) he adversely affected her future promotional and employment prospects.

Bennett's abusive and inappropriate behavior likewise affected a materially adverse change in plaintiff's employment conditions. Retaliatory acts that create a hostile work environment affect the terms and conditions of employment. See Meritor Savings Bank v. Vinson, 477 U.S.57, 64 (1986).

Bennett's remarks to Byler and others during the investigation of plaintiff's complaint in January, 2002, were false and made for the purpose of retaliating against plaintiff for having "opposed a discriminatory employment practice" or were made to "aid and abet" the employer in their retaliation against plaintiff, or, at the very least, were an "attempt to do so" Conn. Gen. Stat. 46a-60(4) and (5). Clearly, a jury could so find based on plaintiff's testimony and the documentary evidence.

The particular threats made by Bennett on January 9 regarding plaintiff's reduced responsibilities and assignment to a remote territory all came to fruition after Bennett's departure. Clearly this presents a question of fact as to his aiding and abetting in retaliation or his attempt to do. By criticizing plaintiff's performance, Bennett influenced decisions made by Byler as to plaintiff's future opportunities at Alea.

The quantity and quality of the adverse actions taken against plaintiff are

30

sufficient to satisfy this element of her claim.

### a. Bennett had Authority as Plaintiff's Supervisor

Bennett was plaintiff's supervisor from the inception of plaintiff's employment in October, 2000, until his resignation in January, 2002. As such, he clearly had authority to affect the terms and conditions of her employment. Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 77 (1986) (the supervisor is understood to be clothed with the employer's authority); Faragher v. City of Boca Raton, 524 U.S. 775, 803 (A supervisor's power and authority invests his or harassing conduct with a particular threatening character.) Clearly, the offer letter which references Purkiss' final authority regarding her offer of employment and its terms is not dispositive of this issue.

### 4. Causal Connection

Plaintiff has also met the causal connection requirement in establishing a prima facie case of retaliation. "Causation can be established either indirectly by means of circumstantial evidence, for example, by showing that the protected activity was followed by adverse treatment in employment, or directly by evidence retaliatory animus." Mandell v. The County of Suffolk and Gallagher, 316 F.3d 368 (2d Cir. 2003).

In this case, plaintiff's protected activities preceded the alleged adverse employment actions. Given the limited burden a plaintiff must meet to establish a prima facie case, this alone is sufficient to demonstrate a causal connection. See Raniola v.

31

Bratton, 243 F.3d 610, 624 (2d Cir. 2001) (explaining that the plaintiff's burden in establishing a prima facie case is a "light one usually demanding only that the protected activity preceded the adverse action in order to satisfy the causation requirement").

In this case, plaintiff claims that Bennett immediately retaliated against her following each of her complaints. It is well settled that proof of the causal connection can be established indirectly by showing that the protected activity was closely followed in time by the adverse action. Manoharan v. Columbia University College of Physicians & Surgeons, 842 F.2d 590, 593 (2d Cir. 1988) ; Davis v. State Univ. of N.Y., 802 F.2d 638, 642 (2d Cir. 1986). In a non-termination case where there is a time lapse, summary judgment is not necessarily warranted. It may be that the opportunities for retaliation did not immediately present themselves to the employer. See Mandell, 316 F.3d at 384.

At the summary judgment stage, temporal proximity is sufficient to create a question of fact as to causation.

### 5. Evidence of Pretext

As to retaliation engaged in by Bennett alone, he denies plaintiff's allegations. Thus there are disputed issues of fact as to whether or not Bennett engaged in the adverse employment actions alleged.

As to the adverse employment actions carried out by defendant employer

32

following plaintiff's departure in which Bennett arguably took part, or attempted to do so, by threatening to reduce plaintiff's job responsibilities and then criticizing her performance with Byler, plaintiff argues as follows regarding defendant's alleged legitimate business reasons for its decisions.

Despite defendant's contention that the higher salaries of the three new Vice President's were based on their previous salaries or superior experience, the evidence is in dispute. Scott Roe's application of employment shows that he was earning $100,000 at his previous employer, less than the plaintiff was earning at ANAC when Roe was hired. As for Duncan and Alexander, the defendant makes conclusory statements about their prior salaries that are not supported by the evidence. (Def. Exh. Exh. G) Based on AAR's own marketing materials, plaintiff had the most experience, and arguably superior experience, and she had been at ANAC for over a year (16 months). Given plaintiff's previous salary, once the cost of living in a particular geographic area is considered, a jury could dismiss as pretextual defendant's proffered reasons for the difference in salary. It is undisputed that the jobs to be done by all the Vice Presidents were identical.

Defendant's contention that the plaintiff's position was unchanged by the restructuring is further undermined by the fact that defendants never assigned anyone to replace her following her departure in 2002. A reasonable juror might conclude that

33

if plaintiff had retained any significant responsibilities following the restructuring of the department, a replacement for plaintiff would have been hired.

The assignment of plaintiff to the Southeast, when it is undisputed that the plan prior to plaintiff's complaint was to hire people who lived in their territories, is also evidence of pretext. A jury could conclude that the decision to hire someone in the Northeast when plaintiff was already living there, which would force plaintiff to either move or have to travel, contrary to the plan in place prior to her complaint, is a pretext for retaliation.

The failure of the defendants to make an exception to the alleged policy of giving promotions only in April raises a genuine issue of material fact which is in dispute. The company had made exceptions on other occasions, arguably under less compelling circumstances, and plaintiff was only asking for the title, not necessarily the raise. A jury could conclude that the decision not to do so in this case was due, at least in part, to retaliation.

Defendant refused plaintiff's request for a transfer to another department because she believed Byler could not work with her. Defendants have not come forward with a legitimate business reason for their failure to even consider such a move.

Finally, defendant is subtly raising the issue of plaintiff's performance as their so called legitimate business reason for refusing her promotion to John Bennett's position,

34

and for paying her a lesser salary than her peers doing the same job, suggesting for example, that she did not get along with the underwriters and had rarely "closed deals." First, it should be noted that there is evidence that the underwriting department was understaffed during the period in question, and that the company did not have the "issuing paper" to close deals. Second, considering Byler's extremely positive comments regarding plaintiff's performance prior to her complaint and the complete absence of any negative comments or documentation regarding her performance prior to her complaint, a jury could conclude that raising these issues at this juncture is a pretext for discrimination. Third, the evidence is undisputed that Bennett continuously told plaintiff to "relax" about not closing any deals (Exh. 12 at D0131), then, on his way out the door, criticized her for not closing any.(Exh. 18 at D0077) As to plaintiff's relationship with the underwriters, she specifically disputes that she did not get along with the underwriters. (Bolick Affidavit)

The cumulative impact of the issues in dispute as set forth by plaintiff permits an inference of retaliation, and thus plaintiff has established a triable issue of fact in response to defendant's proffered explanation.

**B.    Defendant Bennett is not Entitled to Fees**

Plaintiff opposes defendant's motion for fees since her claims are clearly supported by the evidence.

## CERTIFICATION OF SERVICE

I hereby certify that a copy of the foregoing was mailed, postage prepaid, this 8th day of March, 2004, to the following counsel of record:

Mary A. Gambardella
Epstein Becker & Green, P.C.
One Landmark Square, Suite 1800
Stamford, CT 06901-2601

Cindy Schmitt Minniti
ReedSmith LLP
599 Lexington Ave., 29th FL.
New York, NY 10022

*/s/ Barbara E. Gardner*
Barbara E. Gardner