UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| LEIGH BOLICK,<br>　　　　Plaintiff | : CIVIL ACTION NO.<br>: 3:03CV165(PCD) |
| vs. | : |
| ALEA GROUP HOLDINGS, LTD.,<br>ALEA NORTH AMERICA COMPANY,<br>JOHN J. BENNETT, AND<br>ROBERT D. BYLER,<br>　　　　Defendants | :<br>:<br>:<br>:<br>: March 8, 2004 |

FILED
Mar 26  11 32 AM '04
U.S. DISTRICT COURT
NEW HAVEN, CONN.

## LOCAL RULE 56(a)2 STATEMENT

1. Admit

2. Admit

3. Admit

4. Admit

5. Admit

6. Admit

7. Admit

8. Deny (Exh. 8)

9. Admit

10. Admit

11. Admit that during the week of November 6, 2000 plaintiff complained to Byler about Bennett's behavior during the two October 2000 business trips.

12. Deny that plaintiff alleged he only put his arm around her on one occasion. (Complaint ¶10, 15 admit the remainder)

13. Admit

14. Deny (Exh. 2 at 391)

15. Deny (Id.)

16. Admit that Bennett never made explicit sexual demands of Plaintiff, nor did he explicitly say that he wanted to be intimate with Plaintiff. Deny the remainder. (Exh. 1 at 163-177, 198-203; Exh. 2 at 297, 300-306, 308-312, 315-324, 329-330, 332-345, 358-366, 416-428).

17. Admit

18. Admit that on the San Francisco trip plaintiff does not recall Bennett saying anything of a sexual nature when he stood too close to her. Deny the remainder. (Exh. 2 at 320).

19. Admit

20. Admit

21. Deny ((Exh. 6 at 32;Exh. 7 at 11, 34-37, Exh. 5 at 63, Exh. 1 at 233-236, 253 Exh. 2 at 396-401; Exh. 4 at 75; Exh. 8)    21. Admit

22. Deny (Exh. 4 at 56, Exh. 1 at 244)

23. Admit

24. Admit

25. Admit

26. Deny (Complaint ¶8, Exh. 3 at 23)

27. Deny (Exh. 2 at 431, 443-446, 491-492, 556-557; Marti's notes, Byler notes - critical of Leigh in Jan. 2002)

28. Deny (Exh. 18 at D0023, Exh. 1 at 196)

29. Admit, assuming reference is to January, 2002 complaint.

30. Admit

31. Admit that plaintiff voluntarily stayed home until 1/18, when she asked to return and was told no. Deny the remainder (Exh. 2 at 462-463; Exh. Marti's notes D0073)

32. Deny (Marti's notes D0095; Exh. 5 at 53-54)

33. Admit (assuming defendant meant "vice presidents")

34. Deny (Exh. 3 at 85)

35. Admit

36. Admit

37. Deny that plaintiff misrepresented her marital status to obtain group medical and dental coverage for her ex-husband. Admit the remainder.

## DISPUTED ISSUES OF MATERIAL FACT

1. Based on representations made to her by Mr. Bennett and Robert D. Byler, President and Chief Executive Officer of ANAC, Ms. Bolick had expectations that she would be part of the management team at Alea. (Exh. 1 at 100, 157-159; Exh. 2 at 564).

2. Almost immediately, Mr. Bennett behaved inappropriately with plaintiff in the office and on road trips. (Exh. 1 at 161, 167, Exh. 17) On her third day of employment, Mr. Bennett called her into his office and belittled her saying she knew nothing and that it would take forever for plaintiff to be able to go out on the road with him. (*Id*)

3. On their first road trip to San Francisco, Bennett told Ms. Bolick that "being a woman could be an issue" (Exh. 17 at 1) in dealing with clients.

