UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED

MAR 26  11 31 AM '04

| | | |
|---|---|---|
| LEIGH BOLICK, | : | DEFENDANT BENNETT'S |
| | : | REPLY MEMORANDUM OF |
| Plaintiff, | : | LAW IN FURTHER |
| | : | SUPPORT OF HIS MOTION |
| v. | : | FOR SUMMARY JUDGMENT |
| | : | |
| ALEA GROUP HOLDING, LTD., ALEA | : | CIVIL ACTION NO. |
| NORTH AMERICA COMPANY, JOHN J. | : | 3:03 CV 165 (PCD) |
| BENNETT and ROBERT D. BYLER, | : | |
| | : | |
| Defendants. | : | MARCH 23, 2004 |

PRELIMINARY STATEMENT

Defendant John J. Bennett ("Bennett") hereby respectfully submits his Reply to

Plaintiff's Memorandum of Law in Opposition to Bennett's Motion for Summary Judgment ("Pl.

Brief"). Plaintiff's brief is replete with miscitations to the record, unsubstantiated conclusions

and speculation, none of which is sufficient to defeat a motion for summary judgment.[1]  See

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (Nonmovant must

"do more than simply show that there is some metaphysical doubt as to the material facts.");

R.G. Group, Inc. v. Horn & Hardart Co., 751 F.2d 69, 77 (2d Cir. 1984) (Nonmovant "must

provide 'concrete particulars' showing that a trial is needed, and 'it is not sufficient merely to

assert a conclusion without supplying supporting arguments or facts.'"); Nat'l Westminister

Bank v. Ross, 676 F. Supp. 48, 51 (S.D.N.Y. 1987) (Summary judgment must be granted where

nonmoving party relies only upon "speculation, conclusory allegations and mere denials.").

---

[1]     Plaintiff misstates the burdens of proof for proving her claims.  Rather than address Plaintiff's numerous
mischaracterizations of case law, Bennett refers the Court to his February 12, 2004 Memorandum of Law ("Bennett
Brief") at 8-10.

-1-

Accordingly, Bennett's motion for summary judgment should be granted on all claims against him.[2]

## ARGUMENT

### POINT I

**PLAINTIFF HAS NOT ESTABLISHED THAT SHE ENGAGED IN ANY PROTECTED ACTIVITY, OR THAT BENNETT KNEW OF ANY ALLEGED PROTECTED ACTIVITY, PRIOR TO HER JANUARY 2002 COMPLAINT.**

Plaintiff claims that she first engaged in protected activity when she complained to Byler in November 2000.[3] As explained in the Bennett Brief, this complaint is *not* a protected activity because the conduct complained of was not a statutorily prohibited discrimination, nor did Plaintiff have a good faith belief that it was. See Bennett Brief at 10-13; Cruz v. Coach Stores, Inc., 202 F.3d 560, 566 (2d Cir. 2000) ("The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination."); Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., 126 F.3d 276, 292 (2d Cir. 1998) (To establish that plaintiff participated in protected activity, plaintiff must demonstrate that "she possessed a 'good faith, reasonable belief that the [complained of] employment practice was unlawful' under the statute."). Plaintiff offers no evidence to counter her own testimony that, *at the time she complained to Byler*, she did not believe she was complaining of sexual harassment. See Bolick Dep. at 304. Instead, Plaintiff tries to manipulate the facts by presenting a handwritten note, written by someone else, over 14 months after the complaint to Byler. See Pl. Brief at 24. Clearly, this is not probative of

---

[2]    Despite Plaintiff's disingenuous suggestion, Bennett moved for summary judgment on all claims against him. Throughout this litigation, Plaintiff has proceeded against Bennett only on her aiding and abetting retaliation claim. Nonetheless, a retaliation claim is subsumed into a claim of aiding and abetting retaliation. Bennett clearly argued that Plaintiff cannot make out a *prima facie* case of retaliation or aiding and abetting retaliation. See Bennett Brief at 7-23. Accordingly, Bennett clearly moved for summary judgment on *all claims* remaining against him.

[3]    Plaintiff spends a great deal of time discussing Bennett's conduct during the October 2000 trips. See Pl. Brief at 2-5. However, since Plaintiff does not allege she engaged in protected activity prior to November 2000, none of this alleged conduct can constitute retaliation. Therefore, Bennett need not address these allegations, nor should the Court consider them for purposes of Plaintiff's claims against Bennett.

Plaintiff's state of mind at the time she made the complaint. Accordingly, this complaint is not protected activity.

