### UNITED STATES DISTRICT COURT

### DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| Leigh BOLICK, | : | |
|     Plaintiff | : | |
|   vs. | : | Civil No. 3:03cv165 (PCD) |
| | : | |
| ALEA GROUP HOLDINGS LTD., ALEA | : | |
| NORTH AMERICA COMPANY, John | : | |
| J. BENNETT, and Robert D. BYLER, | : | |
|     Defendants. | : | |

### RULING ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56, Defendants Alea Group Holdings, Ltd. ("AGH"), Alea

North American Company ("ANAC"), and Robert Byler, move for summary judgment on all

Counts.  Also pursuant to Fed. R. Civ. P. 56, Defendant John J. Bennett moves for summary

judgment on all remaining Counts against him.  For the reasons stated herein, Defendants AGH,

ANAC, and Byler's Motion [Doc. No. 96] is **granted** in part and Defendant Bennett's Motion

[Doc. No. 109] is **denied**.

## I.     RELEVANT BACKGROUND:[1]

Plaintiff brings the following action alleging unlawful discrimination in violation of

Conn. Gen. Stat.§ 46a-60, et seq. (Count One), retaliation in violation of Conn. Gen. Stat. § 46a-

60, et seq. (Count Two), discriminatory treatment violating Title VII, 42 U.S.C. § 2000e, et seq.

(Count Three), retaliation in violation of Title VII (Count Four), breach of implied in fact

---

[1]     The statement of facts that follows is derived from the parties Local Rule 56 statements and their
briefs.  It is, however, focused on Plaintiff's version of the facts as Defendants argue that even if
Plaintiff's version of the facts is true, she cannot recover.  To the extent necessary, the facts will be
addressed in more detail in the discussion that follows.

contract (Count Five), breach of the implied covenant of good faith and fair dealing (Count Six),
negligent misrepresentation (Count Seven), and violation of the Equal Pay Act (Count Eight). At
this stage in the litigation, Counts Two and Four are the only Counts applicable to Defendant
Bennett.

Defendant ANAC is a reinsurance intermediary. Defendant Byler is Chief Executive
Officer of Alea Alternative Risk, a division of ANAC. Defendant Bennett was Alea Alternative
Risk's Senior Vice President of Marketing and was Bolick's supervisor for the majority of her
employment with ANAC. AGH is ANAC's parent company.

Plaintiff was hired by ANAC in September 2000 for the position of Assistant Vice
President of Marketing. She was told the position would require substantial travel and was
amenable to this possibility. She was hired at a salary of $100,000 and was eligible for other
benefits including a bonus, which Defendants allege was purely discretionary. Plaintiff's
responsibilities would involve marketing insurance products.

Plaintiff contends that from the very beginning of her employment, Bennett was rude to
her. She reports that he told her, among other things, that being a woman might be a problem for
her in the job. Early in her employment, Plaintiff traveled with Bennett on several occasions and
she alleges that he engaged in inappropriate conduct while on these trips.

On a business trip during the week of October 16, 2000, Plaintiff alleges that, among
other things, Bennett put his arm around her shoulder, often stood too close to her, whispered in
her ear, and repeatedly asked her to bring workout clothes for the hotel gym. Plaintiff states that
Bennett would take offense when she moved away from him and asked if she didn't bring gym
clothes because she did not want to be around him. He accused her of smoking pot.

2

On October 30, 2000, Plaintiff and Bennett traveled together to Chicago.  He continued to make comments Plaintiff describes as inappropriate.  He called her a cry baby and repeatedly asked her what her husband thought of her new job and boss.  He asked her whether she brought workout clothes and whether her husband didn't want her working out with him.  Bennett discussed cocaine parties and asked Plaintiff why she thought people wore tongue rings.  Based on his tone, Plaintiff took this to mean that he was trying to start a conversation about sex.

On October 31, 2000, Plaintiff traveled with Bennett to Seattle.  Bennett drank scotch and wine on the plane and told Plaintiff he was reading a book about the sexual exploits of the beautiful people of California.  He leaned his head on Plaintiff's shoulder when he spoke with her.  He became angry when she pushed him away.

During the flight, Plaintiff requested time off during Thanksgiving.  Bennett responded that he would give her time off if she "did something for him."  He then suggested they play cards for "money and fun."  He became upset when Plaintiff did not eat the meal offered on the plane.  After they landed, Bennett sat, not on a seat, but on a metal ledge right next to Plaintiff with his arm resting on the back of the seat touching her.  He again leaned in very close to her when he spoke to her and asked her to play cards.  Plaintiff tried to keep her distance.  Plaintiff alleges that Bennett's attempts to touch her or be near to her were constant and occurred every time they were on the road together.

At the time, ANAC had no written sexual harassment policy.  Plaintiff decided to complain to Byler about Bennett's conduct.  She and Byler met outside the office during the week of November 6, 2000.  Both Byler and Bennett agreed that Plaintiff should no longer travel with Bennett and that Bennett should not know about her complaint.  Byler did not report the

3

matter to Human Resources and Plaintiff did not request that he do so, although she was aware of that option. Bennett remained Plaintiff's supervisor and she continued to see him at the office. Plaintiff met with Byler afterwards and described the situation between her and Bennett as "workable."

In December 2000, Plaintiff met with Marti Lametta, Vice President and Director of Human Resources, and told her that she had "major issues" with Bennett. She alleges that she told Lametta she was working them out with Byler, but that she wanted her in the loop.

Plaintiff did not travel with Bennett from November 2000 until December 2001. Nevertheless, when at the office, Plaintiff states that Bennett would belittle and berate her, often yelling. At other times, Bennett would be extremely complimentary and often made comments about her appearance remarking on her hair and weight. Bennett was known to call other people within the office names as well. Plaintiff alleges that he attempted to isolate her from other employees and became upset when she spoke to Byler outside his presence. In May 2001, Plaintiff had a conversation with Bennett in which she told him he was crossing the line. However, none of Bennett's conduct was explicitly sexual in nature.

In the midst of all this, Plaintiff alleges that Bennett made certain promises to her, namely that she would be his "right hand man," assistant manager of marketing, wanted Plaintiff to grow the marketing department with him, expand nationwide, and for the two of them to handle captive business and run the office.

In December 2001, Bennett wanted to travel with Plaintiff again. Plaintiff agreed. He asked Plaintiff to set up a trip to the gym with a client. They stayed at a hotel, which Bennett described to Plaintiff as romantic. He wanted to workout with Plaintiff again, but she declined.

4

At a dinner with a client, Plaintiff alleges that Bennett once more tried to get very close to Plaintiff, touch her, and put his arm around her.  The next day, Bennett purportedly instigated an argument with her and called her an idiot.  He later claimed it was a joke and that she could not take a joke.

On December 21, 2001, Plaintiff had a conversation with Bennett regarding a job candidate and Bennett allegedly moved closer to Plaintiff, raised his fist, and told her that he was going to sit close enough to her to hit her.  Plaintiff also alleges that he stated that he would "fucking bury [her] ass if [she tried] to undermine [him] with Byler."  Plaintiff states that this exchange frightened her and the she responded by sending Bennett an email threatening to go to Byler and Human Resources if Bennett ever threatened her again.  She then left the office and did not return until January, having taken time off for the Christmas holiday.

On January 9, 2002, after Plaintiff had returned to work, Plaintiff alleges that Bennett told her that they were about to hire another female vice president and that he had decided that he and Plaintiff did not get along.  He allegedly told Plaintiff that she would no longer be his assistant manager of marketing, would no longer handle captive business, internet or market materials, and would market only individual account business.

On January 10, 2002, Plaintiff complained to Human Resources and discussed Bennett's behavior with Marti Lametta, Vice President of Human Resources at ANAC.  Plaintiff claimed that as a consequence of Bennett's actions, she was having difficulty sleeping, eating, working, and focusing.  An investigation followed, however, Bennett resigned before ANAC made any final determination regarding the merit of Plaintiff's contentions.  Bennett received a severance package.

Plaintiff was told to take some time off from work during the investigation and did not return until late February 2002. She expressed reservations about returning to the office and remained fearful of Bennett. Even after returning to the office, she often worked from home.

Plaintiff contends that upon her return, she was treated differently than before she filed her complaint. She claims that she was not involved in the hiring of two of the three new vice presidents. Plaintiff alleges that the three new vice presidents all had salaries higher than her own even though she had greater experience and tenure at ANAC. Furthermore, Plaintiff contends that the two male hires, Jeffrey Alexander and Scott Roe, were both paid more than she and Sandra Duncan.

Plaintiff maintains that she was no longer treated as part of the management team. She alleges that she was no longer included in meetings and was not allowed to attend a conference. The Northeast region, the region Plaintiff desired to work in, was assigned to Jeffrey Alexander and Plaintiff was assigned to the Southeast region. This assignment meant continued travel requirements and less opportunity to engage in captive business. Plaintiff was not given Bennett's old office and remained in a cubicle.

