## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **LEIGH BOLICK,** | ) | **Civil Action No.:** |
| | ) | **3:03 CV 165 (PCD)** |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **ALEA GROUP HOLDINGS, LTD.,** | ) | |
| **ALEA NORTH AMERICA COMPANY,** | ) | |
| **JOHN J. BENNETT, and ROBERT D.** | ) | |
| **BYLER,** | ) | |
| **Defendants.** | ) | **MAY 27, 2005** |

## DEFENDANTS' COMPLIANCE WITH TRIAL PREPARATION ORDER—SECTION B

The Defendants, Alea North America Company ("ANAC"), John J. Bennett, and Robert

D. Byler, respectfully submit Section B of the Trial Preparation Order. Pursuant to this Court's

ruling on Defendants' Motion for Summary Judgment, no claims remain pending against

Defendant Alea Group Holdings, Ltd.

As an initial matter, Defendants assert that Plaintiff's proposed stipulation of undisputed

facts do not comport with the Court's ruling on Summary Judgment (to be addressed in detail in

Part C). Defendants' Proposed Undisputed Facts are therefore based on the ruling by this Court that

the only remaining claims are as follows:

(A) Retaliation against ANAC (Title VII – 42 U.S.C. § 2000e-3 and C.G.S. § 46a-60(4) and

Byler (C.G.S. §46a-60(4)), however limited to Plaintiff's claim that her management responsibilities

were "marginalized" by virtue of: (i) not being allowed to participate in the hiring of the two new

male Vice Presidents (Scott Roe and Jeffrey Alexander); (ii) by being excluded from management

meetings; (iii) in April 2002, she was not allowed to attend a trade conference; and (iv) in April

2002, she was reprimanded by Byler during a marketing staff meeting.

(B) Violation of the Equal Pay Act (29 U.S.C. § 206(d)) against ANAC based on Plaintiff's allegation that she was paid less than similarly situated male Vice Presidents (Scott Roe and Jeffrey Alexander) while performing substantially similar work as a Vice President as of April of 2002.

(C) Retaliation against Bennett (C.G.S. § 46a-60(4)), but limited to Plaintiff's claim that Bennett allegedly made negative comments to Byler regarding her work performance during the course of ANAC's investigation of Plaintiff's January 2002 complaint to Human Resources, on which Byler relied in denying her Bennett's spot after he left the company.

(D) Aiding and abetting retaliation by ANAC against Bennett (C.G.S. §46a-60(5)), but limited to: (i) the claimed marginalization of Bolick's management responsibilities as described above; and (ii) Bennett's alleged negative comments to Byler which Bolick claims aided and abetted Byler's retaliation in not placing her into Bennett's position.

## I.    PROPOSED STIPULATION OF UNDISPUTED FACTS

1.    Defendant ANAC is a reinsurance intermediary. (Byler testimony; Bolick testimony)

2.    Defendant Byler is the Chief Executive Officer of Alea Alternative Risk ("AAR"), an operating division of ANAC. (Byler testimony; Bolick testimony; Complaint)

3.    Defendant Bennett was AAR's Senior Vice President of Marketing and Bolick's supervisor. Bennett resigned from his employment with ANAC in February 2002. (Byler testimony; Bolick testimony; Lametta testimony; Bennett testimony)

4.    Bolick is a high school graduate with two years of college credit, but never earned a college degree. (Bolick testimony)

5.    Just prior to joining ANAC, Bolick was a Senior Underwriter for the Argonaut Insurance Company in Texas, earning between $72,000 and $73,000 per year.    (Bolick testimony; Bolick Resume)

6.    Bolick had lived in Texas for approximately 20 years.   In September 2000, ANAC hired her as an Assistant Vice President.   (Bolick testimony)

7.    Bolick signed ANAC's September 19, 2000 offer letter, which confirmed that she was being hired as an Assistant Vice President at an annual salary of $100,000, and that she was eligible for insurance benefits, relocation expenses from Texas of up to $10,000, as well as the potential for a discretionary bonus.   (Bolick testimony; Bolick Offer letter)

