IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| LEIGH BOLICK,<br>　　　　　　Plaintiff<br><br>vs.<br><br>ALEA GROUP HOLDINGS, LTD., ALEA NORTH AMERICA COMPANY, JOHN J. BENNETT, AND ROBERT D. BYLER,<br>　　　　　　Defendants | : CIVIL ACTION NO.<br>: 3:03 CV 165 (PCD)<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: June 13, 2005 |

# TRIAL PREPARATION ORDER - SECTION C

*<u>Defendants' General Objection</u>* – Defendants object to those facts set forth by Plaintiff in her Proposed Stipulation of Undisputed Facts and Proposed Findings of Fact which relate to the dismissed claim of sexual harassment, the dismissed portions of her claim of retaliation, and to any other facts regarding which the Court has already ruled are no longer at issue. In Defendants' counter-statement, Part B, the remaining claims are set forth.

Defendants contend that only the fact that Bolick made complaints of sexual harassment by Bennett is needed to establish the background for her remaining retaliation claims.

1.　　　　**Proposed Stipulation of Undisputed Facts**

1.　　Defendant Alea North America Company ("ANAC"), is a reinsurance intermediary.

**Defendants' Response:** Agreed.

2.　　Defendant Robert Byler was President and Chief Executive Officer of Alea North America Insurance Company and AAR until March, 2002. Thereafter, he only retained the role

NY:572679v1

of President and Chief Executive Officer of Alea Alternative Risk ("AAR"), a division of ANAC.

**Defendants' Response:** Agreed, except Defendants disagree with any inference Byler was demoted. (Byler testimony; Goldberg testimony)

3.   Defendant Bennett was AAR's Senior Vice President of Marketing and was Bolick's supervisor for the majority of her employment with ANAC.

**Defendants' Response:** Agreed, except that the word "majority" is ambiguous. Bennett resigned from his employment with ANAC in February 2002 and Bolick had no contact with Bennett from the time of Bolick's complaint on January 10, 2002 until she left ANAC. (Byler testimony; Bennett testimony; Lametta testimony)

4.   Plaintiff was hired by ANAC in September 2000 for the position of Assistant Vice President of Marketing. She was hired at a salary of $100,000.

**Defendants' Response:** Agreed.

5.   Her responsibilities involved marketing insurance products.

**Defendants' Response:** Agreed, except Defendants disagree with any inference that marketing insurance products was her sole responsibility.

6.   During October, 2000, plaintiff and Bennett traveled together to Chicago and Seattle.

**Defendants' Response:** Object to this statement as outside the scope of the remaining claims and facts in dispute pursuant to the Court's ruling on Defendants' Motion for Summary Judgment (hereinafter the "Ruling").

7.   ANAC did not have a written sexual harassment policy in 2000 - 2001.

**Defendants' Response:** Object to this statement as outside the scope of the Ruling.

8. During the week of November 6, 2000, plaintiff Leigh Bolick and Robert Byler met outside the office at Bolick's request. Bolick complained about inappropriate behavior by Bennett.

**Defendants' Response:** Agreed.

9. Byler and Bolick agreed that she and Bennett should no longer travel together and that Bennett should not be told that Bolick had complained about his conduct.

**Defendants' Response:** Object to the proposed fact about "travel together" as outside scope of the Ruling. The remainder is agreed.

10. Byler did not report the matter to Human Resources.

**Defendants' Response:** Agreed, except Defendants disagree with any inference that Bolick asked him to report the matter. (Byler testimony; Bolick testimony; the Ruling)

11. Bennett remained Bolick's supervisor and she continued to see him at the office.

**Defendants' Response:** Object to these proposed facts as outside the scope of the Ruling.

12. In October, 2001, Byler wrote to Dennis Purkiss, Chairman and CEO of Alea Group Holdings, Ltd. to request a promotion and raise for plaintiff. He wrote the following about plaintiff's performance: "Leigh has embraced the marketing role and is creating strong relationships. She has almost twenty years experience and brings good underwriting background to the position. She is well organized and has been instrumental in developing enhancements for our marketing MIS."

