# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| LEIGH BOLICK, | : | CIVIL ACTION NO. |
| Plaintiff | : | 3:03CV165(PCD) |
| | : | |
| vs. | : | |
| | : | |
| ALEA GROUP HOLDINGS, LTD., | : | |
| ALEA NORTH AMERICA COMPANY, | : | |
| JOHN J. BENNETT, AND | : | |
| ROBERT D. BYLER, | : | |
| Defendants | : | June 13, 2005 |

Plaintiff's responds to Defendant's Section B submission as follows:

## I.   PROPOSED STIPULATION OF UNDISPUTED FACTS

1.   Defendant ANAC is a reinsurance intermediary.  (Byler testimony; Bolick testimony)

Agree.

2.   Defendant Byler is the Chief Executive Officer of Alea Alternative Risk ("AAR"), an operating division of ANAC. (Byler testimony; Bolick testimony; Complaint)

Agree.

3.   Defendant Bennett was AAR's Senior Vice President of Marketing and Bolick's supervisor.  Bennett resigned from his employment with ANAC in February 2002. (Byler testimony; Bolick testimony; Lametta testimony; Bennett testimony)

Agree.

4.   Bolick is a high school graduate with two years of college credit, but never earned

a college degree.   (Bolick testimony)

    Agree.

5.    Just prior to joining ANAC, Bolick was a Senior Underwriter for the Argonaut Insurance Company in Texas, earning between $72,000 and $73,000 per year.  (Bolick testimony; Bolick Resume)

    Agree.

6.    Bolick had lived in Texas for approximately 20 years.  In September 2000, ANAC hired her as an Assistant Vice President.   (Bolick testimony)

    Agree.

7.    Bolick signed ANAC's September 19, 2000 offer letter, which confirmed that she was being hired as an Assistant Vice President at an annual salary of $100,000, and that she was eligible for insurance benefits, relocation expenses from Texas of up to $10,000, as well as the potential for a discretionary bonus.   (Bolick testimony; Bolick Offer letter)

    Agree.

8.    On October 10, 2000, Bolick started at ANAC's Rocky Hill office in Connecticut. She reported directly to Bennett. (Bolick testimony; Bennett testimony)

    Agree.

9.    While employed by ANAC, Bolick attempted to market insurance products. (Bolick testimony; Byler testimony; Bennett testimony)

    Disagree. While employed by ANAC, Bolick  marketed insurance products. (Bolick

2

testimony)

10.     As a marketer, Bolick was expected to bring in prospective clients and accounts, and to work closely with the underwriters to write the business.  Bolick, as the marketer, had the ultimate responsibility to "close" deals.  (Byler testimony; Bennett testimony)

Disagree.  Bolick, as a marketer, did not have the "ultimate responsibility to close deals. (Bolick testimony - describing her responsibilities, Byler's Notes D0131 indicating that Bennett told plaintiff not to worry about "closing deals", AAR Marketing Strategy Documents - indicating objectives of marketing departing to "help" underwriting close deals)

11.     Bolick could recall closing only one deal during her entire employment with ANAC, but Byler had no record of any deals being closed by her during her active employment. (Bolick testimony; Byler testimony)

Agree that at the time of her deposition, she could recall the name of only two accounts she worked with underwriting to close.  Deny the remainder. (Bolick testimony)

12.     On November 6, 2000, Bolick complained to Byler about certain conduct by Bennett which she claimed to constitute harassment.  (Byler testimony; Bolick testimony)

Agree.

13.     Bolick told Byler specifically that she did not want Bennett to be fired, but asked Byler to resolve the issue.  Byler took steps to resolve the issue, and thereafter, Bolick told Byler the situation had become "acceptable".  (Byler testimony; Bolick testimony)

Disagree.  Bolick told Byler that the situation had become "acceptable", but "not all I'd

3

want" referring to what she assumed, based on Byler's representations, were ongoing efforts to get Bennett's behavior to stop. (Bolick testimony)

14.     Byler did not make Bennett aware of Bolick's complaint to him from November 2001, as a result of Bolick's request he not do so.  (Byler testimony; Bennett testimony)

Disagree.  Unknown whether or not Byler told Bennett of Bolick's complaint.

15.     On January 10, 2002, Bolick complained to Byler and to ANAC's Human Resources Department that Bennett had sexually harassed her. (Byler testimony; Bolick testimony; Lametta testimony)

Disagree. Bolick did not complain to Byler on January 10, 2002, but to Human Resources. (Bolick testimony)

16.     Marti Lametta, the then Vice President and Director of ANAC's Human Resource department, conducted an investigation.  (Lametta testimony; Bolick testimony; Bennett testimony; Byler testimony)

Disagree that Marti Lametta conducted the investigation exclusively.  Others were involved. (Lametta testimony)

17.     Before ANAC's investigation into Bennett's conduct ended and any determinations were made as to the merit of Bolick's allegations, Bennett voluntarily resigned his employment with ANAC.  (Byler testimony; Lametta testimony; Bennett testimony)

Disagree.  During the course of the investigation, Bolick's allegations were becoming "more credible".  When this information was presented to Bennett, he chose to resign. (Lametta

4

testimony)

18.    During the investigation period, Bolick had been told she could work from home, due to her articulated stress and inability to concentrate in the office. (Byler testimony; Bolick testimony; Lametta testimony)

Disagree. During the investigation period, Bolick was told that she must work from home and was not allowed in the office. (Bolick testimony)

19.    Thus, Bolick had no contact with Bennett literally from the instant she complained to Human Resources. (Bolick testimony; Byler testimony; Bennett testimony)

Agree.