4. He had asked her to bring her work out clothes and when she did not he asked if it was because she did not want to be around him. After visiting a client, Bennett would call the clients names and say things like "wasn't I nice to that jerk", "aren't I being nice, even though I hate these guys". He said he bet plaintiff didn't want to be around him. He accused plaintiff of having short term memory problems, and asked if she "smoked pot". After each agency visit, he would ask how she thought he did in the visit. As they walked down the street, he touched plaintiff's shoulder, putting his arm around her. (Exh. 2 at 317)

4

5. He repeatedly stood too close, leaning right into her face or whispering in her ear. When Ms. Bolick moved away, he took offense. (Exh. 17 at 1; Exh. 2 at 318)

6. On October 24, 2000, Mr. Bennett again berated Ms. Bolick in his office when she didn't answer a question the way he wanted. He said "what was all that discussion we had, you think I just did that for fun? You don't think you have to remember anything I say?"(Exh. 17 at 2)

7. Bennett repeatedly belittled Bolick. She found Bennett's conduct demeaning (Exh. 1 at 16, Exh. 2 at 300-302, 310)

8. On their next trip, he continued to make inappropriate comments to plaintiff. He called her a "cry baby" and said she looked like she was going to cry. He repeatedly asked her what her husband thought of her new job and boss. He asked her whether she brought her workout clothes and whether she and her husband had decided she shouldn't workout with him. (*Id* at 3) He spoke about cocaine parties (Exh. 2 at 325-327, 330)and asked plaintiff why she thought people wore tongue rings.(*Id* 334-335) Based on his tone, plaintiff believed he was attempting to initiate a sexual conversation.(*Id*)

9. On the next leg of that same trip, Mr. Bennett had three scotches and 2-3 glasses of wine on the plane. He was reading a book that he said was about "the sexual exploits of the beautiful people of California." At one point, he leaned his head

5

on plaintiff's shoulder and spoke to her. She kept backing away. He was talking about sexual exploits and read a sexual quote from the book he was reading. When she finally pushed him away, he became angry.(Exh. 2 at 338-343)

10. On that same flight, plaintiff asked for a day off at Thanksgiving. He said he could give her time off if she did "something for him". He suggested that if she would play cards for "money and fun", he would give her the time off. Bennett tried to force plaintiff to eat the offered meal, when plaintiff told the attendant she didn't want it. He later said this was an example of her lack of cooperation. Once Bennett and Ms. Bolick landed in Seattle, on an Avis bus late at night, he sat, not on the seat, but on the metal ledge, right next to her, with his arm on the back of the seat touching her. He leaned over into her face asking her to play cards with him. Plaintiff kept moving away. (Exh. 17 at 4-5)

11. Every time they were on the road together, Bennett attempted to touch plaintiff and get too close to her. This behavior was constant. (Exh. 1 at 200, Exh. 2 at 318-320, 426) She would move away and tell him he was getting too close. (Exh. 2 at 320) Bennett would ask Ms. Bolick out for drinks and dinner alone together. (Exh. 2 at 297) On several occasions he tried to find out if she did drugs and talked about drugs. (Exh. 2 at 344)

12. When Ms. Bolick complained to Byler in November, 2000, she told him of the aggressive posturing, physical contact, sexual overtones and intimidation by Mr. Bennett. (Exh. 17 at 6, 27, Exh. 3 at 18-20, Exh. 18 at D0028)

13. Ms. Bolick told Mr. Byler that (1) the behavior must stop, and (2) she did not want to travel with Bennett. Byler agreed to both. He further agreed to handle the matter so that Mr. Bennett would not know that she had complained. (Exh. 17 at 7, Exh. 1 at 181-183)

14. Byler admitted that these were serious allegations (*Id* at 22) and that plaintiff was visibly upset when reporting Bennett's conduct (*Id* at 20). Nevertheless, Byler decided that Ms. Bolick would continue to report to Mr. Bennett.(*Id* at 23) Bolick continued to see Bennett regularly in the office. (Exh. 4 at 56, Exh. 1 at 244, Exh. 12 at D0130) She avoided him as much as possible (Exh. 1 at 244, Exh. 2 at 599)

15. When Bennett did speak to her he was "ugly". According to plaintiff it was "very, very, very uncomfortable." (Exh. 2 at 372)

16. In early December, plaintiff met with Marti Lametta, Vice President and Director of Human Resources, when Ms. Lametta visited the Rocky Hill office, and told her that she had some "major issues" with Bennett, that she was working them out with Rob, but wanted her in the loop in case Bennett started taking any "negative actions" behind her back. Bennett then harassed Bolick for having a conversation with Lametta,

7

and specifically asked her if plaintiff had told Lametta "all about our relationship" ( Exh. 18 at D0023, Exh. 1 at 196).