Even if this complaint were a protected activity, Plaintiff offers no evidence to contradict her own admission or Bennett and Byler's testimony that Bennett was *not* aware of this complaint. See Bolick Dep. at 391, 598; Bennett Dep. at 55; Byler Dep. at 22, 24, 32, 182. Plaintiff merely argues that Bennett must have known about her complaint because he was dismissive in "retaliation for [her] having gone to Byler." See Pl. Brief at 7. This circular and conclusory argument cannot prove that Bennett knew of her complaint.[4]

Plaintiff next speculates that Bennett *may* have deduced that she complained about him from the fact that they no longer traveled together. However, it is clear that Bennett understood that he would no longer travel with Plaintiff *for business reasons*. See Bennett Dep. at 54-55 ("[I]t was always planned that there was going to be a brief training period and maybe for a short time we would travel together, and then as we always planned, we would travel separately."); Bolick Dep. at 181-182. Speculation is not enough to prove an element of a *prima facie* case for purposes of summary judgment. See R.G. Group, 751 F.2d at 77.

Plaintiff next speculates that Bennett knew about her complaint because he was rude to her after November 2000. In addition to being completely unsupported by evidence, Plaintiff's argument is illogical and circular: Plaintiff alleges that she complained to Byler in the first place because she felt that Bennett had been rude to her. It thus makes no sense to suggest that subsequent behavior, which Plaintiff also felt to be rude, was inferably due to Bennett's knowledge of this complaint.

Plaintiff further claims that her December 2000 conversation with Marti Lametta, where she allegedly told Lametta that she had "major issues" with Bennett, is protected activity. Even if this conversation took place as alleged, no protected activity is implicated because Plaintiff

---

[4]    In support of this argument, Plaintiff cites to page 392 of her deposition. However, this testimony does not discuss dismissive behavior at all, and instead shows that Plaintiff did *not* think Bennett's behavior was retaliatory. See Bolick Dep. at 392 (**Question:** [Discussing the work-related compliments Bennett gave Plaintiff] Well, when he told you those things, did you view that as retaliation? **Answer:** No.").

was not complaining about any statutorily prohibited activity. Moreover, there is no evidentiary support to show that Bennett knew that Plaintiff had complained to Lametta about him.

Plaintiff next claims that her December 2001 email to Bennett was a protected activity. In the email Plaintiff threatens that should Bennett make certain comments to her, "Rob and HR will be involved immediately." See Plaintiff's Exh. 11. This email does not constitute a protected activity because, even if it is construed as a complaint to Bennett about his own conduct, the underlying conduct is, at most, rude behavior, and not sexual harassment or any form of statutorily prohibited discrimination. Additionally, Plaintiff offers no evidence that Bennett was aware of Plaintiff's email. In fact, the evidence set forth by Plaintiff makes it clear that Bennett deleted the email without reading it. See Plaintiff's Exh. 18, D0086 (Noting that Bennett "deleted [the email] before reading [it]" because he "got a lot of emails from Leigh [and] couldn't keep up."). Likewise, Bennett's sworn testimony establishes that he *never saw this email*. See Bennett Dep. at 66-67.

Unable to establish any protected activity that Bennett knew of, Plaintiff cites to case law suggesting that resisting a supervisor's "sexual advances" may constitute protected activity. Although Plaintiff cites cases which do not address this issue and, in fact, the most recent case on point held that resisting a sexual advance was *not* a protected activity (Fitzgerald v. Henderson, 36 F. Supp.2d 490, 498-499 (N.D.N.Y. 1998), *aff'd in part and vacated in part*, 251 F.3d 345 (2d Cir. 2001), this is completely irrelevant to the instant case because, as Plaintiff herself has testified, *Bennett never made any sexual advances towards her*. See Bolick Dep. at 296-297.

Finally, Plaintiff cites to Gordon v. NYC Bd. of Ed., 232 F.3d 111 (2d Cir. 2000), for the proposition that "a jury can find retaliation even if the agent denies direct knowledge of plaintiff's protected activity, so long as the jury finds that ... an agent is acting explicitly or implicitly upon the orders of a superior who has the requisite knowledge." See Pl. Brief at 25-26. This is clearly irrelevant because Plaintiff does not allege that anything Bennett did was at the behest of a superior. This is yet another instance of Plaintiff providing irrelevant material in

-4-

an attempt to confuse the issues. Plaintiff cannot establish that she engaged in protected activity prior to January 2002, and even if she could, Plaintiff cannot establish that Bennett was aware of any such protected activity.