In February, Plaintiff requested that her title be changed to Vice President immediately so as to not disadvantage her with the new vice presidents who had been hired. Plaintiff also requested that her business card be changed to reflect this title in time for an important conference in March. This change was not, however, effected until April. Defendants allege that ANAC had a general policy of not allowing promotions until April in any given year. Plaintiff, however, alleges that in the past numerous exceptions to this policy were made.

Plaintiff believes that Byler was following through on Bennett's threats regarding

6

Plaintiff's future employment prospects. She alleges that Byler berated and humiliated her during a meeting in April 2002.

In May 2002, Plaintiff informed Byler that she believed he was retaliating against her for filing her complaint against Bennett. In June 2002, Plaintiff met with Leonard Goldberg, recently appointed Chairman and CEO of ANAC, to discuss her concerns. Plaintiff requested a transfer which was refused and to be considered for Bennett's job. She asserts that the investigation of her complaint was inadequate. Later that month Plaintiff filed a complaint with the Commission on Human Rights and Opportunities. Plaintiff's complaint was eventually found to be without merit. In September 2002, Plaintiff commenced a disability leave. Plaintiff alleges that she is suffering from post traumatic stress disorder and is unable to work. In July 2003, after the exhaustion of her statutory leave, Defendant ANAC terminated Plaintiff. Defendant ANAC maintains that up until her termination, Plaintiff was free to return to work at her former position. Plaintiff alleges that during her leave Defendant ANAC attempted to short change her regarding a wage continuation policy. Plaintiff states that to this day she is unable to work and collects disability.

## II.    STANDARD OF REVIEW:

A party moving for summary judgment must establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). "A party opposing a properly brought motion for summary judgment bears the burden of going beyond the pleadings, and 'designating specific facts showing that there is a genuine issue for trial.'" Amnesty Am. v. Town of W. Hartford, 288 F.3d 467, 470 (2d Cir. 2002), citing

Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  "In

moving for summary judgment against a party who will bear the ultimate burden of proof at trial,

the movant's burden of establishing that there is no genuine issue of material fact in dispute will

be satisfied if he or she can point to an absence of evidence to support an essential element of the

nonmoving party's claim."  Legg v. Dellavolpe, 228 F. Supp. 2d 51, 56 (D. Conn. 2002), citing

Celotex, 477 U.S. at 322.  In determining whether a genuine issue has been raised, all

ambiguities are resolved and all reasonable inferences are drawn against the moving party.

United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962); Quinn

v. Syracuse Model Neighborhood Corp., 613 F.2d 438, 445 (2d Cir. 1980).  Summary judgment

is proper when reasonable minds could not differ as to the import of evidence.  Bryant v.

Maffucci, 923 F.2d 979, 982 (2d Cir. 1991).  "Conclusory allegations will not suffice to create a

genuine issue." Delaware & H. R. Co. v. Conrail, 902 F.2d 174, 178 (2d Cir. 1990).

Determinations of the weight to accord evidence or credibility of witnesses are improper on a

motion for summary judgment as such are within the sole province of the jury.  Hayes v. N.Y.

City Dep't of Corr., 84 F.3d 614, 619 (2d Cir. 1996).

## III.    DISCUSSION:

A.     AGH, ANAC, and Byler's Motion:

1.     Hostile Work Environment:

A Title VII hostile work environment claim involves specific claims about the work

environment, namely, that it is "permeated with 'discriminatory intimidation, ridicule, and insult,'

...'sufficiently severe or pervasive to alter conditions of the victims employment or create an

abusive working environment." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993) (internal

citations omitted).  A hostile work environment claim must allege that the workplace is "permeated" with discriminatory actions that create an "abusive" work environment.  Harris, 510 U.S. at 21.  This test has both objective and subjective components.  The conduct must create an "objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or abusive" and the victim must subjectively perceive the environment to be abusive, otherwise the "conduct has not actually altered the conditions of the victim's employment."  Id. at 21-22.  In so proving, a plaintiff must always demonstrate that "the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimination . . . because of . . . sex."  Oncale v. Sundowner Offshore Servs., 523 U.S. 75, 81, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998) (ellipses in original).  Generally, isolated incidents are not enough to meet the objective standard, however, if a plaintiff can prove that a single incident was "extraordinarily severe" he or she may be able to prevail.  Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000).

In the context of a hostile work environment claim based on gender discrimination, "a work environment which is equally harsh for both men and women cannot support a claim for sex discrimination."  Petrosino v. Bell Atl., 385 F.3d 210, 221 (2d Cir. 2004).  Nevertheless, the "mere fact that men and women are both exposed to the same offensive circumstances on the job site, however, does not mean that, as a matter of law, their work conditions are necessarily equally harsh."  Id.  While "a plaintiff must demonstrate that the conduct occurred because of her sex[,]" there is "little question that incidents that are facially sex-neutral may sometimes be used to establish a course of sex-based discrimination--for example, where the same individual is accused of multiple acts of harassment, some overtly sexual and some not."  Alfano v. Costello,

294 F.3d 365, 375 (2d Cir. 2002) (citation omitted).  "Determining whether workplace

harassment was severe or pervasive enough to be actionable depends on the totality of the

circumstances." Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000).  The perspective

from which a court must consider this question is that of a "reasonable person in the plaintiff's

position." Petrosino, 385 F.3d at 221 (2d Cir. 2004), citing Oncale, 523 U.S. at 81.  It is

appropriate to consider "the social context in which particular behavior occurs and is experienced

by its target." Petrosino v. Bell Atl., 385 F.3d 210, 221 (2d Cir. 2004).  "Where reasonable jurors

could disagree as to whether alleged incidents ... insensitivity or harassment would have

adversely altered the working conditions of a reasonable employee, the issue of whether a hostile

work environment existed may not properly be decided as a matter of law." Patterson v. County

of Oneida, 375 F.3d 206, 227 (2d Cir. 2004).

a. Was the Work Environment Objectively Hostile:

As evidence that her work environment was objectively hostile, Plaintiff cites Bennett's

alleged verbal abuse and belittlement by calling her names such as idiot and stupid, and swearing

at her.  Pl. Mem. Opp. Summ. J. at 21.  Plaintiff refers to her allegation that while on the road

with her, Bennett would ask her about drugs, discuss cocaine parties, tongue rings, read sexually

oriented quotes from a book, often tried to put his arm around her and/or be very close to her, and

made comments about her hair and weight.  Id. at 21-22.  When Plaintiff asked for a day off, he

said that she could if she "did something for him."  Id. at 21.  Once he asked her to play cards

with him "for money and fun."  Id.  Plaintiff claims he attempted to isolate her from others in the

office and physically threatened Plaintiff.  Id. at 22.

Defendants ANAC, AGH, and Byler argue that Plaintiff's claims involve episodic

10

behavior with no real correlation to her sex and that, as Plaintiff admits, Bennett treated males in the office similarly.  Def. Mem. Supp. Summ. J. at 20, <u>citing</u> Bolick Depo. at 312-14 (stating that Bennett called men names, including one individual whom he referred to as a "fat ass").  Indeed, many of Plaintiff's allegations are not overtly sex-based and have no obvious sexual connotation. Nevertheless, as stated, these allegations may of course be considered as part of a hostile work environment claim provided there is enough evidence overall to tie the conduct to Plaintiff's sex. <u>Alfano</u>, 294 F.3d at 375.

By Plaintiff's own account, the only conduct that would suggest an explicit link to her sex occurred primarily in the context of Plaintiff's travels with Bennett.  <u>See</u> Pl. Mem. Opp. Summ. J. at 2-4, 7 (discussing conduct on trips such as suggestive conversation and initiating close physical contact);[2] <u>compare</u> Id. at 6 (discussing conduct when not traveling, such as attempting to isolate Plaintiff and insulting her).[3]  It is worth noting then that Plaintiff complains of conduct while traveling with Bennett in October of 2000, making up approximately three different trips, and did not travel with him from November 2000 until December 2001 after having complained about Bennett's conduct.  Plaintiff did not travel with Bennett again until December 2001 when she apparently grudgingly agreed on her own to travel with Bennett.  Def. Mem. Supp. Summ. J.

---

[2]    While Defendant suggests that this sort of conduct is not explicitly sexual, or tied to Plaintiff's sex, inasmuch as it isn't a direct proposition, Def. Mem. Supp. Summ. J. at 6, a reasonable person could interpret it as impliedly sexual.  This does not, however, resolve the question of whether the environment was objectively hostile as conduct with sexual connotations is not "automatically discrimination" and the "critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed."  <u>Oncale</u>, 523 U.S. at 80 (citation omitted).

[3]    The only exception to this highlighted in Plaintiff's Brief is her allegation that Bennett commented on her weight and hair while at work.  Pl. Mem. Opp. Summ. J. at 6.  However, as noted, there is evidence that Bennett treated other workers similarly.  <u>See</u> Bolick Depo. at 312-14 (stating that Bennett called men names, including one individual whom he referred to as a "fat ass")

at 7, <u>citing</u> Bolick Depo. at 415-18.  Plaintiff also complains of Bennett's conduct on this trip, including referring to how romantic the hotel was (in reference to a trip he took with his wife), getting too close to her, and calling her names.  Pl. Mem. Opp. Summ. J. at 7.  Thus, any conduct that can be reasonably viewed as explicitly linked to Plaintiff's sex occurred over the relatively limited period of time that Plaintiff spent traveling with Bennett.