8.    On October 10, 2000, Bolick started at ANAC's Rocky Hill office in Connecticut. She reported directly to Bennett. (Bolick testimony; Bennett testimony)

9.    While employed by ANAC, Bolick attempted to market insurance products. (Bolick testimony; Byler testimony; Bennett testimony)

10.    As a marketer, Bolick was expected to bring in prospective clients and accounts, and to work closely with the underwriters to write the business.  Bolick, as the marketer, had the ultimate responsibility to "close" deals.  (Byler testimony; Bennett testimony)

11.    Bolick could recall closing only one deal during her entire employment with ANAC, but Byler had no record of any deals being closed by her during her active employment. (Bolick testimony; Byler testimony)

12.    On November 6, 2000, Bolick complained to Byler about certain conduct by Bennett which she claimed to constitute harassment.  (Byler testimony; Bolick testimony)

13.     Bolick told Byler specifically that she did not want Bennett to be fired, but asked Byler to resolve the issue.  Byler took steps to resolve the issue, and thereafter, Bolick told Byler the situation had become "acceptable".  (Byler testimony; Bolick testimony)

14.     Byler did not make Bennett aware of Bolick's complaint to him from November 2001, as a result of Bolick's request he not do so.  (Byler testimony; Bennett testimony)

15.     On January 10, 2002, Bolick complained to Byler and to ANAC's Human Resources Department that Bennett had sexually harassed her.  (Byler testimony; Bolick testimony; Lametta testimony)

16.     Marti Lametta, the then Vice President and Director of ANAC's Human Resource department, conducted an investigation.  (Lametta testimony; Bolick testimony; Bennett testimony; Byler testimony)

17.     Before ANAC's investigation into Bennett's conduct ended and any determinations were made as to the merit of Bolick's allegations, Bennett voluntarily resigned his employment with ANAC.  (Byler testimony; Lametta testimony; Bennett testimony)

18.     During the investigation period, Bolick had been told she could work from home, due to her articulated stress and inability to concentrate in the office.  (Byler testimony; Bolick testimony; Lametta testimony)

19.     Thus, Bolick had no contact with Bennett literally from the instant she complained to Human Resources.  (Bolick testimony; Byler testimony; Bennett testimony)

20.     In or about February 2002, Lametta and Byler contacted Bolick at home to notify her that Bennett had left ANAC.  (Lametta testimony; Byler testimony; Bolick testimony)

21.    They confirmed that Bolick would be returning to her current position, with the same, and possibly expanded, responsibilities, while expressing their enthusiasm at her return. (Lametta testimony; Byler testimony; Bolick testimony)

22.    Rather than agreeing to a prompt return, Bolick expressed resistance.  (Lametta testimony; Byler testimony; Bolick testimony)

23.    Bolick did not return to the office until in or about late February/early March, and even then, continued to often work from home. The exact date of her return is difficult to determine as Bolick continued to work extensive amounts of time from home.  (Lametta testimony; Byler testimony; Bolick testimony)

24.    From the time that she had been hired, Bolick was aware that ANAC planned to divide the Marketing Department into regions and hire a marketer for each region.  (Byler testimony; Bolick testimony)

25.    Consistent with those discussions, in January 2002, ANAC hired Sandra Duncan as the Marketing Vice President for the Midwest Region at an annual salary of $125,000 and paid more than $30,000 in relocation expenses.  (Byler testimony; Duncan testimony; Duncan Offer letter, Application and Resume)

26.    Duncan possessed an MBA Degree in Management and Economics, having graduated from American International College summa cum laude.  (Duncan testimony; Duncan Offer letter, Application and Resume; Byler testimony)