**Defendants' Response:** Object to these proposed facts as outside the scope of the Ruling.

13. Bolick did not travel alone with Bennett from November, 2000 to December, 2001.

**Defendants' Response:** Object to these facts as outside the scope of the Ruling.

14. In December, 2001, Bennett suggested that he and plaintiff travel together again. They went to California.

**Defendants' Response:** Object to these facts as outside the scope of the Ruling.

15. On January 10, 2002, plaintiff went to Human Resources and complained about Bennett's conduct toward her. Bolick made her complaint to Martha ("Marti") Lametta, Vice President of Human Resources at ANAC.

**Defendants' Response:** Agreed.

16. ANAC began an investigation of plaintiff's complaint, during which time plaintiff reported to Byler.

**Defendants' Response:** Agreed, except that Byler and Kevin Costello were coordinating the management of the marketing effort after Bennett left. (Byler testimony)

17. Plaintiff was told to stay at home during the investigation and specifically was told not to attend the office holiday party in January, 2002.

**Defendants' Response:** Object as outside the scope of the Ruling.

18. Bennett resigned and received a severance package in excess of $250,000.00.

**Defendants' Response:** Agreed that Bennett resigned. Object to the remainder as outside the scope of the Ruling.

19.     In the first quarter of 2002, AAR hired three new marketers who were hired at the level of Vice President, to do the same job plaintiff was doing, and who were paid higher salaries than plaintiff.

**Defendants' Response:** Agreed, except Defendants disagree that the marketers were doing the exact same job as was Plaintiff as they were hired for different regions. (See Byler testimony; Bennett testimony; Lametta testimony; Bolick testimony; Duncan testimony; Roe testimony; Alexander testimony; Offer letter, application and resume of Duncan, Roe and Alexander; Bolick Dep.)

20.     At the time those three new Vice Presidents were hired, plaintiff had been approved to be promoted to Vice President on April 1, 2002.

**Defendants' Response:** Agreed.

21.     In February, plaintiff made a request to Byler her title be changed to Vice President immediately so as not to disadvantage her with the new Vice Presidents who had been hired in the Marketing Department. Byler refused to do so.

**Defendants' Response:** Object to these facts as outside the scope of the Ruling.

22.     Plaintiff was assigned to the Southeast region as her new sales territory. Prior thereto, Bennett and plaintiff had marketed the entire United States.

**Defendants' Response:** Object to these facts as outside the scope of the Ruling.

23.     In April, plaintiff was promoted to Vice President and received a raise to $118,000.

**Defendants' Response:** Agreed.

24. The two male Vice Presidents hired were paid $130,000, received signing bonuses of $25,000 and $30,000 respectively and were eligible to participate in the next equity offering by the company. The female Vice President hired was paid $125,000. She did not receive a signing bonus, nor was she told in her offer letter that she would be eligible to participate in the next equity offer.

**Defendants' Response:** Agreed. Defendants disagree with any inference that Ms. Duncan was not paid additional compensation upon hire. Specifically, Scott Roe was paid a $20,000 signing bonus, Jeffrey Alexander was paid a $25,000 signing bonus and Sandra Duncan was paid over $30,000 in relocation fees. (Byler testimony; Bennett testimony; Lametta testimony; Bolick testimony; Duncan testimony; Roe testimony; Alexander testimony; Offer letters of Duncan, Roe and Alexander)

25. In May, 2002, plaintiff complained to Byler that she believed he was retaliating against her for having made a complaint about Bennett to Byler and Human Resources.

**Defendants' Response:** Agreed.

26. In June, 2002, plaintiff met with Marti Lametta and Leonard Goldberg, who had recently been appointed Chairman and CEO of ANAC, to discuss her retaliation complaint.

**Defendants' Response:** Agreed, except that Goldberg became CEO and President of ANAC.

27. Plaintiff requested a transfer or to be promoted to Bennett's old job. Both requests were denied.

**Defendants' Response:** Agreed.

28.     Plaintiff filed a discrimination complaint with the Commission on Human Rights and Opportunities in June, 2002.

**Defendants' Response:** Agreed.

29.     In September, 2002, plaintiff commenced a disability leave.

**Defendants' Response:** Agreed.

30.     Plaintiff was not replaced within the department.

**Defendants' Response:** Object to these facts as outside the scope of the Ruling.

**2.       Proposed Findings of Fact**

1.      When plaintiff accepted the position with ANAC, she moved across the country with the expectation of getting in on the ground floor of a start up. She was particularly interested in getting into management and learning about the captive market. (Bolick)