20.    In or about February 2002, Lametta and Byler contacted Bolick at home to notify her that Bennett had left ANAC. (Lametta testimony; Byler testimony; Bolick testimony)

Agree.

21.    They confirmed that Bolick would be returning to her current position, with the same, and possibly expanded, responsibilities, while expressing their enthusiasm at her return. (Lametta testimony; Byler testimony; Bolick testimony)

Agree.

22.    Rather than agreeing to a prompt return, Bolick expressed resistance. (Lametta testimony; Byler testimony; Bolick testimony)

Disagree. Bolick was resistant to come back to the workplace until she understood what had occurred with John Bennett. (Bolick testimony)

5

23.    Bolick did not return to the office until in or about late February/early March, and even then, continued to often work from home. The exact date of her return is difficult to determine as Bolick continued to work extensive amounts of time from home. (Lametta testimony; Byler testimony; Bolick testimony)

Disagree. Bolick returned to the office in early February. (Byler testimony, depo at 113, Bolick testimony, E-mail from M.Lametta to L.Bolick dated 2/6/02)

24.    From the time that she had been hired, Bolick was aware that ANAC planned to divide the Marketing Department into regions and hire a marketer for each region. (Byler testimony; Bolick testimony)

Agree.

25.    Consistent with those discussions, in January 2002, ANAC hired Sandra Duncan as the Marketing Vice President for the Midwest Region at an annual salary of $125,000 and paid more than $30,000 in relocation expenses. (Byler testimony; Duncan testimony; Duncan Offer letter, Application and Resume)

Agree.

26.    Duncan possessed an MBA Degree in Management and Economics, having graduated from American International College summa cum laude. (Duncan testimony; Duncan Offer letter, Application and Resume; Byler testimony)

Agree.

27.    Prior to joining ANAC, she had been the Manager of Client Services for Risk

Enterprise Management and had spent approximately 15 years with the highly-regarded firm of Tillinghast-Towers Perrin, the last three as a Senior Risk Management Consultant. (Duncan testimony; Duncan Offer letter, Application and Resume; Byler testimony)

Disagree with the term "highly regarded" firm and clarify that Duncan was not at TTP just prior to coming to Alea. (Duncan testimony, Bolick testimony)

28.    When Duncan left Risk Enterprise Management as part of a reduction-in-force, her annual salary was $120,000. (Duncan testimony; Duncan Offer letter, Application and Resume)

Disagree.

29.    Bolick acknowledged there could be areas where Duncan was more experienced than she. (Bolick testimony; Byler testimony)

Disagree, unless clarified that Alea did not do business in those "areas" (Bolick)

30.    In February 2002, ANAC hired Scott Roe as the Marketing Vice President for its West Region at an annual $130,000 salary, plus a one-time $20,000 signing bonus. (Byler testimony; Roe testimony; Roe Offer letter, Application and Resume)

Agree.

31.    Prior to joining ANAC, Roe attained a BA in Finance and an MBA in Finance, and had worked as a Vice President for Aon Risk Services and a Senior Sales Consultant at Broadwing Technology Solutions. He earned more than $120,000 in 2001. (Byler testimony; Roe testimony; Roe Offer letter, Application and Resume)

Disagree.

32.     Also in February 2002, ANAC hired Jeffrey Alexander at an annual $130,000 salary as the Marketing Vice President for its northeast region, which stretched from Maine to North Carolina, including Bermuda.  He also received a one-time $25,000 signing bonus.  (Byler testimony; Alexander testimony; Alexander Offer letter, Application and Resume)

Disagree with the territoey he handled. (Alexander resume, Alexander testimony)

33.     Alexander had obtained a B.S. in Business Administration at Villanova University.  He earned more than $130,000 per year as a Second Vice President at Discover Reinsurance Company in Farmington, Connecticut, and had spent his entire career in the insurance industry.   (Alexander testimony; Alexander Offer letter, Application and Resume; Byler testimony)

Disagree.

34.     On April 1, 2002, the timing being pursuant to standard ANAC practice and policy, Bolick was promoted to Vice President and received a 15%, or $15,000 raise, bringing her annual salary to $118,000 per year. She also received a raise in April 2003 in the amount of $3,450 per year in anticipation of her return to work.  (Byler testimony; Bolick testimony; April 2003 letter to Plaintiff referring to salary increase; Notice of Promotion in 2002)

Agree.