17. Although Ms. Bolick did not travel with Mr. Bennett from November, 2000 to December 2001, his irrational, inconsistent, and abusive behavior toward her continued throughout 2001. Mr. Bennett would be complimentary on one occasion and demeaning and abusive on another. He attempted to isolate plaintiff from others in the office and became furious if she spoke to his boss, Byler, outside his presence. He made inappropriate comments about her appearance, for example, commenting on her hair and weight. Plaintiff never knew from day to day what to expect.

18. Bennett left plaintiff out of important meetings, later saying that "he forgot" to tell her about it. When they were at conventions together, Bennett refused to help plaintiff set up the convention, meet with clients, or introduce her to people. In May, Bennett and plaintiff had a heated discussion following a conversation plaintiff had with Byler. Plaintiff told Bennett that he was clearly "crossing the line" in terms of his behavior. (Exh. 17 at 11, 12; Exh. 1 at 244; Exh. 2 at 352-365, 384-388, 392, 599, Exh. 18 at D0049, 56)

19. The abusiveness was, at least in part, retaliation against plaintiff for having gone to Byler and HR about his behavior. (Id at 392)

20. Despite his abusive behavior toward plaintiff, Mr. Bennett indicated that

8

Bolick had been doing a great job. He told her that she would be getting a promotion to Vice President and a raise effective in or about August, 2001. (Exh. 4 at 37, Exh. 2 at 393-394; Exh. 6 at 43-44) He told her that Mr. Byler had verbally approved of this.(Exh. 2 at 399-400)

21. Bennett told plaintiff that he wanted her to be his "right hand man", "assistant manager of marketing", wanted plaintiff and he to grow the department, to put others in the field around the country, and he and plaintiff to handle captive business and run the office. (Exh. 1 at 252, 255; Exh. 2 at 443-444, 449-450, 601-602) In late 2001, Byler also promised plaintiff that she would be involved in the management of marketing as the department grew. (Exh. 2 at 443-444, 564; Exh. 17 at 13) Neither Lametta or Byler doubted that Bennett had made such promises to plaintiff. Byler told Goldberg and Lametta that he had "no doubt" that John promised Leigh there would be a "split" between captives and individual accounts. (Exh. 5 at 61; Exh. 16)

22. By all accounts, plaintiff was a good performer. In October, 2001, Byler stated that she had "embraced the marketing role", was "creating strong relationships", was "well organized" and was "instrumental in developing enhancements for our marketing MIS." (Exh. 9, Exh. 5 at 14). During this period of time there was a shortage of underwriters to "close deals" (Exh. 3 at 173-174). There was also a lack of product to sell because ANAC did not have "issuing paper"(Exh. 4, 83-84). Bennett continuously

9

told plaintiff to "relax" about not closing any deals. (Exh. 12 at D0131)

23. On a marketing trip in December, 2001, Bennett told plaintiff that he had set up a joint trip to Gold's gym with a client, so she would have to work out on this trip. (Exh. 17 at 14, Exh. 18 at D0013) They stayed at a hotel on the water. Mr. Bennett referred to what a romantic hotel it was. He wanted plaintiff to work out with him but she declined. Bennett and Ms. Bolick met and had drinks with one client and dinner with another. Mr. Bennet once again got too close to plaintiff when they were alone and attempted to touch her and put his arm around her. Plaintiff felt that he was attempting to create an intimate relationship with her. The following day, he instigated an argument with plaintiff and called her an "idiot" accusing her of not knowing the directions back to the hotel. He then said he was joking and she could not "take a joke". (Complaint ¶ 22-23; Exh. 1 199-200; Exh. 2 at 416-419,421-424, 426; Exh. 17 at 14)

24. Following this trip, on December 21, 2001, Mr. Bennett berated plaintiff for something he believed she had said to Mr. Byler. He stated "I'll fucking bury your ass, if you try to undermine me with Byler." As he sat down to speak to her, he raised his fist and said he was going to sit close enough to "hit you." Ms. Bolick was stunned and frightened by this encounter. (Complaint ¶25; Exh. 17 at 17-18; Exh. 1 at 189-190, 192-195)

10

25. When Ms. Bolick returned to her cubicle, she immediately sent Bennett an e-mail referencing the physical threat and stating that if it happened again, she would advise Byler and Human Resources. (Exh. 11) The e-mail was not returned to plaintiff "undelivered". (Bolick Affidavit)

26. Plaintiff feared that Bennett would retaliate against her as a result of the e-mail, but she hoped it would shock him into stopping his behavior so that she would not have to go to Human Resources (Exh. 1 at 197-198; Exh. 2 at 456-457).