**POINT II**

**PLAINTIFF CANNOT ESTABLISH THAT BENNETT TOOK ANY ADVERSE EMPLOYMENT ACTION AGAINST HER.**

Plaintiff's claims against Bennett also fails because she offers absolutely no evidence to show that Bennett ever took any adverse employment action against her. The evidence is undisputed that Bennett did not have authority to change the terms of Plaintiff's employment. See Byler Dep. at 222 ("**Question:** Did [Bennett] have the authority to change Mrs. Bolick's job duties? **Answer:** No. * * * **Question:** Did [Bennett] have the authority to terminate her employment? **Answer:** No."). Despite evidence to the contrary, Plaintiff incorrectly states that as Plaintiff's supervisor, Bennett "clearly had authority to affect the terms and conditions of her employment." Pl. Brief at 28. As support, Plaintiff cites to Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57 (1986) and Faragher v. City of Boca Raton, 524 U.S. 775 (1998) – two cases which have absolutely nothing to do with this issue. Both Meritor and Faragher hold that an *employer* may be liable for a supervisor's sexual harassment. See Meritor, 477 U.S. at 77; Faragher, 524 U.S. at 803. While Plaintiff could argue this with respect to Alea, it has nothing to do with her claims against Bennett. Moreover, neither of these cases even suggest, as Plaintiff would have this Court believe, that decision-making authority is imputed to a supervisor who does not possess such authority. See id. The evidence adduced in this case clearly shows that Bennett did not have power to change the terms of Plaintiff's employment. See Byler Dep. at 222. Even if Bennett had the power to alter Plaintiff's job responsibilities, it is undisputed that Bennett did not do so, nor did he attempt to do so. See Bolick Dep. at 461, 594; Byler Dep. at 210-211.

-5-

In support of her claim of retaliation, Plaintiff identifies just one event, her January 9, 2002 conversation with Bennett. <u>See</u> Pl. Brief at 10. Plaintiff alleges that during this conversation, her "worst fears were realized" when Bennett allegedly told her that Alea was about to hire Sandra Duncan, and that she would no longer be his "right hand man." <u>See</u> Pl. Brief at 9. Neither comment, even if acted upon, constitutes an adverse employment action.[5] <u>See</u> <u>Galabya v. NYC Bd. of Educ.</u>, 202 F.3d 636, 640 (2d Cir. 2000).

Plaintiff *admits* that hiring new Vice Presidents did *not* constitute retaliation. <u>See</u> Bolick Dep. at 434. Plaintiff further admits that since the time she was hired, she knew that Alea was planning to hire additional people. <u>See</u> Bolick Dep. at 157-159. Indeed, Plaintiff does not dispute that she interviewed Duncan before she sent the email to Bennett, and before their January 9, 2002 conversation. <u>See</u> Bolick Dep. at 433; Byler Dep. at 185. Moreover, the evidence in the record does not support the notion that Bennett had the authority to hire anybody, and rather, demonstrates that Bennett did not have final authority to make employment decisions. <u>See</u> Bolick Dep. at 415; Byler Dep. at 222. Furthermore, Plaintiff does not contest the fact that Alea, as a young and growing company, had legitimate business reasons for hiring new Vice Presidents.

Plaintiff's claim that she was no longer Bennett's "right hand man" is likewise unavailing. Plaintiff offers no evidence to suggest that she was Bennett's "right hand man" before their January 2002 conversation. Plaintiff fails to identify any responsibilities that made up this alleged position, and likewise does not point to any responsibilities taken away from her. As such, Plaintiff cannot establish this as an adverse employment action.

Even if Plaintiff had been Bennett's assistant, that position would have ended when Bennett left the company in January 2002. Alea did not replace Bennett until April 2003, six

---

[5] Notably, Plaintiff complained to Human Resources immediately after their January 9, 2002 conversation. <u>See</u> Lametta Dep. at 33; Byler Dep. at 202. Plaintiff and Bennett did not work together or even see each other from the time of this conversation until Plaintiff's deposition in this case. <u>See</u> Bolick Dep. at 594. Plaintiff admits Bennett did not retaliate against her after he left Alea. <u>See</u> <u>id.</u> at 461.

-6-

months after Plaintiff stopped working at Alea. <u>See</u> Byler Dep. at 56. Thus, Plaintiff could not have been the Senior Vice President's assistant because there was no Senior Vice President.