Other courts have noted that in the Second Circuit, hostile work environment claims tend to survive summary judgment "where the record reflects either a continuous and repeated pattern of explicit ... slurs or a few particularly severe incidents of discrimination." <u>Curtis v. Airborne Freight Corp.</u>, 87 F. Supp. 234, 247 (S.D.N.Y. 2000), <u>citing</u> <u>Richardson v. New York State Dep't of Correctional Serv.</u>, 180 F.3d 426 (2d Cir. 1999) (Repeated use of racial epithets and slurs survive summary judgment, but claim involving only three incidents of use of racial slurs does not.) <u>and</u> <u>Tomka v. Seiler Corp.</u>, 66 F.3d 1295 (2d Cir. 1995) (Single incident of sexual assault by supervisors sufficient to defeat summary judgment.).  On its face, the conduct Plaintiff complains of is not particularly severe or pervasive.  Nevertheless, there are some characteristics which mitigate against summary judgment.  First, the more sexually oriented comments and actions took place while Plaintiff was traveling with Bennett and thus potentially isolated from colleagues and familiar circumstances, which may reasonably cause a person to view these incidents as more severe and become more fearful.  Furthermore, the most severe non-explicitly sexual conduct on the part of Bennett (e.g. sitting close enough to her to hit her and threatening to bury her), if credited and tied to the more sexually oriented conduct could be sufficiently severe to satisfy the objective element to a hostile work environment claims.  A reasonable juror could credit Plaintiff's account and infer that Bennett's conduct was based on her sex and severe

enough to be actionable.  A reasonable juror could also credit Plaintiff's account and find

otherwise, but the former is sufficient to defeat summary judgment.[4]

    b.  Whether Bennett's Conduct Can be Imputed to ANAC, AGH, or Byler:

  "[E]mployers are not automatically liable for sexual harassment perpetrated by their

employees."  Petrosino, 385 F.3d at 225 (citation omitted).  "Where an employee is the victim of

sexual harassment, including harassment in the form of a hostile work environment, by

non-supervisory co-workers, an employer's vicarious liability depends on the plaintiff showing

that the employer knew (or reasonably should have known) about the harassment but failed to

take appropriate remedial action."  Id.  When the conduct in question involves an employee in a

supervisory position, liability on the part of the employer hinges on "whether the supervisor's

behavior culminated in a tangible employment action" against the employee" and "if it did, the

employer will, ipso facto, be vicariously liable."  Id. (quotation marks and citations omitted).  An

employer will still be held liable, even in the absence of tangible employment action, unless "it

successfully establishes as an affirmative defense that (a) it exercised reasonable care to prevent

and correct promptly any sexually harassing behavior, and (b) the plaintiff employee

unreasonably failed to take advantage of any preventive or corrective opportunities provided by

the employer or to avoid harm otherwise."  Id.  (quotation marks and citations omitted).

    I.  Tangible Employment Action:

  "A tangible employment action constitutes a significant change in employment status,

---

[4]  Quinn v. Green Tree Credit Corp., 159 F.3d 759, 768 (2d Cir. 1998), a case relied on by
Defendant, is distinguishable inasmuch as the plaintiff therein could rely on only two timely
allegations.  Plaintiff's allegations here are not so limited.  Brennan v. Metropolitan Opera Ass'n,
192 F.3d 310, 319 (2d Cir. 1999) is also distinguishable inasmuch as some of Plaintiff's
allegations, if credited, do involve disparate treatment when compared to her co-workers.

such as hiring, firing, failing to  promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  Burlington Indus. v. Ellerth, 524 U.S. 742, 761, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998).  In most cases, a tangible employment action "inflicts direct economic harm."  Id. at 762.  There is, however, no absolute requirement that it do so.  Mormol v. Costco Wholesale Corp., 364 F.3d 54, 57 (2d Cir. 2004) (citation omitted).

In support of her claim that she suffered a tangible employment action in that "Bennett threatened to reduce plaintiff's management responsibilities and opportunities in the captive market and relegate her to a lesser role marketing an individual territory."  Pl. Mem. Opp. Summ. J. at 24.  Plaintiff goes on to state that these threats were "eventually carried out by Byler following Bennett's departure."  Id.  The position Plaintiff ended up with, she asserts, "was in sharp contrast to the position plaintiff held prior to confronting Bennett with her e-mail on December 21, 2001" and that a reasonable jury could conclude that this was "done in retaliation for plaintiff's failure to engage in an intimate relationship with Bennett and thus a tangible employment action."  Id.

As noted, Plaintiff's claims regarding a tangible employment action took place after Bennett's departure in January of 2002, which she characterizes in her factual discussion as retaliation for her January 10, 2002 sexual harassment complaint.  Pl. Mem. Opp. Summ. J. at 11-14.  While Bennett threatened to carry out these actions, by Plaintiff's own account he did not do so.  Id.  Thus, one must assume that Byler carried out these threats at Bennett's behest in order for the purported tangible employment action(s) to have any connection to Plaintiff's hostile

work environment claim.[5]  Plaintiff presents no evidence that Byler did so and does not

specifically argue the issue.  See Lee-Crespo v. Schering-Plough Del Caribe, Inc., 354 F.3d 34,

45 (1st Cir. 2003) (affirming summary judgment because "there is absolutely no evidence that

anyone other than non-harassers made the decision or that gender discrimination motivated the

decision to move her to a new territory").  Plaintiff does argue that Byler's conduct was in

retaliation for her filing a complaint regarding Bennett's alleged sexual harassment, Pl. Mem.

Opp. Summ. J. at 33-34, a different cause of action entirely, but makes no argument regarding

how Byler's conduct is connected to her hostile work environment claim regarding Bennett's

action.  Indeed, as Bennett was no longer employed by ANAC, the conditions creating the hostile

work environment alleged had ceased altogether.  The only citation to the record Plaintiff

provides regarding this claim is a citation to her own deposition testimony, which simply details

the allegedly tangible employment action.  Pl. Mem. Opp. Summ. J. at 13, citing Bolick Depo. at

433-34, 436-37, 443-446, and 491-92.  Aside from the brief and conclusory claim that Byler was

carrying out Bennett's plan,  Id. at 24, there is no evidentiary basis for this conclusion offered

and the only logical conclusion from the papers submitted is that Plaintiff is actually constructing

a claim for retaliation based on Byler's conduct, not a hostile work environment.  Plaintiff was

the only one present when Bennett made his comments and Plaintiff doesn't even argue that

---

[5]     As discussed above, the tangible employment action test deals specifically with when a plaintiff
claims a hostile work environment based on the actions of a supervisor.  See Petrosino, 385 F.3d at
225 (distinguishing test for employer liability between supervisory and non-supervisory
employees).  The court's obligation, "[w]here the harassment is attributed to a supervisor with
immediate or successively higher authority over the employee[,]" is to look to whether "the
supervisor's behavior culminated in a tangible employment action against the employee."  Id.
(quotation and citation omitted).  If there is no tangible employment action actually related to the
supervisor's conduct, it would not be prudent to apply that test and a court would look instead to
the employer's affirmative defense regarding its remedial efforts.  Id.

Byler knew exactly what Bennett said much less that he carried it out at Bennett's behest. Accordingly, Plaintiff has not met her burden to demonstrate that a question of fact exists regarding the existence of a tangible employment action.[6]

ii.    Affirmative Defense:

Despite Plaintiff's failure to meet her burden regarding a tangible employment action, an employer will still be held liable unless it establishes an affirmative defense that "(a) it exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Petrosino, 385 F.3d at 225.

It is undisputed that after Plaintiff's initial complaint to Byler, she was no longer required to travel with Bennett and that she did not travel with him again until December 2001, when she agreed to go herself, albeit not without some misgivings. Furthermore, Plaintiff initially declined to complain to Human Resources after complaining to Byler. Once Plaintiff was not required to travel with Bennett, she had some brief follow up conversations with Byler during which she indicated that the situation was acceptable. Bolick Depo. at 183; 370-71. Finally, once Plaintiff did complain to Human Resources, this led to an investigation, Bennett's eventual departure, and Plaintiff immediately ceased to have any contact with Bennett at all. Defendants rely on these facts to claim that it did exercise reasonable care and Plaintiff was clearly aware of her complaint options and failed to take advantage of them earlier on in her employment. Def. Mem. Supp. Summ. J. at 25-27.

---

[6]    Regardless, even if Plaintiff could establish this connection, as discussed below, Plaintiff generally fails to establish an adverse employment action.

Plaintiff, however, argues that "an employer has an obligation to investigate a claim of sexual harassment even when the employee decides not to proceed with her complaint. Pl. Mem. Opp. Summ. J. at 26. Additionally, Plaintiff focuses on the lack of a specific sexual harassment policy. Id. at 25-26. Finally, Plaintiff argues that "the company's duty to investigate is not subordinated to the victim's desire to let the matter drop." Id. at 26.[7]

Plaintiff analogizes this case to the Supreme Court's decision in Faragher v. City of Boca Raton. There the Supreme Court found that where the City failed to disseminate its sexual harassment policy, "made no attempt to keep track of the conduct of supervisors[,]" and the record made clear that the "policy did not include any assurance that the harassing supervisors could be bypassed in registering complain[,]" the defendant was foreclosed from raising an affirmative defense to vicarious liability. 524 U.S. 775, 808, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998).