27.    Prior to joining ANAC, she had been the Manager of Client Services for Risk Enterprise Management and had spent approximately 15 years with the highly-regarded firm of Tillinghast-Towers Perrin, the last three as a Senior Risk Management Consultant.  (Duncan testimony; Duncan Offer letter, Application and Resume; Byler testimony)

28.    When Duncan left Risk Enterprise Management as part of a reduction-in-force, her annual salary was $120,000.  (Duncan testimony; Duncan Offer letter, Application and Resume)

29.    Bolick acknowledged there could be areas where Duncan was more experienced than she.  (Bolick testimony; Byler testimony)

30.    In February 2002, ANAC hired Scott Roe as the Marketing Vice President for its West Region at an annual $130,000 salary, plus a one-time $20,000 signing bonus.  (Byler testimony; Roe testimony; Roe Offer letter, Application and Resume)

31.    Prior to joining ANAC, Roe attained a BA in Finance and an MBA in Finance, and had worked as a Vice President for Aon Risk Services and a Senior Sales Consultant at Broadwing Technology Solutions.  He earned more than $120,000 in 2001.  (Byler testimony; Roe testimony; Roe Offer letter, Application and Resume)

32.    Also in February 2002, ANAC hired Jeffrey Alexander at an annual $130,000 salary as the Marketing Vice President for its northeast region, which stretched from Maine to North Carolina, including Bermuda.  He also received a one-time $25,000 signing bonus.  (Byler testimony; Alexander testimony; Alexander Offer letter, Application and Resume)

33.    Alexander had obtained a B.S. in Business Administration at Villanova University. He earned more than $130,000 per year as a Second Vice President at Discover Reinsurance Company in Farmington, Connecticut, and had spent his entire career in the insurance industry. (Alexander testimony; Alexander Offer letter, Application and Resume; Byler testimony)

34.    On April 1, 2002, the timing being pursuant to standard ANAC practice and policy, Bolick was promoted to Vice President and received a 15%, or $15,000 raise, bringing her annual salary to $118,000 per year. She also received a raise in April 2003 in the amount of

$3,450 per year in anticipation of her return to work.  (Byler testimony; Bolick testimony; April 2003 letter to Plaintiff referring to salary increase; Notice of Promotion in 2002)

35.    On May 31, 2002, Bolick complained to Byler that she believed he had been retaliating against her for previously complaining about Bennett.  (Byler testimony; Bolick testimony; Lametta testimony; Goldberg testimony; Lametta investigation notes regarding retaliation complaint; Goldberg investigation notes regarding retaliation complaint; Byler notes regarding retaliation complaint; Complaint)

36.    Plaintiff alleged her management responsibilities had been reduced in that she was not allowed to participate in the hiring of the two new male Vice Presidents, she was excluded from management meetings, and in April 2002 she was not allowed to attend a certain "captive" conference. (Byler testimony; Bolick testimony; Lametta testimony; Goldberg testimony; Lametta investigation notes regarding retaliation complaint; Goldberg investigation notes regarding retaliation complaint; Byler notes regarding retaliation complaint)

37.    In addition, Bolick claimed that during an April 10, 2002 marketing staff meeting, Byler was rude, abrasive, and acted in a generally inappropriate manner toward her.  (Byler testimony; Bolick testimony; Goldberg testimony; Lametta testimony; Lametta investigation notes regarding retaliation complaint; Goldberg investigation notes regarding retaliation complaint; E-mails between Bolick, Lametta and Goldberg regarding retaliation complaint; Byler notes regarding retaliation complaint; E-mails between Byler and Bolick regarding "captive" conference)

38.    Marti Lametta and Leonard Goldberg, ANAC's President, conducted an investigation into Bolick's claim that Byler had acted inappropriately toward her.  (Lametta testimony; Bolick testimony; Goldberg testimony; Roe testimony; Alexander testimony; June 21,

2002 memo from Goldberg to Bolick; Lametta investigation notes regarding retaliation complaint; Goldberg investigation notes regarding retaliation complaint; E-mails between Bolick, Lametta and Goldberg regarding retaliation complaint)