**Defendants' Response:** Object to these facts as outside the scope of the Ruling.

2.      Almost immediately after she began her employment, Bennett acted inappropriately with plaintiff on sales trips when they traveled together and in the office. He would belittle and yell at her, told her that being a woman might be a problem for her, attempted to get too close to her, whispered in her ear, asked her to work out with him, put his arm around her, make comments about drugs and comments filled with sexual innuendo. He would comment on her appearance, for example, her hair or her weight. (Bolick)

**Defendants' Response:** Object to these facts as outside the scope of the Ruling.

3.      Plaintiff told Bennett that he was getting too close and attempted to steer the conversation away from inappropriate topics, but his erratic behavior persisted. (Bolick)

**Defendants' Response:** Object to these facts as outside the scope of the Ruling.

4.     When plaintiff complained to Byler she requested that 1) Bennett's behavior stop; and 2) that she no longer have to travel with Bennett. (Bolick)

**Defendants' Response:** Object to any fact other than the fact a complaint was made as outside the scope of the Ruling.

5.     Byler led plaintiff to believe that he would take some action to stop Bennett's behavior, including going to Human Resources and instituting some sort of training. (Bolick)

**Defendants' Response:** Disagreed. (Byler testimony; Bolick testimony; Ruling) Further object as outside the scope of the Ruling.

6.     Although, ANAC did not have a written policy on sexual harassment, there was a verbal policy that included a requirement that any inappropriate behavior be reported to Human Resources. (Lametta)

**Defendants' Response:** Object to these facts as outside the scope of the Ruling.

7.     In December, 2000, plaintiff reported to Marti Lametta of Human Resources that she was having "major issues" with Bennett. She told Ms. Lametta that she was working them out with Byler, but wanted her in the loop. (Bolick)

**Defendants' Response:** Object to these facts as outside the scope of the Ruling.

8.     Bennett then harassed plaintiff about her conversation with Ms. Lametta, asking if plaintiff told Lametta "about their relationship." (Bolick)

**Defendants' Response:** Object to these facts as outside the scope of the Ruling.

9.      From October through May, 2001, Bennett failed to train Bolick. For example, he failed to include her in meetings, did not introduce her to important clients at conferences, even though Byler told plaintiff that he expected Bennett to do so. (Bolick)

**Defendants' Response:** Object to these facts as outside the scope of the Ruling.

10.     Bennett's irrational, inconsistent, and abusive behavior toward plaintiff continued throughout 2001. Bennett attempted to isolate plaintiff from others in the office and became furious if she spoke to Byler outside his presence. (Bolick)

**Defendants' Response:** Object to these facts as outside the scope of the Ruling.

11.     Bennett and Byler led plaintiff to believe that the captive business would be handled separately, as it had been at Byler and Bennett's previous employer, and that Bennett and plaintiff would handle it. (Bolick)

**Defendants' Response:** Object to these facts as outside the scope of the Ruling.

12.     Bennett and Byler also led plaintiff to believe that they would hire marketers who lived in their sales territories to cut down on travel. (Bolick and Lametta)

**Defendants' Response:** Object to these facts as outside the scope of the Ruling.

13.     Bennett and Byler also led plaintiff to believe that she would be part of the management team as the department grew. (Bolick)

**Defendants' Response:** Object to these facts as outside the scope of the Ruling.

14.     Bennett again behaved inappropriately on the trip to California in December, 2001. He then was verbally abusive to plaintiff towards the end of the trip. Soon after the trip, while at the office, Bennett threatened to hit plaintiff and raised his fist at her, because he believed plaintiff

was trying to undermine him with Byler. He threatened to "bury her ass if she undermined him with Byler". (Bolick and e-mail from plaintiff to Bennett dated 12/01)

**Defendants' Response:** Object to these facts as outside the scope of the Ruling.

15.  Following this assault, plaintiff wrote Bennett an e-mail in which she threatened to go to "Rob and HR" if his behavior did not stop. (Bolick and e-mail)

**Defendants' Response:** Object to these facts as outside the scope of the Ruling.

16.  Following a vacation for the Christmas holiday, on Jan. 9, 2002, the next time plaintiff saw Bennett, he told her that they had hired another female vice president and that he had decided that he and Plaintiff did not get along, that she would no longer be his assistant manager of marketing, would no longer handle captive business, internet or marketing materials, and would market only individual account business. (Bolick)