35.     On May 31, 2002, Bolick complained to Byler that she believed he had been retaliating against her for previously complaining about Bennett.  (Byler testimony; Bolick

8

testimony; Lametta testimony; Goldberg testimony; Lametta investigation notes regarding

retaliation complaint; Goldberg investigation notes regarding retaliation complaint; Byler notes

regarding retaliation complaint; Complaint)

     Agree.

36.    Plaintiff alleged her management responsibilities had been reduced in that she

was not allowed to participate in the hiring of the two new male Vice Presidents, she was

excluded from management meetings, and in April 2002 she was not allowed to attend a certain

"captive" conference. (Byler testimony; Bolick testimony; Lametta testimony; Goldberg

testimony; Lametta investigation notes regarding retaliation complaint; Goldberg investigation

notes regarding retaliation complaint; Byler notes regarding retaliation complaint)

     Agree.

37.    In addition, Bolick claimed that during an April 10, 2002 marketing staff meeting,

Byler was rude, abrasive, and acted in a generally inappropriate manner toward her.  (Byler

testimony; Bolick testimony; Goldberg testimony; Lametta testimony; Lametta investigation

notes regarding retaliation complaint; Goldberg investigation notes regarding retaliation

complaint; E-mails between Bolick, Lametta and Goldberg regarding retaliation complaint;

Byler notes regarding retaliation complaint; E-mails between Byler and Bolick regarding

"captive" conference)

     Agree.

38.    Marti Lametta and Leonard Goldberg, ANAC's President, conducted an

investigation into Bolick's claim that Byler had acted inappropriately toward her.  (Lametta

testimony; Bolick testimony; Goldberg testimony; Roe testimony; Alexander testimony; June 21,

2002 memo from Goldberg to Bolick; Lametta investigation notes regarding retaliation

complaint; Goldberg investigation notes regarding retaliation complaint; E-mails between

Bolick, Lametta and Goldberg regarding retaliation complaint)

Agree with clarification that their investigation was limited to the marketing meeting in

April, 2002, despite plaintiff's additional allegations.  (Bolick testimony, e-mails)

39.    Before they formed any conclusions, and after Bolick told them she did not

believe she could work again with Byler, Bolick told them that her complaint could be resolved

by promoting her into Bennett's former Senior Vice President position, thereby installing her as

the supervisor of the three other Marketing Vice Presidents.  (Lametta testimony; Bolick

testimony; Goldberg testimony; June 21, 2002 memo from Goldberg to Bolick; E-mails between

Bolick, Lametta and Goldberg regarding retaliation complaint; Lametta investigation notes

regarding retaliation complaint; Goldberg investigation notes regarding retaliation complaint)

Disagree. (Bolick testimony, 7/16/02 e-mail)

40.    Such a promotion would then compel Bolick to work even more closely with

Byler, as the Senior Vice President reported directly to him. (Lametta testimony; Byler

testimony)

Disagree. (Bolick testimony)

41.    After the investigation of the April 10, 2002 marketing staff meeting, which

10

primarily included interviews with a number of participants who attended the subject marketing

staff meeting, it was determined that Bolick's allegations could not be substantiated.  In fact, the

attendees interviewed stated that Byler had not acted "inappropriately", and some even opined

that Bolick did not consistently behave in an appropriate manner toward Byler and her other

superiors.  (Lametta testimony; Byler testimony; Bolick testimony; Goldberg testimony; Roe

testimony; Alexander testimony; June 21, 2002 memo from Goldberg to Bolick; Lametta

investigation notes regarding retaliation complaint; Goldberg investigation notes regarding

retaliation complaint; E-mails between Bolick, Lametta and Goldberg regarding retaliation

complaint; Byler notes regarding retaliation complaint)

Disagree (Bolick testimony, Duncan testimony, "Investigation"6/18/02)

42.     Furthermore, with respect to Bolick's suggestion that she should be placed into

Bennett's former position, thus obtaining an instant promotion, Lametta and Goldberg advised

Bolick that she was well suited to continue in her position as Vice President.  Goldberg and

Lametta thus underscored ANAC's desire to have Bolick remain in her position, performing her

functions, and participating in ANAC's growth and anticipated prosperity.  (Lametta testimony;

Bolick testimony; Goldberg testimony; June 21, 2002 memo from Goldberg to Bolick; E-mails

between Bolick, Lametta and Goldberg regarding retaliation complaint)

Disagree.

43.     Nevertheless, Bolick stopped working and commenced a disability leave,

claiming stress and anxiety from the events at ANAC prevented her from working.  (Lametta

11

testimony; Bolick testimony; Goldberg testimony; June 21, 2002 memo from Goldberg to Bolick)

Disagree. Bolick commenced a disability leave in September, 2002. (Bolick testimony).