27. Instead, Ms. Bolick's worst fears were realized when on January 9, 2002, Mr. Bennett told Ms. Bolick that they were about to hire another female Vice President, Sandra Duncan, and that he had decided that he and plaintiff did not get along. He said he didn't know why this happened but that it seemed to have happened "that morning in Los Angeles". He then told plaintiff that she would no longer be his assistant manager as Marketing grows, that she would no longer be handling any captive business, internet or marketing material, that she was no longer his "right hand man", and that she would market only individual account business in a regular territory. (Complaint ¶26) Mr. Bennett essentially took away everything Ms. Bolick had been promised when she left a secure job in Texas and joined Alea in October 2000. (Exh. 2 at 431-432)

28. On January 10, 2002, plaintiff called Human Resources and arranged to

11

meet with Marti Lametta, Vice President of Human Resources at ANAC. Ms. Bolick reported everything that had occurred with Mr. Bennett since she began her employment, including the recent physical threat. (Exh. 17 at 21; Exh. 5 at 30-31) Ms. Bolick told Ms. Lametta that she was experiencing difficulty sleeping, eating, working and focusing. (*Id*) Ms. Lametta recalled that plaintiff was visibly upset, crying, nervous and stressed as she told the story.

29. Ms. Lametta found plaintiff's complaints credible. (*Id*) Ms. Lametta responded that this was clearly sexual harassment and that there were other reports of Bennett behaving inappropriately with women in the office. For example, even though Bennett was married, he had asked women at the office to go out with him. (Exh. 5 at 49-50, Exh. 18 at D0091)

30. An investigation followed which included interviews with plaintiff, Byler and Bennett. When confronted with the allegations, Bennett asked if there were any witnesses. (Exh. 17 at 22) When confronted with the December 21st e-mail, Bennett asked "can Leigh prove (I) read it?" (Exh. 18 at D0086) Although Bennett denied the allegations, he admitted that he may have told plaintiff "I'm going to murder you." (Exh. 12 at D0127)

31. He then made statements critical of Bolick designed to undermine plaintiff's standing with Byler. For example, he said that plaintiff had difficulty getting along with

12

the underwriters (Exh. 12 at D0133, Exh. 18 at D0034), that she had been critical of Vance Sawamurra (SVP of Underwriting), Byler and the company (Id) and that her criticism of management had "increased in the last quarter"(Exh. 18 at D0077), that she was too aggressive and "rubs clients the wrong way"(Id at D0029, D0083), that she never closed any deals.(Id at D0077)

32. As the investigation progressed, Marti Lametta testified that "it was becoming more credible for Leigh." (Exh. 5 at 54) Dennis Purkiss and Marti Lametta met with Bennett and advised him that he could walk away and they would give him a very generous deal. (Exh. 4 at 81) Mr. Bennett agreed to resign and was given a severance package. (*Id*)

33. Ms. Bolick was told to come back to work around February 1, 2002 (Exh. 2 at 465) and did return to work soon after that. (Exh. 1 at 249; Exh. 3 at 113) During this time however, plaintiff began counseling and worked at home often. (Exh. 17 at 31, Exh. 2 at 459) She was experiencing increased anxiety over how she was being treated and her change in status at the office. During the hiring process, plaintiff had been promised a part on the management team. (Exh. 1 at 252; Exh. 2 at 449, 564) After Bennett's threats and criticisms of Bolick, she was treated differently by Byler than before her complaint and differently than others in comparable positions in the office. Byler admits that he treated Bolick differently after her complaint (Exh. 3 at 132).