While Plaintiff only cites to the January 2002 conversation as "Retaliation By Bennett," she nonetheless alleges that a number of additional actions are attributable to Bennett. <u>See</u> Pl. Brief at 10, 28-30. First, Plaintiff summarily states that Bennett retaliated against her by creating a hostile work environment. <u>See</u> Pl. Brief at 30. However, Plaintiff cannot succeed on this claim because she does not point to anything which is "sufficiently severe or pervasive to alter the conditions of [her] employment," as is required to prove a hostile work environment. <u>See</u> <u>Alfano v. Costello</u>, 294 F.3d 365-373 (2d Cir. 2002).

Second, Plaintiff claims, for the first time, that Bennett failed to train her. <u>See</u> Pl. Brief at 30. Plaintiff does not provide any evidence for this claim, nor has any evidence been taken to support such a claim. Accordingly, this claim should be disregarded by the Court. Although Plaintiff actively avoided Bennett and requested not to travel with him, she complains that he excluded her from meetings and refused to introduce her to people at conventions. <u>See</u> <u>id.</u> at 6; Bolick Dep. at 181-182, 244, 599. Notably, Plaintiff and Bennett only attended two conventions together after she complained to Byler. Plaintiff does not recall who Bennett refused to introduce her to, but she does state that they were "high-level" people in the industry, two and three levels above her. <u>See</u> <u>id.</u> at 364. Accordingly, there are legitimate reasons for not including Plaintiff at these meetings. Nonetheless, Plaintiff *attended these meetings anyway.* <u>See</u> <u>id.</u> at 364-365. As such, this cannot rise to the level of an adverse employment action..

Third, Plaintiff alleges that she suffered an adverse employment action when Bennett allegedly raised his fist and told Plaintiff that he will sit close enough "to hit [her]" and that he would "fucking bury [her] if she undermined [him] with Byler." Neither of these comments constitutes an adverse employment action.[6] <u>See</u> <u>O'Dwyer v. Snow</u>, 2004 U.S. Dist. LEXIS 3528

---

[6]     Notably, Plaintiff admits that this conversation was in response to a negative comment Plaintiff made about a prospective employee Bennett wanted to hire. <u>See</u> Bolick Dep. at 189-191. Thus, Bennett's alleged comments were clearly not causally related to any protected activity.

(March 9, 2004 S.D.N.Y.).    In <u>O'Dwyer</u>, Plaintiff alleged that, in response to her scheduling a meeting with her union, her supervisor "'jumped across the desk,' stretched out his hand toward her, coming as close as two inches to her face so that she jumped back in reaction ... Plaintiff alleges that she felt physically threatened ... felt unable to continue working and was afraid of further physical threats." <u>Id.</u> at *8-9.  The court held that "behavior [which] simply leaves a plaintiff feeling frightened or threatened does not constitute an adverse employment action." <u>Id.</u> at *32-33.

In short, Plaintiff was never subjected to *any* adverse employment action, either by Bennett or by anybody else at Alea.  It is undisputed that Plaintiff was never demoted, never suffered a diminution in job responsibilities, and never suffered a reduction in salary.  On the contrary, after Plaintiff's complaint to Human Resources, Plaintiff received a raise and a promotion, based on *Bennett's recommendation*.  <u>See</u> Bolick Dep. at 558; Bennett Dep. at 37. To the extent Plaintiff claims that she was not promoted sooner, was not the highest paid Vice President, was not given the Bermuda territory (which she did not have before her complaint), and her traveling did not decrease, she is really claiming that she was not placed in a *better* position after her complaint.  Failing to place Plaintiff in a better position after her complaint is *not* an adverse employment action.

Finally, Plaintiff discusses various events that occurred after Bennett left Alea.  <u>See</u> Pl. Brief at 12-17.  None of these events are relevant to the claims against Bennet because, as Plaintiff readily admits, Bennett *did nothing to retaliate against her after he left the company*. <u>See</u> Bolick Dep. at 461.  Thus Bennett need not address these arguments and the Court should not consider them for purposes of Plaintiff's retaliation claim against Bennett.