The present circumstances are different from Faragher in at least two important respects. First, the plaintiff in Faragher "did not complain to higher management" about her supervisors. 524 U.S. at 782. Second, she was employed as a lifeguard and employment was structured in a "paramilitary configuration" with a "clear chain of command" such that "lifeguards had no significant contact with higher city officials..." Id. at 781. The obvious implication of this latter fact is that it would be extremely difficult for an employee to know they could bypass their immediate supervisor were they not so informed by management. Here, Plaintiff did complain and bypass Bennett, thus she obviously knew of, or was able to figure out, an effective manner of

---

[7]     Although, Plaintiff does not so cite, this is a direct quote from Malik v. Carrier Corp., 202 F.3d 97, 106 (2d Cir. 2000).

voicing her grievance.  Thus, Defendants' failure to disseminate written policy clearly did not

have the prejudicial effect it did in <u>Faragher</u>.  Accordingly, that fact alone does not foreclose

Defendants' affirmative defense.

This, of course, does not change the fact that "an employer's investigation of a sexual

harassment complaint is not a gratuitous or optional undertaking...."  <u>Malik v. Carrier Corp.</u>, 202

F.3d 97, 105 (2d Cir. 2000).  Moreover, "the company's duty to investigate is not subordinated to

the victim's desire to let the matter drop."  <u>Id</u>. at 106.  The record presently before the Court

clearly establishes that Defendants took some remedial action in response to both Plaintiff's

complaints, the latter resulting in Bennett's departure from Defendants' employment, and that

Plaintiff did not press her initial complaint before Human Resources.  It is also clear that Bennett

was allowed to continue to supervise Plaintiff after her initial complaint, but that Defendants did

follow up with Plaintiff to ascertain whether she was in fact happy with the resolution of her first

complaint.  While, it may be true that summary judgment is inappropriate when the "evidence

creates an issue of fact as to whether an employer's action is effectively remedial and prompt,"

<u>Gallagher v. Delaney</u>, 139 F.3d 338, 348 (2d Cir. 1998), there is no indication on the record

before the Court that in her initial complaint, Plaintiff expressed any dissatisfaction with

anything but traveling with Bennett.  <u>See</u> Pl. Mem. Opp. Summ. J. at 5-7 (describing Bennett's

conduct while traveling and her initial complaint to Byler).  Thus, while Defendants' obligation

to investigate extends beyond merely checking in with Plaintiff, Defendants' action taken was

prompt, Plaintiff's traveling with Bennett ceased, and if Plaintiff was dissatisfied, the record does

not reflect that ANAC was aware.  Indeed, there is evidence to suggest she was indeed satisfied.

Accordingly, Defendant has properly supported its Motion regarding an affirmative defense and

18

Plaintiff has failed to meet her burden in opposition.  Summary judgment is therefore **granted** on her hostile work environment claim on the grounds that liability cannot be imputed to her employer.

     2.    <u>Quid Pro Quo</u>:[8]

"Courts have traditionally recognized two forms of sexual harassment: 'quid pro quo' harassment and 'hostile work environment' harassment."  <u>Mormol</u>, 364 F.3d at 57 (citation omitted).  The two phrases "quid pro quo" and "hostile work environment" do not appear in the text of Title VII, but they are nonetheless useful to distinguish between cases involving a threat which is carried out and offensive conduct in general.  <u>Id</u>., <u>citing</u> <u>Burlington Indus., Inc. v. Ellerth</u>, 524 U.S. at 753.  The distinction therefore demonstrates that "Title VII is violated by either explicit or constructive alterations in the terms or conditions of employment..."  <u>Id</u>.

Quid pro quo harassment occurs when "submission to or rejection of [unwelcome sexual] conduct by an individual is used as the basis for employment decisions affecting such individual."  <u>Karibian v. Columbia Univ.</u>, 14 F.3d 773, 777 (2d Cir. 1994) (citation omitted brackets in original).  A "plaintiff must present evidence that she was subject to unwelcome sexual conduct, and that her reaction to that conduct was then used as the basis for decisions affecting the compensation, terms, conditions or privileges of her employment."  <u>Id</u>. (citations omitted).  If a plaintiff so proves, "the law imposes strict liability on the employer for quid pro quo harassment."  <u>Id</u>.

---

[8]    Defendant argues that this claim was not raised in the Amended Complaint and should not be considered.  Def. Reply Br. at 1.  As the issues are similar to the hostile work environment claim and Defendant has had the opportunity to argue the issue in its Reply, there is little prejudice and the claim will be considered.  <u>Cruz v. Coach Stores, Inc.</u>, 202 F.3d 560, 569 (2d Cir. 2000).

Again the majority of the conduct Plaintiff alleges affected the terms of her employment was not actually carried about by Bennett and as above Plaintiff does not establish any connection between Byler's conduct and Bennett's. Presumably as a consequence, Plaintiff focuses only on Bennett's response to Plaintiff's October 2000 request for time off, by asking her what she will do for him, suggesting they play cards for money and fun, and his alleged conduct during the December 2001 trip in which he threatened her physically and threatened "to remove plaintiff's managerial responsibilities and move her to a remote territory." Pl. Mem. Opp. Summ. J. at 23.

The first instance complained of is facially neutral and while it might, when considered in the aggregate with other conduct alleged, support a hostile work environment claim, here the only question is whether this particular incident conditioned employment benefits on acquiescence to sexual advances. It is not clear that the conduct was a sexual advance, it doesn't even rise to the level of touching, but even accepting the possibility that it could be (and equal possibility that it couldn't), Plaintiff's only evidence that it was is her own sense of the situation, Bolick Depo. at 351, and Bennett never actually explained that the favors or "fun" aspect of playing cards was sexual. To find that Plaintiff created a question of fact based on this record would turn any claim, no matter how neutral the conduct, so long as one could plausibly read a sinister motive into it, into a quid pro quo claim simply based on Plaintiff's subjective sense of the situation. Without some more objective component, summary judgment would be rendered superfluous and would become an exercise in futility, when it is well established that summary judgment may be granted in cases such as these. See Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (noting that the Second Circuit has gone "out of its way" to "remind" district

courts that summary judgment can be awarded in Title VII cases).  Accordingly, without more, Plaintiff cannot proceed on this issue.

With regard to Bennett's conduct after the December 2001 business trip, while again this conduct may be considered in the aggregate to create a hostile work environment, nowhere does Plaintiff's account of the facts reasonably establish that Bennett  linked sexual submission to employment benefits.  See Pl. Mem. Opp. Summ. J. at 7-8 (describing Bennett's attempts to touch Plaintiff, overtures regarding the gym, and comments regarding the romantic nature of the hotel and subsequent threats).  There is no explicit link between any possible inappropriate conduct and Bennett's January 2002 threats.  Plaintiff offers no analysis linking them.  The conduct itself suggests no link and while it may, if Plaintiff's assertions are believed and coupled with other conduct, amount to the sort of offensive conduct that could create a hostile work environment, there is no reasonable basis to infer that when Bennett conducted himself in the manner described he was conditioning tangible benefits on acquiescence to sexual advances. Summary judgment is therefore appropriate and **granted**.

3.    Retaliation:

In a Title VII action involving allegations of retaliation, a plaintiff must first make out a prima facie case.  The prima facie case for retaliation requires "[1] participation in a protected activity known to the defendant; [2] an employment action disadvantaging the plaintiff; and [3] a causal connection between the protected activity and the adverse employment action."  Quinn v. Green Tree Credit, 159 F.3d at 769 (internal citations omitted).  The burden to establish a prima facie case is a "minimal."  James v. New York Racing Assoc., 233 F.3d 149, 153-54 (2d Cir. 2000).  ANAC does not dispute that Plaintiff engaged in protected activity known to Defendants.

21

Def. Mem. Supp. Summ. J. at 28-29.[9]  An adverse employment action can be as wide ranging as

"discharge, refusal to hire, refusal to promote, demotion, reduction in pay" and even reprimand.

Morris v. Lindau, 196 F.3d 102, 110 (2d Cir.1999).  There is of course a threshold and a "bruised

ego is not enough." Burlington Indus., Inc., v. Ellerth, 524 U.S. at 761 (internal citations

omitted).  Causation can be demonstrated "indirectly by showing that the protected activity was

followed closely by discriminatory conduct,  "through other evidence such as disparate treatment

of fellow employees who engaged in similar conduct," or "directly through evidence of

retaliatory animus directed against a plaintiff by the defendant."  De Cintio v. Westchester

County Medical Center, 821 F.2d 111, 115 (2d Cir. 1987) (internal citations omitted).

Title VII also imposes certain burdens of production on the parties.  While the "ultimate

burden of persuading the trier of fact that the defendant intentionally discriminated against the

plaintiff remains at all times with the plaintiff[,]" the burden of production shifts from plaintiff to

defendant and back.  Texas Dep. of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981).