39.     Before they formed any conclusions, and after Bolick told them she did not believe she could work again with Byler, Bolick told them that her complaint could be resolved by promoting her into Bennett's former Senior Vice President position, thereby installing her as the supervisor of the three other Marketing Vice Presidents.   (Lametta testimony; Bolick testimony; Goldberg testimony; June 21, 2002 memo from Goldberg to Bolick; E-mails between Bolick, Lametta and Goldberg regarding retaliation complaint; Lametta investigation notes regarding retaliation complaint; Goldberg investigation notes regarding retaliation complaint)

40.     Such a promotion would then compel Bolick to work even more closely with Byler, as the Senior Vice President reported directly to him. (Lametta testimony; Byler testimony)

41.     After the investigation of the April 10, 2002 marketing staff meeting, which primarily included interviews with a number of participants who attended the subject marketing staff meeting, it was determined that Bolick's allegations could not be substantiated.  In fact, the attendees interviewed stated that Byler had not acted "inappropriately", and some even opined that Bolick did not consistently behave in an appropriate manner toward Byler and her other superiors.  (Lametta testimony; Byler testimony; Bolick testimony; Goldberg testimony; Roe testimony; Alexander testimony; June 21, 2002 memo from Goldberg to Bolick; Lametta investigation notes regarding retaliation complaint; Goldberg investigation notes regarding retaliation complaint; E-mails between Bolick, Lametta and Goldberg regarding retaliation complaint; Byler notes regarding retaliation complaint)

42.    Furthermore, with respect to Bolick's suggestion that she should be placed into Bennett's former position, thus obtaining an instant promotion, Lametta and Goldberg advised Bolick that she was well suited to continue in her position as Vice President.  Goldberg and Lametta thus underscored ANAC's desire to have Bolick remain in her position, performing her functions, and participating in ANAC's growth and anticipated prosperity.  (Lametta testimony; Bolick testimony; Goldberg testimony; June 21, 2002 memo from Goldberg to Bolick; E-mails between Bolick, Lametta and Goldberg regarding retaliation complaint)

43.    Nevertheless, Bolick stopped working and commenced a disability leave, claiming stress and anxiety from the events at ANAC prevented her from working.  (Lametta testimony; Bolick testimony; Goldberg testimony; June 21, 2002 memo from Goldberg to Bolick)

44.    Bolick never returned to work, yet ANAC continued to keep Bolick as an employee for approximately ten months, and thus, for a number of months even beyond her exhaustion of all statutorily guaranteed leave time.  Eventually, on July 15, 2003, however, ANAC terminated Bolick's employment.  (Lametta testimony; Bolick testimony)

## II.    **PROPOSED FINDINGS OF FACT**

*1.-44.  Defendants incorporate the Undisputed Facts above as if fully set forth herein.*

45.    Bolick, in support of her retaliation claim, raised only vague, generic, and unsubstantiated facts as to a reduction in her management responsibilities.  Specifically, she alleged that she was not allowed to participate in the hiring of the two new male Vice Presidents, she was excluded from management meetings, in April 2002, she was not allowed to attend a certain "captive" conference, and in April 2002, she was treated abrasively by Byler in front of staff at a marketing meeting.  (Lametta testimony; Byler testimony; Bolick testimony; Goldberg testimony;

Roe testimony; Alexander testimony; June 21, 2002 memo from Goldberg to Bolick; Lametta investigation notes regarding retaliation complaint; Goldberg investigation notes regarding retaliation complaint; E-mails between Bolick, Lametta and Goldberg regarding retaliation complaint; Byler notes regarding retaliation complaint; E-mails between Byler and Bolick regarding "captive" conference)