**Defendants' Response:** Object to these facts as outside the scope of the Ruling, except agreed the company had already been planning to hire another vice president, plans with which Bolick was familiar. (Bolick testimony; Bennett testimony; Bolick testimony; Byler testimony; Lametta testimony)

17.  On January 10, 2002, plaintiff made a complaint to Human Resources. She met with Marti Lametta, Vice President of Human Resources, and reported everything that had occurred with Mr. Bennett since she began her employment, including the physical threat. (Bolick and Lametta)

**Defendants' Response:** Agree only that Bolick complained about Bennett's alleged misconduct to Human Resources/Marti Lametta on January 10, 2002. (Bennett testimony; Bolick testimony; Lametta testimony) Object to the rest of these facts as outside the scope of the Ruling.

18. Plaintiff was visibly upset, crying, nervous and stressed as she told Ms. Lametta what had occurred. Ms. Lametta found plaintiffs complaint credible. Ms. Lametta stated that there were other reports of Bennett behaving inappropriately in the office with women. (Bolick, Lametta)

**Defendants' Response:** Object to these facts as outside the scope of the Ruling.

19. When confronted with the allegations, Bennett asked if there were any witnesses. He also criticized plaintiff's performance saying she was critical of Byler and didn't get along with the underwriters. (Lametta, Byler, investigation notes)

**Defendants' Response:** Object to these facts as outside the scope of the Ruling.

20. As the investigation progressed, it appeared that plaintiff was telling the truth. Bennett was given an offer to resign, which he accepted. (Bolick, Lametta, Bennett)

**Defendants' Response:** Agree only that Bennett voluntarily resigned. Object to rest of these facts as outside the scope of the Ruling.

21. Following plaintiff's complaint to Human Resources, Byler was demoted. (Bolick, Byler)

**Defendants' Response:** Object to these facts as outside the scope of the Ruling. Further, disagreed. (Byler testimony; Goldberg testimony)

22. Byler carried out Bennett's threats by reducing her management responsibilities and relegating her to a lesser role in the department. (Bolick)

**Defendants' Response:** Object to these facts as including facts outside the scope of the Ruling. Further, to the extent this allegation relates to the remaining retaliation claims, disagreed. (Bolick testimony; Lametta testimony; Byler testimony; Goldberg testimony; June 21, 2002 memo from Goldberg to Bolick; E-mails between Bolick, Lametta and Goldberg regarding retaliation

NY:572679v1                                11

complaints; Lametta investigation notes regarding retaliation complaint; Goldberg investigation notes regarding retaliation complaint; Byler notes regarding retaliation complaint; E-mails between Byler and Bolick regarding "captive" conference)

23. The reduction in plaintiff's role in the department was contrary to what Byler had said to plaintiff in late November, 2001, regarding her role in management as the department grew and was contrary to the previously stated plan to have the marketers live in their territories to cut down on travel. (Bolick, Lametta)

**Defendants' Response:** Object to facts about "territories" and vague "reduction" of Bolick's role in the department as outside the scope of the Ruling. As to the applicability to the remaining claims, disagreed. There was no reduction in Plaintiff's role in the department or management and nothing contrary to a plan Byler allegedly represented. (Bennett testimony; Byler testimony; Bolick testimony; Lametta testimony; Goldberg testimony; June 21, 2002 memo from Goldberg to Bolick; E-mails between Bolick, Lametta and Goldberg regarding retaliation complaint; E-mails between Byler and Bolick regarding "captive" conference)

24. When plaintiff returned to work in February, 2002, she was treated differently than before she filed her complaint. (Bolick, Byler)

**Defendants' Response:** Object to these facts as including facts outside the scope of the Ruling. To the extent it applies to the remaining claims, agree only that Plaintiff was treated "differently" upon her return to work in that she was promoted in April 2002 and given a raise after her complaint about Bennett. Disagreed as to any inference of other "differential" treatment. (Byler testimony; Bolick testimony; Lametta testimony; Goldberg testimony; June 21, 2002 memo from Goldberg to Bolick; Lametta investigation notes regarding retaliation complaint; Goldberg investigation notes regarding retaliation complaint; E-mails between Bolick, Lametta and