44. Bolick never returned to work, yet ANAC continued to keep Bolick as an employee for approximately ten months, and thus, for a number of months even beyond her exhaustion of all statutorily guaranteed leave time. Eventually, on July 15, 2003, however, ANAC terminated Bolick's employment. (Lametta testimony; Bolick testimony)

Agree.

## II. PROPOSED FINDINGS OF FACT

*1.-44. Defendants incorporate the Undisputed Facts above as if fully set forth herein.*

45. Bolick, in support of her retaliation claim, raised only vague, generic, and unsubstantiated facts as to a reduction in her management responsibilities. Specifically, she alleged that she was not allowed to participate in the hiring of the two new male Vice Presidents, she was excluded from management meetings, in April 2002, she was not allowed to attend a certain "captive" conference, and in April 2002, she was treated abrasively by Byler in front of staff at a marketing meeting. (Lametta testimony; Byler testimony; Bolick testimony; Goldberg testimony; Roe testimony; Alexander testimony; June 21, 2002 memo from Goldberg to Bolick; Lametta investigation notes regarding retaliation complaint; Goldberg investigation notes regarding retaliation complaint; E-mails between Bolick, Lametta and Goldberg regarding retaliation complaint; Byler notes regarding retaliation complaint; E-mails between Byler and

12

Bolick regarding "captive" conference)

      Disagree. (Bolick testimony will set forth specifics as to her claim of retaliation)

      46.     However, Bolick failed to present any evidence whatsoever that her responsibilities ever included direct or indirect participation in the hiring of the Vice Presidents.  In any event, Byler and/or Bennett did consult with her regarding the hire of Sandra Duncan.  Moreover, Bolick was unable to identify any evidence of a nexus between her complaint about Bennett and her not being involved in the hire of the Vice Presidents.  (Bolick testimony; Byler testimony; Lametta testimony; Goldberg testimony; Lametta investigation notes regarding retaliation complaint; Goldberg investigation notes regarding retaliation complaint; Offer letters, Applications and Resumes of Roe, Alexander, Duncan)

      Disagree. (Bolick testimony as to her marginalization in the department and removal from any decisions associated with the operation of the department, despite written objectives that her job responsibilities included hiring staff for marketing)

      47.     Bolick further failed to proffer evidence of any concrete, economic or other quantifiable disadvantage as a direct result of her allegation that she was not allowed to participate in the hiring of the two new male Vice Presidents. (Byler testimony; Bolick testimony)

      Disagree. (Bolick testimony as to her treatment following her return to work in February, 2002, and the contrast with her role in the department prior to her complaint on January 9, 2002, the resulting effect on her reputation and ability to advance within the company.)

13

48.    Especially because there was no effect on her status, position, or compensation, her lack of participation in the hiring of the two new male Vice Presidents, even if true, cannot constitute adverse actions indicative of retaliatory motive.  (Lametta testimony; Byler testimony; Bolick testimony)

Disagree. (Bolick testimony as to her treatment following her return to work in February, 2002, and the contrast with her role in the department prior to her complaint on January 9, 2002, of which the failure to include her in the hiring of new Vice Presidents was just a small part. There was an effect on her reputation and ability to advance within the company or the industry)

49.    Bolick's description regarding her alleged exclusion from management meetings is similarly vague, and nevertheless inaccurate–there is no evidence Bolick was deliberately excluded from meetings that she should or would have attended based on her position or responsibilities. Further, she was unable to proffer any evidence of a nexus between her complaint about Bennett and such exclusion, even if true.  (Bolick testimony; Lametta testimony; Goldberg testimony; Byler testimony; June 21, 2002 memo from Goldberg to Bolick; Lametta investigation notes regarding retaliation complaint; Goldberg investigation notes regarding retaliation complaint; E-mails between Bolick, Lametta and Goldberg regarding retaliation complaint; Byler notes regarding retaliation complaint)

Disagree. (Bolick testimony as to her treatment following her return to work in February, 2002, and the contrast with her role in the department prior to her complaint on January 9, 2002.)

50.    Bolick further failed to proffer evidence of any concrete, economic or other

14

disadvantage as a direct result of her not attending certain management meetings, even if she was deliberately excluded. (Byler testimony; Bolick testimony; Goldberg testimony; June 21, 2002 memo from Goldberg to Bolick; Lametta investigation notes regarding retaliation complaint; Goldberg investigation notes regarding retaliation complaint)

Disagree. (Bolick testimony regarding the effect on her reputation and her ability to advance within the company or the industry)

51.    Especially because there was no effect on her status, position, or compensation, exclusion from management meetings, even if true, cannot constitute adverse action indicative of retaliatory motive. (Lametta testimony; Byler testimony; Bolick testimony; Goldberg testimony; June 21, 2002 memo from Goldberg to Bolick; Lametta investigation notes regarding retaliation complaint; Goldberg investigation notes regarding retaliation complaint)