13

34. Plaintiff was no longer treated as part of the management team as she had been prior to her complaint. Byler no longer spoke to plaintiff when she was in the office. (Exh. 2 at 491-492) Plaintiff's salary was less than the three new hires in the same position, despite her greater experience and tenure at Alea. (Exh. 10) The males were paid more than the females doing the same job. (Exh. 3 at 91-92) Plaintiff was paid the least.[1] (Complaint ¶31, 33) Ms. Bolick was excluded from management meetings by Byler. (Exh. 2 at 491-492) The Northeast region, the most desirable territory, that plaintiff lived in, was being assigned to one of the new male hires, Jeff Alexander. Plaintiff was assigned the Southeast, which meant that she would have to travel often. This was contrary to the proposed plan to have people live in their territories to cut down on travel. (Exh. 5 at 60-61; Exh. 2 at 443-444,495, 508, Exh. 3 at 30)

35. Byler followed through on Bennett's threats of January 9, 2002. ( Exh. 2 at 433-434, 436-437, 443-446, 491-492).

36. In May, 2002, Mr. Byler assigned the Bermuda territory to Jeff Alexander, who had already been assigned the Northeast territory. Captive business was

---

[1] In addition, the new male hires were paid sign on bonuses, and were designated as "Key Employees" in their offer letters. As such they were offered equity in the company at the time they were hired. The females, Ms. Bolick and Ms. Duncan, were not offered equity at the time they were hired. Byler testified that the criteria for offering somebody equity at the time they were hired was that they would be a "performer" and would have an "important impact for Alea". (Exh. 3 at 29-98)

14

concentrated in the Northeast and Bermuda (Exh. 7 at 60-61) Alexander was not familiar with clients in the captive sector and had little or no marketing background as compared to plaintiff. Byler admits that plaintiff and Bennett had done the majority of Bermuda marketing before January, 2002, and that next to Byler, plaintiff had the most contacts in the captive market (Exh. 3 at 165-166, 209). Being shut out of this part of the business would affect plaintiff's career opportunities in the future.(Exh. 2 at 542-543)

37. Prior to January 9, 2002, Bennett told plaintiff that she would be his assistant manager in charge of captive business.(Complaint ¶ 37; Exh. 1 at 255; Exh. 2 at 449-450 ). Likewise, Byler had always represented that Bolick would be involved in the management of the department as it grew. (Exh. 2 at 564).

38. Byler used the information from Bennett that plaintiff "did not get along with the underwriters" in refusing to consider plaintiff for Bennett's position, when she requested it in June, 2002. (Exh. 3 at 59-60)

39. Prior to the meeting to discuss plaintiff's complaint of retaliation, Goldberg had a "plan" as to how the investigation would proceed . (Exh. 6 at 59-60) According to Marti Lametta's notes from a discussion with Byler on June 3, the "plan" was to "call her on the inadequacies", "have the discussion on the relationship" and "reject assignment to Bermuda". The notes then indicate "legitimate nondiscriminatory reason to **end the**

15

***relationship*** to overcome the challenge of discrimination". Finally the notes say "make points about her unprofessionalism". (Exh. 18 D0112-0113)

40. Plaintiff met with Goldberg and Lametta on June 6. Plaintiff told Goldberg and Lametta that given everything that had occurred, Bolick did not believe Byler could work with her. She stated that she hoped they had options for her - perhaps elsewhere in the company. Goldberg refused on the spot to transfer plaintiff to another position in the company. (Exh. 2 at 548 - 549)

41. Bennett was aware that plaintiff complained about sexual harassment to Byler and/or Lametta in late 2000.

42. The e-mail of December 21, 2001 from plaintiff to Bennett was protected activity.

43. Bennett read the e-mail.

44. Plaintiff had a good faith, reasonable belief that the conduct of Bennett violated the law.

45. Plaintiff's responsibilities were materially diminished when she was assigned to market the Southeast territory.

46. Bennett had authority to alter the terms and conditions of plaintiff's employment.

47. There was no policy that would have prevented plaintiff's promotion in

16

THE PLAINTIFF, LEIGH BOLICK

_____
Barbara E. Gardner
CT07623
843 Main St., Suite 1-4
Manchester, CT 06040
(860)643-5543
(860)645-9554(fax)
Bg@bgardnerlaw.com

18

## CERTIFICATION OF SERVICE

I hereby certify that a copy of the foregoing was mailed, postage prepaid, this 8th day of March, 2004, to the following counsel of record:

Mary A. Gambardella
Epstein Becker & Green, P.C.
One Landmark Square, Suite 1800
Stamford, CT 06901-2601

Cindy Schmitt Minniti
ReedSmith LLP
599 Lexington Ave., 29th FL.
New York, NY 10022

*Barbara E. Gardner* (signature)
Barbara E. Gardner