**POINT III**

**PLAINTIFF OFFERS NO EVIDENCE TO SUPPORT HER
CLAIM THAT BENNETT AIDED AND ABETTED ANY
ADVERSE EMPLOYMENT ACTION AGAINST HER.**

In her Brief, Plaintiff argues, *for the first time*, that statements Bennett allegedly made during the January 2002 investigation caused Byler to take adverse employment actions against Plaintiff.[7]  See Pl. Brief at 10-11.  Plaintiff relies solely on her self-serving handwritten notes to establish that Bennett made these statements.  See id.  Nonetheless, the statements at issue were responses to questions during the investigation prompted by Plaintiff's complaint.  At most, these statements are the equivalent of a negative job evaluation.  It is well-settled in the Second Circuit that "[n]egative evaluations alone, without any accompanying adverse result ... such as demotion, suspension [or] loss of wages" cannot constitute an adverse employment action.  See Valentine v. Standard & Poor's, 50 F.Supp. 2d 262, 283-284 (S.D.N.Y. 1999), *aff'd* 205 F.3d 1327 (2d Cir. 2000).  There is absolutely no evidence that these statements had any influence whatsoever on anything Byler subsequently did.  On the contrary, Byler specifically testified that Bennett never asked him to take away any of Plaintiff's job responsibilities.  See Byler Dep. at 210-211.

Indeed, Plaintiff herself does not believe that Byler took any actions based on Bennett's alleged comments, rather she alleges that Byler himself acted in retaliation.   See Complaint ¶¶ 39, 41.  Plaintiff argues that Byler took adverse employment actions in retaliation for her engaging in protected activity.  She then contradicts that claim by arguing that Byler took the very same actions because of comments Bennett made regarding Plaintiff's performance.  Plaintiff simply cannot have it both ways and accordingly, this claim should fail.[8]

---

[7]     As discussed in Defendant Alea's brief in support of their motion for summary judgment, the subsequent acts Plaintiff alleges Byler to have performed do not constitute adverse employment actions.  For this reason alone, this claim against Bennett should fail.

[8]     Plaintiff also mentions that Bennett's comments were "an attempt" to retaliate against her.  See Pl. Brief at 30.  This novel allegation, which Plaintiff makes for the first time in her Brief, is neither explained nor developed by

Moreover, Plaintiff's claim that Bennett's comments during the investigation were an attempt to aid and abet retaliation is premised on the theory that such comments were untrue. See Pl. Brief at 30. There is absolutely no evidence to support Plaintiff's assertion that Bennett's statements were untrue. On the contrary, Byler testified that he was alerted to the very problems Bennett allegedly mentions during the investigation – Plaintiff's inability to get along with underwriters and management – back in 2000, soon after Plaintiff started work and long before she engaged in any protected activity. See Byler Dep. at 59-60. Accordingly, Plaintiff cannot succeed on an aiding and abetting retaliation claim.

## POINT IV

### PLAINTIFF DOES NOT DEMONSTRATE A CAUSAL CONNECTION BETWEEN PROTECTED ACTIVITY AND AN ADVERSE EMPLOYMENT ACTION.

The only protected activity Plaintiff engaged in was her January 2002 complaint to Human Resources. To the extent that Plaintiff claims she engaged in protected activity prior to January 2002, she has not set forth any evidence to show that Bennett knew of the activity. Without this requisite knowledge, Plaintiff cannot establish that any conduct was taken *because of* the protected activity. Accordingly, Plaintiff cannot establish a causal connection. Likewise, Plaintiff cannot establish any causal connection based upon her complaint in January 2002 because, by her own admission, she and Bennett had absolutely no contact whatsoever after this complaint, and Bennett did not retaliate against her after he left Alea. See Bolick Dep. at 461. Accordingly, summary judgment should be granted on all claims against Bennett.

---

Plaintiff. Nonetheless, Plaintiff offers absolutely no evidence to support this new claim, which must therefore be dismissed along with her other claims.

-10-

## POINT V

### BENNETT IS ENTITLED TO ATTORNEYS' FEES.

Plaintiff does not adequately oppose Bennett's motion for fees. As the foregoing brief and the entire evidentiary record indicate, Plaintiff bases her claims against Bennett solely on unsupported conclusory allegations and speculation.

### CONCLUSION

For the foregoing reasons, Bennett respectfully requests that the Court grant his Motion for Summary Judgment, dismiss Plaintiff's claims against him in their entirety, and award Bennett costs, fees and such other and further relief as the Court may deem just and proper.

Dated:    New York, New York
          March 23, 2004

Reed Smith LLP

By: *Cindy Schmitt Minniti*
    David J. Weissman ct24702
    Cindy Schmitt Minniti ct25495
    599 Lexington Avenue, 29th Fl.
    New York, NY 10022
    P: (212) 521-5436
    F: (212) 521-5450
    cminniti@reedsmith.com

*Attorneys Pro Hac Vice for*
*Defendant John J. Bennett*

-11-