> [If] the plaintiff succeeds in proving the prima facie case, the burden shifts to the
> defendant to articulate some legitimate nondiscriminatory reason for the [negative
> employment action].  Third, should the defendant carry this burden, the plaintiff must
> then have an opportunity to prove by a preponderance of the evidence that the legitimate
> reasons offered by the defendant were not its true reasons, but were pretext for
> discrimination.

Id. at 252-53.  This burden shifting analysis applies to retaliation cases.  Reed v. A.W. Lawrence,

95 F.3d 1170, 1178 (2d Cir. 1996).  If Plaintiff fails to meet her burden, summary judgment is

appropriate.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265

---

[9]       In a footnote Defendants "query" whether the November 2000 complaint constitutes protected
activity.  Def. Mem. Supp. Summ. J. at 29 n. 14.  If Defendants wish to argue a point, they should
do so outright.  Nevertheless, as discussed with respect to Bennett's motion below, there is some
evidentiary support that Plaintiff did intend her complaint to be about sexual harassment.

(1986) (Summary judgment enters when "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").  Summary judgment in a Title VII claim depends on the strength of the plaintiff's prima facie case, the "probative value of the proof that the employer's explanation is false", and "any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law." Reese v. Sanderson Plumbing, 530 U.S. 133, 148-49, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000).

Generally, the judge and not the jury decides whether a plaintiff has satisfied the requirements of McDonnell Douglas's minimal version of a prima facie case.  Gordon v. New York City Bd. of Educ., 232 F.3d 111, 116 (2d Cir. 2000) (citation omitted).  "[W]hen a retaliation case does go to the jury, the jury's task is simply to determine the ultimate question of whether the plaintiff met her burden of proving that the defendant was motivated by [the desire to retaliate]." Id. (citation omitted).

a.     Adverse Employment Action:

Defendants ANAC, AGH, and Byler argue that Plaintiff cannot establish that she suffered an adverse employment action.  Def. Mem. Supp. Summ. J. at 29-32.  Plaintiff alleges the following adverse employment actions:

> 1) her promotion was unreasonably delayed causing lost use of increased wages, humiliation and damage to her reputation;
> 2) she was demoted in that her managerial responsibilities were taken from her and the opportunity to do captive business was taken from her;
> 3) she was assigned to a remote territory, the Southeast, when she lived in the Northeast, which would require her to travel more frequently[;]
> 4) she was paid less than the three new Vice Presidents who were doing the same job, even though she had greater experience, and seniority at the company;
> 5) she remained in a cubicle, while the new male Vice President got Bennett's old office;

23

6) she was refused permission to go to a conference on captives and was told it was "over her head[;]"

7) she was left out of meetings, ignored by Byler, and isolated[;]

8) she was humiliated at a marketing meeting by Byler, who objected to everything she said and cut her off when she attempted to speak[;]

9) the Bermuda territory, which, along with the Northeast, contained the vast majority of captive business was assigned to the newest and least experienced new male hire[;]

10) defendant refused to transfer plaintiff to another department[; and]

11) after she left work in September, 2002, her wage continuation benefits were withheld.

Pl. Mem. Opp. Summ. J. at 32-33.

Some of Defendants arguments on this issue are more properly discussed in relation to the burden shifting analysis, but it is appropriate to establish here that demotion without change in pay, benefits, duties, or prestige is insufficient to establish an adverse employment action, as is reassignment to more inconvenient job.  See Burlington Indus. v. Ellerth, 524 U.S. at 761 (citing with approval Kocsis v. Multi-Care Management, Inc., 97 F.3d 876, 887 (6th Cir. 1996) and Harlston v. McDonnell Douglas Corp., 37 F.3d 379, 382 (8th Cir. 1994)).  As such, Plaintiff's allegations regarding her territorial assignment, the salaries of new hires, and being left in a cubicle do not rise to the level of adverse employment actions.  It is undisputed that when she began her employment with Defendants, she traveled frequently and often in the Midwest and Southeast.  As far as her expectation that she would stop traveling, she has not shown that, other than her own subjective disappointment in the inconvenience, she suffered any harm.  As such, continuing to travel after being assigned to the Southeast is not a change in her employment conditions at all.  While Plaintiff maintains this was less prestigious, Plaintiff points to nothing in the record to back up this assertion or explain how this was the case.  See Pl. Mem. Opp. Summ. J. at 11.  Plaintiff admits that the territory itself has nothing to do with salary.  Bolick Depo. at 492.  Plaintiff clearly wanted to have more involvement in captive marketing, but the only

24

mention of how this would benefit Plaintiff in any tangible sense is that she saw captive

marketing as "an opportunity to get into this lucrative insurance market." Pl. Mem. Opp. Summ.

J. at 2. It is not clear, however, how this impacts the actual conditions of her employment with

ANAC and sounds much more like a subjective long term goal of Plaintiff's unrelated to her

official duties at the time. Regardless, the relationship is unclear and that is enough to defeat her

claim at this stage.

   Plaintiff cites the higher salaries of newly hired vice presidents, despite her alleged

greater experience, as an adverse employment action. Pl. Mem. Opp. Summ. J. at 11, 32. While

these claims seem more logically to fall under her Equal Pay Act claim, and are indeed made in

that context as well, it is not clear how this was an adverse *change* in her employment conditions.

She makes no clear claim of entitlement to a higher salary that she was denied, nor does she

allege that her salary was reduced. Nothing happened at all to her and there is simply no

cognizable action (or inaction) supportive of a retaliation claim. She cites to no case law holding

otherwise.

   Regarding Plaintiffs wage continuation benefits, the most that she establishes was that

she was initially denied 13 weeks of coverage and told she was entitled to only six. Bolick Depo.

at 579-80. Plaintiff alleges that the wages were withheld for "several weeks" but it is clear that

she did receive the benefits to which she was entitled after the unspecified delay. Pl. Mem. Opp.

Summ. J. at 15. A delay by itself is not necessarily an adverse employment if there are no

adverse consequences. See e.g. Rooney v. Witco Corp., 722 F. Supp. 1040, 1047 (S.D.N.Y.,

1989) (five day delay in receiving benefits not adverse). Based on the record before the Court, it

is simply impossible to discern whether Plaintiff was in fact disadvantaged or merely annoyed.

See Richardson v. New York State Dep't of Correctional Serv., 180 F.3d 426, 446 (2d Cir. 1999)

(plaintiff must show he or she suffered a "materially adverse change in the terms and conditions

of employment").  Accordingly, she fails to support this claim of an adverse employment action.

Plaintiff also fails to support her claim that she should have been transferred to another

department.  See Id. at 14.  Plaintiff does not establish that she had any entitlement to a transfer

such that its denial constituted any sort of loss or material change in her employment conditions.

See Williams v. R.H. Donnelley, Corp., 368 F.3d 123, 128 (2d Cir. 2004) (denial of a transfer

merely because the plaintiff had a subjective desire to move did "not meet the objective indicia of

an adverse employment action").

However, with regard to her other claims involving a delayed promotion, reduced

management responsibilities, and being kept out of meetings, there is cause to believe, given the

minimal burden one faces to make out a prima facie case, that these actions may, if proven, rise

to the level of an adverse employment action.  Failure to promote, if done in retaliation, is of

course an adverse action  Morris, 196 F.3d at 110.  While Plaintiff is only asserting a delay in a

promotion, she asserts that the suffered lost use of wages and damage to her professional

reputation.  Pl. Mem. Opp. Summ. J. at 32.

A reduction in management responsibilities could also rise to the level of an adverse

action.  See Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000)

("significantly diminished material responsibilities" can constitute an adverse employment

action).  If Plaintiff's testimony is credited, she was lead to believe she would participate in these

activities as part of her responsibilities as a vice president, Pl. Mem. Opp. Summ. J. at 6-7, and

being unable to do so could, quite obviously, impact her position and effectiveness within the

company leading to potentially more serious consequences as well.  In support of this allegation she states that she wasn't allowed to participate in the hiring of two new vice presidents (but appears to have participated in hiring Duncan), she was excluded from management meetings, in March 2002 was not allowed to attend a conference, and in April 2002 was reprimanded by Byler in front of a marketing meeting.  Pl. Mem. Opp. Summ. J. at 11-13.  Taken together, these actions could constitute an adverse employment action.

      b.    Causation:

Defendants' arguments focus on territory assignments, Def. Mem. Supp. Summ. J. at 32, which have been dealt with above.  To the extent that there are other arguments raised, they are better addressed below.  However, the timing of the events of which Plaintiff complains, considering she was out of work until February 2002, are extremely close in time to her complaint to Human Resources, which was made in January 2002.  See Pl. Mem. Opp. Summ. J at 11-13.  Accordingly, Plaintiff raises an inference supporting causation sufficient to survive summary judgment on her remaining claims.  De Cintio, 821 F.2d at 115 (internal citations omitted).

      c.    Burden Shifting Analysis:

Plaintiff claims that her promotion was unreasonably delayed two months (from February to April 2002) and that as a consequence she lost use of the increased wages and damaged her reputation.  Pl. Mem. Opp. Summ. J. at 32.  Defendants offer the legitimate non-retaliatory reason for this delay that there was a general policy of not permitting promotions until April in any given year.  Def. Mem. Supp. Summ. J. at 33-34.  Moreover, Defendants point out that Plaintiff received her promotion that included a 15% raise.  Id. at 33.