46.    However, Bolick failed to present any evidence whatsoever that her responsibilities ever included direct or indirect participation in the hiring of the Vice Presidents. In any event, Byler and/or Bennett did consult with her regarding the hire of Sandra Duncan. Moreover, Bolick was unable to identify any evidence of a nexus between her complaint about Bennett and her not being involved in the hire of the Vice Presidents. (Bolick testimony; Byler testimony; Lametta testimony; Goldberg testimony; Lametta investigation notes regarding retaliation complaint; Goldberg investigation notes regarding retaliation complaint; Offer letters, Applications and Resumes of Roe, Alexander, Duncan)

47.    Bolick further failed to proffer evidence of any concrete, economic or other quantifiable disadvantage as a direct result of her allegation that she was not allowed to participate in the hiring of the two new male Vice Presidents. (Byler testimony; Bolick testimony)

48.    Especially because there was no effect on her status, position, or compensation, her lack of participation in the hiring of the two new male Vice Presidents, even if true, cannot constitute adverse actions indicative of retaliatory motive. (Lametta testimony; Byler testimony; Bolick testimony)

49.    Bolick's description regarding her alleged exclusion from management meetings is similarly vague, and nevertheless inaccurate–there is no evidence Bolick was deliberately excluded

from meetings that she should or would have attended based on her position or responsibilities. Further, she was unable to proffer any evidence of a nexus between her complaint about Bennett and such exclusion, even if true.  (Bolick testimony; Lametta testimony; Goldberg testimony; Byler testimony; June 21, 2002 memo from Goldberg to Bolick; Lametta investigation notes regarding retaliation complaint; Goldberg investigation notes regarding retaliation complaint; E-mails between Bolick, Lametta and Goldberg regarding retaliation complaint; Byler notes regarding retaliation complaint)

50.    Bolick further failed to proffer evidence of any concrete, economic or other disadvantage as a direct result of her not attending certain management meetings, even if she was deliberately excluded.  (Byler testimony; Bolick testimony; Goldberg testimony; June 21, 2002 memo from Goldberg to Bolick; Lametta investigation notes regarding retaliation complaint; Goldberg investigation notes regarding retaliation complaint)

51.    Especially because there was no effect on her status, position, or compensation, exclusion from management meetings, even if true, cannot constitute adverse action indicative of retaliatory motive.  (Lametta testimony; Byler testimony; Bolick testimony; Goldberg testimony; June 21, 2002 memo from Goldberg to Bolick; Lametta investigation notes regarding retaliation complaint; Goldberg investigation notes regarding retaliation complaint)

52.    Bolick's description regarding the April 2002 "captive" conference also fails.  No evidence was presented that established Byler's denial of her request that she be permitted to attend was based on anything other than legitimate, business reasons.  (Bolick testimony; Lametta testimony; Byler testimony; Goldberg testimony; June 21, 2002 memo from Goldberg to Bolick Lametta investigation notes regarding retaliation complaint; Goldberg investigation notes

regarding retaliation complaint; Byler notes regarding retaliation complaint; E-mails between Byler and Bolick regarding "captive" conference)

53.     Bolick further failed to proffer evidence of any concrete, economic or other disadvantage as a direct result of her not being allowed to attend the April 2002 "captive" conference. (Byler testimony; Bolick testimony; Lametta testimony; Goldberg testimony; June 21, 2002 memo from Goldberg to Bolick; Lametta investigation notes regarding retaliation complaint; Goldberg investigation notes regarding retaliation complaint)

54.     Especially because there was no effect on her status, position, or compensation, this denial cannot constitute adverse action indicative of retaliatory motive.  (Lametta testimony; Byler testimony; Bolick testimony; Goldberg testimony; June 21, 2002 memo from Goldberg to Bolick; Lametta investigation notes regarding retaliation complaint; Goldberg investigation notes regarding retaliation complaint)