NY:572679v1                                    12

Goldberg regarding retaliation complaint; Byler notes regarding retaliation complaint; E-mails between Byler and Bolick regarding "captive" conference)

25. Although plaintiff was due for a promotion and raise in April, 2002, she requested that her title be changed to Vice President immediately (in February) so as not to disadvantage her with the new vice presidents who had been hired. She also requested that her business card be changed to reflect this title in time for an important conference in March, 2002. The defendant refused. (Bolick, Byler)

**Defendants' Response:** Object to these facts as outside the scope of the Ruling.

26. ANAC had a general policy of giving promotions in April, however exceptions to this policy have been made. (Bolick, Lametta, Purkiss)

**Defendants' Response:** Object to these facts as outside the scope of the Ruling.

27. During a marketing meeting in April, 2002, Byler berated and humiliated plaintiff in front of others in the department. (Bolick, Lametta, investigation report)

**Defendants' Response:** Disagreed. Marti Lametta and Leonard Goldberg, ANAC's President, conducted an investigation into Bolick's retaliation claim and determined that Bolick's allegations could not be substantiated. The attendees of the April 2002 Marketing Meeting interviewed stated that Byler had not acted "inappropriately", and some even opined that Bolick did not consistently behave in an appropriate manner toward Byler and her other superiors. Bolick herself acted inappropriately toward Byler and others during that April 10, 2002 meeting. (Lametta testimony; Byler testimony; Bolick testimony; Goldberg testimony; Roe testimony; Alexander testimony; June 21, 2002 memo from Goldberg to Bolick; Lametta investigation notes regarding retaliation complaint; Goldberg investigation notes regarding retaliation complaint; E-mails between Bolick,

Lametta and Goldberg regarding retaliation complaint; Byler notes regarding retaliation complaint)

28. The investigation of plaintiff's retaliation complaint was inadequate. In response to her complaint, defendants crafted a plan to terminate the employment relationship. (Bolick, Lametta, Goldberg, Judd, investigation notes)

**Defendants' Response:** Object to these facts as outside the scope of the Ruling.

29. Plaintiff is suffering from post traumatic stress disorder and is unable to work. (Bolick, Herzog)

**Defendants' Response:** Disagreed. The testimony of Dr. Adamakos establishes that Plaintiff is not suffering from post traumatic stress disorder, and certainly none traceable to the remaining claims in this case. Rather, based on his physiological evaluation of her, Dr. Adamakos' opinion is she is suffering from the stress in connection with events prior to her working at ANAC. Moreover, the source of her damages is due to her own decision not to return to work. Moreover, Defendants object to the proposed finding of fact as she cannot segregate the cause of her emotional distress and connect that distress to any of the remaining claims in this case. (Adamakos testimony and documentation he relied upon; Adamakos report; Bolick testimony; Bolick Dep.)

30. Plaintiff has suffered compensatory and front pay damages due to defendant's conduct (Bolick, Wishnick)

**Defendants' Response:** Disagreed. See response to #29. Plaintiff cannot establish a nexus between the remaining claims at issue and any purported damages. (Lametta testimony; Byler testimony; Bolick testimony; Goldberg testimony; Roe testimony; Alexander testimony; Duncan testimony; Bennett testimony; Adamakos testimony; June 21, 2002 memo from Goldberg to

Bolick; Lametta investigation notes regarding retaliation complaint; Goldberg investigation notes regarding retaliation complaint; E-mails between Bolick, Lametta and Goldberg regarding retaliation complaint; Byler investigation notes regarding retaliation complaint; Bolick Dep.)

31.   Plaintiff's ability to earn a living in the future has been compromised due to defendant's conduct.  (Bolick, Herzog, Wishnick, vocational expert)

**Defendants' Response:** Disagreed.  Also, Bolick has failed to mitigate any claimed damages.  (Adamakos testimony; Bolick testimony; Bolick Dep.)