Disagree. (Bolick testimony regarding the effect on her reputation and ability to advance within the company)

52.    Bolick's description regarding the April 2002 "captive" conference also fails. No evidence was presented that established Byler's denial of her request that she be permitted to attend was based on anything other than legitimate, business reasons. (Bolick testimony; Lametta testimony; Byler testimony; Goldberg testimony; June 21, 2002 memo from Goldberg to Bolick Lametta investigation notes regarding retaliation complaint; Goldberg investigation notes regarding retaliation complaint; Byler notes regarding retaliation complaint; E-mails between Byler and Bolick regarding "captive" conference)

Disagree (Bolick testimony that this was part of a pattern of negative treatment by Byler following closely in time after Bolick's protected activity)

53.     Bolick further failed to proffer evidence of any concrete, economic or other disadvantage as a direct result of her not being allowed to attend the April 2002 "captive" conference. (Byler testimony; Bolick testimony; Lametta testimony; Goldberg testimony; June 21, 2002 memo from Goldberg to Bolick; Lametta investigation notes regarding retaliation complaint; Goldberg investigation notes regarding retaliation complaint)

Disagree (Bolick testimony as stated above regarding harm to reputation and ability to advance in her career)

54.     Especially because there was no effect on her status, position, or compensation, this denial cannot constitute adverse action indicative of retaliatory motive.  (Lametta testimony; Byler testimony; Bolick testimony; Goldberg testimony; June 21, 2002 memo from Goldberg to Bolick; Lametta investigation notes regarding retaliation complaint; Goldberg investigation notes regarding retaliation complaint)

Disagree. (Bolick testimony, *id*)

55.     Byler's alleged behavior at the April 10, 2002 marketing meeting could not be substantiated despite a good faith investigation by the company, which included interviews with attendees.  (Bolick testimony; Byler testimony; Lametta testimony; Goldberg testimony; Roe testimony; Alexander testimony; June 21, 2002 memo from Goldberg to Bolick; Lametta investigation notes regarding retaliation complaint; Goldberg investigation notes regarding

16

retaliation complaint; E-mails between Bolick, Lametta and Goldberg regarding retaliation complaint; Byler notes regarding retaliation complaint)

Disagree (Bolick testimony, Duncan testimony, "Investigation" 6/18/02)

56.    Moreover, Bolick was unable to establish any nexus between her complaint about Bennett and Byler's behavior, even if true. (Bolick testimony; Lametta testimony; Goldberg testimony; Byler testimony; June 21, 2002 memo from Goldberg to Bolick; Lametta investigation notes regarding retaliation complaint; Goldberg investigation notes regarding retaliation complaint; Byler notes regarding retaliation complaint)

Disagree (Bolick testimony and inference based on temporal proximity)

57.    Moreover, testimony proffered at trial corroborated Defendants' assertions that Bolick's description of Byler's purported behavior was inaccurate. Bolick herself acted inappropriately toward Byler and others during that April 10, 2002 meeting. (Bolick testimony; Byler testimony; Lametta testimony; Goldberg testimony; Roe testimony; Alexander testimony; June 21, 2002 memo from Goldberg to Bolick; Lametta investigation notes regarding retaliation complaint; Goldberg investigation notes regarding retaliation complaint; Byler notes regarding retaliation complaint)

Disagree. (Bolick testimony, Duncan testimony, "Investigation" 6/18/02)

58.    Bolick further failed to proffer evidence of any concrete, economic or other disadvantage as a result of Byler's purported behavior at that April 10, 2002 meeting. (Bolick testimony; Lametta testimony; Byler testimony; Goldberg testimony; June 21, 2002 memo from

17

Goldberg to Bolick; Lametta investigation notes regarding retaliation complaint; Goldberg investigation notes regarding retaliation complaint; Byler notes regarding retaliation complaint)

Disagree. (Bolick testimony, Duncan testimony, effect on plaintiff's reputation and ability to advance her career.)

59.    Especially because there was no effect on her status, position, or compensation, being given the "cold shoulder" by Byler, even if true, cannot constitute adverse action indicative of retaliatory motive.  (Bolick testimony; Lametta testimony; Byler testimony; Goldberg testimony; June 21, 2002 memo from Goldberg to Bolick; Lametta investigation notes regarding retaliation complaint; Goldberg investigation notes regarding retaliation complaint; Byler notes regarding retaliation complaint)

Disagree. (Bolick testimony, *id*)

60.    Bolick failed to proffer any actual evidence that the reasons given for any other "actions", even if deemed "adverse", were connected to protected activity or otherwise motivated by retaliatory animus.  Thus, proof of the requisite causal connection between the alleged adverse actions and her engagement in protected activity is absent.  (Bolick testimony; Lametta testimony; Byler testimony; Bennett testimony; Goldberg testimony; June 21, 2002 memo from Goldberg to Bolick; Lametta investigation notes regarding retaliation complaint; Goldberg investigation notes regarding retaliation complaint; E-mails between Bolick, Lametta and Goldberg regarding retaliation complaint; Byler notes regarding retaliation complaint; E-mails between Byler and Bolick regarding "captive" conference)