Plaintiff, however, contends that Defendants made "numerous" exceptions to this rule in the past and therefore a jury could reasonably conclude the refusal to accommodate her request was in retaliation for her complaint and the policy itself is, as applied, simply pretext for that motive. Pl. Mem. Opp. Summ. J. at 12, 35. Plaintiffs's citations to the record do not bear out her assertions and she can point to only one example of a promotion and possibly another involving a title change made at other times. To refer to the practice as "routine" is clearly overreaching. The refusal therefore to make an exception to a general practice when the deviation from such a practice is clearly rare. That remote possibility is insufficient to constitute a reasonable basis to infer pretext. Accordingly, Plaintiff fails to support her claim of retaliation with respect to the timing of her promotion.

Plaintiff alleges other adverse employment actions best summed up as marginalization within her department and reduction/diminution in management responsibilities. Defendants do not provide a legitimate business reason for these actions and at best dispute Plaintiff's version of events. See Def. Reply Br. at 7 (regarding one incident in which Plaintiff alleges she was publicly undermined by Byler). This is not sufficient to establish entitlement to summary judgment and there is a material question of fact as to whether Defendants' conduct regarding Plaintiff's alleged marginalization within the marketing department was in fact motivated by retaliatory animus.

Accordingly, pursuant to Fed. R. Civ. P. 56(d), it is established that the only facts in dispute regarding Plaintiff's retaliation claim are those just outlined. See Fed. R. Civ. P. 56(d) ("If on motion under this rule judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary ... [the court] shall thereupon make an order specifying the facts

that appear without substantial controversy, including the extent to which the amount of damages or other relief is not in controversy, and directing such further proceedings in the action as are just. Upon the trial of the action the facts so specified shall be deemed established, and the trial shall be conducted accordingly").  All other factual claims are not in dispute and recovery is foreclosed by law.  Summary judgment is **denied** on this Count, but Plaintiff may only proceed at trial to prove her claim based on those facts that are in dispute.

       4.     Equal Pay Act:

      To prove a violation of the equal pay act, a plaintiff must demonstrate that "I) the employer pays different wages to employees of the opposite sex; ii) the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and iii) the jobs are performed under similar working conditions."  Lavin-Mceleney v. Marist College, 239 F.3d 476, 480 (2d Cir. 2001) (citation omitted).  In order to demonstrate similar working conditions, a "plaintiff need not demonstrate that her job is identical to a higher paid position, but only must show that the two positions are 'substantially equal'" in skill, effort, and responsibility."  Id.  Once a prima facie case is made out, liability for the employer is strict and "proof of the employer's discriminatory intent is not necessary for the plaintiff to prevail on her claim."  Belfi v. Prendergast, 191 F.3d 129, 136 (2d Cir. 1999).  The employer may, however, assert one or more of four exceptions to the Act as an affirmative defense that "different payment to employees of opposite sexes is made pursuant to (I) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex."  Corning Glass Works v. Brennan, 417 U.S. 188, 196, 94 S. Ct. 2223, 41 L. Ed. 2d 1 (1974).  With respect to the affirmative defenses, the burden of persuasion shifts to the defendant.  Belfi,

191 F.3d at 136. "Following such proof by the employer, the plaintiff may counter the employer's affirmative defense by producing evidence that the reasons the defendant seeks to advance are actually a pretext for sex discrimination." Id. In deciding whether the reasons are in fact pretext, the appropriate inquiry "is whether the employer has used the factor reasonably in light of the employer's stated purpose as well as its other practices." Id.

Plaintiff points to two new male vice presidents who were hired at a higher salary than her own. Pl. Mem. Opp. Summ. J. at 11. Plaintiff asserts that the new female vice president hire was paid less than the male hires. Id. As an initial matter, Plaintiff's citation to the record do not clearly bear out her claims. For example, Plaintiff's claim that she had more experience than the new hires is born out only by citing to her own resume with no citation to any documentation of the new vice presidents' credentials. Second, Plaintiff's allegation that the "males were paid more than the females doing the same job" is supported with a citation to Byler's deposition that stands only for the proposition that Plaintiff was paid less than the new hires. Id.; citing Byler Depo at 91-92. As it is clear that one of the new vice presidents hires was female, the cited testimony does not entirely support Plaintiff's claims.[10] Indeed, Defendants dispute whether Plaintiff can make out a prima facie case based on evidence that Duncan was paid comparably to the other male hires. Def. Mem. Supp. Summ. J. at 37. Nevertheless, there is evidence to suggest that Duncan was paid less than the two male hires. See e.g. Byler Depo. at

---

[10] Plaintiff apparently intends to assert that Duncan was not offered equivalent compensation as the new male hires. Plaintiff backs up this assertion with the statement that she and Duncan did not receive equity when they were hired. Pl. Mem. Opp. Summ. J. at 11 n. 1. First, in examining the cited portions of the records, there is no real support for the asserted fact that Plaintiff did not receive equity and it is even less clear whether Duncan did not. See Byler Depo. at 97 (Plaintiff's lawyer stating that Duncan did not). This Court is aware of no authority that would establish that a party's lawyer's statement as part of a question at a deposition can be used as support for a factual allegation at summary judgment.

30

63-64; Def. R. 56 Stat. at 9-10.  Furthermore, it is undisputed that Plaintiff was paid less than the new hires, two of which, were male.  Based on this evidence Plaintiff at least raises a question regarding sex-based pay discrepancies.

In response, Defendants point to qualifications possessed by Alexander and Roe which it is asserted justify greater compensation.  See Def. Mem. Supp. Summ. J. at 9-13 (discussing prior higher salaries and other factors) and 36 (citing Byler's deposition testimony and discussing, for example, a background in alternative-risk).[11]  Defendant does not point to any company objective criteria for interpreting these qualifications, however.  Plaintiff relies solely on the fact that she was employed longer than the newer hires (Plaintiff had 20 years experience versus 10-18 years among the new hires) to cast doubt on Defendants' explanations.  Pl. Mem. Opp. Summ. J. at 11.  It is undisputed that the positions and responsibilities were the same and at least in terms of balancing factors such as experience and skill sets and whether Defendants' justification defeats any inference of discrimination, the question is one of fact and more appropriately addressed to a jury and not the Court on summary judgment.  Accordingly, summary judgment is **denied** on this count.

5.    Common Law Claims:

Plaintiff asserts implied contract claims, breach of the covenant of good faith and fair dealing, and negligent misrepresentation all in connection with Defendants' failure to pay her a bonus in 2001.

a.    Implied Contract:

---

[11]    Plaintiff's claim that there is "no admissible evidence to suggest what Duncan and Alexander made at their prior employment" is not supported by any citation or argument and is therefore not considered here.

"A contract implied in fact, like an express contract, depends on actual agreement."

Coelho v. Posi-Seal International, Inc., 208 Conn. 106, 111 544 A.2d 170, 173 (1988) (citations

omitted). Accordingly, Plaintiff bears the burden to prove that Defendants "agreed, either by

words or action or conduct, to undertake [some] form of actual contract commitment to [her]

under which [she] could not be terminated without just cause. Id. at 112; 544 A.2d at 173

(citations omitted). "To form a valid and binding contract in Connecticut, there must be a mutual

understanding of the terms that are definite and certain between the parties." L & R Realty v.

Connecticut Nat'l Bank, 53 Conn. App. 524, 534 (Conn. App. 1999). So long as any essential

matters are left unresolved, the contract is not complete. Adair v. Pfizer, Inc., 245 F. Supp. 2d

437, 441 (D. Conn. 2003). "Essential or material terms in a contract involving an employment

relationship include, duration, compensation and the employee's duties." Id.

Plaintiff claims the existence of a contractual entitlement to a bonus based on her offer

letter and the attachment remuneration policy. Pl. Mem. Opp. Summ. J. at 16; Pl. Exh. 8. The

offer letter and attached policy establishes certain conditions, or "targets," upon the fulfillment of

which, employees are said to be entitled to a bonus. The letter, however, also clearly states that

"this is not a guaranteed bonus" and refers to the remuneration policy for further information. Pl.

Exh. 8. The remuneration policy states that "there will be no minimum bonus guaranteed" and

again that "there will be no 'bonus guarantees.'" Id. Accordingly, there is no basis to imply a

contract with the requisite certainty of terms required under Connecticut law. If anything, the

terms are clear that there is no bonus commitment. Accordingly, summary judgment is **granted**.