55.     Byler's alleged behavior at the April 10, 2002 marketing meeting could not be substantiated despite a good faith investigation by the company, which included interviews with attendees.  (Bolick testimony; Byler testimony; Lametta testimony; Goldberg testimony; Roe testimony; Alexander testimony; June 21, 2002 memo from Goldberg to Bolick; Lametta investigation notes regarding retaliation complaint; Goldberg investigation notes regarding retaliation complaint; E-mails between Bolick, Lametta and Goldberg regarding retaliation complaint; Byler notes regarding retaliation complaint)

56.     Moreover, Bolick was unable to establish any nexus between her complaint about Bennett and Byler's behavior, even if true.  (Bolick testimony; Lametta testimony; Goldberg testimony; Byler testimony; June 21, 2002 memo from Goldberg to Bolick; Lametta

investigation notes regarding retaliation complaint; Goldberg investigation notes regarding retaliation complaint; Byler notes regarding retaliation complaint)

57.   Moreover, testimony proffered at trial corroborated Defendants' assertions that Bolick's description of Byler's purported behavior was inaccurate.   Bolick herself acted inappropriately toward Byler and others during that April 10, 2002 meeting.   (Bolick testimony; Byler testimony; Lametta testimony; Goldberg testimony; Roe testimony; Alexander testimony; June 21, 2002 memo from Goldberg to Bolick; Lametta investigation notes regarding retaliation complaint; Goldberg investigation notes regarding retaliation complaint; Byler notes regarding retaliation complaint)

58.   Bolick further failed to proffer evidence of any concrete, economic or other disadvantage as a result of Byler's purported behavior at that April 10, 2002 meeting.   (Bolick testimony; Lametta testimony; Byler testimony; Goldberg testimony; June 21, 2002 memo from Goldberg to Bolick; Lametta investigation notes regarding retaliation complaint; Goldberg investigation notes regarding retaliation complaint; Byler notes regarding retaliation complaint)

59.   Especially because there was no effect on her status, position, or compensation, being given the "cold shoulder" by Byler, even if true, cannot constitute adverse action indicative of retaliatory motive.   (Bolick testimony; Lametta testimony; Byler testimony; Goldberg testimony; June 21, 2002 memo from Goldberg to Bolick; Lametta investigation notes regarding retaliation complaint; Goldberg investigation notes regarding retaliation complaint; Byler notes regarding retaliation complaint)

60.   Bolick failed to proffer any actual evidence that the reasons given for any other "actions", even if deemed "adverse", were connected to protected activity or otherwise motivated by retaliatory animus.   Thus, proof of the requisite causal connection between the alleged adverse

actions and her engagement in protected activity is absent. (Bolick testimony; Lametta testimony; Byler testimony; Bennett testimony; Goldberg testimony; June 21, 2002 memo from Goldberg to Bolick; Lametta investigation notes regarding retaliation complaint; Goldberg investigation notes regarding retaliation complaint; E-mails between Bolick, Lametta and Goldberg regarding retaliation complaint; Byler notes regarding retaliation complaint; E-mails between Byler and Bolick regarding "captive" conference)

61.    Bolick also failed to produce evidence that Bennett made any derogatory comments to Byler about her performance which motivated ANAC to deny Bolick a promotion into Bennett's position after his departure from ANAC. (Bolick testimony; Lametta testimony; Byler testimony; Bennett testimony; Goldberg testimony; June 21, 2002 memo from Goldberg to Bolick; Lametta investigation notes regarding retaliation complaint; Goldberg investigation notes regarding retaliation complaint; Byler notes regarding retaliation complaint)

62.    Bolick similarly failed to produce evidence that any action by Bennett resulted in the "marginalizing" of her management responsibilities. (Byler testimony; Bolick testimony; Lametta testimony; Bennett testimony; Goldberg testimony; June 21, 2002 memo from Goldberg to Bolick; Lametta investigation notes regarding retaliation complaint; Goldberg investigation notes regarding retaliation complaint; Byler notes regarding retaliation complaint)