32.   Defendants engaged in a discriminatory practice with malice or with reckless indifference to the rights of plaintiff when they intentionally discriminated (retaliated) against plaintiff and when they paid her less than males doing the same job without justification.   (Bolick, investigation notes)

**Defendants' Response:** Object to these facts to the extent they relate to claims outside the scope of the Ruling.   Further, disagreed.   Defendants did not engage in any practice of discrimination/retaliation or aiding and abetting retaliation as described in the limited remaining claims, and there is no Equal Pay Act violation.  There is no evidence of Defendants acted with malice or reckless indifference by allegedly retaliating against Plaintiff and no malice or reckless indifference in paying Bolick less than Scott Roe and Jeffrey Alexander.  The three other Vice Presidents were paid slightly more than Plaintiff based on ANAC's legitimate and reasonable perception that they had superior education, experience and higher prior salary to warrant a higher compensation than Bolick.  (Lametta testimony; Byler testimony; Bolick testimony; Goldberg testimony; Bennett testimony; Roe testimony; Alexander testimony; Duncan testimony; June 21, 2002 memo from Goldberg to Bolick; Lametta investigation notes regarding retaliation complaint; Goldberg investigation notes regarding retaliation complaint; E-mails

between Bolick, Lametta and Goldberg regarding retaliation complaint; Byler investigation notes regarding retaliation complaint; E-mails between Byler and Bolick regarding "captive" conference)

3.      **Claims of Law**

1.      Defendants violated Conn. Gen. Stat. §46a-60 (4) when they retaliated against plaintiff for complaining of sexual harassment.

**Defendants' Response:** Object to this claim of law in so far as it refers to retaliation outside the scope of the Ruling. Further, disagreed. Plaintiff failed to sustain her burden of proving any of the Defendants violated Title VII, 42 U.S.C. Section 2000e-3, or C.G.S. § 46a-60(4) by retaliating for her complaints against Bennett. (Lametta testimony; Byler testimony; Bolick testimony; Goldberg testimony; Bennett testimony; Roe testimony; Alexander testimony; Duncan testimony; June 21, 2002 memo from Goldberg to Bolick; Lametta investigation notes regarding retaliation complaint; Goldberg investigation notes regarding retaliation complaint; E-mails between Bolick, Lametta and Goldberg regarding retaliation complaint; Byler investigation notes regarding retaliation complaint; E-mails between Byler and Bolick regarding "captive" conference; Bolick Dep.) Plaintiff failed to establish an adverse employment action and a casual connection between the protected activity and the adverse employment action. See Reed v. A. W Lawrence & Co., Inc., 95 F.3d 1170, 1178 (2d Cir. 1996); Lesson v. Ari of Connecticut, Inc., 51 F. Supp.2d 135 (D. Conn. 1999); Fayson v. Kaleida Health Inc. and Croston, No. 00-CV-0860 (ECSR), 2002 WL 31194559 (W.D.N.Y Sept. 18, 2002), aff'd mem., 71 Fed. Appx. 875 (2d Cir 2003). Further, Defendants have articulated legitimate, non-retaliatory reasons for the decisions and conduct at issue. McDonnell Douglas v. Green, 411 U.S. 792 (1973). Finally, Plaintiff is unable to prove pretext for retaliation. Id.

3.[1]    Defendants Bennett and Byler violated Conn. Gen. Stat. §46a-60(5) when they aided and abetted in the alleged discriminatory employment practice.

**Defendants' Response:** Object to this claim of law in so far as it refers to discrimination/retaliation outside the scope of the Ruling. Further, disagreed. Bolick failed to sustain her burden of proving any of the Defendants retaliated or aided and abetted retaliation in the alleged manner remaining as disputed for Bolick's complaints against Bennett. Plaintiff similarly failed to sustain her burden of proving any claim of aiding or abetting retaliation against Bennett [i.e., against Bennett as to his connection with alleged marginalization of her management responsibilities and alleged negative comments about her performance on which she claims Byler relied in denying her Bennett's position]. (Lametta testimony; Byler testimony; Bolick testimony; Bennett testimony; Goldberg testimony; Bennett testimony; Roe testimony; Alexander testimony; June 21, 2002 memo from Goldberg to Bolick; Lametta investigation notes regarding retaliation complaint; Goldberg investigation notes regarding retaliation complaint; E-mails between Bolick, Lametta and Goldberg regarding retaliation complaint; E-mails between Byler and Bolick regarding "captive" conference; Byler investigation notes regarding retaliation complaint; Bolick Dep.)

4.    Defendant ANAC violated Title VII, 42 U.S.C. §2000e-3, when it retaliated against plaintiff for complaining of discrimination.