18

Disagree. (Bolick testimony, *id,* temporal proximity, Lametta testimony of marketing plan prior to plaintiff's complaint)

61.    Bolick also failed to produce evidence that Bennett made any derogatory comments to Byler about her performance which motivated ANAC to deny Bolick a promotion into Bennett's position after his departure from ANAC.  (Bolick testimony; Lametta testimony; Byler testimony; Bennett testimony; Goldberg testimony; June 21, 2002 memo from Goldberg to Bolick; Lametta investigation notes regarding retaliation complaint; Goldberg investigation notes regarding retaliation complaint; Byler notes regarding retaliation complaint)

Disagree.  (Lametta notes, Byler notes stating criticisms of plaintiff by Bennett during investigation of sexual harassment complaint)

62.    Bolick similarly failed to produce evidence that any action by Bennett resulted in the "marginalizing" of her management responsibilities.  (Byler testimony; Bolick testimony; Lametta testimony; Bennett testimony; Goldberg testimony; June 21, 2002 memo from Goldberg to Bolick; Lametta investigation notes regarding retaliation complaint; Goldberg investigation notes regarding retaliation complaint; Byler notes regarding retaliation complaint)

Disagree. (Bolick testimony, temporal proximity, Lametta notes, Byler notes, investigation notes, Lametta testimony regarding marketing plan)

63.    As to Plaintiff's claim that Defendants violated the Equal Pay Act, Defendants presented significant testimony and documents substantiating that the $7,000-$12,000 difference in Bolick's salary was based on Byler's view of their comparative superior skills, experience,

and prior salary history of all three Vice Presidents of Marketing. (Bolick testimony; Byler

testimony; Offer letters, Applications and Resumes of Duncan, Roe and Alexander; Duncan, Roe

and Alexander testimony)

Disagree. Bolick testimony re: her experience, difference in cost of living between Texas

and Connecticut, knowledge of experience of other three Vice Presidents, treatment of females

by defendant, Alea Annual Review 2001, Lametta testimony regarding treatment of females,

Alea marketing materials)

64.    On the other  hand, Plaintiff failed to proffer any evidence to dispute the

articulated rationale of ANAC. (Byler testimony; Bolick testimony; Bolick Resume; Offer

letters, Applications and Resumes of Duncan, Roe and Alexander; Duncan, Roe and Alexander

testimony)

Disagree (*Id*)

65.    Moreover, a closer look at the salaries of the Vice Presidents hired in early 2002

underscores the complete absence of discriminatory motivation by the company. (Bolick

testimony; Byler testimony; Offer letters, Applications and Resumes of Duncan, Roe and

Alexander; Duncan, Roe and Alexander testimony)

Disagree (*Id*)

66.    For example, it was undisputed that Duncan, the female Vice President, was hired

at the same starting compensation as were the males, and possibly with a starting compensation

higher than that of Roe, due to payment of relocation expenses at the time of her hire exceeding

20

$30,000.  (Byler testimony; Duncan testimony; Bolick testimony; Offer letter, Application and Resume of Duncan)

Disagree. (Bolick testimony, Byler testimony as to equity offering, offer letters)


III.    **DEFENDANTS' CLAIMS OF LAW**

A.    Plaintiff failed to sustain her burden of proving any of the Defendants violated Title VII, 42 U.S.C. Section 2000e-3 by retaliating against her in any way for her internal complaints against Bennett or Byler.

Specifically, Plaintiff failed to sustain her burden of proving (1) retaliation by ANAC (Title VII and CFEPA) and Byler (CFEPA), limited to Plaintiff's claim of marginalization of specific management responsibilities; and (2) retaliation against Bennett (CFEPA), limited to Plaintiff's claim that Bennett made negative comments to Byler regarding her work performance during the course of ANAC's investigation of Plaintiff's January 2002 complaint to Human Resources.

Disagree.  Plaintiff has proffered evidence that she engaged in protected activity which was closely followed in time by significantly different treatment as to job responsibilities, demeanor of and treatment by her supervisor, causing a negative affect on her reputation within the company and outside the company, altered her career path within the company so that she was no longer involved in management, all contrary to her status within the company prior to her complaint and contrary to

21

the plan for the operation of the department prior to her complaint. Plaintiff has also proffered

evidence that Bennett made negative comments regarding plaintiff's performance during the

investigation of her sexual harassment complaint, which was closely followed by adverse

employment actions instituted by Byler.

B.    Plaintiff similarly failed to sustain her burden of proving any claim of aiding or

abetting retaliation against Bennett [i.e., against Bennett as to his connection with alleged

marginalization of her management responsibilities and negative comments about her performance

on which Byler relied].