### b.    Breach of Covenant of Good Faith and Fair Dealing:

Every contract implies a covenant of good faith and fair dealing. De La Concha of

32

Hartford, Inc. v. Aetna Life Ins. Co., 269 Conn. 424, 432, 849 A.2d 382, 387 (2004), citing

Magnan v. Anaconda Industries, Inc., 193 Conn. 558, 566, 479 A.2d 781 (1984). To constitute a

breach of the implied covenant of good faith and fair dealing, "the acts by which a defendant

allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to

receive under the contract must have been taken in bad faith." Id. at 433, 849 A.2d at 388. Bad

faith means more than simple negligence, it "implies both actual or constructive fraud, or a

design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some

contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by

some interested or sinister motive." Id. When there is no contract, there can be no action for a

breach of the covenant of good faith and fair dealing. Franco v. Yale Univ., 238 F. Supp. 2d 449,

455 (D. Conn. 2002).

Plaintiff claims a violation of this covenant regarding the fact that she did not receive a

bonus in 2001. Plaintiff cannot establish the existence of a contract, implied or otherwise, her

claim under the covenant of good faith and fair dealing must fail. Furthermore, even if she had

established the existence of a contract, she has presented no evidence of bad faith. Plaintiff does

not even argue the issue in her Opposition Brief. Pl. Mem. Opp. Summ. J. at 39-40.

      c.     Negligent Misrepresentation:

"One who, in the course of his business, profession or employment . . . supplies false

information for the guidance of others in their business transactions, is subject to liability for

pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to

exercise reasonable care or competence in obtaining or communicating the information."

D'Ulisse-Cupo v. Board of Directors of Notre Dame High School, 202 Conn. 206, 218, 520 A.2d

217, 218 (1987). "[F]alsity is an essential element of a negligent misrepresentation claim, and [the plaintiff] bears the burden of demonstrating that the defendants made certain representations regarding the availability of alternative scheduling arrangements that were in fact untrue." Daley v. Aetna Life & Cas. Co., 249 Conn. 766, 793, 733-34, A.2d 112, 128 (1999).

Plaintiff claims that Defendants failed to exercise proper care in making representations regarding her entitlement to a bonus in 2001. Plaintiff rests this claim on her assertions that there was an implied contract. Pl. Mem. Opp. Summ. J. at 39. Therefore, she fails for the same reasons stated above, namely, that there is no basis for finding that Plaintiff was contractually entitled to a bonus or that Defendants failed to communicate accurately her limited entitlement to a bonus. Plaintiff therefore fails to demonstrate the falsity of Defendants' representations. Summary judgment is therefore **granted**.

6.     Liability of AGH:

Defendant asserts that there is no factual basis to infer AGH's liability in this matter. Def. Mem. Supp. Summ. J. at 3 n. 2. Plaintiff bases her Complaint on her "understanding that Dennis Purkiss, CEO of AGH, made the final decisions regarding employment matters." Pl. Mem. Opp. Summ. J. at 16, 40-41.

There is a four-part test for "ascertaining whether two entities constituted a single employer." Cook v. Arrowsmith Shelburne, Inc., 69 F.3d 1235, 1240 (2d Cir. 1995). Courts looks to the "(1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control." Id. In the context of Title VII litigation, courts focus on "centralized control of labor relations." Id.

While there is evidence to suggest that AGH has a global head of human resources who

would presumably exercise some control over ANAC, this position was only established in 2003 and does not appear to have existed during Plaintiff's employment. Purkiss Depo. at 16-17. Prior to the creation of this position, such matters were handled locally. Id. at 17-18. While Plaintiff asserts that she was told Purkiss was involved in the investigation of her complaint, this information was second hand and she provides no detail to substantiate the nature of his involvement. Bolick Depo. at 145-50. Indeed, Plaintiff testifies that she never even spoke to Purkiss. Id. at 150. Purkiss testifies that his involvement was limited to being informed of the investigation, but that he had no further involvement. Purkiss Depo. at 62.

Based on the record before the Court, there is an insufficient basis to infer AGH's involvement in the matter, or that there was "centralized control of labor relations" such that AGH may be held liable. Cook, 69 F.3d at 1240. Accordingly, summary judgment is **granted** and all claims are dismissed against AGH.

B.    Bennett's Motion:

Plaintiff has two remaining claims against Bennett: retaliation in violation of Title VII and aiding and abetting retaliation in violation of the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-(a)(5). Bennett moves for summary judgment on both counts.[12]

The principles involved in Plaintiff's retaliation action against Bennett individually are the same as those outlined above vis a vis ANAC, AGH, and Byler, namely, that Plaintiff must

---

[12]    Plaintiff argues that Bennett failed to move for summary judgment on the retaliation claim. Pl. Mem. Opp. Summ. J. at 1 n. 1. As Defendant notes, the aiding and abetting claim requires unlawful retaliation as a necessary condition to aiding and abetting, thus, Bennett's arguments regarding the aiding and abetting claim apply equally to the retaliation claim. Def. Reply Br. at 2 n. 2.

establish a prima facie case involving participation in a protected activity known to the

defendant, an adverse employment action, and a causal connection between the protected activity

and the adverse employment action.  Quinn v. Green Tree Credit, 159 F.3d at 769 (internal

citations omitted).

The Connecticut Fair Employment Practices Act ("CFEPA") establishes that it is a

violation of the act "[f]or any person, whether an employer or an employee or not, to aid, abet,

incite, compel or coerce the doing of any act declared to be a discriminatory employment practice

or to attempt to do so."  Conn. Gen. Stat. § 46a-(a)(5).  "[T]his provision contemplates liability

for a party who in some way helps or compels another to act in a discriminatory manner."

Tyszka v. Edward McMahon Agency, 188 F. Supp. 2d 186, 195 (D. Conn. 2001).

1.    Retaliation Claim against Bennett:

Plaintiff alleges four instances of protected conduct: her complaint to Byler in November

2000, to Marti Lametta in December 2000, to Bennett whenever she resisted his alleged

overtures, and in January 2002 to Human Resources. Pl. Mem. Opp. Summ. J. at 23.  Bennett

argues that only the January 2002 complaint constitutes protected activity.  See Def. Mem. Supp.

Summ. J. at 12-13 (arguing that November 2000 complaint is not protected activity), Def. Reply

Br. at 3-5 (arguing that neither the December 2000 complaint nor Plaintiff's complaints directly

to Bennett constitute protected activity).

In order for an employee's conduct to constitute protected activity, it must be an "action

taken to protest or oppose statutorily prohibited discrimination."  Cruz v. Coach Stores, Inc., 202

F.3d 560, 566 (2d Cir. 2000).  Furthermore, Plaintiff must have a "good faith, reasonable belief

that the underlying challenged actions of the employer violated the law."  Quinn v. Green Tree

Credit, 159 F.3d at 769.  Bennett argues that Plaintiff did not view her November 2000 or

December 2000 complaints as complaints involving sexual harassment and that it cannot

therefore constitute protected activity.  Def. Mem. Supp. Summ. J. at 12, Def. Reply Br. at 2-3,

see also Bolick Depo. at 304-321 (stating at various points that she did not believe Bennett's

conduct was sexual harassment).  Plaintiff counters this argument by asserting that her

"complaint included descriptions of aggressive behavior with sexual innuendo" and that a jury

could find that the conduct to which she was subjected was "objectively offensive."  Pl. Mem.

Opp. Summ. J. at 24.

Bennett's citation to Plaintiff's deposition testimony does not establish that Plaintiff did

not believe she was complaining about sexual harassment in November 2000.  It establishes that

for most of the conduct that she alleges occurred, she did not believe it to be sexual in nature *at

the time it happened*.  There is nothing to prevent Plaintiff from later coming to believe, based on

other conduct or even hindsight, that conduct she initially thought simply inappropriate was

based on unlawful considerations of her sex and then complaining about it (assuming of course

any action she brought would not be time-barred).  However, there is another problem with

Bennett's arguments in that Plaintiff does state at least once that she did believe Bennett's

behavior to be sexual harassment.  Bolick Depo. at 308.  This is sufficient to raise the question

that Plaintiff did at least intend to complain about what she regarded as sexual harassment.

Plaintiff's belief that Bennett's conduct was discriminatory would also be reasonable based at

least on the possibility that she sufficiently raised a hostile work environment claim as discussed

above.  Accordingly, the November 2000 complaint is deemed to be protected activity.

A defendant, of course, must be aware that Plaintiff engaged in a protected activity.

37

<u>Quinn v. Green Tree Credit</u>, 159 F.3d at 769.  It is undisputed that Plaintiff's November 2000 complaint was to be kept secret from Bennett.  Bennett therefore argues that Plaintiff cannot make out a prima facie case.  Def. Mem. Supp. Summ. J. at 13-14.  Plaintiff, however, claims that Bennett was aware at least that she talked to Marti Lametta and asked if she told her "about our relationship."  Pl. Mem. Opp. Summ. J. at 25.  Additionally, Plaintiff argues that being told he would no longer travel with Plaintiff may have raised a red flag for Bennett and allowed him to infer she had complained about him.  <u>Id</u>.  Finally, Plaintiff alleges that his subsequent conduct, namely his alleged anger towards her and alleged failure to assist her and include her in meetings, suggests his awareness of her complaint.  <u>Id</u>.