63.    As to Plaintiff's claim that Defendants violated the Equal Pay Act, Defendants presented significant testimony and documents substantiating that the $7,000-$12,000 difference in Bolick's salary was based on Byler's view of their comparative superior skills, experience, and prior salary history of all three Vice Presidents of Marketing. (Bolick testimony; Byler testimony; Offer letters, Applications and Resumes of Duncan, Roe and Alexander; Duncan, Roe and Alexander testimony)

64.    On the other hand, Plaintiff failed to proffer any evidence to dispute the articulated rationale of ANAC. (Byler testimony; Bolick testimony; Bolick Resume; Offer letters, Applications and Resumes of Duncan, Roe and Alexander; Duncan, Roe and Alexander testimony)

65.    Moreover, a closer look at the salaries of the Vice Presidents hired in early 2002 underscores the complete absence of discriminatory motivation by the company. (Bolick testimony; Byler testimony; Offer letters, Applications and Resumes of Duncan, Roe and Alexander; Duncan, Roe and Alexander testimony)

66.    For example, it was undisputed that Duncan, the female Vice President, was hired at the same starting compensation as were the males, and possibly with a starting compensation higher than that of Roe, due to payment of relocation expenses at the time of her hire exceeding $30,000. (Byler testimony; Duncan testimony; Bolick testimony; Offer letter, Application and Resume of Duncan)

## III.    DEFENDANTS' CLAIMS OF LAW

A.    Plaintiff failed to sustain her burden of proving any of the Defendants violated Title VII, 42 U.S.C. Section 2000e-3 by retaliating against her in any way for her internal complaints against Bennett or Byler.

Specifically, Plaintiff failed to sustain her burden of proving (1) retaliation by ANAC (Title VII and CFEPA) and Byler (CFEPA), limited to Plaintiff's claim of marginalization of specific management responsibilities; and (2) retaliation against Bennett (CFEPA), limited to Plaintiff's claim that Bennett made negative comments to Byler regarding her work performance during the course of ANAC's investigation of Plaintiff's January 2002 complaint to Human Resources.

B.    Plaintiff similarly failed to sustain her burden of proving any claim of aiding or abetting retaliation against Bennett [i.e., against Bennett as to his connection with alleged marginalization of her management responsibilities and negative comments about her performance on which Byler relied].

C.    Plaintiff also failed to sustain her burden of proving that her gender played any role whatsoever in ANAC's decisions regarding the compensation of the male Vice Presidents in violation of the Equal Pay Act, 29 U.S.C. Section 206(d).

## IV.    **PROPOSED EXHIBITS**

1.    Offer letter to Sandra Duncan, dated January 17, 2002

2.    Offer letter to Jeffrey Alexander, dated February 22, 2002

3.    Offer letter to Scott D. Roe, dated January 28, 2002

4.    Resume of Sandra Duncan

5.    Resume of Scott Roe

6.    Resume of Jeffrey Alexander

7.    Employment application of Sandra Duncan

8.    Employment application of Scott Roe

9.    Employment application of Jeffrey Alexander

10.    Offer letter to Leigh Bolick dated September 19, 2000 with attachment

11.    Resume of Leigh Bolick submitted to ANAC

12.    Letter to Plaintiff reflecting raise in April of 2003

13.    Notice of Promotion in 2002

14.    E-mail communications between Byler and Bolick regarding April 2002 "captive" conference

15.    Byler notes regarding retaliation complaint

16.    Interoffice Memo dated June 21, 2002 from Leonard Goldberg to Leigh Bolick

17.    Lametta handwritten and typewritten notes of investigation regarding retaliation complaint against Byler

18.    E-mail communications dating between 6/10/02 and 7/16/02 between Bolick, Lametta, and Goldberg regarding retaliation complaint against Byler