**Defendants' Response:** See response to Plaintiff's claim of law #1 and #3, above.

5.    Defendant ANAC violated the Fair Labor Standards Act, 29 U.S.C. §201 et seq., as amended by the Equal Pay Act, 29 U.S.C. §206(d) when it paid different wages to male employees doing the same job as plaintiff.

---

[1] Plaintiff has no Claim of Law number 2.

NY:572679v1                                                17

**Defendants' Response:** Disagreed. Plaintiff failed to sustain her burden of proving that her gender played any role whatsoever in ANAC's decisions regarding her compensation in relation to that of the two male Vice Presidents in violation of the Equal Pay Act, 29 U.S.C. Section 206(d). The Defendants have demonstrated there is a legitimate reason for the discrepancy in pay and the Plaintiff has failed to establish that the reason for the disparity asserted by the employer is only a pretext. Corning Glass Works v. Brennen, 417 U.S. 188, 195 (1974); Wolper v. McGraw-Hill, Inc., No 94 Civ 0976 (WK) 1997 WL 252032 (S.D.N.Y., May 13, 1997); Graham v. Texas Gulf, 662 F. Supp 1451 (D. Conn. 1987) aff'd mem., 842 F. 2d 1287 (2d Cir. 1988) (Lametta testimony; Byler testimony; Bolick testimony; Goldberg testimony; Bennett testimony; Roe testimony; Alexander testimony; Duncan testimony; Offer letter, Application and Resume of Roe, Duncan and Alexander; Bolick Resume; Bolick Dep.)

6. Plaintiff is entitled to compensatory, front pay and punitive damages under both Title VII, 41 U.S.C. §1981a and Conn. Gen. Stat. §46a-104. Pollard v. E.I.Dupont, 532 U.S. 843 (2001); Kilduff v. Adams, 219 Conn. 314, 324 (1991); Bridgeport Hospital v. Commission on Human Rights and Opportunities, 232 Conn. 91, 113 (1995). This includes lost future earning capacity resulting from defendant's discriminatory conduct. Williams v. Pharmacia, Inc., 137 F.3d 944 (7th Cir. 1998).

**Defendants' Response:** Disagreed. Plaintiff cannot establish her remaining claims and is not entitled to compensatory, front pay or punitive damages. See above. Bolick failed to proffer evidence of any concrete, economic or other quantifiable damages, or any malice, recklessness or other evidence that would entitle her to punitive damages. There was no effect on her status, position, or compensation from any claimed action. Bolick also failed to mitigate her damages. She is also unable to prove or segregate any emotional distress damages caused by the remaining claims

NY:572679v1                                18

from those allegedly caused by dismissed claims or events prior to her employment with ANAC. (Lametta testimony; Byler testimony; Bolick testimony; Bennett testimony; Goldberg testimony; Roe testimony; Alexander testimony; Duncan testimony; June 21, 2002 memo from Goldberg to Bolick; Lametta investigation notes regarding retaliation complaint; Goldberg investigation notes regarding retaliation complaint; E-mails between Bolick, Lametta and Goldberg regarding retaliation complaint; Byler investigation notes regarding retaliation complaint; Offer letter, Application and Resume of Roe, Duncan and Alexander; Bolick Resume; Bolick Dep.)

7. An award of back pay is mandatory under the Equal Pay Act if a violation of the Act has occurred. 29 U.S.C. §216(b). Plaintiff is entitled to an award of liquidated damages in the same amount as back pay if violation of the act is proven. *Id.*

**Defendants' Response:** Disagreed. Even if Plaintiff is entitled to back pay, such back pay is limited to the time period between her April 2002 promotion to Vice President -- the position at issue in the EPA claim -- and when she left her employment with ANAC. Further, pursuant to the discretion of the Court, Plaintiff is not entitled to an award of liquidated damages if Defendant employer shows that the act of omission giving rise to the action was in good faith and he had reasonable grounds to believe his act of omission was not a violation of Equal Protection Act. 29 U.S.C § 260. Here, there is no willful violation of the EPA.

4.        **Proposed Exhibits**

1.    Offer letter dated Sept. 19, 2000.

**Defendants' Response:** Agree as to admissibility.

2.    Memorandum (e-mail) from R. Byler to M. Lametta re budget 2002 salary increases above 3%