Disagree. Plaintiff has produced evidence that Bennett made negative comments to Byler

during the investigation of her sexual harassment complaint. Thereafter, Byler made decisions

regarding plaintiff's job responsibilities that were contrary to the plan in place prior to the

complaint, he treated plaintiff differently than prior to her complaint by isolating her and excluding

her from meetings and altering her responsibilities, all of which negatively affected plaintiff's

reputation and career.

C.    Plaintiff also failed to sustain her burden of proving that her gender played any

role whatsoever in ANAC's decisions regarding the compensation of the male Vice Presidents in

violation of the Equal Pay Act, 29 U.S.C. Section 206(d).

Disagree. Plaintiff has produced evidence that females were paid less than males doing

the same job. Plaintiff had more experience than the males, and had been at ANAC for over a

year when they were hired. There were very few females employed by the company and females

were treated differently than males in their terms of employment.

## IV.     PROPOSED EXHIBITS

1.     Offer letter to Sandra Duncan, dated January 17, 2002

2.     Offer letter to Jeffrey Alexander, dated February 22, 2002

3.     Offer letter to Scott D. Roe, dated January 28, 2002

4.     Resume of Sandra Duncan

5.     Resume of Scott Roe

6.     Resume of Jeffrey Alexander

7.     Employment application of Sandra Duncan

8.     Employment application of Scott Roe

9.     Employment application of Jeffrey Alexander

10.     Offer letter to Leigh Bolick dated September 19, 2000 with

attachment

11.     Resume of Leigh Bolick submitted to ANAC

12.     Letter to Plaintiff reflecting raise in April of 2003

13.     Notice of Promotion in 2002

14.     E-mail communications between Byler and Bolick

regarding April 2002 "captive" conference

15.     Byler notes regarding retaliation complaint

23

16.     Interoffice Memo dated June 21, 2002 from Leonard Goldberg to Leigh Bolick

17.     Lametta handwritten and typewritten notes of investigation regarding retaliation complaint against Byler

18.     E-mail communications dating between 6/10/02 and 7/16/02 between Bolick, Lametta, and Goldberg  regarding retaliation complaint against Byler

19.     Goldberg investigation notes regarding Bolick's retaliation complaint against Byler

20.     Resume/Curriculum Vitae of Dr.  Harry Adamakos

21.     Report of Dr. Harry Adamakos and documents on which he relied

22.     Notes of Dr. Steven A. Kagel, Ph.D.

Disagree.  Plaintiff may object based on relevance and prejudice, depending on the portions of the notes offered. Fed.R.Evid. 402,403.

23.     Judgment of Divorce between Thomas Bolick and Leigh Bolick

Disagree.  Irrelevant and more prejudicial than probative. Fed.R.Evid. 402,403.

24.     Petition for Divorce between Thomas Bolick and Leigh Bolick

Disagree.  Irrelevant and more prejudicial than probative. Fed.R.Evid. 402,403.

25.    Social worker report from Bolick's prior divorce proceeding in 1996

Disagree. Irrelevant and more prejudicial than probative. Fed.R.Evid. 402, 403.

26.    Sworn answers to interrogatories by Bolick in prior divorce proceeding

Disagree.  Irrelevant and more prejudicial than probative. Fed. R.Evid. 402,403.

27.    Cody Saiz – choice of custodial parent in 1997

Disagree.  Irrelevant and more prejudicial than probative. Fed.R.Evid. 402, 403.

28.    Excerpts from the transcript of Deposition of Leigh Bolick

Disagree.  Plaintiff reserves the right to object depending on the particular portions of the transcript that defendant offers.

The Defendants expressly reserve the right to introduce any exhibit introduced by Plaintiff during their case in chief, and/or to amend this list depending on the Plaintiff's showing at trial.

## V.    WITNESSES

1.    <u>Leigh Bolick</u> is expected to testify as to all claims and defenses in this action.

2.    <u>Robert Byler</u> is expected to testify as to all claims and defenses in this action.

25

3.      <u>Marti Lametta</u>, the former Vice President and Director of Human Resources, is expected to testify as to the investigation of Bolick's retaliation claims, the company's decisions incident thereto, and the company's responses to Bolick's request that she be placed into Bennett's position.

4.      <u>Len Goldberg</u>  is expected to testify as to Bolick's retaliation claims, the company's decisions incident thereto, and the company's responses to Bolick's request that she be placed into Bennett's position.

5.      <u>John Bennett</u>, the former Senior Vice President of ANAC, is expected to testify as to all claims of retaliation against Defendants, and the affirmative defenses thereto.

6.      <u>Sandra Duncan</u> is expected to testify regarding her background, qualifications and employment experience upon hire by ANAC.

7.      <u>Jeffrey Alexander</u> is expected to testify regarding his background, qualifications and employment experience upon hire by ANAC.  He is also expected to testify regarding the marketing meeting about which Bolick complained.

8.      <u>Scott D. Roe</u> is expected to testify regarding his background, qualifications and employment experience upon hire by ANAC.  He is also expected to testify regarding the marketing meeting about which Bolick complained.