The Second Circuit has consistently held that "to satisfy the knowledge requirement," nothing "more is necessary than general corporate knowledge that the plaintiff has engaged in a protected activity."  <u>Gordon</u>, 232 F.3d 111 at 116.  "The lack of knowledge on the part of particular individual agents is admissible as some evidence of a lack of a causal connection, countering plaintiff's circumstantial evidence of proximity or disparate treatment" not that she did not engage in protected activity  <u>Id</u>. at 117.  Thus, Plaintiff is deemed to have met the protected activity and knowledge requirement of a prima facie case and any arguments regarding Bennett's specific knowledge are more appropriately applied to the causation question.[13]

First, however, Plaintiff must establish that she suffered an adverse employment action as a consequence of Bennett's conduct.  <u>Quinn v. Green Tree Credit</u>, 159 F.3d at 769.  Of the adverse employment actions, she sets forth in her Opposition Brief, Pl. Mem. Opp. Summ. J. at

---

[13]    As discussed below, Plaintiff's claims stemming from her November 2000 complaint fail for other reasons and it is not necessary to reach the causation question.

28-29, only the first four occurred while Bennett was employed by ANAC and were actually carried out by Bennett.  Thus, for the latter as Bennett did not actually carry out the retaliatory act, he can at most have aided and abetted such an act.

Regarding Plaintiff's allegations that Bennett, physically threatened her by raising his fist, threatened to "bury" her "ass," Plaintiff cites no case law to establish that physical threats are adverse employment actions.  Pl. Mem. Opp. Summ. J. at 28.  While certainly not tolerable and very likely actionable under other theories of recovery such as assault, Plaintiff has given the Court no indication that such conduct would fall under Title VII's prohibition on discrimination in the terms and conditions of one's employment.  See Richardson, 180 F.3d at 446 (plaintiff must show he or she suffered a "materially adverse change in the terms and conditions of employment").  Furthermore, to the extent that Bennett's alleged statement that he would bury Plaintiff was a threat regarding future action he would take to affect the terms and conditions of her employment, the threat itself is not an adverse employment action for the purposes of a retaliation claim.  See Bennett v. Watson Wyatt & Co., 136 F. Supp. 2d 236, 248 (S.D.N.Y. 2001) ("threats of disciplinary action and excessive scrutiny do not constitute adverse employment actions").

Plaintiff's allegations concerning Bennett's alleged failure to train her may rise to the level of an adverse employment action.  See Little v. NBC, 210 F. Supp. 2d 330, 382 (S.D.N.Y. 2002) (failure to train may constitute an adverse employment action if it caused Plaintiff some tangible disadvantage).  There is no reason to reach that question here, however, because Plaintiff fails to indicate when this conduct took place.  The only indication is that it was sometime during the seven month period after Plaintiff's initial complaint to Byler.  Bolick Depo. at 361.  This

raises a question regarding causation.  See Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273, 121 S. Ct. 1508; 149 L. Ed. 2d 509 (2001) ("cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be "very close").  Plaintiff relies solely on temporal proximity to establish causation and this time gap is insufficient to support that inference.

Plaintiff only remaining allegation involves the allegation that Bennett made false negative statements regarding her work performance during the course of ANAC's investigation of Plaintiff's January 2002 complaint to human resources.  Pl. Mem. Opp. Summ. J. at 28.  There is no dispute that the January 2002 complaint constitutes a protected activity and Plaintiff casts this as an adverse employment action by Bennett in retaliation for her complaint.  Id.

Under certain circumstances a "negative job evaluation may constitute adverse employment action."  Sanders v. N.Y. City Human Res. Admin., 361 F.3d 749, 756 (2d Cir. 2004).  The evaluation must however have an affect on the conditions of her employment.  See Id. (plaintiff's claim failed because she "offered no proof that this evaluation had any effect on the terms and conditions of her employment").  Here, Plaintiff alleges that "Byler used the information from Bennett that [she] 'did not get along with the underwriters' in refusing to consider plaintiff for Bennett's position, when she requested it in June, 2002."  Pl. Mem. Opp. Summ. J. at 15.  This is different from Plaintiff's earlier allegation that Byler carried out Bennett's threats as here, she specifically alleges he used retaliatory information Bennett gave him.  Accordingly, if Plaintiff's account is credited, she has stated an adverse employment action. Furthermore, Bennett's discussion of legitimate non-retaliatory reasons for his conduct does not

address this allegation, Def. Mem. Supp. Summ. J. at 23, and Plaintiff may therefore proceed on this claim.

Summary judgment is **denied**, however, the only remaining issue in dispute is whether Bennett's statements during the investigation of Plaintiff's complaint amount to unlawful retaliation.

2.      CFEPA - Aiding and Abetting:

As an initial matter, it bears repeating that as an employer cannot aid or abet its own discriminatory or retaliatory conduct, Bennett could not aid or abet what Plaintiff claims to be his own retaliatory conduct.  See Bolick v. Alea Group Holdings, Ltd,., 278 F. Supp. 2d 278, 283 (D. Conn. 2003) (ruling on motion to dismiss in this case finding that employer cannot aid or abet its own discriminatory practice).  "To apply the aiding and abetting provision of CFEPA against an employee who was the sole perpetrator of the alleged harassment would produce an illogical result."  Id. at 282.  An employee may of course aid and abet the employer's discriminatory conduct.  Id. at 283 n. 5.  Thus, while Plaintiff may plead in the alternative, she can only maintain an aiding or abetting action against Bennett for conduct that does not rise to the level of retaliation itself and for him to have aided and abetted, ANAC must have taken some action that amounts to retaliation.

As discussed above with respect to her hostile work environment claim, virtually all of the allegations that Plaintiff makes[14] regarding ANAC (e.g. delayed promotion, territorial assignments) involve no specific connection to the hostile work environment itself, having

---

[14]     Plaintiff does not discuss separately which adverse employment actions are retaliation attributable to Bennett or ANAC, rather lumps them together asserting that they are either attributable to Bennett directly or that it constitutes aiding and abetting.  Pl. Mem. Opp. Summ. J. at 28.

occurred after Bennett left, and looked much more like a retaliation claim. Indeed, Plaintiff is proceeding against ANAC on a limited basis in such a retaliation claim. In order to prevail as well on a claim that Bennett aided and abetted that retaliation Plaintiff must show that Bennett helped or compelled the retaliatory conduct. Tyszka, 188 F. Supp. 2d at 195. Plaintiff makes no direct argument regarding causation in this sense. See Pl. Mem. Opp. Summ. J. at 31-32. However, Plaintiff does state in her discussion of adverse employment actions that "her management responsibilities were taken from her and the opportunity to do captive business was taken from her as Bennett stated would happen..." Id. at 28. While it has already been determined that Plaintiff does not make out a claim regarding the captive business opportunities, she is proceeding against ANAC with respect to her alleged marginalization within the department. Bennett's conduct here cannot itself be retaliatory, not having had the opportunity to carry out his threats, but to the extent that Plaintiff does make out a retaliation claim based on conduct by ANAC after Bennett's departure and crediting her allegation of the threat and its being carried out shortly thereafter, Plaintiff creates a question sufficient to survive summary judgment.

Additionally and as discussed above, Plaintiff alleges that Bennett made negative comments to Byler and others during the course of their investigation of her 2002 complaint. See Pl. Mem. Opp. Summ. J. at 28. As above, Plaintiff is proceeding against Bennett on her retaliation claim on this ground. So too then may Plaintiff proceed on her aiding and abetting claim if a jury finds that by virtue of Bennett's discriminatory acts, Plaintiff was retaliated against, but that Bennett's actions do not themself constitute retaliation. Plaintiff therefore raises

a triable question of fact regarding this claim.[15]

Accordingly, while summary judgment is **denied** on Plaintiff's aiding and abetting claim, the only remaining material questions of fact implicate Bennett's statements made during the investigation of her complaint to human resources and her later alleged marginalization within the department.

3.     Fees:

Because Plaintiff's claim survives summary judgment, Bennett's request for fees is **denied**.

**IV.     CONCLUSION:**

For the reasons stated herein, Defendants AGH, ANAC, and Byler's Motion [Doc. No. 96] is **granted** in part, **denied** in part and Defendant Bennett's Motion [Doc. No. 109] is **denied**. Summary judgment is granted on Counts One, Three, Five, Six, and Seven of Plaintiff's Amended Complaint.  Furthermore, all claims are dismissed against Defendant AGH.  As to Counts Two, Four, and Eight, Plaintiff may only proceed on the disputed questions of fact outlined herein.

SO ORDERED.

Dated at New Haven, Connecticut, March __30__, 2005.

_____
                              /s/
Peter C. Dorsey, U.S. District Judge
United States District Court

---

[15]     However, with respect to this aiding and abetting claim, it is important to note that Plaintiff never mentions that she viewed this action as retaliatory in her brief opposing ANAC's motion.  See Pl. Mem. Opp. Summ. J. at 14 (only mentioning that she asked to be considered with nothing more) and 32-33 (discussing alleged retaliatory adverse actions without mentioning not being considered for Bennett's position).  Accordingly, ANAC was not on notice as to this argument and while Plaintiff may attempt to prove her claim against Bennett, ANAC cannot be held responsible for this particular claim should she prove retaliation occurred as it was not adequately raised.