19.    Goldberg investigation notes regarding Bolick's retaliation complaint against Byler

20.    Resume/Curriculum Vitae of Dr. Harry Adamakos

21.    Report of Dr. Harry Adamakos and documents on which he relied

22.    Notes of Dr. Steven A. Kagel, Ph.D.

23.    Judgment of Divorce between Thomas Bolick and Leigh Bolick

24.    Petition for Divorce between Thomas Bolick and Leigh Bolick

25.    Social worker report from Bolick's prior divorce proceeding in 1996

26.    Sworn answers to interrogatories by Bolick in prior divorce proceeding

27.    Cody Saiz – choice of custodial parent in 1997

28.    Excerpts from the transcript of Deposition of Leigh Bolick

The Defendants expressly reserve the right to introduce any exhibit introduced by Plaintiff during their case in chief, and/or to amend this list depending on the Plaintiff's showing at trial.

## V.    **WITNESSES**

1.    <u>Leigh Bolick</u> is expected to testify as to all claims and defenses in this action.

2.    <u>Robert Byler</u> is expected to testify as to all claims and defenses in this action.

3.    <u>Marti Lametta</u>, the former Vice President and Director of Human Resources, is expected to testify as to the investigation of Bolick's retaliation claims, the company's decisions

incident thereto, and the company's responses to Bolick's request that she be placed into Bennett's position.

4.     Len Goldberg is expected to testify as to Bolick's retaliation claims, the company's decisions incident thereto, and the company's responses to Bolick's request that she be placed into Bennett's position.

5.     John Bennett, the former Senior Vice President of ANAC, is expected to testify as to all claims of retaliation against Defendants, and the affirmative defenses thereto.

6.     Sandra Duncan is expected to testify regarding her background, qualifications and employment experience upon hire by ANAC.

7.     Jeffrey Alexander is expected to testify regarding his background, qualifications and employment experience upon hire by ANAC.  He is also expected to testify regarding the marketing meeting about which Bolick complained.

8.     Scott D. Roe is expected to testify regarding his background, qualifications and employment experience upon hire by ANAC.  He is also expected to testify regarding the marketing meeting about which Bolick complained.

9.     Dr. Harry Adamakos is expected to testify as an expert concerning his psychological evaluation of Plaintiff and his findings regarding Plaintiff's claim of severe emotional distress as a result of her experiences at ANAC, including his expert opinion that there were other significant prior stressors occurring prior to her employment at ANAC which contributed in large part to "overreaction" or "severe" distress she may have suffered while employed there; that such prior, traumatic events were more significant stressors than those experiences that form the basis of her emotional distress claim; and which stressors could have contributed to an underlying psychological vulnerability and basis for her reaction to what she believed happened in this case.  Dr. Adamakos'

testimony will, in focusing on Plaintiff's own statements of the cause of her distress, establish that Plaintiff cannot quantify the emotional distress caused by the specific events remaining at issue of the case, but rather, that her focus was on events no longer actionable herein.  Dr. Adamakos will also testify as to her treatment/evaluation by Dr. Gamble, Dr. Kagel and Dr. Herzog.  (See attached CV for Dr.  Harry Adamakos)

The Defendants expressly reserve the right to call any witness called by Plaintiff during their case in chief, and further reserve the right to amend this list depending on the Plaintiff's showing at trial.

## VI.    DESCRIPTION OF PROPOSED EVIDENCE

*[For witness testimony, see above descriptions]*

1.    Offer letter to Sandra Duncan, dated January 17, 2002

2.    Offer letter to Jeffrey Alexander, dated February 22, 2002

3.    Offer letter to Scott D. Roe, dated January 28, 2002

4.    Resume of Sandra Duncan

5.    Resume of Scott Roe

6.    Resume of Jeffrey Alexander

7.    Employment application of Sandra Duncan

8.    Employment application of Scott Roe

9.    Employment application of Jeffrey Alexander

10.    Offer letter to Leigh Bolick dated September 19, 2000 with attachment.

11.    Resume of Leigh Bolick submitted to ANAC.

12.    Letter to Plaintiff reflecting raise in April of 2003

13.    Notice of Promotion in 2002

NY:552806v1