9.      <u>Dr. Harry Adamakos</u> is expected to testify as an expert concerning his psychological evaluation of Plaintiff and his findings regarding Plaintiff's claim of severe emotional distress as a result of her experiences at ANAC, including his expert opinion that there were other significant

prior stressors occurring prior to her employment at ANAC which contributed in large part to

"overreaction" or "severe" distress she may have suffered while employed there; that such prior,

traumatic events were more significant stressors than those experiences that form the basis of her

emotional distress claim; and which stressors could have contributed to an underlying psychological

vulnerability and basis for her reaction to what she believed happened in this case.  Dr. Adamakos'

testimony will, in focusing on Plaintiff's own statements of the cause of her distress, establish that

Plaintiff cannot quantify the emotional distress caused by the specific events remaining at issue of

the case, but rather, that her focus was on events no longer actionable herein.  Dr. Adamakos will

also testify as to her treatment/evaluation by Dr. Gamble, Dr. Kagel and Dr. Herzog.  (See attached

CV for Dr.  Harry Adamakos)

The Defendants expressly reserve the right to call any witness called by Plaintiff during their

case in chief, and further reserve the right to amend this list depending on the Plaintiff's showing at

trial.

## VI.     DESCRIPTION OF PROPOSED EVIDENCE

*[For witness testimony, see above descriptions]*

1. Offer letter to Sandra Duncan, dated January 17, 2002

2. Offer letter to Jeffrey Alexander, dated February 22, 2002

3. Offer letter to Scott D. Roe, dated January 28, 2002

4.      Resume of Sandra Duncan

5.      Resume of Scott Roe

6.      Resume of Jeffrey Alexander

7.      Employment application of Sandra Duncan

8.      Employment application of Scott Roe

9.      Employment application of Jeffrey Alexander

10.     Offer letter to Leigh Bolick dated September 19, 2000 with attachment.

11.     Resume of Leigh Bolick submitted to ANAC.

12.     Letter to Plaintiff reflecting raise in April of 2003

13.     Notice of Promotion in 2002

***[Items 1 through 13 are relevant to the Equal Pay Act claim.]***

14.     E-mail communications between Byler and Bolick regarding April 2002 "captive" conference

15.     Byler notes regarding retaliation complaint

16.     Interoffice Memo dated June 21, 2002 from Leonard Goldberg to Leigh Bolick

17.     Lametta handwritten and typewritten notes of investigation regarding retaliation complaint against Byler

18.     E-mail communications dating between 6/10/02 and 7/16/02

28

between Bolick, Lametta, and Goldberg regarding retaliation complaint against Byler

19.     Goldberg investigation notes regarding Bolick's retaliation complaint against Byler

*[Items 14 through 19 are relevant to Bolick's retaliation claims]*

20.     Resume/Curriculum Vitae of Dr. Harry Adamakos

21.     Report of Dr. Harry Adamakos and documents on which he relied

22.     Notes of Dr. Steven A. Kagel, Ph.D.

Disagree. Plaintiff may object based on relevance and prejudice depending on portion of notes offered. Fed.R.Evid. 402, 403.

23.     Judgment of Divorce between Thomas Bolick and Leigh Bolick

Disagree. Irrelevant and more prejudicial than probative. Fed.R.Evid. 402,403.

24.     Petition for Divorce between Thomas Bolick and Leigh Bolick

Disagree. Irrelevant and more prejudicial than probative. Fed.R.Evid. 402,403.

25.     Social worker report from Bolick's prior divorce proceeding in 1996

Disagree. Irrelevant and more prejudicial than probative. Fed.R.Evid. 402,403

26.     Sworn answers to interrogatories by Bolick in prior divorce proceeding

Disagree. Irrelevant and more prejudicial than probative. Fed.R.Evid. 402, 403.

27.     Cody Saiz – choice of custodial parent in 1997

Disagree. Irrelevant and more prejudicial than probative. Fed.R.Evid. 402,403

*[Items 20 through 27 are relevant to Bolick's claim for emotional distress damages]*

28.     Excerpts from the transcript of Deposition of Leigh Bolick

*[Relevant to all claims]*


THE PLAINTIFF, LEIGH BOLICK


_____

Barbara E. Gardner
CT07623
843 Main St., Suite 1-4
Manchester, CT 06040
(860)643-5543
(860)645-9554(fax)
Bg@bgardnerlaw.com


30

## CERTIFICATION OF SERVICE

I hereby certify that a copy of the foregoing was mailed, postage prepaid, this 13th day of June, 2005 to the following counsel of record:

Mary A. Gambardella
Epstein Becker & Green, P.C.
One Landmark Square, Suite 1800
Stamford, CT 06901-2601

Cindy Schmitt Minniti, Esq.
ReedSmith LLP
599 Lexington Ave., 29th FL.
New York, NY 10022

_____
Barbara E. Gardner